## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

VIRGINIA WOLF and CAROL
SCHUMACHER, ROY BADGER and
GARTH WANGEMANN, CHARVONNE
KEMP and MARIE CARLSON, and JUDITH
TRAMPF and KATHARINA HEYNING,

**Plaintiffs,**

**vs.**

SCOTT WALKER, in his official capacity as
Governor of Wisconsin, J.B. VAN HOLLEN,
in his official capacity as Attorney General of
Wisconsin, RICHARD G. CHANDLER, in his
official capacity as Secretary of Revenue of
Wisconsin, OSKAR ANDERSON, in his
official capacity as State Registrar of
Wisconsin, GARY KING, in his official
capacity as Eau Claire County District
Attorney, JOSEPH CZARNEZKI, in his
official capacity as Milwaukee County Clerk,
and SCOTT MCDONELL, in his official
capacity as Dane County Clerk,

**Defendants.**

**Case No.  14-cv-64**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.      Plaintiffs Virginia Wolf and Carol Schumacher, Roy Badger and Garth
Wangemann, Charvonne Kemp and Marie Carlson, and Judith Trampf and Katharina Heyning
(collectively, "Plaintiffs") are all loving, committed, same-sex couples.  They bring this action
pursuant to 42 U.S.C. § 1983 to challenge the validity under the United States Constitution of
Article XIII, § 13 of the Constitution of Wisconsin.  That provision bars marriage between two
people of the same sex and further bars the recognition of any legal status substantially similar to
marriage for same-sex couples.  Plaintiffs further challenge, on the same basis, any and all

provisions of Wisconsin's marriage statutes (Wis. Stat. ch. 765) that refer to marriage as a relationship between a "husband and wife," if and to the extent that such provisions constitute a statutory ban on marriage for same-sex couples (collectively with Article XIII, § 13, the "marriage ban").  Plaintiffs seek declaratory and injunctive relief for violations of the Equal Protection and Due Process Clauses of the U.S. Constitution (U.S. Const. amend. xiv, § 1).

2.     Marriage is universally recognized and celebrated as the hallmark of a couple's love for and commitment to each other.  When two people marry, they commit personally and publicly to build a life together, and they ask their families, friends, communities, and government to respect, honor, and support that commitment.  Marriage has long been recognized and valued for its beneficial contribution to the welfare of society and to individual happiness.  Lesbians and gay men in Wisconsin are denied the freedom afforded to different-sex couples in this State to have their loving, committed relationships recognized through marriage.

3.     Historically, marriage in the United States has been a much more restrictive institution than it is today.  Through various mechanisms, states have at times prohibited marriage among slaves, interracial marriage, and even marriage between two people of different faiths.  State laws also made a woman the subordinate partner in a marriage, legally barred from controlling her own finances and property.  Wisconsin, however, once had a laudable history of supporting the freedom to marry on equal terms.  For example, Wisconsin never banned marriage between people of different races.  In 1850, Wisconsin became one of the first states to enact legislation protecting the property rights of married women, and by the turn of the twentieth century, Wisconsin had lifted many other legal restrictions on a married woman's ability to exercise financial independence from her husband.

4.     Now, through the actions of legislatures and courts across the country, 17 states and the District of Columbia have extended the freedom to marry to same-sex couples.  Yet Wisconsin, a historic leader in marriage equality, maintains one of the most restrictive bans on marriage for same-sex couples in the nation.  Wisconsin's constitutional amendment barring same-sex couples from marrying not only denies loving, committed, same-sex couples the dignity and status that only marriage can confer on their relationships and their families, it also prohibits the extension to same-sex couples of the same legal protections, duties, and benefits that married couples are allowed by law.  The State deprives same-sex couples of these rights and freedoms for no other reason than their sexual orientation and their sex.

5.     The Plaintiffs in this action are three same-sex couples who seek the freedom to marry in Wisconsin to establish and affirm publicly the love they feel for each other and the mutual commitment they have made, and one same-sex couple who asks the State of Wisconsin to recognize the marriage that they have legally contracted in another jurisdiction.  Wisconsin's denial of the freedom to marry has harmed these couples and their families in numerous ways. Carol Schumacher was unable to seek family and medical leave to care for Virginia Wolf when she was ill because they were not married.  Roy Badger and Garth Wangemann struggle financially to pay for health insurance that would be more affordable if they were married. Judith Trampf was denied the right to make health care decisions for her unconscious partner because she could not prove her entitlement to do so.  And every one of these couples suffers the stigma that comes from the State's denigration of their relationships as unworthy of recognition.

6.     Wisconsin's marriage ban inflicts two additional harms on Plaintiffs.  First, the Supreme Court's ruling in *United States v. Windsor*, 570 U.S. ___, 133 S. Ct. 2675 (2013), which prohibits the federal government from treating state-sanctioned marriages of same-sex

couples differently from marriages between a man and a woman, means that all federal spousal protections and obligations now flow to married same-sex couples living in states that recognize their marriages. Some of those protections are also extended, as a result of *Windsor*, to married same-sex couples living in states where their marriages are not recognized. But Wisconsin's marriage ban deprives the unmarried Plaintiff couples any access to these federal spousal benefits—benefits they could receive if they lived across the state line in Iowa or Minnesota and benefits they could access if they simply left the State to marry.

7.      But leaving the State to marry puts Plaintiffs in the way of the second harm. Wisconsin's marriage ban discourages these unmarried Plaintiffs from marrying elsewhere and puts the married Plaintiffs at imminent risk of prosecution under Wis. Stat. § 765.30(1) (the "marriage evasion statute" or "marriage evasion law"), which makes it a criminal offense for a Wisconsin resident to leave the State to contract a marriage that is prohibited or void here. By solemnizing their love and commitment in a state that acknowledges the dignity of their relationship, Carol Schumacher and Virginia Wolf risk criminal prosecution in their home state. The unmarried Plaintiffs are forced to choose between the risk of prosecution and foregoing access to any federal spousal protections. Once again, Wisconsin has no justification for this treatment other than Plaintiffs' sexual orientation and sex.

8.      Wisconsin's refusal to recognize these Plaintiffs' committed relationships, its elimination of even the possibility of seeking redress through the state legislature, and the possibility of criminal prosecution for doing nothing more than marrying the person they love has led these Plaintiffs to seek relief from this Court. Plaintiffs ask that the Court fulfill its solemn duty of ensuring to all Americans the fundamental freedoms that the Constitution of the United States guarantees. Wisconsin's marriage ban denies those freedoms. Plaintiffs therefore

ask this Court to declare unconstitutional and enjoin enforcement of Article XIII, § 13 of the Wisconsin Constitution and any provisions of Wisconsin's marriage law that could be construed as limiting marriage to different-sex couples, on the grounds that they violate the Equal Protection and Due Process Clauses of the United States Constitution (U.S. Const. amend. xiv, § 1). Plaintiffs also ask this court to enjoin enforcement of the marriage evasion statute against these Plaintiffs on the same grounds.

## Jurisdictional Statement

9.      Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress deprivations of rights, privileges, and immunities secured by the Constitution of the United States under color of State law. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

## Venue

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants Walker, Van Hollen, Chandler, Anderson, McDonell and King reside and have offices within the district and all Defendants reside in the State of Wisconsin, and because the events giving rise to Plaintiffs Wolf, Schumacher, Trampf, and Heyning's claims occurred, and will occur, in this district.

## The Plaintiffs

11.     Plaintiffs Virginia Wolf and Carol Schumacher reside in Eau Claire, Wisconsin. They are a loving, committed, same-sex couple legally married under the laws of Minnesota. They wish to have their Minnesota marriage recognized here.

12.     Plaintiffs Roy Badger and Garth Wangemann reside in Milwaukee, Wisconsin. They are a loving, committed, same-sex couple, and they wish to marry in Wisconsin. They would marry in Wisconsin but for the marriage ban.

13.     Plaintiffs Charvonne Kemp and Marie Carlson reside in Milwaukee, Wisconsin. They are a loving, committed, same-sex couple, and they wish to marry in Wisconsin.  They would marry in Wisconsin but for the marriage ban.

14.     Plaintiffs Judith "Judi" Trampf and Katharina "Katy" Heyning reside in Madison, Wisconsin.   They are a loving, committed, same-sex couple, and they wish to marry in Wisconsin.  They would marry in Wisconsin but for the marriage ban.

### The Defendants

15.     Defendant Scott Walker is sued in his official capacity as the Governor of the State of Wisconsin.  Walker is a person within the meaning of 42 U.S.C. § 1983, and he is, was, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as governor, Walker has a duty under the Wisconsin Constitution to ensure that the laws of the State of Wisconsin, including the marriage ban and the marriage evasion statute, are faithfully executed.

16.     Defendant J.B. Van Hollen is sued in his official capacity as Attorney General of Wisconsin.  Van Hollen is a person within the meaning of 42 U.S.C. § 1983, and he is, was, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as Attorney General, Van Hollen has authority to initiate a prosecution under Wisconsin's marriage evasion statute.

17.     Defendant Richard G. Chandler is sued in his official capacity as Secretary of Revenue of the State of Wisconsin.  Chandler is a person within the meaning of 42 U.S.C. § 1983, and he is, was, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as Secretary of Revenue, Chandler has authority to enforce the revenue code of Wisconsin, including its provisions related to the treatment for revenue purposes of marriages contracted in Wisconsin and in other jurisdictions.

6

18.     Defendant Oskar Anderson is sued in his official capacity as State Registrar. Anderson is a person within the meaning of 42 U.S.C. § 1983, and he is, was, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as State Registrar, Anderson has the authority to establish the form of a marriage license in Wisconsin, and to accept for registration and assign a date of registration to marriage documents.

19.     Defendant Gary King is sued in his official capacity as Eau Claire County District Attorney.  King is a person within the meaning of 42 U.S.C. § 1983, and he was, is, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as District Attorney, King has the authority to initiate a prosecution under the marriage evasion statute.

20.     Defendant Joseph J. Czarnezki is being sued in his official capacity as Milwaukee County Clerk.  Czarnezki is a person within the meaning of 42 U.S.C. § 1983, and he is, was, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as Milwaukee County Clerk, Czarnezki has the authority to issue or withhold a marriage license, and to ensure compliance with laws that prohibit the issuance of a marriage license to a same-sex couple.

21.     Defendant Scott McDonell (collectively with Walker, Van Hollen, Chandler, Anderson, King, and Czarnezki, "Defendants") is being sued in his official capacity as Dane County Clerk.  McDonell is a person within the meaning of 42 U.S.C. § 1983, and he is, was, and will be acting under color of state law at all times relevant to this Complaint.  In his capacity as Dane County Clerk, McDonell has the authority to issue or withhold a marriage license, and to ensure compliance with laws that prohibit the issuance of a marriage license to a same-sex couple.

**General Allegations**

22.     Wisconsin law would allow Virginia and Carol, Roy and Garth, Charvonne and Marie, and Judi and Katy to marry or have their marriages recognized here but for the fact that they are same-sex couples.  They are not related to one another by blood or marriage.  None is married to anyone else, and all are over the age of 18.  All of them have the capacity to consent to marry, and each couple consents or has consented to marry one another.

### *Virginia Wolf and Carol Schumacher*

23.     Virginia Wolf and Carol Schumacher have been in a loving, committed relationship for more than 38 years.  Together they raised two children, a daughter and a son, and they now have four grandchildren, two girls and two boys.  They live in Eau Claire with their dog "Z," a border collie/Australian shepherd mix.  When domestic partnerships became available in Wisconsin in 2009, Carol and Virginia were the first couple in Eau Claire to sign up.

24.     Virginia, who will turn 75 next month, is a professor emeritus of English at the University of Wisconsin, Stout, where she worked and taught for 24 years.  Virginia retired from the university on January 1, 2001. She is also a former minister in the Unitarian Universalist Church, and remains an active church member.  Virginia was born and raised in Kansas, where she met Carol.  They moved to Wisconsin in 1977 when Virginia took the university job.

25.     Carol, age 60, retired five years ago, after a 30-year career that included working as an elections administrator for the City of Eau Claire, and also as the city clerk there.  Carol also has a Master of Arts in marriage and family therapy, and worked as a therapist for a few years at the University of Wisconsin, Madison.  So while she has counseled other people on issues in their marriages, she is not able to get the State of Wisconsin to recognize her own.  Like Virginia, she was born and raised in Kansas.  Carol, too, is active in their church.

26.     Virginia and Carol met through mutual friends in Lawrence, Kansas, when Virginia was looking for someone to help with housekeeping and child care in exchange for room and board.  At the time, Virginia had two young children from a previous relationship. Virginia and Carol ended up raising the children together.   Their daughter, Laura, known as Niña, now 47, lives near Oshkosh with her husband and two daughters, Samantha, 16, and Megan, 12.  David, their son, is 42 and lives in Cottage Grove with his two sons, Finn, 4, and Graham, 2.

27.     Carol's extended family has always been supportive of Carol, Virginia, and their family.  Virginia's family is religiously conservative, and were not completely approving of her and Carol.  Still, they were never unkind and have always included Virginia and Carol in the family

28.     In the 1980's Carol and Virginia tried several times to sign up for a family membership at the YMCA in Eau Claire. The YMCA denied their applications because its policy was to refuse to recognize a same-sex couple as a family.

29.     Carol and Virginia face other obstacles in taking care of each other that they would not face if they could marry.  Over the years, Virginia has had a few surgeries and other illnesses.  On those occasions, Carol, who worked for the City of Eau Claire, was not permitted to take family leave to care for Virginia.  And until 2009, when Virginia and Carol became domestic partners, they could not be covered under each other's health insurance.  If Carol had been recognized as Virginia's spouse, she could have been covered immediately.

30.     On another occasion, Virginia was in the emergency room for chest pains, and an emergency room nurse refused to let Carol into the treatment area to comfort Virginia, ostensibly because Carol was not legally Virginia's family.

31.     Carol and Virginia married in the Unitarian Universalist Church in Eau Claire on December 21, 1990, the 15th anniversary of their first date in 1975.  A Unitarian minister officiated at the ceremony, where Carol and Virginia wore silk suits and carried flowers, and their children gave them away.  Despite below-freezing Wisconsin weather, the church was packed, and so was the party at Carol and Virginia's home afterward.  However, the State of Wisconsin did not recognize this marriage.

32.     Carol and Virginia were married legally in Minnesota on December 21, 2013, their 38th anniversary.  As Virginia put it, "We've been inching towards matrimony for 38 years!"  But being married under the laws of Minnesota is not enough.  For one thing, their marriage in Minnesota puts Carol and Virginia at risk of prosecution under Wisconsin's marriage evasion statute.  More importantly, Carol and Virginia want to have their marriage recognized under the laws of Wisconsin, their home state and the state where they have made their lives and raised their family.  For Carol, "the main reason I want my marriage to Virginia to be recognized is that it would be an affirmation of our relationship and our family."  Virginia says, "the protections and benefits we're missing out on are also still really important to me."

33.     Their granddaughters would like to see their marriage recognized too.  That wish grew even stronger last summer, when Samantha and Megan attended the wedding of a same-sex couple in Minneapolis, where Virginia officiated as a Unitarian Universalist Minister.  Both girls were really moved by the ceremony, and they talked about it a lot afterwards.  They would like their grandmothers' love to receive the same acknowledgement and respect in their home state.

34.     After 38 years of a committed, loving relationship and family life, the State of Wisconsin still treats Carol and Virginia as legal strangers and treats Carol as a legal stranger to the couple's children.  Carol and Virginia look forward to the day when Wisconsin recognizes

their relationship as deserving of the same legal protections, respect, and dignity that are accorded to marriages between different-sex spouses every day.

### Roy Badger and Garth Wangemann

35.     Plaintiffs Roy Badger, 56, and Garth Wangemann, 58, met through mutual friends in 1975, when both were in college at the University of Wisconsin, Milwaukee. They have been a couple for 37 years, since the day in 1976 when each came out to the other.  Garth loves Roy for his "gentle and giving" nature.  Once, when Roy and Garth were still in college and Garth was strapped for cash, Roy helped with Garth's dorm bill.  Roy says that Garth "has a terrific heart."  For example, Garth is a pen pal to several gay inmates, because, in Roy's words, he's "trying to be supportive to people who have been abandoned by everyone."

36.     Garth is a lifelong Wisconsinite and grew up in Sheboygan.  Roy was born in Illinois, and moved around the Midwest as a young child until his stepfather got a trucking job in Burlington, Wisconsin when Roy was about 12, and the family settled there.  Today, the couple lives in Milwaukee with their two dogs, Daisy and Winston.

37.     Roy and Garth are members of the United Church of Christ in Milwaukee.   On August 16, 2009, Roy and Garth had a private church commitment ceremony with just a handful of friends, their pastor, and the pastor's wife.  The memory of the ceremony is bittersweet, says Roy, because "it felt like something we were doing in secret."

38.     In 2009, Roy and Garth also registered as domestic partners in order to qualify for the limited protections domestic partnership provides them.  However, they know that their domestic partnership provides them with only a few state law protections and none of the federal protections, recognition, and respect reserved to married couples.

11

39.     For 32 years, Roy has worked at the university where he and Garth met.  He is the editor of the campus directory.  Garth worked in customer service for a retail costume website, but his job was outsourced in May of 2013 and Garth was laid off.  Since then, Garth has been doing some temp work for the company while looking for full-time work.

40.     Like many Americans, Roy and Garth have been struggling financially in recent years.  They lost their condo to foreclosure four years ago, and both of them had to file for bankruptcy.  Worse, since Garth was laid off last year, he has been paying for health insurance through COBRA.  On only Roy's salary and Garth's unemployment, the couple is finding it increasingly difficult to afford rent, household expenses, and Garth's health insurance.  They have had to sell many of their belongings on eBay just to meet Garth's COBRA payment.

41.     Health care coverage is a major concern for Roy and Garth, but so is their ability to make health and end-of-life decisions for each other, and to have those decisions respected by both doctors and their families.  In 2011, Garth was diagnosed with lung cancer.  While still in the hospital recovering from successful surgery for the cancer, Garth had a serious medical emergency—one his doctors still don't fully understand.  He coded three times, and his doctors decided to place Garth in a medically induced coma from which he did not emerge for more than a month.

42.     During this period, the doctors held several meetings with Garth's family to decide how to proceed.  Before the surgery—at the suggestion of Garth's surgeon—Garth had signed a power of attorney, giving Roy the authority to make medical decisions for him, authority that any different-sex spouse could count on without question.  Even though Roy had the legal authority to make decisions for Garth, Roy included Garth's father in the discussions.

43.     Garth's relationship with his father had not been easy.  When, at 20, Garth told his family he was gay, his father kicked him out of the house, hurling a piece of furniture at Garth as he packed up his car to leave.  Garth was estranged from his family—allowed home only at Christmas—for nearly three decades until his mother became ill with lung cancer.

44.     During Garth's own health crisis, Roy made it clear that he believed Garth would survive, and he insisted on keeping him on life support during the coma.  Garth's father wanted to take Garth off life support.  After he recovered, Garth learned from his sisters that his father had gone so far as to talk with attorneys about trying to override Roy's power of attorney.  Garth later said that he was not upset that his father wanted to take him off life support, but "what hurt the most was that he still didn't look at Roy as my spouse after all this time."  Garth was so hurt and upset that he no longer speaks to his father.

45.     If Roy and Garth had been able to enter into a legal marriage in Wisconsin, Roy's authority to make end-of-life decisions would have been unquestioned.

46.     Fortunately, Garth recovered from the coma and he remains cancer-free, but he still has lingering nerve damage and balance problems, and he also suffers from diabetes. Because they are a same-sex couple and their relationship is not recognized by the State, Roy and Garth remain vulnerable.  As a state employee, Roy can get Garth coverage through his employer-provided health insurance, but it will still be expensive—more expensive than if Garth were Roy's spouse—because unlike married couples Roy is likely to be taxed on the value of the insurance.  Moreover, Roy and Garth cannot be certain that the State, their families, and health care providers will recognize the decision-making authority that each has given to the other. Different-sex couples, who are legally allowed to marry in this State, do not face these same risks.

### *Charvonne Kemp and Marie Carlson*

47.     Charvonne Kemp, 43, and Marie Carlson, 48, have been in love and committed exclusively to each other for seven years.  They live in Milwaukee, where Charvonne works for UMB Fund Services in Milwaukee as a mutual fund accountant.  She handles the cash flows and trade activity, and strikes a price for NASDAQ daily.  Marie is a raw materials handler for Wrought Washer.  Marie is responsible for allocating, tracking, and moving all of the steel that comes in and out of the company's Milwaukee facility.

48.     Charvonne and Marie met in a MySpace group for lesbians over 30.  At first the group was a place for members to share dating stories and get advice.  Eventually, the group decided that half the members should be mentors to the other half, giving them dating advice and support.  Charvonne was assigned to be Marie's mentor, but the two fell for each other and started dating instead.

49.     Charvonne moved around when she was growing up, even globe-trotting a bit with her military stepfather.  She was living in Los Angeles when she and Marie first started dating.  Marie, who had lived in Milwaukee since the third grade, moved out to L.A. to be with Charvonne, but the two didn't stay long.  Charvonne had two sons from a prior marriage and a prior relationship, and she and Marie believed that Wisconsin was a better place to raise them than L.A.  So the entire family came back to Milwaukee in early 2007.

50.     Charvonne and Marie's older son, Alexander, is 21 and serves in the Air Force.  He and his wife, Autumn, have two children of their own, a daughter, Kylie, two, and a son, Kaden, who was born last summer.  Their younger son, Christopher, is just 11 so he still lives at home with Marie, Charvonne, and Charvonne's younger brother and sister.  Marie and Charvonne were active in the PTA at Christopher's school.  They've both served as PTA

officers, and Charvonne twice served on search committees to select a new school principal. Charvonne is currently on the Governance Council Committee at Christopher's school. Both sons consider Marie to be their stepmother, even if the State of Wisconsin does not.

51.     Charvonne says their relationship works because "Marie and I have similar interests and moral codes but we're independent enough in ourselves that we're okay if I want to go do something or she wants to be alone for a while." Charvonne spends time on her own cooking, sewing, quilting, gardening, and even dancing in a local Turkish dance group.

52.     Together, Charvonne, Marie, and Christopher are enthusiastic members of the Society for Creative Anachronism, and enjoy medieval reenactments with the group. The whole family swims at the YMCA once a week, and they enjoy Christopher's many school performances—including an opera performed by his class. Last year, Marie coached Christopher's baseball team.

53.     Marie's extended family was not always accepting of Marie and Charvonne and their family. But Marie's mother came to Milwaukee to be with them when they registered as domestic partners, and they expect that both Marie's parents will come to Milwaukee when Marie and Charvonne are allowed to marry. To Marie and Charvonne's surprise and delight, Marie's mother recently updated her Facebook page to tag Charvonne as her daughter-in-law.

54.     Charvonne's extended family is close and supportive. Charvonne is African-American, the daughter and granddaughter of civil rights activists. She thinks that her grandmother, an NAACP veteran, laid down the law a long time ago making it clear that, in their family, a same-sex couple was the same as any other.

55.     Marie and Charvonne are domestic partners, but that is not enough. When Charvonne's mother died, Marie had to use vacation time to go to the funeral—she couldn't take

bereavement leave.  And without marriage in Wisconsin, if either Marie or Charvonne got seriously ill the federal Family and Medical Leave Act would not protect them.

56.     At bottom, though, Marie and Charvonne want very much to get married for the same reasons most couples do.  "I love her and want to spend the rest of my life with her," says Charvonne of Marie.  Marriage is "that final commitment to another person.… I'm old fashioned in that way."  Marie says "I want to call Charvonne my wife and have people understand what that means. . . . I want to do it the right way and the right way is marriage."   They have thought about going to Illinois or Massachusetts or Canada to get married, especially after the Supreme Court's decision in *Windsor*, but Charvonne says, "I'm not a big fan of breaking the law."  For Marie, if the marriage is not recognized in Wisconsin, "it doesn't mean what it's supposed to mean."  Marie feels strongly that the commitment she has made to Charvonne and their sons, and that they have made to Marie, should be legally recognized.  "I want to proudly walk with my family."  According to Charvonne, "Everyone else in our lives accepts us as a couple except the law."

### Judi Trampf and Katy Heyning

57.     Judith "Judi" Trampf, 53, and Katharina "Katy" Heyning, 51, will celebrate 25 years together this July.  They met at Girl Scout Camp in Wyoming in 1982.  Later, they were both members of a group of camp alumna from the Midwest who would get together outside of summer camp.  They got to really know each other through the group, and discovered a lot of interests in common.  After a few years, they fell for each other and started dating.

58.     Both Judi and Katy work at the University of Wisconsin, Whitewater.  Katy is the Dean of the College of Education and Professional Studies, and Judi is Director of Human Resources and Diversity.  When they aren't working, they garden and host dinner parties for

friends at the home they share in Madison, Wisconsin. They also spend their time boating, kayaking, and traveling together—it doesn't matter where—and they are Rally Chairs for their BMW Motorcycle Club. Judi and Katy registered as domestic partners in Madison on August 5, 2009.

59.     Katy's family accepts Judi, and Judi's family has long viewed Katy as a family member. When Katy had surgery and her own mother couldn't travel to be with her, Judi's mother stepped in. When Judi's father, who lived in Ripon, Wisconsin, was ill and hospitalized in 1994, Katy ran his business for him, travelling to Ripon with Judi three times a week, 70 miles each way, to help. Even so, after Judi and Katy had been together for 15 years, Judi's family insisted on a wedding so that Judi and Katy's relationship could be celebrated properly. They held a commitment ceremony on June 19, 2004 in James Madison Park in Madison, Wisconsin, followed by a reception for 150 friends, family, and colleagues.

60.     Many years ago, Judi and Katy prepared health care powers of attorney for each other, but they know that such paperwork is no substitute for the security that marriage provides. In 2002, while on a trip to New Orleans, Katy had a seizure. In the emergency room, where Katy lay unconscious, Judi explained that she was Katy's partner and designated health care decision maker. But Judi was told that unless she had the health care power of attorney document in hand, she would not be allowed to make any medical decisions on Katy's behalf. The documents were at home in Wisconsin, so the hospital informed Judi that Katy's brother, as her nearest relative, had the authority to make health care decisions, not Judi. "My brother was not as aware of my wishes as Judi," says Katy.

61.     After Katy regained consciousness, she had trouble concentrating and responding to questions.  Judi repeatedly answered questions on Katy's behalf, and yet the health care providers continued to direct their questions to Katy, and to ignore Judi.

62.     Out of concern that Katy might have another seizure and that Judi would not be permitted to make decisions for her, Judi and Katy ended up cutting their trip short and returning to Wisconsin, even though Katy was feeling better and they would have liked to stay.  They now keep scanned copies of their health care powers of attorney on their phones so they are accessible wherever they go.

63.     Judi and Katy's current domestic partner status would not have solved the problem they encountered in New Orleans.  That status is only recognized in Wisconsin, while marriage is understood everywhere and widely respected.  And even in Wisconsin, Judi and Katy find that domestic partnership is not well understood, and they have on at least one occasion been asked to prove their partnership status with documentation—a request that married couples almost never encounter.  "Legally, we have to have so many more documents, wills, and other things and we're penalized even when we do have them," says Judi.  Domestic partnership also does not entitle Judi or Katy to federal protections that are reserved for spouses.

64.     After 25 years, Judi and Katy have built a life together.  They jointly own a house, two cars, a pontoon boat, and several bank accounts.  Judi and Katy wish to marry because, according to Judi, "we want to know that if one of us is ill or dies, we will have the same protections as any other married couple after 25 years of being together."  More than that, though, Katy would like the public recognition that Judi is the love of her life.  "We have been in love and faithful to each other for more than 25 years.  We have cared for each other in sickness

and in health, and we would like public recognition through marriage of our commitment until death do us part."

### The Discriminatory Wisconsin Marriage Ban

65.     The State of Wisconsin establishes laws governing marriage. Wisconsin's marriage ban provides that "Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state." Wis. Const. Art. XIII, § 13.

66.     Wisconsin's marriage ban is one of the most restrictive bans on marriage for same-sex couples in the nation. On its face, it expressly bars both marriage between two people of the same sex and the recognition of *any* legal status substantially similar to marriage. As a result, on its face, Wisconsin's constitutional amendment does not permit Roy and Garth, Charvonne and Marie, and Judi and Katy to marry, and prohibits the recognition of Virginia and Carol's out-of-state marriage.

67.     Worse, Wisconsin law makes it a criminal offense to go outside the State to contract a marriage prohibited under the laws of Wisconsin. A violation bears penalties of up to $10,000 in fines and nine months in prison. Wis. Stat. § 765.30(1)(a).

### Wisconsin's Domestic Partnership Statute

68.     In 2009, the Wisconsin legislature passed a domestic partnership law, Wis. Stat. ch. 770, which creates the status of domestic partnership that carries with it some, but nowhere near all, of the protections and obligations accorded to married couples. The domestic partnership law did not end the exclusion of same-sex couples from marriage. Indeed, it cannot do so under the terms of Wisconsin's discriminatory marriage ban, which prohibits granting same-sex couples any status that is substantially similar to marriage.

69.     Moreover, even the limited domestic partnership law is currently under challenge in the Wisconsin Supreme Court in *Appling v. Walker*, No. 2011AP1572.  A decision in that case is pending.

70.     Even if the domestic partnership law were to be upheld, it is not an adequate substitute for marriage.  Denying two people in a loving, committed relationship the freedom to marry denies them the opportunity to express and legally embody their commitment in the most serious way that society provides.  It refuses them the opportunity to enter into a relationship that is universally respected and recognized as a symbol of their love and commitment.  The novel domestic partnership designation withholds from same-sex couples the reverence and recognition associated only with marriage.  It offers no more than a mundane entryway to an extremely limited subset of benefits.  The essence of marriage is a private and public celebration of love and commitment; domestic partnerships fail to achieve that goal.  Marriage is something many people hope for from a young age, an ideal they aspire to; domestic partnership is not.

71.     Denying Plaintiffs and other lesbian and gay couples the freedom to marry also would make it impossible for them to receive the protections currently provided only to married couples under federal law.  After *Windsor*, the federal Defense of Marriage Act ("DOMA") no longer excludes same-sex couples from access to federal marriage responsibilities and protections.  But even if same-sex couples move to Wisconsin after marrying elsewhere or risk criminal prosecution by leaving the State to marry, Wisconsin same-sex couples would still be denied those federal law protections for spouses that require the marriage to be recognized in their state of residence, such as veteran and family medical leave protections.

72.     Barring same-sex couples from marriage also disqualifies them from critically important state law protections and responsibilities that different-sex couples rely upon to secure

their commitment to each other, and to safeguard their families. Even if they obtain a domestic partnership under Wisconsin's domestic partnership law, same-sex couples are still denied numerous protections and obligations, including:

      (a)    the presumption of parenthood for a non-birth parent with respect to any child born within the marriage;

      (b)    the right to adopt a spouse's child;

      (c)    eligibility for stepparent visitation rights for the surviving spouse of a deceased parent of a minor child;

      (d)    the "married persons credit" and personal exemptions for state income tax purposes;

      (e)    certain tax deductions for medical insurance expenses for a spouse;

      (f)    certain tax deductions for long term care insurance for a spouse;

      (g)    eligibility of  a surviving spouse of a veteran to be buried with their spouse in a veterans' cemetery;

      (h)    entitlement of a surviving spouse to seek damages for loss of society and companionship in case of wrongful death;

      (i)    the presumption of confidentiality for communications with health insurers about a spouse's medical condition; and

      (j)    protection against discrimination on the basis of marital status in numerous contexts.

73.    If the Wisconsin Supreme Court holds that the domestic partnership law violates Wisconsin's constitutional marriage ban, same-sex couples would lose even the limited benefits that the law does provide.

74.    Wisconsin and this country have subjected lesbian and gay people to scorn and discrimination for many years, and they have done so because lesbians and gay men form intimate relationships with a person of the same sex.  Although Wisconsin and this country have taken some steps to reduce discrimination against lesbians and gays, Wisconsin's ban on marriage for same-sex couples is a striking and continuing vestige of the long history of discrimination towards lesbians and gay men.  The marriage ban and the marriage evasion statute, together with the new, separate, inferior, and poorly understood status of domestic partnership instead of marriage, send a powerful message to same-sex couples, their families, and the public that lesbians and gay men are not good enough for marriage and their relationships are undeserving of the respect and dignity associated with marriage alone.

75.    The substantive and dignitary inequities imposed on committed same-sex couples include particular harms to same-sex couples' children, who are equally deserving of the stability, permanence, and legitimacy that are enjoyed by children of different-sex couples who marry.  Civil marriage affords official sanctuary to the family unit, offering parents and children critical means to secure legal parent-child bonds, and a familiar, public way of demonstrating those bonds to third parties. By denying same-sex couples marriage, Wisconsin reinforces the view held by some that the family bonds that unite same-sex parents and their children are less consequential, enduring, and meaningful than those of different-sex parents and their children. Same-sex couples and their children accordingly must live with the vulnerability and stress inflicted by a lack of access to the same mechanisms for securing their legal relationships, and the ever-present possibility that others may question their familial relationship—in social, legal, educational, and medical settings and in moments of crisis—in a way that spouses can avoid by simple reference to being married.

76.     Children from a young age understand that marriage signifies an enduring family unit, and likewise understand that Wisconsin has deemed a class of families as less worthy than other families, undeserving of marriage, and not entitled to the same societal recognition and support as other families. Wisconsin has no interest adequate to justify marking the children of same-sex couples, including the children of Plaintiffs, with a badge of inferiority that will invite disrespect in school, on the playground, and in every other sphere of their lives.

77.     Because Wisconsin denies lesbian and gay couples the esteem and understanding associated with marriage and stigmatizes them by relegating them to a separate and unequal legal status, one of the Plaintiff couples left the State to marry, subjecting themselves to an ongoing risk of criminal prosecution.  All Plaintiff couples have been injured by Wisconsin's refusal to allow them to marry or to recognize their marriages entered elsewhere.

**Wisconsin's Exclusion of Same-Sex Couples from Marriage Is Not Rationally Related To A Legitimate Governmental Purpose, Let Alone Substantially Related To An Important Governmental Purpose Or Narrowly Tailored To A Compelling Governmental Purpose**

78.     Wisconsin's discriminatory exclusion of same-sex couples from marriage does not serve any compelling, important, or even legitimate government interest.

79.     While the government has an interest in protecting child welfare, the exclusion of same-sex couples from marriage does not further this interest.  There is no rational connection between excluding lesbian and gay couples from marriage and encouraging "traditional" different-sex couples to have children within marriage.  Further, there is a consensus among child welfare experts, reflecting over 30 years of research, that children raised by same-sex couples are just as well adjusted as are children raised by different-sex couples.  Moreover, excluding same-sex couples from marriage serves only to harm the children raised by lesbian and gay couples.

23

80.     There is no legitimate governmental interest in promoting traditional marriage or uniformity of marriage practices: a discriminatory marriage law cannot be justified solely on the basis of its long tradition or its common practice.   Similarly, there is no state interest in promoting traditional marriage or uniformity of marriage practices with regard to same-sex couples who already have legal marriages from other jurisdictions.   Such couples merely seek to enjoy a legal status that has already been conferred.

81.     While the government may have fiscal interests, cost savings alone cannot justify a discriminatory allocation of a government benefit, absent an independent justification for why one class of people is burdened with the responsibility for the savings.   Moreover, the exclusion of same-sex couples from marriage is not the least restrictive means nor is it sufficiently narrowly tailored to further, nor even rationally related to, this interest, because allowing same-sex couples to marry will not increase any costs for the State of Wisconsin.   Indeed, experience shows that states that have ended the exclusion of same-sex couples from marriage, including Iowa, have experienced increases in state revenues as a direct result.

82.     Providing same-sex couples access, via domestic partnership status, to only a portion of the protections and responsibilities of marriage, while denying them the esteem and universal recognition of marriage, can only be explained as an effort to denigrate lesbian and gay persons.   Reminding lesbian and gay couples of the history of discrimination, the domestic partnership status is by definition separate and unequal.   Labeling lesbian and gay couples as inferior is not a legitimate governmental interest, but is per se discriminatory.

83.     The State deprives same-sex couples of these freedoms for no other reason than their sexual orientation and their sex.

**Count One**
**Violation of Due Process**

84.     Plaintiffs re-allege paragraphs 1 through 83 as though fully set forth herein.

85.     Amendment XIV, § 1 of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ."

86.     The Due Process Clause protects the fundamental right to marry the person of one's choice and related constitutional rights to liberty, dignity, autonomy, family integrity, and association.

87.     Wisconsin's marriage ban does not permit same-sex couples to marry nor does it permit the recognition of the marriages of same-sex couples lawfully entered into outside of Wisconsin.

88.     There is no adequate justification for the exclusion of Plaintiffs from marriage or the refusal to recognize Plaintiffs' marriages.  Moreover, the exclusion of same-sex couples from marriage is not narrowly tailored nor is it the least restrictive alternative to further a compelling or important government interest.

89.     Defendants' duties and actions to ensure compliance with the marriage ban preventing Plaintiffs from lawfully marrying in the State of Wisconsin, and preventing the recognition of Plaintiffs' marriages lawfully entered into outside Wisconsin, deprives Plaintiffs of the fundamental right to marry and their constitutional rights to liberty, dignity, autonomy, family integrity, and association without due process of law.

**Count Two**
**Violation of Equal Protection Based on Sexual Orientation**

90.     Plaintiffs re-allege paragraphs 1 through 83 as though fully set forth herein.

91.     Amendment XIV, § 1 of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

25

92.     Same-sex couples in committed relationships who wish to marry are similarly situated in every material respect to different-sex couples in committed relationships who wish to marry. Same-sex couples who have lawfully married outside of Wisconsin are similarly situated in every material respect to different-sex couples who have lawfully married outside of Wisconsin.

93.     Wisconsin's marriage ban does not permit same-sex couples to marry nor does it permit the recognition of the marriages of same-sex couples lawfully entered into outside of Wisconsin. It therefore discriminates facially and as applied to Plaintiffs and other lesbian and gay couples on the basis of sexual orientation.

94.     Discrimination on the basis of sexual orientation is suspect and demands a heightened level of scrutiny under the United States Constitution, since the marriage ban and Defendant's actions in administering and enforcing it purposefully single out a minority group (lesbians and gay men) that historically has suffered discriminatory treatment and been relegated to a position of political powerlessness solely on the basis of stereotypes and myths regarding their sexual orientation—a characteristic that bears no relation to their ability to contribute to society and is immutable in that it is central to their core identity.

95.     There is no adequate justification for the exclusion of Plaintiffs from marriage or the refusal to recognize Plaintiffs' marriages. Moreover, the exclusion of same-sex couples from marriage is not narrowly tailored nor is it the least restrictive alternative to further a compelling or important government interest. The marriage ban is not even rationally related to any legitimate government interest.

96.     Defendants' duties and actions to ensure compliance with the marriage ban preventing Plaintiffs from lawfully marrying in the State of Wisconsin, and preventing the

recognition of Plaintiffs' marriages lawfully entered into outside Wisconsin, deprives Plaintiffs of the equal protection of the laws based on their sexual orientation.

## Count Three
## Violation of Equal Protection Based on Gender

97.     Plaintiffs re-allege paragraphs 1 through 83 as though fully set forth herein.

98.     Amendment XIV, § 1 of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

99.     The Wisconsin marriage ban discriminates based on gender because it permits a man and woman to marry, but does not allow a man to marry a man, or a woman to marry a woman, and because it permits different-sex marriages lawfully entered into outside of Wisconsin to be recognized but does not allow the marriages of same-sex couples lawfully entered into outside of Wisconsin to be recognized.

100.     Discrimination on the basis of sex is suspect and demands heightened scrutiny under the United States Constitution.

101.     There is no adequate justification for the exclusion of Plaintiffs from marriage or the refusal to recognize Plaintiffs' marriages.  Moreover, the exclusion of same-sex couples from marriage is not narrowly tailored nor is it the least restrictive alternative to further a compelling or important government interest.   The marriage ban is not even rationally related to any legitimate government interest.

102.     Defendants' duties and actions to ensure compliance with the marriage ban preventing Plaintiffs from lawfully marrying in the State of Wisconsin, and preventing the recognition of Plaintiffs' marriages lawfully entered into outside Wisconsin, deprives Plaintiffs of the equal protection of the laws based on their gender.

**Prayer For Relief**

103.     WHEREFORE, Plaintiffs request that this Court enter judgment:

(A)     declaring that Article XIII, § 13 of the Wisconsin Constitution and all provisions of the Wisconsin marriage laws (Wis. Stat. ch. 765) that refer to marriage as a relationship between a "husband" and a "wife" and operate as a statutory ban on marriage for same-sex couples violate the Due Process Clause and the Equal Protection Clause of the United States Constitution (Amendment XIV, § 1) by preventing Plaintiffs from lawfully marrying in the State of Wisconsin and by preventing the recognition of Plaintiffs' marriages lawfully entered into outside of the State;

(B)     permanently enjoining all Defendants from enforcing Article XIII, § 13 and any other sources of state law that operate to exclude same-sex couples from marriage or to deny recognition of the marriages of same-sex couples validly contracted in another jurisdiction;

(C)     permanently enjoining Defendants Van Hollen and King from enforcing Wisconsin's marriage evasion statute against same-sex couples who marry outside of Wisconsin;

(D)     awarding Plaintiffs the costs and expenses of this action together with reasonable attorneys' fees; and

(E)     entering such other and further relief as deemed appropriate by the Court.

Dated:  February 3, 2014                        Respectfully submitted,


                                                By:  /s Laurence J. Dupuis                    
                                                     By Their Attorneys


JOHN A. KNIGHT*                                 JAMES D. ESSEKS**
American Civil Liberties Union Foundation       American Civil Liberties Union Foundation
Lesbian Gay Bisexual Transgender Project        Lesbian Gay Bisexual Transgender Project
180 North Michigan Avenue                       125 Broad Street
Suite 2300                                      New York, New York 10004
Chicago, Illinois 60601                         (212) 549-2623
(312) 201-9740                                  jesseks@aclu.org
jaknight@aclu.org

LAURENCE J. DUPUIS                              HANS GERMANN**
SBN: 1029261                                    GRETCHEN E. HELFRICH**
American Civil Liberties Union of Wisconsin     FRANK DICKERSON**
Foundation                                      Mayer Brown LLP
207 E. Buffalo Street, Suite 325                71 South Wacker Drive
Milwaukee, Wisconsin 53202                      Chicago, Illinois  60606-4637
(414) 272-4032                                  Telephone:  (312) 782-0600
ldupuis@aclu-wi.org                             Facsimile:  (312) 701-7711
                                                hgermann@mayerbrown.com
                                                ghelfrich@mayerbrown.com
                                                fdickerson@mayerbrown.com


*    admission pending
**   admission *pro hac vice* to be filed

29