## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

VIRGINIA WOLF and CAROL
SCHUMACHER, KAMI YOUNG and
KARINA WILLES, ROY BADGER and
GARTH WANGEMANN, CHARVONNE
KEMP and MARIE CARLSON, JUDITH
TRAMPF and KATHARINA HEYNING,
SALUD GARCIA and PAM KLEISS,
WILLIAM HURTUBISE and LESLIE
PALMER, and JOHANNES WALLMANN
and KEITH BORDEN,

**Plaintiffs,**

**vs.**

SCOTT WALKER, in his official capacity as
Governor of Wisconsin, J.B. VAN HOLLEN,
in his official capacity as Attorney General of
Wisconsin, RICHARD G. CHANDLER, in his
official capacity as Secretary of Revenue of
Wisconsin, OSKAR ANDERSON, in his
official capacity as State Registrar of
Wisconsin, GARY KING, in his official
capacity as Eau Claire County District
Attorney, JOHN CHISHOLM, in his official
capacity as Milwaukee County District
Attorney, JOSEPH CZARNEZKI, in his
official capacity as Milwaukee County Clerk,
WENDY CHRISTENSEN, in her official
capacity as Racine County Clerk, and SCOTT
MCDONELL, in his official capacity as Dane
County Clerk,

**Defendants.**

Case No.  14-cv-64

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

FACTS ................................................................................................................... 2

LEGAL STANDARD .............................................................................................. 7

ARGUMENT ......................................................................................................... 7

I.    The Marriage Ban Violates The Due Process Clause By Interfering With The Fundamental Rights To Marry And Remain Married ................................. 8

    A.    The Marriage Ban Violates The Fundamental Right To Marry The Person Of One's Choice ................................................................. 9

        1.    The freedom to marry is a fundamental right belonging to the individual ......................................................................... 9

        2.    The scope of a fundamental right under the due process clause does not depend on who has exercised that right in the past ..................................................................................... 10

    B.    The Marriage Ban Violates Plaintiffs' Right To Remain Married ......... 12

II.    The Marriage Ban Denies Plaintiffs Equal Protection Of The Laws .................. 15

    A.    The Marriage Ban Denies Plaintiffs Equal Protection Of The Laws On The Basis Of Sex ................................................................. 16

        1.    The marriage ban facially discriminates on the basis of sex ....... 16

        2.    The marriage ban subjects Plaintiffs to sex stereotyping ............. 18

        3.    Laws denying equal protection on the basis of sex are subject to heightened scrutiny that Wisconsin's ban cannot satisfy ..................................................................................... 20

    B.    The Marriage Ban Denies Plaintiffs Equal Protection Of The Laws On The Basis Of Sexual Orientation ......................................... 20

        1.    The marriage ban discriminates on basis of sexual orientation ................................................................................. 20

        2.    Laws denying equal protection on the basis of sexual orientation must be subject to heightened scrutiny ..................... 21

III.    The Marriage Ban Is Unconstitutional Under Any Standard Of Review ........... 26

    A.    The Marriage Ban Cannot Be Justified By An Interest In Maintaining A "Traditional" Definition Of Marriage ............................ 29

    B.    The Marriage Ban Cannot Be Justified By An Interest In Encouraging Responsible Procreation By Heterosexual Couples .......... 31

    C.    The Marriage Ban Cannot Be Justified By An Interest In "Optimal Childrearing." .......................................................................... 34

i

CONCLUSION..............................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Casino Queen, Inc.*,
  739 F.3d 972 (7th Cir. 2014) ........................................................................7

*Appling v. Walker*,
  No. 2011AP1572 (Wis. Filed June 20, 2011) ........................................38

*Baehr v. Lewin*,
  852 P.2d 44 (Haw. 1993), *aff'd*, 950 P.2d 1234 (Haw. 1997) ...............16

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
  531 U.S. 356 (2001) ...................................................................................39

*Ben-Shalom v. Marsh*,
  881 F.2d 454 (7th Cir. 1989) ...................................................................22

*Bishop v. United States ex rel Holder*,
  2014 WL 116013 (N.D. Okla. Jan. 14, 2014) ................................. *passim*

*Bostic v. Rainey*,
   --- F. Supp. 2d ---, 2014 WL 561978 (D. Va. Feb. 13, 2014)............28, 30, 34, 37

*Bourke v. Beshear*,
   --- F. Supp. 2d ----, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014) ........30, 32, 33, 34

*Bowen v. Gilliard*,
  483 U.S. 587 (1987)........................................................................22, 25, 26

*Bowers v. Hardwick*,
  478 U.S. 186 (1986)........................................................................11, 21, 22

*Caban v. Mohammed*,
  441 U.S. 380 (1979)....................................................................................19

*Califano v. Westcott*,
  443 U.S. 76 (1979)......................................................................................17

*Cece v. Holder*,
  733 F.3d 662 (7th Cir. 2013) ...................................................................26

*Christian Legal Soc'y v. Martinez*,
  130 S. Ct. 2971 (2010)...............................................................................21

*City of Chi. v. Shalala*,
   189 F.3d 598 (7th Cir. 1999) ...................................................................27

*Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)................................................................... *passim*

*Cleveland Bd. of Educ. v. LaFleur*,
   414 U.S. 632 (1974)..........................................................................9

*DeBoer v. Snyder*,
   2014 WL 1100794 (E.D. Mich. March 21, 2014) ...............................28, 30, 33, 36

*De Leon v. Perry*,
   --- F. Supp. 2d ---, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014) .............28, 30, 32

*Doe by Doe v. City of Belleville*,
   119 F.3d 563 (7th Cir. 1997), *vacated and remanded on other grounds*, *City of Belleville v. Doe by Doe*, 523 U.S. 1001 (1998)................................................18

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972)...................................................................33, 35

*Fleishman v. Continental Cas. Co.*,
   698 F.3d 598 (7th Cir. 2012) ................................................................7

*Friendship Med. Ctr., Ltd. v. Chi. Bd. of Health*,
   505 F.2d 1141 (7th Cir. 1974) .............................................................33

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)........................................................................24

*Golinski v. U.S. Office of Pers. Mgmt.*,
   824 F. Supp. 2d 968 (N.D. Cal. 2012) ........................................... *passim*

*Goodpaster v. City of Indianapolis*,
   736 F.3d 1060 (7th Cir. 2013) .............................................................27

*Griego v. Oliver*,
   316 P.3d 865 (N.M. 2013) ..............................................................23, 35

*Griswold v. Conn.*,
   381 U.S. 479 (1965)..........................................................................9

*Heller v. Doe by Doe*,
   509 U.S. 312 (1993)........................................................................29

*Hodgson v. Minn.*,
   497 U.S. 417 (1990).......................................................................9, 14

*Howard v. Child Welfare Agency Review Bd.*,
    2004 WL 3154530, *aff'd sub nom Dep't of Human Servs. v. Howard*,
    238 S.W.3d 1 (Ark. 2006) ................................................................................................36

*Hunter v. Erickson*,
    393 U.S. 385 (1969) ..........................................................................................................25

*In re Adoption of Doe*,
    2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008), *aff'd sub nom. Fla. Dep't of*
    *Children & Families v. Adoption of X.X.G.*, 45 So. 3d 79 (Fla. Dist. Ct. App. 2010).............36

*In re Balas*,
    449 B.R. 567 (Bankr. C.D. Cal. 2011) ..............................................................................23

*In re Campbell's Estate*,
    260 Wis. 625, 51 N.W.2d 709 (1952) ..............................................................................14

*In re Marriage Cases*,
    183 P.3d 384 (Cal. 2008) .................................................................................10, 12, 23

*In re Ray's Will*,
    205 N.W. 917 (1925) ..........................................................................................................3

*J.E.B. v. Ala. ex rel. T.B.*,
    511 U.S. 127 (1994) ..........................................................................................................17

*Johnson v. Cal.*,
    543 U.S. 499 (2005) ..........................................................................................................18

*Kerrigan v. Comm'r of Pub. Health*,
    957 A.2d 407 (Conn. 2008) ..............................................................................................23

*Kitchen v. Herbert*,
    --- F. Supp. 2d ---, 2013 WL 6697874 (D. Utah Dec. 20, 2013) ...................................*passim*

*Knussman v. Md.*,
    272 F.3d 625 (4th Cir. 2001) ............................................................................................19

*Lanham v. Lanham*,
    136 Wis. 360, 117 N.W. 787 (1908) .................................................................................14

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ...........................................................................................................*passim*

*Loving v. Virginia*,
    388 U.S. 1 (1967) .............................................................................................9, 10, 12, 17

*Marsh v. Chambers*,
    463 U.S. 783 (1983) .................................................................................... 29

*McConkey v. Van Hollen*,
    2010 WI 57, 783 N.W.2d 855 ................................................................ 38, 39

*McLaughlin v. Fla.*,
    379 U.S. 184 (1964) .................................................................................... 17

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) .................................................................................... 19

*Moore v. City of E. Cleveland*,
    431 U.S. 494 (1977) .................................................................................... 14

*Nabozny v. Podlesny*,
    92 F.3d 446 (7th Cir. 1996) .................................................................. 20, 23

*Nev. Dep't of Human Res. v. Hibbs*,
    538 U.S. 721 (2003) .................................................................................... 19

*Obergefell v. Wymyslo*,
    2013 WL 6726688 (S.D. Ohio Dec. 23, 2013) ...................................... 13, 23

*Owen v. Owen*,
    178 Wis. 609, 190 N.W. 363 (1922) .......................................................... 14

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) .................................................................................... 29

*Pedersen v. U.S. Office of Pers. Mgmt.*,
    881 F. Supp. 2d 294 (D. Conn. 2012) ........................................ 22, 23, 24, 26

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010), *appeal dismissed sub nom. Perry v. Brown*,
    725 F.3d 1140 (9th Cir. 2013) ....................................................... *passim*

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) .................................................................................... 14

*Plyler v. Doe*,
    457 U.S. 202 (1982) .............................................................................. 26, 34

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) .............................................................................. 18, 19

*Prince v. Mass.*,
    321 U.S. 158 (1944) .................................................................................... 14

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ........................................................................................10

*Romer v. Evans*,
    517 U.S. 620 (1996) ............................................................................27, 33, 37

*Royster Guano Co. v. Va.*,
    253 U.S. 412 (1920) ........................................................................................33

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ........................................................................................14

*Schroeder v. Hamilton Sch. Dist.*,
    282 F.3d 946 (7th Cir. 2002) .....................................................................21, 22

*Sevcik v. Sandoval*,
    No. 12-17668 (9th Cir. Oct. 25, 2013), ECF No. 24 ........................................30

*SmithKline Beecham Corp. v. Abbott Labs.*,
    740 F.3d 471 (9th Cir. 2014) .........................................................................23

*Srail v. Vill. of Lisle, Ill.*,
    588 F.3d 940 (7th Cir. 2009) .........................................................................27

*Stanley v. Ill.*,
    405 U.S. 645 (1972) ..................................................................................19, 37

*Strauss v. Horton*,
    207 P.3d 48 (2009) ....................................................................................12, 13

*Toeller v. Wisc. Dept. of Corr.*,
    461 F.3d 871 (7th Cir. 2006) .........................................................................20

*Turner v. Safley*,
    482 U.S. 78 (1987) ......................................................................................9, 10

*U.S. Dep't of Agriculture v. Moreno*,
    413 U.S. 528 (1973) ..................................................................................37, 40

*United States v. Va.*,
    518 U.S. 515 (1996) ........................................................................................20

*United States v. Windsor*
    133 S. Ct. 2675 (2013) ............................................................................ *passim*

*Varnum v. Brien*,
    763 N.W.2d 862 (Iowa 2009) ................................................................. *passim*

*Wash. v. Seattle Sch. Dist. No. 1,*
    458 U.S. 457 (1982) ........................................................................................25

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ..........................................................................................8

*White v. Fleming,*
    522 F.2d 730 (7th Cir. 1975) ........................................................................18

*Windsor v. United States,*
    699 F.3d 169 (2d Cir. 2012).............................................................22, 23, 24

*Wis. Educ. Ass'n Council v. Walker,*
    705 F.3d 640 (7th Cir. 2013) ........................................................................27

*Zablocki v. Redhail,*
    434 U.S. 374 (1978) ................................................................................*passim*

**CONSTITUTIONS AND STATUTES**

U.S. Const. ...........................................................................................1, 2, 11

U.S. Const. Amend. XIV, § 1 ...................................................................*passim*

Wis. Const. Art. XIII, § 13...........................................................................*passim*

Wis. Const. Art. XII, § 1 ...............................................................................25

42 U.S.C. § 1983 .............................................................................................1

Cal. Fam. Code 308(b) ..................................................................................13

Wis. Sess. Laws ch. 112 § 901 (1981)........................................................24

Wis. Stat. § 48.82 ...........................................................................................5

Wis. Stat. § 48.82(1) .......................................................................................6

Wis. Stat. § 765.001(2) .................................................................................15

Wis. Stat. § 765.30(1)(a) .......................................................................3, 4, 5

Wis. Stat. §§ 891.40(1), 891.41(1).................................................................5

**OTHER AUTHORITIES**

*Restatement (Second) of Conflict of Laws* § 283(2) (1971) ......................14

Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* (2002) ....................2

vi

David H. Fowler, *Northern Attitudes Towards Interracial Marriage: Legislation and Public Opinion in the Middle Atlantic and the States of the Old Northwest 1780-1930* (1987)......................................................................................................................................2

Richard A. Posner, *Sex and Reason* (1992) ..............................................................................23

Barbara S. Gamble, "Putting Civil Rights to a Popular Vote," 41 Am. J. Pol. Sci. 245 (1997) ...........................................................................................................................................25

Donald P. Haider-Markel, *et al.*, "Lose, Win, or Draw?: A Reexamination of Direct Democracy and Minority Rights," 60 Pol. Research. Q. 304 (2007) ......................................25

Joseph Ranney, "Abraham Lincoln's Legacy to Wisconsin Law, Part 1: A New Birth of Freedom: Civil Rights Law in Wisconsin," 81 Wis. Law. 12 (Dec. 2008) ..............................3

Steve Sanders, "The Constitutional Right to (Keep Your) Same-Sex Marriage," 110 Mich. L. Rev. 1421 (2012)...........................................................................................13, 14, 15

## INTRODUCTION

Plaintiffs Virginia Wolf and Carol Schumacher, Kami Young and Karina Willes, Roy Badger and Garth Wangemann, Charvonne Kemp and Marie Carlson, Judith Trampf and Katharina Heyning, Salud Garcia and Pam Kleiss, William Hurtubise and Leslie Palmer, and Johannes Wallmann and Keith Borden (collectively, "Plaintiffs") filed this action pursuant to 42 U.S.C. § 1983 to challenge the validity of Article XIII, § 13 of the Constitution of Wisconsin, as well as all provisions of Wisconsin's marriage statutes that could be construed to constitute a statutory ban on marriage for same-sex couples (collectively with Article XIII, § 13, the "marriage ban"), under the United States Constitution.  Plaintiffs Wolf and Schumacher and Young and Willes seek recognition of their legally contracted out-of-state marriage by the State of Wisconsin; Plaintiffs Badger and Wangemann, Kemp and Carlson, Trampf and Heyning, Garcia and Kleiss, and Hurtubise and Palmer seek the freedom to marry in Wisconsin to affirm publicly the love they have for each other and the mutual commitments they have made; and Plaintiffs Wallmann and Borden seek to remain married in Wisconsin, rather than have their existing marriage voided.  In addition, Plaintiffs Wolf and Schumacher and Young and Willes seek protection from prosecution under Wisconsin's marriage evasion statute, which subjects them to potential criminal penalties for marrying outside the State.[1]

Wisconsin's marriage ban violates the United States Constitution in four ways.  First, as alleged in Count One of Plaintiffs' Amended Complaint, the ban violates the Due Process Clause by interfering with the fundamental right of gay and lesbian people to marry the person of their

---

[1]     Defendants King and Chisholm, represented by the Attorney General, concede that the marriage evasion statute cannot be applied to resident same-sex couples who have left Wisconsin to marry.  *See* March 11, 2014 Stipulation (Dkt # 55-1).  Plaintiffs request that the Court enter a declaration to that effect.  In addition, Plaintiffs note that without a ruling from this Court, these Defendants' concession is not binding on district attorneys in other counties in Wisconsin and may not be binding on future attorneys general.

choice.  Second, as alleged in Count Two, the marriage ban violates the fundamental right of married same-sex couples who move to Wisconsin to keep their existing marriage, rather than have the State nullify that marriage against their will.  Third, as alleged in Count Three, Wisconsin's prohibition on marriage for same-sex couples violates the Equal Protection Clause because the ban treats people differently on the basis of their sex, but is neither narrowly tailored nor the least restrictive alternative to further a compelling or important government interest. Fourth, as alleged in Count Four, the marriage ban classifies on the basis of sexual orientation, which should be treated as a constitutionally suspect basis for legislative classification, but bears no rational relationship to any legitimate state interest, and thus fails to satisfy any level of equal protection scrutiny.

Plaintiffs seek summary judgment on all counts in their amended complaint.  The material facts in this matter are undisputed, and because the marriage ban violates the U.S. Constitution in the ways described above, Plaintiffs are entitled to judgment as a matter of law.

## FACTS

Marriage in the United States has evolved considerably as an institution.  At different times in this country's history, states have employed various mechanisms to prohibit certain people from marrying, such as slaves and interracial couples, and also to make a woman the subordinate marital partner, legally barred from controlling her own finances and property. Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 4-7 (2002).  Wisconsin, however, once had a laudable history of supporting the freedom to marry on equal terms.  For example, Wisconsin never banned marriage between people of different races.  *See* David H. Fowler, *Northern Attitudes Towards Interracial Marriage: Legislation and Public Opinion in the Middle Atlantic and the States of the Old Northwest 1780-1930* 336 (1987).  In 1850, Wisconsin became one of the first states to enact legislation to protect the property rights of married

2

women. Joseph Ranney, "Abraham Lincoln's Legacy to Wisconsin Law, Part 1: A New Birth of Freedom: Civil Rights Law in Wisconsin," 81 Wis. Law. 12, 20, 59 (Dec. 2008).  By the early twentieth century, Wisconsin had lifted many other legal restrictions on a married woman's ability to exercise financial independence from her husband.  *See In re Ray's Will*, 205 N.W. 917, 918 (1925) (citing Wis. Stat. 1925, §§ 246.01-246.11) ("Under the Married Woman's Act she now has the power to convey her interest, and that power reduces what would be an estate by entirety at common law to a mere joint tenancy.").

Despite its history as a leader in marriage equality, Wisconsin now has one of the most restrictive bans on marriage for same-sex couples in the nation.  Article XIII, § 13 of the Wisconsin Constitution provides: "Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state.  A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state."  Wis. Const. Art. XIII, § 13.  As a result of this marriage ban, two people who love each other and wish to commit to each other and build a life and family together are prohibited from marrying in Wisconsin and denied recognition of their existing marriage entered legally under the laws of another jurisdiction, including a marriage of long standing, if they are of the same sex.  Further, while two states that border Wisconsin, Minnesota and Iowa, permit a same-sex couple to marry and a third, Illinois, will do so by June, Wisconsin law makes it a crime to leave the State to contract a marriage that would be void or prohibited here.  Wis. Stat. § 765.30(1)(a).

Plaintiffs Virginia Wolf and Carol Schumacher, Kami Young and Karina Willes, Roy Badger and Garth Wangemann, Charvonne Kemp and Marie Carlson, Judith "Judi" Trampf and Katharina "Katy" Heyning, Salud Garcia and Pam Kleiss, William Hurtubise and Leslie "Dean" Palmer, and Johannes Wallmann and Keith Borden (collectively, "Plaintiffs") are all loving,

3

committed, same-sex couples.  Plaintiffs' Proposed Findings of Fact in Support of Their Motion for Summary Judgment ("Findings of Fact") ¶ 5.

Virginia Wolf and Carol Schumacher, as well as Kami Young and Karina Willes, are legally married under the laws of Minnesota.  Findings of Fact ¶¶ 6-7.  They wish to have their marriages recognized in Wisconsin.  *Id*.  They are similarly situated in all relevant respects to different-sex couples whose validly contracted out-of-state marriages are recognized in Wisconsin.  But for the fact that they are a same-sex couple, Wisconsin would regard their marriage as valid in this State.  In addition, because they married in another state, Plaintiffs Wolf, Schumacher, Young and Willes risk criminal prosecution under Wis. Stat. § 765.30(1)(a), which makes it a criminal offense to leave the State to enter into a marriage that is considered void or prohibited here.

Roy Badger and Garth Wangemann, Charvonne Kemp and Marie Carlson, Judi Trampf and Katy Heyning, Salud Garcia and Pam Kleiss, and Bill Hurtubise and Dean Palmer wish to marry in Wisconsin.  Findings of Fact ¶¶ 8-12.  They are similarly situated in all relevant respects to different-sex couples who wish to marry in this State.  But for the fact that they are same-sex couples, they would be permitted to marry here.

Johannes Wallmann and Keith Borden wish to be allowed to continue to live as a married couple as they did for four years in California, where their Canadian marriage was recognized.  Findings of Fact ¶¶ 13, 40.  They are similarly situated in all relevant respects to different-sex married couples who move from one state to another.

All Plaintiff couples are harmed by the State of Wisconsin's denial to them of the freedom to marry.  Findings of Fact ¶ 28.  They are denied the full complement of state law protections and obligations that are accorded to different-sex married couples.  Findings of Fact

4

¶ 29.   The unmarried Plaintiffs are also denied all federal spousal protections and obligations, and the married Plaintiffs are denied those federal spousal protections and obligations that are reserved to couples whose marriages are recognized in their state of residence.  Findings of Fact ¶¶ 30-31.   Further, the unmarried Plaintiffs are in a Catch-22, because while they might access some federal benefits by marrying in another state, they are deterred from doing so by the fear of prosecution in Wisconsin.  Findings of Fact ¶ 32.

This denial of the legal protections of marriage is not an abstract matter.  Plaintiffs Kami Young and Karina Willes will shortly suffer a devastating harm as a result of the marriage ban. Kami and Karina are expecting a daughter in April.  Findings of Fact ¶ 23.   Under the law as it stands now, Wisconsin will refuse to recognize Karina as the baby's parent as it would if their marriage were recognized.  Karina will have no legal connection whatsoever to the baby.  In fact, as far as the law is concerned, Karina and the baby will be strangers.  *Id*.  In contrast, if Kami and Karina's marriage were recognized, Karina would automatically be recognized as the baby's parent pursuant to Wisconsin law's presumption of parenthood for children born to married couples.  *See* Wis. Stat. §§ 891.40(1), 891.41(1); *see also* Findings of Fact ¶ 23.   And although adoption should be unnecessary if Kami and Karina's marriage were recognized, Wisconsin law does not allow Karina to secure her parental rights through a step-parent adoption.  Wis. Stat. § 48.82; Findings of Fact ¶ 24.   Nor will Wisconsin allow Karina to take advantage of the second-parent adoption process available in many other states. Kami and Karina will be deprived of access to the same legal protections of their parental relationship with their child that are available to married couples, for no other reason than that they are the same sex.  Findings of Fact  ¶ 25.

5

Bill Hurtubise and Dean Palmer are suffering a similar harm. They elected to have Dean adopt two of their children on his own because they were advised during the foster-to-adopt process that in Wisconsin, an unmarried couple could not jointly adopt a child. *See* Wis. Stat. § 48.82(1); *see also* Findings of Fact ¶ 26. As a result, Bill is only a legal guardian to those children and not a full legal parent. Findings of Fact ¶ 26. They plan to formally adopt their third child as well, but still face the obstacle of being unmarried. *Id*. Like Kami and Karina, they are not afforded the same legal protections for their parental relationship that married couples who become parents enjoy.

Other Plaintiffs have experienced tangible harms from the State's denial to them of the protections and benefits of marriage. Garth Wangemann and Roy Badger discovered first-hand how little protection their relationship receives when Garth was ill and Roy was designated to make health care decisions on his behalf. Garth had executed a health-care power-of-attorney giving Roy the authority to carry out Garth's wishes, but Garth's father looked for ways to override that authority and take the decisions out of Roy's hands. Findings of Fact ¶ 39. If Roy had been Garth's spouse, such an effort would have been virtually unthinkable. Judi Trampf and Katy Heyning had a similar experience when, on a trip to New Orleans, Katy became ill and Judi was told that without a power-of-attorney in hand (the signed, executed document was at home in Wisconsin), she would not be allowed to make decisions on Katy's behalf. *Id*. Married spouses virtually never encounter such disrespect for their relationships or such suspicion about their legal arrangements.

Plaintiffs have been denied family leave (Findings of Fact ¶ 38), spousal health care coverage (Findings of Fact ¶¶ 28, 38), and crucial legal protections for their parental

relationships with their children (Findings of Fact ¶¶ 23-26), all as a result of Wisconsin's refusal to allow them to marry or to recognize their legal marriages.

Keith Borden and Johannes Wallmann have effectively had their existing marriage voided for purposes of Wisconsin law. After living as a married couple for more than four years in California and relying on the protections and obligations accorded to married couples there—filing joint state tax returns, accumulating marital property, and relying on that state's intestacy laws—they arrived in Wisconsin only to have this State treat their relationship as a legal nullity. Findings of Fact ¶ 40.

Furthermore, all Plaintiffs suffer the ongoing harm and indignity of the State's denigration of their relationships and their families. Findings of Fact ¶¶ 33-37. By withholding from these couples the respect, recognition, and support that only marriage confers on a relationship, Wisconsin stigmatizes these couples and their families as unworthy of the opportunity to express and legally embody their commitment in the most serious way that society provides. Findings of Fact ¶¶ 34-35. The State's disrespect invites others to denigrate Plaintiffs' relationships as well. Findings of Fact ¶ 38. The State of Wisconsin inflicts these harms for no other reason than these couples' sexual orientation and their sex.

## LEGAL STANDARD

"Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014) (citing Fed. R. Civ. P. 56 and *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012)).

## ARGUMENT

Several district courts have already recognized that bans on marriage by same-sex couples violate both the Equal Protection and Due Process Clauses of the United States

7

Constitution.  Plaintiffs here are entitled to judgment as a matter of law on all four counts of their amended complaint on the same basis.  The ban violates the Due Process Clause in that it interferes with both the fundamental right to marry the person of one's choice and the fundamental right to keep one's existing marriage.  The ban also violates the Equal Protection Clause of the U.S. Constitution because it classifies on the basis of both sex and sexual orientation, but is neither narrowly tailored nor the least restrictive means to further a compelling state interest.  And even if the marriage ban is subject to the lesser scrutiny of rational basis review, it is still wanting because it is not rationally related to any legitimate state interest.

I.      **The Marriage Ban Violates The Due Process Clause By Interfering With The Fundamental Rights To Marry And Remain Married.**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  The guarantee of due process protects individuals from arbitrary governmental intrusion into fundamental rights.  *See*, *e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).  Under the Due Process Clause, when legislation burdens the exercise of a right deemed to be fundamental, the government must show that the intrusion "is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).  Wisconsin's marriage ban does not comport with these requirements.  It interferes, without adequate justification, with both the fundamental right to marry and the fundamental right to remain married.

8

A.     **The Marriage Ban Violates The Fundamental Right To Marry The Person Of One's Choice.**

1.     **The freedom to marry is a fundamental right belonging to the individual.**

It is beyond dispute that the freedom to marry is a fundamental right protected by the Due Process Clause.  *See*, *e.g.*, *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right," and marriage is an "expression[] of emotional support and public commitment."); *Zablocki*, 434 U.S. at 384 ("The right to marry is of fundamental importance for all individuals."); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Griswold v. Conn.*, 381 U.S. 479, 486 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for as noble a purpose as any involved in our prior decisions.").

While states have a legitimate interest in regulating and promoting marriage, the fundamental right to choose one's spouse belongs to the individual. "[T]he regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns *other than disagreement with the choice the individual has made*." *Hodgson v. Minn.*, 497 U.S. 417, 435 (1990) (emphasis added); *see also Loving*, 388 U.S. at 12 ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State.");

9

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse. . . .").

**2.     The scope of a fundamental right under the due process clause does not depend on who has exercised that right in the past.**

Plaintiffs wish to marry or to have their marriages recognized by the State of Wisconsin. That they have historically been excluded from the institution of marriage is not a reason to continue that discrimination.  In *Loving*, the court did not defer to the historical exclusion of mixed-race couples from marriage. "Instead, the Court recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 992 (N.D. Cal. 2010), *appeal dismissed sub nom. Perry v. Brown*, 725 F.3d 1140 (9th Cir. 2013).  As the federal district court observed in its recent decision striking down Utah's marriage ban, "[i]nstead of declaring a new right to interracial marriage, the Court held that individuals could not be restricted from exercising their existing right to marry on account of the race of their chosen partner." *Kitchen v. Herbert*, --- F. Supp. 2d ---, 2013 WL 6697874, at *15 (D. Utah Dec. 20, 2013).

Indeed, the Supreme Court has never defined the right to marry by reference to those permitted to exercise that right.  Thus, the Supreme Court addresses "the fundamental right to marry" in its decisions, *see Loving*, 388 U.S. at 12; *Turner*, 482 U.S. at 94-96; *Zablocki*, 434 U.S. at 383-86; not "the right to interracial marriage," "the right to inmate marriage," or "the right of people owing child support to marry." *Accord In re Marriage Cases*, 183 P.3d 384, 421 n.33 (Cal. 2008) (*Turner* "did not characterize the constitutional right at issue as 'the right to inmate marriage.'").

10

Similarly, in *Lawrence v. Texas*, 539 U.S. 558 (2003), the Court held that the "liberty of persons" (including same-sex couples) to form personal and intimate relationships with a person of the same sex is protected by the Fourteenth Amendment's protection of liberty, notwithstanding the historical existence of sodomy laws and their use against gay people.  The Court explained that its decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986), was flawed because it failed to appreciate the "extent of the liberty at stake" by focusing on "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy," rather than to consider the "far reaching consequences" of the right at stake, which "touch[es] upon the most private human conduct, sexual behavior, and in the most private of places, the home."  *Lawrence,* 539 U.S at 566-67 (quotation marks and citations omitted).  Here, Plaintiffs do not seek a new right to same-sex marriage, but rather seek to remove the marriage ban, which prevents Plaintiffs from exercising the same right to marry enjoyed by different-sex couples, and does so merely on account of the sex of their chosen partner.  The right to marry is fundamental, deeply rooted in this nation's history and tradition for the purposes of constitutional protection, even though same-sex couples have not historically been allowed to exercise that right.  "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry."  *Id.* at 572 (citation omitted).  While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a fundamental right once that right is recognized as one that due process protects.  This critical distinction—that history guides the *what* of due process rights, but not the *who* of which individuals may exercise them—is central to due process jurisprudence.  "[F]undamental rights,

11

once recognized, cannot be denied to particular groups on the ground that those groups have historically been denied those rights." *In re Marriage Cases*, 183 P.3d at 430.

In addition, the State's due process violation is not ameliorated by the fact that the marriage ban in theory allows each Plaintiff to marry a person of the opposite sex. The court struck down the interracial marriage ban at issue in *Loving* even though it allowed whites to marry whites and non-whites to marry non-whites. *Loving*, 388 U.S. at 12 ("The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations."). As the *Kitchen* court noted, "The right to marry is not simply the right to become a married person by signing a contract with someone of the opposite sex." *Kitchen*, 2013 WL 6697874, at *13.

**B.     The Marriage Ban Violates Plaintiffs' Right To Remain Married.**

The marriage ban not only denies same-sex couples the right to marry, it also purports to nullify the *existing* legal rights and obligations of married same-sex couples, such as Plaintiffs Johannes Wallmann and Keith Borden, by declaring that their marriages are not "valid" or "recognized." Wis. Const. Art. XIII, § 13. In practical effect, Johannes and Keith have been divorced for state law purposes without their consent for as long as they live in Wisconsin. Basic due process principles prohibit a state from capriciously interfering with an existing marriage in this way.

Johannes and Keith married in Canada in 2007, where they had planned to live in Toronto after moving from New York. Findings of Fact ¶ 13. They ended up moving instead to California, because Johannes was offered a full-time teaching job there. Findings of Fact ¶ 40. Under California law, their marriage was held to be valid and entitled to recognition. *Strauss v. Horton*, 207 P.3d 48, 122 (Cal. 2009) (2008 constitutional amendment limiting marriages to men and women did not apply retroactively to invalidate same-sex marriages performed prior to its

effective date); Cal. Fam. Code 308(b) (out-of-state same-sex marriages contracted prior to November 5, 2008 were valid in California).  Until they moved from California to Wisconsin in 2012, then, Johannes and Keith were a legally married couple, filing joint state tax returns, providing Keith with spousal health insurance benefits on Johannes's Cal State health insurance plan, accumulating marital property, and taking comfort in the knowledge that, had it been necessary, either one of them could have made critical health decisions on the other's behalf. Findings of Fact ¶ 40.

Established due process principles support the right to remain married—a liberty interest in the ongoing existence of one's marriage without inappropriate government interference— which is complementary to, but distinguishable from, the right to marry itself.  Steve Sanders, "The Constitutional Right to (Keep Your) Same-Sex Marriage," 110 Mich. L. Rev. 1421 (2012); *see also Zablocki*, 434 U.S. at 397 n.1 (Powell, J., concurring) (observing that "there is a sphere of privacy or autonomy surrounding an existing marital relationship into which the State may not lightly intrude"); *Obergefell v. Wymyslo*, 2013 WL 6726688, at *6 (S.D. Ohio Dec. 23, 2013) (recognizing a same-sex couple's right to remain married as "appropriately protected by the Due Process Clause").

This right to remain married is grounded in the principle that couples like Johannes and Keith, who married in good faith and to whom the rights and responsibilities of marriage have already attached, acquire important interests on which they are entitled to rely wherever they may subsequently move.  As the California Supreme Court observed, married couples "acquire[] vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances." *Strauss*, 207 P.3d at 122.  For this reason, the "place of celebration rule"—the

13

principle that a marriage's validity should be determined by the law of the jurisdiction where it was celebrated, not a subsequent domicile—is deeply rooted in American legal history and tradition.  *See, e.g.*, *Restatement (Second) of Conflict of Laws* § 283(2) (1971).  Indeed, "[i]f two people who were once married are suddenly rendered legal strangers to one another," as the Wisconsin marriage ban would do to Johannes and Keith for state law purposes, "property rights are potentially altered, spouses disinherited, children put at risk, and financial, medical, and personal plans and decisions thrown into turmoil."  Sanders, *supra*, at 1450.  *See also In re Campbell's Estate*, 260 Wis. 625, 631, 51 N.W.2d 709, 712 (1952) ("Marriages valid where celebrated are valid everywhere.") (citing *Lanham v. Lanham*, 136 Wis. 360, 117 N.W. 787 (1908); *Owen v. Owen*, 178 Wis. 609, 190 N.W. 363 (1922)).

A state may not impose such concrete and coercive harms on legally married couples merely by fiat.  As the Supreme Court has explained many times, the Due Process Clause protects a "'private realm of family life which the state cannot enter.'"  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992) (quoting *Prince v. Mass.*, 321 U.S. 158, 166 (1944)).  Where the government undertakes "intrusive regulation of the family" aimed at "forcing all to live in certain narrowly defined family patterns," judicial deference is inappropriate.  *Moore v. City of E. Cleveland*, 431 U.S. 494, 499, 506 (1977) (plurality opinion).  "[A] state interest in standardizing its children and adults, making the 'private realm of family life' conform to some state-designed ideal, is not a legitimate state interest at all."  *Hodgson*, 497 U.S. at 452.  Just as a state may not sever the legal relationship between parent and child without strong due process protections, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), a state should not be allowed to effectively nullify an existing legal relationship between two spouses with no due process whatsoever.

14

Like all states, Wisconsin generally regulates domestic relations with the intention of promoting stability and security in marital and family relationships, not undermining them. *See* Wis. Stat. § 765.001(2) ("It is the intent of [Wisconsin's Family Code] to promote the stability and best interests of marriage and the family."); *see also* Sanders, *supra* at 1465 ("Law traditionally has validated marriages . . . because doing so protects the stability of legal relationships, advances reasonable expectations, prevents the casual evasion of legal responsibilities, and contributes to smooth functioning of the interstate system."). But Wisconsin's marriage ban stands as a stark, even perverse, exception to this policy. There can be no possible interest sufficient to justify the marriage *nullification* that the ban imposes on couples like Johannes and Keith.

In short, the freedom to marry, to have one's lawful marriage recognized, and to remain married are fundamental rights protected by the United States Constitution. Wisconsin's marriage ban prevents lesbians and gay men from marrying and denies recognition to those who have legally married under the laws of other jurisdictions, and therefore violates their fundamental rights. As discussed in Part III, *infra*, the marriage ban is not supported by any state interest, let alone a "sufficiently important state interest" (*Zablocki*, 434 U.S. at 388) to justify barring the Plaintiff couples from exercising their fundamental right to marry. Therefore, Wisconsin's marriage ban violates due process by effectively nullifying the protections and recognition of marriages upon which couples like Keith and Johannes have come to rely without sufficient justification, and must be struck down.

## II.   The Marriage Ban Denies Plaintiffs Equal Protection Of The Laws.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State . . . [shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. In addition to violating the Due

Process clause, Wisconsin's marriage ban also violates the Equal Protection Clause in two ways. First, the ban discriminates on the basis of sex both by classifying individuals based on their gender and by subjecting individuals to sex stereotyping.  Second, the ban discriminates on the basis of sexual orientation.

**A.     The Marriage Ban Denies Plaintiffs Equal Protection Of The Laws On The Basis Of Sex.**

Wisconsin's marriage ban discriminates on the basis of sex, in violation of the Equal Protection Clause, both because (1) the law facially discriminates on the basis of sex and (2) the law subjects Plaintiffs to sex stereotyping.  Laws that classify on the basis of sex are subject to heightened scrutiny.

**1.     The marriage ban facially discriminates on the basis of sex.**

Wisconsin's marriage ban, on its face and as applied, discriminates on the basis of sex.[2] Each Plaintiff would be able to marry his or her partner if the Plaintiff were of a different sex. Consequently, Plaintiffs' own sex precludes them from marrying the individual of their choosing.  A law that restricts marriage based on a person's sex is facially discriminatory.  *See Kitchen*, 2013 WL 6697874, at *20; *Perry*, 704 F. Supp. 2d at 996; *Baehr v. Lewin*, 852 P.2d 44, 64 (Haw. 1993) (Hawaii marriage statute "on its face and as applied regulates access to the marital status and its concomitant rights and benefits on the basis of the applicants' sex."), *aff'd*, 950 P.2d 1234 (Haw. 1997).[3]

---

[2]     It makes perfect sense that a ban on same-sex marriage constitutes both a sex and sexual orientation classification, since an individual's sexual orientation is defined based on the sex of the person to whom the individual is physically and emotionally attracted and with whom the person forms a committed intimate relationship.

[3]     Initially, *Baehr* was a plurality decision of two of the five judges, with a third judge concurring on different grounds, and the case was ordered remanded for trial to determine whether the state had a compelling justification for the exclusion. Before the case was remanded, however, one of the two dissenting judges was replaced, and the court then ruled that on remand the trial would be conducted "consistent with the plurality opinion," which thereby became the opinion of the court.  852 P.2d at 74.

The marriage ban cannot be defended on the ground that it treats men and women equally by denying the right to marry to both men (who wish to marry men) and women (who wish to marry women).  This argument, made with regard to race instead of sex, was squarely rejected in *Loving v. Virginia*.  In *Loving*, the State of Virginia argued that its anti-miscegenation laws did not discriminate based on race because the prohibition against mixed-race marriage applied equally to both black and white citizens.  388 U.S. at 7-8.  The Court rejected this argument, holding that "the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race."  *Id*. at 9.  *See also McLaughlin v. Fla.*, 379 U.S. 184, 192-93 (1964) (holding that a race-related anti-cohabitation law was an unconstitutional racial classification even though the law applied equally to white and black persons). As the court in *Kitchen* recognized, "the fact of equal application to both men and women does not immunize Utah's Amendment 3 [which similarly denied the validity or recognition of marriages between same-sex couples] from the heightened burden of justification that the Fourteenth Amendment requires of state laws drawn according to sex."  *Kitchen*, 2013 WL 6697874, at *20.

*Loving* and *McLaughlin* cannot be cabined on a theory that those cases addressed race, not sex.  The same reasoning has clearly been applied to gender.  *See J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994) (striking down preemptory challenges based on gender-based assumptions as to *both* sexes, despite equal application of the rule as to men and women); *see also Califano v. Westcott*, 443 U.S. 76, 83-85 (1979) (classification can be sex-based even if the effects of its application are felt equally by men and women).  Nor can the marriage ban be defended on the ground that it was not enacted with the intent to discriminate against either men or women.  *See Loving*, 388 U.S. at 11 n.11 (holding that Virginia's ban on interracial marriage was

17

unconstitutional "even assuming an even-handed state purpose to protect the 'integrity' of all races"); *Johnson v. Cal.*, 543 U.S. 499, 506 (2005) (holding that California's racially "neutral" practice of segregating inmates by race when first incarcerated to avoid racial violence was a race classification that had to be reviewed under strict scrutiny, notwithstanding the fact that prison officials were not singling out one race for differential treatment).

### 2.    The marriage ban subjects Plaintiffs to sex stereotyping.

In addition to its overt discrimination on the basis of sex, the marriage ban also perpetuates and enforces stereotypes regarding the expected and traditional roles of men and women, namely that men marry and create families with women, and women marry and create families with men.  When government restricts men and women from participation in civil society and its institutions based on sex stereotypes, it does so on the "basis of gender."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).  *See also White v. Fleming*, 522 F.2d 730, 737 (7th Cir. 1975) ("[I]t is impermissible under the equal protection clause to classify on the basis of stereotyped assumptions concerning propensities thought to exist in some members of a given sex."); *Doe by Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir. 1997) (holding that "reliance upon stereotypical notions about how men and women should appear and behave" "reasonably suggests" that "a particular action . . . can be attributed to sex."), *vacated and remanded on other grounds*, *City of Belleville v. Doe by Doe*, 523 U.S. 1001 (1998).

To be clear, Plaintiffs do not advocate that traditional roles for men and women within marriage be discarded, as some married men and women find happiness framing marriage around such roles: some married women may take pride in culinary or childrearing skill, and some married men may enjoy breadwinning.  However, most spouses also deviate from sex stereotypes to some degree: husbands may play an active role in childrearing, and wives may be

primary breadwinners, for example.  What is important is that government may not *enforce* conformity with traditional sex stereotypes.  *Price Waterhouse*, 490 U.S. at 250.

The Supreme Court has made emphatically clear that gender classifications cannot be based on or validated by "fixed notions concerning the roles and abilities of males and females." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982).[4]  And in the context of parenting responsibilities, the Supreme Court has rejected the notion of "any universal difference between maternal and paternal relations at every phase of a child's development." *Caban v. Mohammed*, 441 U.S. 380, 388-89 (1979); *see also Stanley v. Ill.*, 405 U.S. 645 (1972) (holding that a state law presumption that unmarried fathers were unfit parents violated Due Process and Equal Protection Clauses).  The Court has also recognized that stereotypes about distinct parenting roles for men and women foster discrimination in the workplace and elsewhere.  *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003) ("Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. . . . These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees.").  Thus, "generalizations about typical gender roles in the raising and nurturing of children" are constitutionally insufficient bases for differential treatment of the sexes by the government.  *Knussman v. Md.*, 272 F.3d 625, 636 (4th Cir. 2001) (upholding liability of state

---

[4]       As evidence that the ban is an instance of sex stereotyping, one of the frequently asserted justifications for the restriction is the notion that "optimal parenting" requires two parents of different sexes. *See infra* pp. 34-37. As the Supreme Court of Iowa explained: "the traditional notion that children need a mother and a father to be raised into healthy, well-adjusted adults is based more on stereotypes than anything else." *Varnum v. Brien*, 763 N.W.2d 862, 899 n.26 (Iowa 2009).

agency under the Equal Protection Clause for failure to grant father paid leave as primary caregiver for newborn).

### 3. Laws denying equal protection on the basis of sex are subject to heightened scrutiny that Wisconsin's ban cannot satisfy.

It is well settled that laws that discriminate on the basis of sex are subject to heightened scrutiny. Classifications based on sex can be sustained only where the government demonstrates that they are "substantially related" to an "important governmental objective[.]" *United States v. Va.*, 518 U.S. 515, 533 (1996) (internal quotation marks omitted); *see also Toeller v. Wisc. Dept. of Corr.*, 461 F.3d 871, 877 (7th Cir. 2006) ("[S]tatutory classifications that distinguish between males and females are subject to heightened scrutiny" and "are valid only if they serve important governmental objectives and employ measures that are substantially related to the achievement of those objectives.") (internal quotation marks omitted); *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996) (holding that it is "well settled that to survive constitutional scrutiny, gender based discrimination must be substantially related to an important governmental objective"). As discussed in Part III, *infra*, Wisconsin's marriage ban cannot survive even rational basis review, much less heightened scrutiny.

### B. The Marriage Ban Denies Plaintiffs Equal Protection Of The Laws On The Basis Of Sexual Orientation.

Wisconsin's marriage ban denies lesbians and gay men the equal protection of laws on the basis of their sexual orientation. Laws that classify based on sexual orientation are subject to heightened scrutiny. But even if the court were to apply rational basis review, the marriage ban could not survive.

### 1. The marriage ban discriminates on basis of sexual orientation.

Wisconsin's marriage ban denies equal protection of the laws on the basis of sexual orientation on its face. The ban states that "[o]nly a marriage between one man and one woman

20

shall be valid or recognized as a marriage in this state." Wis. Const. Art. XIII, § 13. The marriage ban further codifies the second-class status of same-sex couples by providing that "[a] legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state," ensuring that both the dignitary and substantive rights associated with marriage are denied to lesbians and gay men. *Id.*

That Wisconsin's marriage ban does not explicitly refer to sexual orientation is no defense. As Justice O'Connor explained in *Lawrence* (concurring in the judgment on equal protection grounds), "[w]hile it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual" so that "[t]hose harmed by this law are people who have a same-sex sexual orientation." 539 U.S. at 581, 583. The court in *Perry* recognized the same notion in the context of marriage, explaining that "[t]hose who choose to marry someone of the opposite sex—heterosexuals—do not have their choice of marital partner restricted by [California's marriage ban]. Those who would choose to marry someone of the same sex—homosexuals—have had their right to marry eliminated by an amendment to the state constitution." *Perry*, 704 F. Supp. 2d at 996. *See also Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2990 (2010) ("Our decisions have declined to distinguish between status and conduct in [the context of sexual orientation]."). Because the Wisconsin law targets conduct exclusively engaged in by lesbians and gay men, it discriminates on the basis of sexual orientation.

## 2. Laws denying equal protection on the basis of sexual orientation must be subject to heightened scrutiny.

The Seventh Circuit has in the past applied rational basis review in cases of discrimination based on sexual orientation. *See*, *e.g.*, *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002) (citing cases, including *Bowers*, 478 U.S. 186, for the proposition

that "homosexuals do not enjoy any heightened protection under the Constitution" and therefore must show that the law "was not rationally related to a legitimate state interest."). However, the precedent supporting rational basis review for sexual orientation classifications, including *Schroeder*, is called into question by *Lawrence*, 539 U.S. 558, which overturned *Bowers v. Hardwick*. *See Pedersen v. U.S. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012) ("The Supreme Court's holding in *Lawrence* 'remov[ed] the precedential underpinnings of the federal case law supporting the defendants' claim that gay persons are not a [suspect or] quasi-suspect class.'") (citations omitted); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012) ("[T]he reasoning in [prior circuit court decisions], that laws discriminating against gay men and lesbians are not entitled to heightened scrutiny because homosexual conduct may be legitimately criminalized, cannot stand post-*Lawrence*."). For this reason, the Court must visit anew the question of what level of scrutiny to apply to classifications based on sexual orientation.[5]

After *Lawrence*, lower courts must apply the criteria mandated by the Supreme Court to determine whether sexual orientation classifications should receive heightened scrutiny. These criteria include:

> A) whether the class has been historically "subjected to discrimination"; B) whether the class has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society"; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group"; and D) whether the class is "a minority or politically powerless."

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (quoting *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987), and *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985)), *aff'd United States v. Windsor*, 133 S. Ct. 2675 (2013). Of these considerations, the first two are the

---

[5]  The Seventh Circuit's most recent application of the four-factor analysis to sexual orientation predates *Lawrence*. *See Ben-Shalom v. Marsh*, 881 F.2d 454, 464-66 (7th Cir. 1989) (relying on *Bowers* to conclude that gays and lesbians are not members of a suspect class).

most important.  *See id.* ("Immutability and lack of political power are not strictly necessary factors to identify a suspect class."); *accord Golinski*, 824 F. Supp. 2d at 987.

As several federal and state courts have recently recognized, any faithful application of those factors leads to the inescapable conclusion that sexual orientation classifications must be recognized as suspect or quasi-suspect and subjected to heightened scrutiny.  *See*, *e.g.*, *Windsor*, 699 F.3d at 181-85; *Golinski*, 824 F. Supp. 2d at 985-90; *Pedersen*, 881 F. Supp. 2d at 310-33; *Obergefell*, 2013 WL 6726688, at *14-*18; *Perry*, 704 F. Supp. 2d at 997; *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D. Cal. 2011); *Griego v. Oliver*, 316 P.3d 865, 880-84 (N.M. 2013); *Varnum*, 763 N.W.2d at 885-96; *In re Marriage Cases*, 183 P.3d at 441-44; *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-31 (Conn. 2008).  *See also SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 480-84 (9th Cir. 2014) (finding heightened scrutiny applicable to sexual orientation without examining the four factors).

Unequivocally, lesbians and gay men have historically been subjected to discrimination.  As the Second Circuit recognized in *Windsor*, "[i]t is easy to conclude that homosexuals have suffered a history of discrimination.  Windsor and several amici labor to establish and document this history, but we think it is not much in debate."  699 F.3d at 182.  For centuries, the prevailing attitude toward lesbians and gay men has been "one of strong disapproval, frequent ostracism, social and legal discrimination, and at times ferocious punishment."  Richard A. Posner, *Sex and Reason* 291 (1992); *see also Nabozny*, 92 F.3d at 457 n.10 (recognizing "considerable discrimination leveled against homosexuals").  The existence of the marriage ban itself, targeted at lesbians and gay men, is further evidence of discrimination.

Moreover, courts have agreed with near unanimity that homosexuality is irrelevant to one's ability to perform or contribute to society.  "There are some distinguishing characteristics,

such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society, at least in some respect. But homosexuality is not one of them." *Windsor*, 699 F.3d at 182; *accord Golinski*, 824 F. Supp. 2d at 986 ("[T]here is no dispute in the record or the law that sexual orientation has no relevance to a person's ability to contribute to society"); *Pedersen*, 881 F. Supp. 2d at 320 (same).  In this respect, sexual orientation is akin to race, gender, alienage, and national origin, all of which "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Cleburne*, 473 U.S. at 440.[6]

Third, the limited ability of gay people as a group to protect themselves in the political process, although not essential for recognition as a suspect or quasi-suspect class, s*ee Windsor*, 699 F.3d at 181, also weighs in favor of heightened scrutiny.  In analyzing this factor, "[t]he question is not whether homosexuals have achieved political successes over the years; they clearly have.  The question is whether they have the strength to politically protect themselves from wrongful discrimination." *Id*. at 184.  The political influence of lesbians and gay men stands in sharp contrast to the political power of women in 1973, when a plurality of the Court concluded in *Frontiero v. Richardson* that sex-based classifications required heightened scrutiny. 411 U.S. 677, 688 (1973).  After all, Congress had already passed Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963, both of which protect women from discrimination in the workplace.  *See id*. at 687-88.  In contrast, there is still no express federal ban on sexual orientation discrimination in employment, housing, or public accommodations, and 29 states have no such protections either.  *See Golinski*, 824 F. Supp. 2d at 988-89, *Pedersen*, 881 F. Supp.

---

[6]      Indeed, Wisconsin's own antidiscrimination protections for gays and lesbians recognize that sexual orientation is virtually never a relevant criterion in evaluating an individual. *See* Wis. Sess. Laws ch. 112 § 901 (1981) (adding sexual orientation as a protected class to numerous Wisconsin antidiscrimination statutes).

2d at 326-27.  And over the past 20 years, more than two-thirds of ballot initiatives that proposed to enact (or prevent the repeal of) basic antidiscrimination protections for gay and lesbian individuals have failed.  Indeed, gay people "have seen their civil rights put to a popular vote more often than any other group."  Barbara S. Gamble, "Putting Civil Rights to a Popular Vote," 41 Am. J. Pol. Sci. 245, 257 (1997); *see also* Donald P. Haider-Markel, *et al.*, "Lose, Win, or Draw?: A Reexamination of Direct Democracy and Minority Rights," 60 Pol. Research Q. 304 (2007).

The marriage ban itself acts to lock same-sex couples out of the normal political process. Wisconsin's exclusion of same-sex couples from marriage is the only marriage law enshrined in the Wisconsin Constitution.  Wis. Const. Art. XIII, § 13.  Plaintiffs cannot simply lobby the Wisconsin state legislature to remove the marriage ban through the ordinary political process. Instead, they are uniquely burdened with having to amend the Wisconsin Constitution, a much more difficult and cumbersome process.  *See* Wis. Const. Art. XII, § 1 (governing the amendment process).  A selective disparity in the ability to advocate for a change in the law, disadvantaging a single class of people, is constitutionally suspect.  *See Wash. v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 483-84 (1982) (laws that subject "one group" to a "debilitating and often insurmountable disadvantage" in enacting legislation are constitutionally suspect); *Hunter v. Erickson*, 393 U.S. 385, 393 (1969) ("[T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size.").

Finally, sexual orientation is an "immutable" characteristic.  *Bowen*, 483 U.S. at 602. The Seventh Circuit has noted that an "immutable or fundamental characteristic might be membership in an extended family, *sexual orientation*, a former association with a controversial

25

group, or membership in a group whose ideas or practices run counter to the cultural or social convention of the country. The latter group might seem plausibly alterable, but we respect an individual's right to maintain characteristics that are fundamental to their individual identities." *Cece v. Holder*, 733 F.3d 662, 669 (7th Cir. 2013) (citation and quotation marks omitted) (emphasis added). The Seventh Circuit's view is consistent with a broad medical and scientific consensus that sexual orientation is immutable. *See Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."); *accord Golinski*, 824 F. Supp. 2d at 986; *Pedersen*, 881 F. Supp. 2d at 320-24. It is also consistent with the Supreme Court's recognition that sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual—even if such a choice could be made. *See Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom").

Because classifications based on sexual orientation are suspect based on the factors identified in *Bowen* and *Cleburne*, they should be subject to strict scrutiny. Classifications that disadvantage a suspect class are "treated as presumptively invidious" and must be "precisely tailored to serve a compelling government interest" to pass constitutional muster. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

## III.    The Marriage Ban Is Unconstitutional Under Any Standard Of Review.

Wisconsin's marriage ban fails any level of scrutiny. The marriage ban cannot survive heightened scrutiny because the State cannot meet its burden of demonstrating that the ban is necessary to serve a compelling governmental interest, let alone that the ban is precisely tailored so as to use the least restrictive means consistent with the attainment of that interest. The

26

marriage ban fails even rational basis review because it bears no rational relationship to any legitimate state interest.

Even rational basis review requires a serious analysis of the statute and the asserted justifications; it is not sufficient for the government to simply assert the existence of means and ends for its actions. As the Supreme Court recognized in *Romer v. Evans*, 517 U.S. 620, 632 (1996), "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the *relation* between the classification adopted and the object to be attained" (emphasis added). *See also Cleburne*, 473 U.S. at 446 (holding that a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"). It is this "search for the link between classification and objective" that "gives substance to the Equal Protection Clause" and "provides guidance and discipline for the legislature." *Romer*, 517 U.S. at 632. The requirement "that the classification bear a rational relationship to an independent and legitimate legislative end . . . ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id*. at 633.

Rational basis review is not a rubber stamp for discrimination. There must be "a 'rational relationship between the *disparity of treatment* and some legitimate governmental purpose.'" *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013) (emphasis added) (quoting *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 946 (7th Cir. 2009)); *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (holding, regarding a city public smoking ban, that "[r]ather than identify a rational reason for infringing on citizens' ability to smoke in public, we must identify a rational reason for the distinction the ordinance draws between traditional bars and tobacco specialty bars."); *City of Chi. v. Shalala*, 189 F.3d 598, 605

(7th Cir. 1999) (holding that the court must analyze the "disparity of treatment" and its relationship to a "legitimate governmental purpose.").

Numerous federal district courts have found that marriage bans violate rational basis review. For example, in *Bishop v. United States ex rel Holder*, 2014 WL 116013 (N.D. Okla. Jan. 14, 2014), the court considered all "conceivable justifications" for Oklahoma's marriage ban, including the State's claims that the law "promot[ed] morality (*id*. at *26)[7], "encourag[ed] 'responsible procreation'" (*id*. at *28), "promot[ed] the 'optimal' child-rearing environment" (*id*. at *30), and prevented the "fundamental[] redefin[ition] of marriage [which] could have a severe and negative impact on the institution as a whole" (*id*. at *32). The court considered each of the purported justifications and concluded "that exclusion of same-sex couples [from marriage] is 'so attenuated' from any of these goals that the exclusion cannot survive rational basis review." *Id*. at *33. The district courts in *Perry*, 704 F. Supp. at 997-1003, *Kitchen*, 2013 WL 6697874, at *24-28, *Bostic v. Rainey*, --- F. Supp. 2d ---, 2014 WL 561978, at *14-22 (D. Va. Feb. 13, 2014), *De Leon v. Perry*, --- F. Supp. 2d ---, 2014 WL 715741, at *14-18 (W.D. Tex. Feb. 26, 2014), and *DeBoer v. Snyder*, 2014 WL 1100794, at *11-15 (E.D. Mich. March 21, 2014), considered similar arguments and found that California's, Utah's, Virginia's, Texas's, and Michigan's marriage bans lacked a rational basis. None of the purported interests offered by these states (or the private marriage ban proponents in California) provide a rational basis for the Wisconsin marriage ban, nor is there any other conceivable rational basis for it.

---

[7]     Plainly, after *Windsor,* 133 S. Ct. 2675, and *Lawrence,* 539 U.S. 558, moral disapproval cannot be a rational basis for a law that discriminates against lesbians and gays. 133 S. Ct. at 2694; 539 U.S. at 577. *See also Bishop*, 2014 WL 116013, at *26-27.

## A.   The Marriage Ban Cannot Be Justified By An Interest In Maintaining A "Traditional" Definition Of Marriage.

Maintaining a "traditional" definition of marriage is not a legitimate state interest and thus cannot justify the marriage ban.  "Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis."  *Heller v. Doe by Doe*, 509 U.S. 312, 326-27 (1993).  Indeed, the fact that a form of discrimination has been "traditional" is a reason to be *more* skeptical of its rationality.  "The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a tradition of disfavor for a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification."  *Cleburne*, 473 U.S. at 453 n.6 (Stevens, J., concurring) (alterations incorporated; quotation marks omitted); *see also Marsh v. Chambers*, 463 U.S. 783, 791-92 (1983) (even longstanding practice should not be "taken thoughtlessly, by force of long tradition and without regard to the problems posed by a pluralistic society").

As the Supreme Court has explained, "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579.  Even the dissent in *Lawrence* recognized that "'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples." *Id*. at 601 (Scalia, J., dissenting).  While "[p]rivate biases may be outside the reach of the law, . . . the law cannot, directly or indirectly, give them effect" at the expense of a disfavored group's constitutional rights.  *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

Moreover, as the federal district court recognized in *Perry*, the "argument that tradition prefers opposite-sex couples to same-sex couples equates to the notion that opposite-sex relationships are simply better than same-sex relationships.  Tradition alone cannot legitimate

this purported interest." *Perry*, 704 F. Supp. 2d at 998.  Indeed, the *Perry* court found that "[t]he tradition of restricting marriage to opposite-sex couples does not further *any* state interest." *Id*. District Courts in Utah, Virginia, Kentucky, Oklahoma, Texas, and Michigan have also rejected the tradition argument. *Kitchen*, 2013 WL 6697874, at *27 (argument is flawed as "[t]he traditional view of marriage has in the past included certain views about race and gender roles that were insufficient to uphold laws based on these views."); *Bostic*, 2014 WL 561978, at *15 ("tradition alone cannot justify denying same-sex couples the right to marry any more than it could justify Virginia's ban on interracial marriage."); *Bourke v. Beshear*, --- F. Supp. 2d ----, 2014 WL 556729, at *7 (W.D. Ky. Feb. 12, 2014) (rejecting Kentucky's argument that its policy of "preserving the state's institution of traditional marriage" justified refusal to recognize out-of-state marriages of same-sex couples); *Bishop*, 2014 WL 116013, at *32; *De Leon*, 2014 WL 715741, at *16 ("tradition, alone, cannot form a rational basis for a law."); *DeBoer*, 2014 WL 1100794, at *15 ("[T]radition and morality are not rational bases for [Michigan's ban on marriage for same-sex couples].").

Nor is there any credible argument that allowing same-sex couples to marry will diminish the institution by deterring different-sex couples from marrying.  Indeed, "[i]n an amicus brief submitted to the Ninth Circuit Court of Appeals by the District of Columbia and fourteen states that currently permit same-sex marriage, the states assert that the implementation of same-sex unions in their jurisdictions has not resulted in any decrease in opposite-sex marriage rates, any increase in divorce rates, or any increase in the number of nonmarital births." *Kitchen*, 2013 WL 6697874, at *27 (citing Brief of State Amici at 24-28, *Sevcik v. Sandoval*, No. 12-17668 (9th Cir. Oct. 25, 2013), ECF No. 24).

In deciding the constitutionality of Oklahoma's marriage ban, the court rejected an argument based on tradition, because it "is impermissibly tied to moral disapproval of same-sex couples as a class." *Bishop*, 2014 WL 116013, at *32. The court reasoned that "civil marriage . . . is not an institution with 'moral' requirements for any other group of citizens," *id.*, since the state "does not ask a couple if they intend to be faithful to one another, if they intend to procreate, or if they would some-day consider divorce, thereby potentially leaving their child to be raised in a single-parent home." *Id*. Rather, the "[e]xclusion of just one class of citizens from receiving a marriage license based upon the perceived 'threat' they pose to the marital institution is, at bottom, an arbitrary exclusion based upon the majority's disapproval of the defined class." *Id*. The same reasoning applies in Wisconsin, where a tradition of excluding same-sex couples from marriage fails to provide a rational basis for its marriage ban.

### B.    The Marriage Ban Cannot Be Justified By An Interest In Encouraging Responsible Procreation By Heterosexual Couples.

There is no rational connection between the marriage ban and any state interest relating to parenting or child welfare because: 1) many people procreate without marrying, and procreation is not a precondition of entering a marriage; 2) many married people choose not to or are unable to procreate; and, most importantly, 3) different-sex couples' procreative decisions do not depend in any way on whether lesbian and gay couples can marry. The benefits and protections accompanying marriage that may encourage heterosexual couples to marry before procreating existed before Wisconsin passed its constitutional marriage ban and will still exist after the marriage ban is struck down. Moreover, same-sex couples parent children who are born to them through assisted reproduction, are adopted, or were born during a prior heterosexual relationship, so the relationship between marriage and procreation offers no rational basis for denying same-sex couples and their children the advantages of marriage. *See Varnum*, 763 N.W.2d at 902

31

("Conceptually, the promotion of procreation as an objective of marriage is compatible with the inclusion of gays and lesbians within the definition of marriage.  Gay and lesbian persons are capable of procreation."); *id* at 901-02 ("the exclusion of gays and lesbians from marriage does not benefit the interests of those children of heterosexual parents, who are able to enjoy the environment supported by marriage with or without the inclusion of same-sex couples"); *see also De Leon*, 2014 WL 715741, at *14 (holding that "limiting marriage to opposite-sex couples fails to further th[e] interest" of responsible procreation, and that Texas's marriage ban instead "causes needless stigmatization and humiliation for children being raised by the loving same-sex couples being targeted.").

Even if responsible procreation is narrowed to include only "natural procreation," the argument fails rational basis review because Wisconsin does not make ability or desire to naturally procreate a condition of marriage.  That Wisconsin fails to "impose the classification on other similarly situated groups (here, other non-procreative couples) can be probative of a lack of rational basis."  *Bishop*, 2014 WL 116013, at *29; *see also Bourke*, 2014 WL 556729, at *8 (noting that "Kentucky does not require proof of procreative ability to have an out of state marriage recognized," an exclusion that "makes just as little sense as excluding post-menopausal couples or infertile couples on procreation grounds.").   Ultimately, as the *Bishop* court concluded, even

> [a]ssuming a state can rationally exclude citizens from marital benefits due to those citizens' inability to "naturally procreate," the state's exclusion of only same-sex couples in this case is so grossly underinclusive that it is irrational and arbitrary. . . . [T]he "carrot" of marriage is equally attractive to procreative and non-procreative couples, is extended to most non-procreative couples, but is withheld from just one type of non-procreative couple. Same-sex couples are being subjected to a "naturally procreative" requirement to which no other Oklahoma citizens are subjected, including the infertile, the elderly, and those who simply do not wish to ever procreate.

32

*Bishop*, 2014 WL 116013, at *30; *see also DeBoer*, 2014 WL 1100794, at *13 ("The prerequisites for obtaining a marriage license under Michigan law do not include the ability to have children, a requirement to raise them in any particular family structure, or the prospect of achieving certain 'outcomes' for children.").

And further narrowing the argument to an assertion that marriage is intended to promote stability among different-sex couples, since only they can accidentally procreate, still fails to offer a rational basis for the marriage ban, since rational basis review requires "some ground of difference having a fair and substantial relation to the object of the legislation," *Friendship Med. Ctr., Ltd. v. Chi. Bd. of Health*, 505 F.2d 1141, 1152 (7th Cir. 1974) (quoting *Royster Guano Co. v. Va.*, 253 U.S. 412, 415, (1920)).  The connection between a ban on marriage for same-sex couples and responsible procreation—even if limited to natural procreation—is already so attenuated as to be irrational, as numerous courts have found.  It is even more fanciful to suggest a rational connection between Wisconsin's marriage ban and an interest in stability for couples who accidentally procreate.   Moreover, even if encouraging procreation—or accidental procreation—in the context of a stable relationship is one of the purposes for marriage, it plainly is not marriage's *only* purpose.  "The breadth of the [marriage ban] is so far removed from these particular justifications that [it is] impossible to credit them."  *Romer*, 517 U.S. at 635; *see also Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (law that discriminates between married and unmarried persons in access to contraceptives is "so riddled with exceptions" that the interest claimed by the government "cannot reasonably be regarded as its aim").

As recognized in a recent decision by the Western District of Kentucky, the responsible procreation argument "has failed rational basis review in every court to consider [it] post-*Windsor*, and most courts pre-*Windsor*."  *Bourke*, 2014 WL 556729, at *8.  Indeed, the *Perry*,

33

*Kitchen*, and *Bishop* courts all concluded that "[p]ermitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages." *Perry*, 704 F. Supp. 2d at 972; *Kitchen*, 2013 WL 6697874, at *25; *Bishop*, 2014 WL 116013, at *29; *Bostic*, 2014 WL 561978, at *18.  Indeed, given that same-sex couples may also have children, the *Perry* court concluded that "[t]he only rational conclusion in light of the evidence is that [California's marriage ban] makes it less likely that California children will be raised in stable households" by preventing same-sex couples from marrying.  *Perry*, 704 F. Supp. 2d at 1000.

**C.     The Marriage Ban Cannot Be Justified By An Interest In "Optimal Childrearing."**

Just as with the responsible procreation argument, the optimal childrearing argument "has failed rational basis review in every court to consider [it] post-*Windsor*, and most courts pre-*Windsor*." *Bourke*, 2014 WL 556729, at *8.  This is unsurprising, as the language of *Windsor* is quite clear.  The marriage ban "humiliates tens of thousands of children now being raised by same-sex couples" by "plac[ing] same-sex couples in an unstable position of being in a second-tier marriage" and "demean[ing] the couple, whose moral and sexual choices the Constitution protects." *Windsor*, 133 S. Ct. at 2694.  The ban "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Id.*[8]

For the purpose of summary judgment, the *Bishop* court assumed that Oklahoma's argument that the optimal childrearing arrangement is one where a married biological mother

---

[8]     Moreover, to the extent that the marriage ban is intended to discourage same-sex couples from parenting by disadvantaging the children of same-sex couples, the ban fails constitutional review.  *See Plyler*, 457 U.S. at 220 ("[I]mposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.  Obviously, no child is responsible for his birth and penalizing the … child is an ineffectual—as well as unjust—way of deterring the parent.") (citation and quotation marks omitted).

and father raised a child was correct and still concluded that Oklahoma's marriage ban could not survive rational basis review. The court noted that it "cannot discern[] a single way that excluding same-sex couples from marriage will 'promote' this 'ideal' child-rearing environment." *Bishop*, 2014 WL 116013, at *31. Indeed, the *Bishop* court concluded that "[e]xclusion from marriage does not make it more likely that a same-sex couple desiring children, or already raising children together, will change course and marry an opposite-sex partner" but that "[i]t is more likely that any potential or existing child will be raised by the same-sex couple without any state-provided marital benefits and without being able to 'understand the integrity and closeness of their own family and its concord with other families in their community.'" *Id.*; *see also Griego*, 316 P.3d at 886 ("[W]e fail to see how *forbidding* same-gender marriages will result in the marriages of *more* opposite-gender couples for the purpose of procreating, or how *authorizing* same-gender marriages will result in the marriages of *fewer* opposite-gender couples for the purpose of procreating.") (emphasis in the original).[9]

Similarly, the *Kitchen* court did not need to reach the question of the optimal child-rearing arrangement, finding that "[t]here is no reason to believe that [Utah's marriage ban] has any effect on the choices of couples to have or raise children, whether they are opposite-sex couples or same-sex couples." 2013 WL 6697874, at *26. "If anything, [Utah's marriage ban] detracts from the State's goal of promoting optimal environments for children," both by inflicting the dignitary harm identified in *Windsor* and by "den[ying] the families of [children of same-sex couples] a panoply of benefits that the State and the federal government offer to families who are legally wed." *Id.*

---

[9]   A governmental purpose to discourage same-sex couples from raising children would be illegitimate, since all citizens possess a fundamental right to decide "whether to bear or beget a child." *Eisenstadt*, 405 U.S. at 453.

Like the *Bishop* and *Kitchen* courts, this Court need not decide whether the government has an interest in favoring different-sex over same-sex parents. However, the overwhelming scientific consensus, based on decades of peer-reviewed research, shows that children raised by same-sex couples are just as well adjusted as those raised by different-sex couples. Every major pediatric, mental health, and child welfare organization in the United States has endorsed this scientific consensus.[10] Numerous courts have found that "the evidence shows beyond any doubt that parents' genders are irrelevant to children's developmental outcomes." *Perry*, 704 F. Supp. 2d at 1000. *See also DeBoer*, 2014 WL 1100794, at *12 ("In short, the isolated studies cited by the state defendants do not support the argument that children raised by heterosexual couples have better outcomes than children raised by same-sex couples. To the contrary, the overwhelming weight of the scientific evidence supports the "no differences" viewpoint."); *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct. Nov. 25, 2008) ("[B]ased on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption."), *aff'd sub nom. Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So. 3d 79 (Fla. Dist. Ct. App. 2010); *Howard v. Child Welfare Agency Review Bd.*, 2004 WL 3154530, at *9 and 2004 WL 3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004) (holding based on factual findings regarding the well-being of children of gay parents that "there was no rational relationship between the [exclusion of gay people as foster

---

[10]     These organizations include: the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, the Child Welfare League of America, the American Psychological Association, the American Psychoanalytic Association, and the American Psychiatric Association. *See* Brief of American Psychological Ass'n, et al., as Amici Curiae on the Merits in Support of Affirmance, *Windsor*, 133 S. Ct. 2675, (No. 12-307), 2013 WL 871958, at *14-26; Brief of the American Sociological Ass'n, in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, *Hollingsworth v. Perry*, 133 S. Ct. 2653 (2013), and *Windsor*, 133 S. Ct. 2675, (Nos. 12-144, 12-307), 2013 WL 840004, at *6-14.

parents] and the health, safety, and welfare of the foster children."), *aff'd sub nom. Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006); *Varnum*, 763 N.W.2d at 899 & n.26 (concluding, after reviewing "an abundance of evidence and research," that "opinions that dual-gender parenting is the optimal environment for children . . . is based more on stereotype than anything else"); *Golinski*, 824 F. Supp. 2d at 991 ("More than thirty years of scholarship resulting in over fifty peer-reviewed empirical reports have overwhelmingly demonstrated that children raised by same-sex parents are as likely to be emotionally healthy, and educationally and socially successful as those raised by opposite-sex parents.").

The *Bostic* court also rejected the optimal parenting argument, noting that the "rationale rests upon an unconstitutional, hurtful and unfounded presumption that same-sex couples can't be good parents." *Bostic*, 2014 WL 561978, at *19. The *Bostic* court compared the optimal parenting rationale to the presumption that unmarried fathers are unfit to raise children, which the Supreme Court struck down in *Stanley v. Illinois*, 405 U.S. 645 (1972), noting that *Stanley*'s holding "has been construed to mean that the State could not conclusively presume that any particular unmarried father was unfit to raise his child; the Due Process Clause required a more individualized determination." *Bostic*, 2014 WL 561978, at *19 (quotation marks and citation omitted). Just as it is unconstitutional to presume that unmarried fathers are unfit to raise children, it is likewise unconstitutional to presume that same-sex couples are, across the board, likely to be less fit parents than different-sex couples.

Courts look for a rational basis for legislation to ensure that the State has not engaged in line-drawing merely for "the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see also Windsor*, 133 S. Ct. at 2693; *Cleburne*, 473 U.S. at 450; *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). But the history of Wisconsin's

37

marriage ban shows that it *is* an instance of such line-drawing.   Findings of Fact ¶ 41. Legislative sponsors of the ban described their goal in clear terms: "This proposal would prevent same-sex marriage from being legalized in this state."   Declaration of Laurence J. Dupuis ("Dupuis Decl."), Ex. 1 ("CoSponsorship Memo").  A constitutional amendment was necessary, the sponsors urged, because "[n]othing in our state constitution presently protects against our State Supreme Court doing the same thing the Massachusetts Supreme Court did in 2003 . . . and legislating from the bench to radically alter marriage in this state and judicially impose same-sex marriage on this state."  *Id*.  One legislative staffer simply described the proposal as the "[g]ay marriage joint resolution."  *Id*., Ex. 2 ("Drafting File") at 15.[11]

Moreover, Wisconsin's own Supreme Court has already concluded that the marriage ban was enacted precisely for the purpose of preventing same-sex couples from marrying.  Observing that "[t]he general purpose of a constitutional amendment is not an interpretive riddle," and that "[t]ext and historical context should make the purpose of most amendments apparent," *McConkey v. Van Hollen*, 2010 WI 57, ¶ 54-55, 783 N.W.2d 855, 869, the Wisconsin Supreme Court found that the intent and purpose of the marriage ban "was to preserve the legal status of marriage in Wisconsin as between only one man and one woman," and to do so through a constitutional amendment to "ensure[] that no legislature, court, or any other government entity

[11]      Non-legislative proponents of the amendment were even more transparent about their purpose to discriminate as well as their motives.  Vote Yes for Marriage, an organization that advocated for the marriage ban, urged that "[h]omosexual activists shouldn't get to ***redefine marriage*** because they want easier access to health-care benefits."  Dupuis Decl., Ex. 3 ("Vote Yes For Marriage Flyer") at 3.  In discussing "[h]ow we got here," the Family Research Institute of Wisconsin ("FRIW"), one of the primary advocates for the marriage ban, argued that "[h]omosexual activists use judicial activists," and pointed with alarm to State Supreme Court decisions in Vermont and Massachusetts that resulted in civil unions and marriage for same-sex couples in those states.  *Id*., Ex. 4 ("FRIW PowerPoint") at 13.  FRIW then went even further in its disparagement of gays and lesbians, comparing marriage between partners of the same sex to polygamy. *Id.* at 18-19.  One of the ban's strongest supporters, Julaine Appling of Wisconsin Family Action, went on in 2009 to file suit seeking to overturn Wisconsin's domestic partner statute, contending that even the limited benefits that the statute provides are a violation of the marriage ban's prohibition of the creation or recognition of a substantially similar relationship to marriage.  *See Appling v. Walker*, No. 2011AP1572 (Wis. Filed June 20, 2011).

can get around the first sentence [which "preserves the one man-one woman character of marriage"] by creating or recognizing 'a legal status identical or substantially similar to that of marriage.'"  *Id*.  The Court also found that the "[t]he sponsors of the amendment were quite clear that state supreme court decisions overturning the marriage laws of other states [and requiring those states to permit same-sex couples to marry] were the primary reason for the amendment." *Id*. ¶ 55 and n.22 (citing the Co-Sponsorhip Memo, *supra*).

The Wisconsin marriage ban thus was not enacted at a time before people had "even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage."  *Windsor*, 133 S. Ct. at 2689. The awareness of such aspirations on the part of same-sex couples—and the desire to thwart them—are precisely the reasons the ban was proposed in the first place.  The "practical effect" of the ban is consonant with that intent: the marriage ban excludes same-sex couples from marriage, delegitimizes their relationships, and thereby "impose[s] a disadvantage, a separate status, and so a stigma upon" same-sex couples and their families in the eyes of the state and the broader community.  *Id*. at 2693.  The ban is not rationally related to any legitimate interest, and thus no interest "overcomes the purpose and effect to disparage and to injure" same-sex couples and their families.  *Id*. at 2696.

Such a purpose does not necessarily reflect malice or hatred on the part of the laws' supporters.  *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring).  It may stem from "negative attitudes," *Cleburne*, 473 U.S. at 448, "fear," *id.*, "irrational prejudice," *id.* at 450, or nothing more than an "instinctive mechanism to guard against people who appear to be different in some respects from ourselves," *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring).  Whatever the motivation, a "bare . . . desire to harm a politically

unpopular group cannot constitute a *legitimate* governmental interest." *Moreno*, 413 U.S. at 534. And because no other interest is served by the marriage ban, it fails under any standard of review.

## CONCLUSION

As demonstrated above, Wisconsin's marriage ban violates both the Due Process Clause and the Equal Protection Clause of the United States Constitution. As a result, Plaintiffs are entitled to judgment as a matter of law on all four counts of their amended complaint. This Court should therefore grant Plaintiffs' Motion for Summary Judgment.

Dated: March 24, 2014

JOHN A. KNIGHT
American Civil Liberties Union Foundation
Lesbian Gay Bisexual Transgender Project
180 North Michigan Avenue
Suite 2300
Chicago, Illinois 60601
(312) 201-9740
jaknight@aclu.org

LAURENCE J. DUPUIS
SBN: 1029261
American Civil Liberties Union of
Wisconsin Foundation
207 E. Buffalo Street, Suite 325
Milwaukee, Wisconsin 53202
(414) 272-4032
ldupuis@aclu-wi.org

* admitted *pro hac vice*

By: /s Gretchen E. Helfrich
Counsel for Plaintiffs

JAMES D. ESSEKS*
American Civil Liberties Union Foundation
Lesbian Gay Bisexual Transgender Project
125 Broad Street
New York, New York 10004
(212) 549-2623
jesseks@aclu.org

HANS J. GERMANN*
GRETCHEN E. HELFRICH*
FRANK DICKERSON*
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
(312) 782-0600
hgermann@mayerbrown.com
ghelfrich@mayerbrown.com
fdickerson@mayerbrown.com