IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VIRGINIA WOLF and CAROL SCHUMACHER,
KAMI YOUNG and KARINA WILLES,
ROY BADGER and GARTH WANGEMANN,
CHARVONNE KEMP and MARIE CARLSON,
JUDITH TRAMPF and KATHARINA HEYNING,
SALUD GARCIA and PAM KLEISS,
WILLIAM HURTUBISE and LESLIE PALMER,
and JOHANNES WALLMANN and
KEITH BORDEN,

       Plaintiffs,

      v.                                     Case No. 14-C-00064-SLC

SCOTT WALKER, J.B. VAN HOLLEN, OSKAR
ANDERSON, JOSEPH CZARNEZKI, WENDY
CHRISTENSEN, and SCOTT MCDONELL,

       Defendants.

---

**RESPONSE AND APPENDIX
OF STATE DEFENDANTS WALKER, VAN HOLLEN, AND ANDERSON
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

J.B. VAN HOLLEN
Attorney General

TIMOTHY C. SAMUELSON
Assistant Attorney General
State Bar #1089968

THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

CLAYTON P. KAWSKI
Assistant Attorney General
State Bar #1066228

Attorneys for Defendants,
Scott Walker, J.B. Van Hollen,
and Oskar Anerson

# TABLE OF CONTENTS

Page

INTRODUCTION....................................................................................................1

BACKGROUND ....................................................................................................3

SUMMARY OF ARGUMENT .................................................................................6

ARGUMENT ..........................................................................................................7

I.     The Due Process Clause Does Not Require Wisconsin To Give Same-Sex Couples The Positive Right To Civil Marriage And Leaves The Area Of Affirmative Governmental Obligations To The Democratic Political Process...........................................................................7

     A.     Wisconsin's choice not to give same-sex couples the positive right to civil marriage under state law does not infringe constitutionally protected liberty interests. ...............................8

     B.     Principles of federalism support the conclusion that Wisconsin is not constitutionally compelled to give same-sex couples the positive right to civil marriage..................................................14

     C.     Wisconsin may affirmatively grant or withhold the positive right of civil marriage based on majoritarian policy choices made through the democratic political process....................................20

II.     Wisconsin's Marriage Laws Are Not Subject To Heightened Scrutiny. ........25

     A.     Plaintiffs' substantive due process claims are not subject to heightened scrutiny because they are not based upon fundamental rights.......................................................................25

          1.     The fundamental right to marry does not include a fundamental right to marry a person of the same sex. .............25

          2.     Wisconsin's marriage laws do not interfere with Plaintiffs' right to remain married.............................................29

**B.** **Plaintiffs' equal protection claims are not entitled to heightened scrutiny because sexual orientation is not a suspect class and Wisconsin's marriage laws do not discriminate on the basis of gender.**....................................................................31

1. **Sexual orientation is not a suspect class.**...................32

2. **The Marriage Amendment does not discriminate on the basis of gender.**..........................................................32

**III.** **Wisconsin's Marriage Laws Are Supported By Rational Bases.** ...................33

**A.** **Under rational basis, laws must be upheld where plausible policy reasons exist.**......................................................33

**B.** **Wisconsin's marriage laws were not motivated by animus.** ...............35

1. **Plaintiffs fail to meet their burden of establishing that the Marriage Amendment and Wisconsin's other marriage laws were motivated by animus.** ................................36

2. **The gay and lesbian community is not the type of powerless class referred to in *Cleburne*.**....................................40

3. ***Windsor* does not support the animus theory.** ..........................42

4. **District courts, both pre- and post-*Windsor*, have rejected the argument that similar marriage laws were motivated by animus.**..........................................................44

**C.** **Many rational bases support Wisconsin's marriage laws.**...................45

1. **Tradition, maintaining the status quo, protecting the democratic process, and proceeding cautiously are rational bases for Wisconsin's marriage laws.**..........................45

a. **Tradition is a rational basis.** ...........................................45

b. **Proceeding with caution and maintaining the status quo are rational bases.**..........................................46

c. **Protecting the democratic process is a rational basis.** ...............................................................47

**2.** **Responsible procreation and optimal childrearing are rational bases for Wisconsin's marriage laws.** ........................48

    **a.** **Wisconsin recognizes traditional marriage as optimal for families.** ........................................48

    **b.** **Wisconsin promotes responsible procreation and optimal childrearing.** ......................................49

    **c.** **Wisconsin's interests in promoting responsible procreation and optimal childrearing are supported by authority.** ....................................51

    **d.** **Children benefit from stable, married, biological parenting.** .........................................................52

    **e.** **The social science data on same-sex parenting is undeveloped and unreliable.** ...........................53

    **f.** **Plaintiffs' arguments in opposition to tradition, responsible procreation, and optimal childrearing are unavailing.** .................................54

**3.** **Same-sex marriage could affect other legal restrictions to marriage and adversely affect the institution of marriage.** ..........................................................55

    **a.** **Extending the fundamental right to marriage to include same-sex couples logically results in other restrictions to marriage being found unconstitutional.** ...............................................55

    **b.** **Redefining marriage without regard to gender and procreation transforms the marital norm, potentially with indirect, unanticipated, and long-term consequences.** ................................56

**IV.** *Baker v. Nelson* **Forecloses Plaintiffs' Fourteenth Amendment Claims.** ........59

**CONCLUSION** ............................................................62

# CASES CITED

Adams v. Howerton,
486 F. Supp. 1119 (C.D. Cal. 1980),
aff'd on other grounds, 673 F.2d 1036 (9th Cir. 1982) .................................................... 52

Alden v. Maine,
527 U.S. 706 (1999) ...................................................................................................... 14

Andersen v. King Cnty.,
138 P.3d 963 (Wash. 2006) ...................................................................................... 49, 52

Baehr v. Lewin,
852 P.2d 44 (Haw. 1993) ................................................................................................. 4

Baker v. Nelson,
409 U.S. 810 (1972) .................................................................................. 4, 7, 59, 60, 61

Baker v. Vermont,
744 A.2d 864 (Vt. 1999) ................................................................................................. 4

Baker v. Nelson,
291 Minn. 310 (1971) ................................................................................................ 52, 59

Bd. of Trs. of Univ. of Ala. v. Garrett,
531 U.S. 356 (2001) ...................................................................................................... 36

Beal v. Doe,
432 U.S. 438 (1977) ........................................................................................................ 9

Belcher v. Norton,
497 F.3d 742 (7th Cir. 2007) ..................................................................................... 25-26

Bishop v. United States ex rel. Holder,
962 F. Supp. 2d 1252 (N.D. Okla. 2014) ...................................................................... 32

Boggs v. Boggs,
520 U.S. 833 (1997) ...................................................................................................... 15

Bond v. United States,
131 S. Ct. 2355 (2011) ................................................................................................... 14

Bourke v. Beshear,
2014 WL 556729 (W.D. Ky. Feb. 12, 2014) ................................................................ 44

Bowen v. Gilliard,
483 U.S. 587 (1987) ...................................................................................................... 40

Campbell v. Blumberg,
  260 Wis. 625, 51 N.W.2d 709 (1952) ........................................................... 50

Cece v. Holder,
  733 F.3d 662 (7th Cir. 2013) ..................................................................... 40

Citizens for Equal Prot. v. Bruning,
  455 F.3d 859 (8th Cir. 2006) ................................................. 32, 46, 52, 60

City of Dallas v. Stanglin,
  490 U.S. 19 (1989) .................................................................................... 33

Clark v. Cnty. of Winnebago,
  817 F.2d 407 (7th Cir. 1987) ..................................................................... 34

Cleburne v. Cleburne Living Ctr.,
  473 U.S. 432 (1985) ....................................................................... 35, 36, 41

Collins v. City of Harker Heights, Tex.,
  503 U.S. 115 (1992) .................................................................................. 20

Conaway v. Deane,
  932 A.2d 571 (Md. 2007) .......................................................................... 52

Cruzan v. Dir., Mo. Dep't of Health,
  497 U.S. 261 (1990) .................................................................................. 17

DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,
  489 U.S. 189 (1989) ......................................................................... 7, 8, 20

Discovery House, Inc. v. Consol. City of Indianapolis,
  319 F.3d 277 (7th Cir. 2003) ..................................................................... 34

Dist. Attorney's Office for Third Judicial Dist. v. Osborne,
  557 U.S. 52 (2009) .............................................................................. 15, 20

Ex parte Burrus,
  136 U.S. 586 (1890) .................................................................................. 15

Express, Inc.,
  490 U.S. 477 (1989) .................................................................................. 61

Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.,
  508 U.S. 307 (1993) ................................................. 33, 34, 35, 54

Fricke v. Fricke,
  257 Wis. 124, 42 N.W.2d 500 (1950) ............................................. 39, 45, 50

Goodridge v. Dep't of Pub. Health,
798 N.E.2d 941 (Mass. 2003) ............................................................... 4, 39, 57

Harris v. McRae,
448 U.S. 297 (1980) ............................................................................... 9

Heller v. Doe,
509 U.S. 312 (1993) ............................................................................ 31, 35

Henry v. Himes,
2014 WL 1418395 (S.D. Ohio Apr. 14, 2014) ................................. 44

Hernandez v. Robles,
855 N.E.2d 1 (N.Y. 2006) .............................................................. 1-2, 51-52

Hicks v. Miranda,
422 U.S. 332 (1975) ............................................................................. 60

High Tech Gays v. Defense Indus. Sec. Clearance Office,
895 F.2d 563 (9th Cir. 1990) ............................................................ 40

Hunter v. Underwood,
471 U.S. 222 (1985) ............................................................................ 38

Idris v. City of Chicago,
552 F.3d 564 (7th Cir. 2009) ............................................................ 26

In re Interest of Angel Lace,
184 Wis. 2d 492, 516 N.W.2d 678 (1994) ....................................... 5

In re Kandu,
315 B.R. 123 (Bankr. W.D. Wash. 2004) ....................................... 26, 52

In re Marriage of J.B. & H.B.,
326 S.W.3d 654 (Tex. App. 2010) .................................................... 52

Irizarry v. Bd. of Educ. of Chicago,
251 F.3d 604 (7th Cir. 2001) ............................................................ 53

Jackson v. Abercrombie,
884 F. Supp. 2d 1065 (D. Haw. 2012) ..................................... passim

Jackson v. City of Joliet,
715 F.2d 1200 (7th Cir. 1983) .......................................................... 8

Johnson v. Robison,
415 U.S. 361 (1974) ............................................................................. 55

Kitchen v. Herbert,
    961 F. Supp. 2d 1181 (D. Utah 2013)....................................... 44, 60

Kitzman v. Kitzman,
    167 Wis. 308, 166 N.W. 789 (1918)........................................ 50

Lawrence v. Texas,
    539 U.S. 558 (2003)........................................ passim

Lewis v. Harris,
    908 A.2d 196 (N.J. 2006)........................................ 57

Lofton v. Sec'y of the Dep't of Children & Family Servs.,
    358 F.3d 804 (11th Cir. 2004) ........................................ 54

Loving v. Virginia,
    388 U.S. 1 (1967)........................................ 10, 26, 27

Lyannes v. Lyannes,
    171 Wis. 381, 177 N.W. 683 (1920)........................................ 48, 50

Maher v. Roe,
    432 U.S. 464 (1977)........................................ 9, 21

Mandel v. Bradley,
    432 U.S. 173 (1977)........................................ 59, 60

Mansell v. Mansell,
    490 U.S. 581 (1989)........................................ 15

Marshall v. United States,
    414 U.S. 417 (1974)........................................ 54

Mass v. Dep't of Health & Human Servs.,
    682 F.3d 1 (1st Cir. 2012)........................................ 60

Maynard v. Hill,
    125 U.S. 190 (1888)........................................ 2-3, 51

McConkey v. Van Hollen,
    2010 WI 57, 326 Wis. 2d 1, 783 N.W.2d 855 ........................................ passim

Moore v. Sims,
    442 U.S. 415 (1979)........................................ 15

Morrison v. Sadler,
    821 N.E.2d 15 (Ind. Ct. App. 2005)........................................ 52

Nat'l Paint & Coatings Ass'n v. City of Chicago,
45 F.3d 1124 (7th Cir. 1995) ................................................................. 25, 35

Nevel v. Village of Schaumburg,
297 F.3d 673 (7th Cir. 2002) ................................................................. 36

New State Ice Co. v. Liebmann,
285 U.S. 262 (1932).............................................................................. 17

Nordlinger v. Hahn,
505 U.S. 1 (1992)...................................................................... 33-34, 36, 37

Obergefell v. Wymyslo,
962 F. Supp. 2d 968 (S.D. Ohio 2013) .................................................. 44

Ohio ex rel. Popovici v. Agler,
280 U.S. 379 (1930).............................................................................. 16

Olech v. Village of Willowbrook,
160 F.3d 386 (7th Cir. 1998) ................................................................. 36

Oregon v. Ice,
555 U.S. 160 (2009).............................................................................. 17

Oriental Health Spa v. City of Fort Wayne,
864 F.2d 486 (7th Cir. 1988) ................................................................. 33

Palmer v. Thompson,
403 U.S. 217 (1971).............................................................................. 38

Pennoyer v. Neff,
95 U.S. 714 (1877)................................................................................ 15

Planned Parenthood of Se. Penn. v. Casey,
505 U.S. 833 (1992).............................................................................. 20

Poe v. Ullman,
367 U.S. 497 (1961)...................................................................... 15, 20, 21

Pro Eco, Inc. v. Bd. of Comm'rs of Jay Cnty.,
57 F.3d 505 (7th Cir. 1995) ................................................................... 34

Racine Charter One, Inc. v. Racine Unified Sch. Dist.,
424 F.3d 677 (7th Cir. 2005) ................................................................. 34

Reiser v. Residential Funding Corp.,
380 F.3d 1027 (7th Cir. 2004) ............................................................... 32

Reno v. Flores,
507 U.S. 292 (1993) ............................................................................... 26

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
490 U.S. 477 (1989) ............................................................................... 61

Roe v. Wade,
410 U.S. 113 (1973) ............................................................................... 11

Romer v. Evans,
517 U.S. 620 (1996) ............................................................. 31, 35, 41, 43

Rust v. Sullivan,
500 U.S. 173 (1991) ............................................................................. 9, 21

Saenz v. Roe,
526 U.S. 489 (1999) ............................................................................... 14

Schroeder v. Hamilton Sch. Dist.,
282 F.3d 946 (7th Cir. 2002) ................................................................ 32

Schuette v. Coal. to Defend Affirmative Action,
2014 WL 1577512 (U.S. Apr. 22, 2014) ............................................... 22

Sevcik v. Sandoval,
911 F. Supp. 2d 996 (D. Nev. 2012) ............................................... passim

Singer v. Hara,
522 P.2d. 1187 (Wash. Ct. App. 1974) ................................................. 52

Skinner v. Oklahoma,
316 U.S. 535 (1942) ........................................................................... 3, 51

Smith v. City of Chicago,
457 F.3d 643 (7th Cir. 2006) ........................................................... 33, 54

Sosna v. Iowa,
419 U.S. 393 (1975) ............................................................................... 15

Srail v. Vill. of Lisle, Ill.,
588 F.3d 940 (7th Cir. 2009) ........................................................... 33, 54

Standhardt v. Superior Court,
77 P.3d 451 (Ariz. Ct. App. 2003) ....................................................... 52

State v. Roberts,
169 Wis. 570, 173 N.W. 310 (1919) ..................................................... 51

Tully v. Griffin, Inc.,
429 U.S. 68 (1976) ........................................................................... 60

Turner v. Safley,
482 U.S. 78 (1987) ........................................................................... 10

U.S. Dep't of Agric. v. Moreno,
413 U.S. 528 (1973) ................................................................... 35, 42

United States v. Booker,
375 F.3d 508 (7th Cir. 2004) ......................................................... 61

United States v. Lopez,
514 U.S. 549 (1995) ........................................................... 14, 15, 17

United States v. O'Brien,
391 U.S. 367 (1968) ................................................................... 34, 38

United States v. Windsor,
133 S. Ct. 2675 (2013) ............................................................. passim

Washington v. Glucksberg,
521 U.S. 702 (1997) ........................................................... 17, 20, 28

Webster v. Reproductive Health Servs.,
492 U.S. 490 (1989) ........................................................................... 9

Wilson v. Ake.,
354 F. Supp. 2d 1298 (M.D. Fla. 2005) ................................... 47-48, 60

Windsor v. United States,
699 F.3d 169 (2d Cir. 2012), ......................................................... 61

Wroblewski v. City of Washburn,
965 F.2d 452 (7th Cir. 1992) ......................................................... 34

Zablocki v. Redhail,
434 U.S. 374 (1978) ................................................................... 10, 51

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VIRGINIA WOLF and CAROL SCHUMACHER,
KAMI YOUNG and KARINA WILLES,
ROY BADGER and GARTH WANGEMANN,
CHARVONNE KEMP and MARIE CARLSON,
JUDITH TRAMPF and KATHARINA HEYNING,
SALUD GARCIA and PAM KLEISS,
WILLIAM HURTUBISE and LESLIE PALMER,
and JOHANNES WALLMANN and
KEITH BORDEN,

        Plaintiffs,

    v.                              Case No. 14-C-00064-SLC

SCOTT WALKER, J.B. VAN HOLLEN, OSKAR
ANDERSON, JOSEPH CZARNEZKI, WENDY
CHRISTENSEN, and SCOTT MCDONELL,

        Defendants.

---

## RESPONSE OF STATE DEFENDANTS WALKER, VAN HOLLEN, AND ANDERSON IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

Millions of Wisconsinites deeply and sincerely understand marriage in traditional terms, as between one man and one woman, as the foundation of the family and thus society, and the optimal setting for bearing and raising children.

The meaning of marriage is fairly and correctly reflected by Wisconsin's marriage laws, namely, that marriage only exists between one man and one woman. Wisconsin law is consistent with sociological and historical norms crossing all cultures, religions and times. *See, e.g.*, *Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006) ("Until a few decades ago, it

was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex."). This does not and is not intended to demean other family structures nor is it borne from any intent to discriminate.

The State Defendants[1] do *not* pass judgment on members of the lesbian, gay, bisexual and transgender ("LGBT") community or same-sex couples in general, or the committed, loving relationships of the Plaintiffs involved in this litigation.

The focus of this brief is on the merits of traditional marriage, the legal and rational bases supporting it, and Wisconsinites' overwhelming support for traditional marriage laws. The brief also emphasizes the importance of letting democracy and the legislative process progress naturally and gradually, and proceeding with caution before deciding to transform the legal institution of marriage from its traditional meaning. As laboratories of democracy, states are free to experiment with changing marriage norms if they choose to do so, or they may prudently proceed with caution before making any fundamental changes. Wisconsin has chosen the latter course.

The State has long supported traditional marriage as the optimal environment for raising children, the foundation of the family and thus of society. *See, e.g.*, Wis. Stat. § 765.001(2) ("intent" of Family Code is to promote "[m]arriage [a]s the institution that is the foundation of the family and society;" marriage is "a legal relationship between 2 equal persons, a husband and wife" to provide "support and maintenance of . . . minor children and of the other spouse"). These policy bases have historically been approved by the United States Supreme Court. *See, e.g.*, *Maynard v. Hill*, 125 U.S. 190, 205, 211 (1888) (traditional marriage is "the most

---

[1]Defendants Scott Walker, J.B. Van Hollen, and Oskar Anderson are collectively referred to as the "State Defendants."

important relation in life" and "the foundation of the family and of society, without which there would be neither civilization nor progress"); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (same).

The scope of dispute in this litigation is narrow. Plaintiffs and State Defendants agree that marriage is a fundamental right and that the states have a historic and legitimate interest in regulating and promoting marriage. (*See* Dkt. #71 at 9). State Defendants concede many of Plaintiffs' proposed facts, including that they are all "loving, committed, same-sex couples" (Dkt. #72, ¶ 5), and that each couple wishes to marry in Wisconsin (*id.*, ¶¶ 8-12) or to have their out-of-state marriage recognized here (*id.*, ¶¶ 6-7, 13).

The parties differ on the definition and legal status of civil marriage, the purposes for which it exists, and whether the fundamental right to marry must be extended to same-sex couples on substantive due process and equal protection grounds, theories that have never been recognized by the Supreme Court or the Seventh Circuit.

Article XIII, § 13 of the Wisconsin Constitution (the "Marriage Amendment") withstands constitutional scrutiny because traditional marriage is reasonably based on society's collective experience, has proven optimal for families, children, and society in general, and is an area of traditional state concern subject to the will of the people. The people of the State of Wisconsin thus had rational, prudent reasons for voting to maintain the status quo in the Marriage Amendment.

## BACKGROUND

Same-sex marriage is a new social construct. "No country allowed same-sex couples to marry until the Netherlands did so in 2000." *U.S. v. Windsor*, 133 S. Ct. 2675, 2715 (2013) (Alito, J., dissenting) (footnote omitted).

Same-sex marriage jurisprudence in the United States began in 1972 when the United States Supreme Court unanimously dismissed, "for want of a substantial federal question," an appeal from the Minnesota Supreme Court presenting the same questions at issue here: whether a State's refusal to sanction same-sex marriage violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See Baker v. Nelson*, 409 U.S. 810 (1972). In 1993, the Hawaii Supreme Court declared the state's refusal to grant same-sex couples marriage licenses discriminatory. *Baehr v. Lewin*, 852 P.2d 44, 59 (Haw. 1993).[2] Six years later, the Vermont Supreme Court held that Vermont must offer all the benefits of marriage to same-sex couples, either through marriage or "an alternative legal status." *Baker v. Vermont*, 744 A.2d 864, 886-87 (Vt. 1999). The Vermont Legislature then enacted a civil union law. *See* Vt. Stat. Ann. tit. 15, § 1201, *et seq*. In 2003, the Massachusetts Supreme Judicial Court held that limiting the protections, benefits, and obligations of civil marriage to heterosexual couples violated the Massachusetts Constitution. *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003).

Meanwhile, in 1996 Congress passed, and President Clinton signed, the federal Defense of Marriage Act ("DOMA"). *See* Pub. L. 104-109, 110 Stat. 2419 (1996). DOMA defined "marriage," for the purposes of various federal benefits and programs, as "only a legal union between one man and one woman as husband and wife." 1 U.S.C. § 7. DOMA defined "spouse" as "a person of the opposite sex who is a husband or a wife." *Id*. Finally, DOMA provided that:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex

---

[2] Hawaii voters later adopted a constitutional amendment allowing the Legislature to reserve marriage for opposite-sex couples. Haw. Const. art. I, § 23.

that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

28 U.S.C. § 1738C.

Against this backdrop, the Wisconsin Legislature addressed Wisconsin's marriage laws. During both the 2003 and 2005 sessions, the Wisconsin State Assembly and Senate adopted a joint resolution to amend the Wisconsin Constitution. (State Defs. Facts, ¶¶ 8-13).[3] In November 2006, 1,264,310 Wisconsin citizens approved the Marriage Amendment by a wide margin (59% to 41%). (*Id.*, ¶¶ 17-19). The Amendment provides:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.

Wis. Const. art. XIII, § 13.

Before the Marriage Amendment was adopted, marriage in Wisconsin was already statutorily limited to unions between one man and one woman. *See* Wis. Stat. § 765.01 ("Marriage, so far as its validity at law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting is essential, and which creates the legal status of husband and wife."); *McConkey v. Van Hollen*, 2010 WI 57, ¶ 53, 326 Wis. 2d 1, 783 N.W.2d 855 (citing Wis. Stat. § 765.001(2) (2005–06) ("'Under the laws of this state, marriage is a legal relationship between 2 equal persons, a husband and wife.'"); *In re Interest of Angel Lace*, 184 Wis. 2d 492, 504, n.1, 516 N.W.2d 678 (1994) ("Wisconsin does not recognize same-sex marriages."); Wis. Legis. Ref. Bureau, "Constitutional Amendment & Advisory Referendum to Be Considered by Wisconsin Voters, Nov. 7, 2006," *Wisconsin Briefs* 06-12 (Sept. 2006), at 2 (before the Marriage Amendment, "only a marriage between a husband and wife is recognized as valid in this state") (State Defs. Facts, ¶ 6).

---

[3]State Defendants' Proposed Findings of Fact in Opposition to Plaintiffs' Motion for Summary Judgment, filed contemporaneously herein, are referred to as "State Defs. Facts."

The Marriage Amendment was "an effort to preserve and constitutionalize the status quo, not to alter the existing character or legal status of marriage." *McConkey*, 326 Wis. 2d 1, ¶ 53; *see also* (Dkt. #73-1, 73-3, 73-4).

## SUMMARY OF ARGUMENT

Plaintiffs are not entitled to summary judgment. Each of their claims challenging the constitutionality of Wisconsin's marriage laws fails.

Plaintiffs' substantive due process claims fail for several reasons. First, the Due Process Clause does not obligate states to confer positive rights, *e.g.*, same-sex marriage benefits, on individuals. Moreover, principles of federalism require that the Marriage Amendment be upheld. Marriage policy has long been recognized as a matter reserved to the States, permitting them to proceed cautiously with respect to transforming traditional social norms, including the legal status of civil marriage. Although states are free to experiment, they are not required to do so, particularly where, as here, the long term effects of same-sex marriage are uncertain. The states need not be neutral between competing visions of controversial social issues.

Plaintiffs' substantive due process claims are subject to rational basis scrutiny because they are not based upon fundamental rights deeply rooted in our nation's history and traditions. Plaintiffs' equal protection claims are also subject to rational basis scrutiny because Wisconsin's marriage laws do not, on their face, discriminate on the basis of sexual orientation or gender. And, the Marriage Amendment is not motivated by animus. Wisconsin's marriage laws survive rational basis scrutiny because they rationally promote the State's legitimate interest in maintaining the status quo, protecting the democratic process, and proceeding cautiously in the face of rapidly transforming social change regarding the legal status of civil marriage.

Plaintiffs' motion for summary judgment also fails because *Baker v. Nelson*, the only Supreme Court decision to address whether same-sex marriage is a fundamental right under the Due Process Clause and Equal Protection Clause, summarily dismissed the same claims Plaintiffs are asserting for lack of a substantial federal question.

In short, the United States Constitution does not require that Wisconsin give Plaintiffs the relief they seek. State Defendants, therefore, request that the Court deny Plaintiffs' motion for summary judgment.

## ARGUMENT

### I. The Due Process Clause Does Not Require Wisconsin To Give Same-Sex Couples The Positive Right To Civil Marriage And Leaves The Area Of Affirmative Governmental Obligations To The Democratic Political Process.

Counts 1 and 2 of the Amended Complaint claim that the Marriage Amendment[4] violates the Due Process Clause of the Fourteenth Amendment.

Plaintiffs, however, ignore the fundamental principle that the Due Process Clause does not impose affirmative obligations on the states to *confer* positive rights on individuals. Instead, the Due Process Clause only limits states' power to *deprive* individuals of their negative rights to life, liberty, or property. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).[5] By asking this Court to hold that the Due Process Clause not only prohibits Wisconsin from infringing the negative right of same-sex couples to decide how to arrange their own private and domestic affairs, but also compels the State to affirmatively license, endorse, and support the arrangements they have chosen, Plaintiffs seek an unprecedented and unwarranted

---

[4]Plaintiffs also challenge "any and all provisions of Wisconsin's marriage statutes (Wis. Stat. ch. 765) that refer to marriage as a relationship between a 'husband and wife,' if and to the extent that such provisions constitute a statutory ban on marriage for same-sex couples." (Dkt. #26, ¶ 1).

[5]For purposes of this discussion, positive rights require the government to do something, and negative rights require the government to refrain from doing something.

expansion of the scope of the Due Process Clause into an area of traditional state authority that the Constitution leaves to the democratic political process.

A. **Wisconsin's choice not to give same-sex couples the positive right to civil marriage under state law does not infringe constitutionally protected liberty interests.**

The Due Process Clause is phrased not as an affirmative command, but as a prohibition forbidding the states from depriving the people of certain things. U.S. Const. amend. XIV, § 1. Accordingly, the Seventh Circuit has expressly rejected the view that "the liberties secured by the [Due Process] clause include not only the traditional negative liberties—the right to be let alone, in its various forms—but also certain positive liberties[.]" *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983) (Posner, J.). To the contrary, our Constitution

> is a charter of negative rather than positive liberties. The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services.

*Id.* at 1203 (citations omitted).

The Supreme Court has likewise emphasized this distinction between negative and positive rights under the Due Process Clause. *See DeShaney*, 489 U.S. at 195-96 (Due Process Clause "prevent[s] government from abusing [its] power, or employing it as an instrument of oppression," but "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual") (internal quotations omitted). The Framers were content to leave the area of affirmative governmental obligations "to the democratic political processes." *Id.*

The Supreme Court has consistently applied this distinction in the abortion context. Although the constitutional right of privacy protects a woman's right to obtain an abortion and precludes government from prohibiting or punishing her exercise of that right, there is no

corresponding obligation on government to affirmatively endorse or support her exercise of the abortion right. For example, the Court has repeatedly held that the Constitution does not prohibit statutory restrictions on the use of Medicaid funds to pay for abortions. *See*, *e.g.*, *Harris v. McRae*, 448 U.S. 297 (1980); *Maher v. Roe*, 432 U.S. 464 (1977); *Beal v. Doe*, 432 U.S. 438 (1977). In this context, the Court reasons that "the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions," but "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Harris*, 448 U.S. at 317-18. To translate this "limitation on governmental power" into "an affirmative funding obligation" would mark "a drastic change in our understanding of the Constitution" that is not supported by the Due Process Clause. *Id.* at 318. "Whether freedom of choice that is constitutionally protected warrants federal subsidization is a question for Congress to answer, not a matter of constitutional entitlement." *Id.*; *accord Rust v. Sullivan*, 500 U.S. 173 (1991) (government may restrict use of public funds for abortion counseling and advocacy); *Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989) (government may restrict use of public facilities and public employees to perform abortions). In short, the principles of substantive due process do not impose affirmative obligations on government.

Under this reasoning, the Due Process Clause may not limit a state's ability to promote gay and lesbian persons from deciding how to arrange their own intimate and domestic affairs or punishing them for exercising their personal freedom in such matters. As with the abortion right, however, there is no corresponding obligation on the government to affirmatively license, or officially endorse, the intimate and domestic relationships that gay and lesbian persons may choose to enter. In Wisconsin, civil marriage is a government-run licensing system that provides

licensees with a panoply of tangible or material benefits—*e.g.*, tax benefits, entitlements, inheritance and other death benefits, property ownership benefits, surrogate decision-making rights, and the benefit of certain evidentiary privileges—and with the intangible or expressive benefits of public legitimation and endorsement that may arise from the official licensing and recognition of one's domestic relationship. Just as the Due Process Clause does not require government to subsidize the exercise of other personal constitutional rights, it also does not require states to affirmatively confer those benefits to anyone.

This reasoning is also consistent with the constitutional right to marriage recognized in *Loving v. Virginia*, 388 U.S. 1 (1967), *Zablocki v. Redhail*, 434 U.S. 374 (1978), and *Turner v. Safley*, 482 U.S. 78 (1987). Those cases do not establish a positive right requiring government to affirmatively license or endorse a person's domestic relationships or to affirmatively support the relationships with the tangible or intangible benefits of marriage. Rather, they recognize a negative right requiring the government to refrain from infringing the freedom of individuals to decide for themselves how to arrange their own private and domestic affairs. Under any other reading, a state would be constitutionally prohibited from deciding to simply get out of the marriage licensing business altogether and to instead regulate domestic relations through other means. *Loving* and its progeny do not require such a drastic infringement on state regulatory power in the area of domestic relations.

The positive rights rationale is also reflected in the Supreme Court's most important recent decisions involving the constitutional rights of homosexuals. *See United States v. Windsor*, 133 S. Ct. 2675 (2013); *Lawrence v. Texas*, 539 U.S. 558 (2003).

*Lawrence* held that the protection of liberty under the Due Process Clause gives adults the right to engage in private, consensual sexual conduct "without intervention of the

government." 539 U.S. at 578. The court reasoned that the constitutional right to liberty protects individuals from "unwarranted government intrusions into . . . private places" and into "spheres of our lives and existence . . . where the State should not be a dominant presence," including the sphere of "autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct." *Id.* at 562; *see also id.* at 565 (Due Process Clause recognizes right to make certain fundamental decisions affecting one's personal destiny without government interference) (citing *Roe v. Wade*, 410 U.S. 113 (1973)). Accordingly, "liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex" and thereby allows adult homosexuals to choose to enter intimate relationships "in the confines of their homes and their own private lives and still retain their dignity as free persons." *Lawrence*, 539 U.S. at 567, 572.

Lawrence did "not involve whether the government must give formal recognition to any relationship that homosexual persons may seek to enter." *Id.* at 567. Criminal anti-sodomy statutes like the one at issue in *Lawrence* implicate a constitutional liberty interest because they "touch[] upon the most private human conduct, sexual behavior, and in the most private of places, the home." *Id.* Such criminal statutes "seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." *Id. Lawrence* held that the Due Process Clause protects the liberty of individuals to control certain personal affairs without governmental interference, without regard to whether those personal affairs are "entitled to formal recognition in the law." *Id.* The court plainly did not say that the states are constitutionally compelled to give formal recognition to the decisions individuals make regarding their personal affairs. It said the opposite. *Id.*

Nor did *Lawrence* say that the states are required to give symbolic or expressive legitimation or endorsement to same-sex relationships. To the extent that *Lawrence* dealt with the symbolic or expressive effects of the anti-sodomy statute, its holding was that "[t]he State cannot demean [the petitioners'] existence or control their destiny *by making their private sexual conduct a crime*." *Id.* (emphasis added). *Lawrence* recognized that coercive intrusion of the state into the realm of individual personal autonomy could cause expressive or stigmatic harms, as well as material harms, but the court expressly did not hold that the Due Process Clause requires a state to affirmatively recognize, legitimize, endorse, or subsidize the private personal conduct of any individual or group.

The negative/positive rights distinction was reaffirmed in *Windsor*, where the Supreme Court held that the Due Process Clause of the Fifth Amendment was violated by Section 3 of DOMA,[6] which defined marriage, for all federal-law purposes, as a legal union between one man and one woman. *Windsor* emphasized that DOMA was "directed to a class of persons that the laws of New York, and of 11 other States, have sought to protect." *Windsor*, 133 S. Ct. at 2690. New York's decision to exercise its historic authority to define the marital relation by extending the marriage right to same-sex couples had given additional protection and dignity to the bonds of intimate relationship and sexual intimacy between those same-sex partners, and had therefore "conferred upon them a dignity and status of immense import." *Id.* at 2692. DOMA, however, departed from the long tradition of federal deference to state-law definitions of marriage and instead imposed restrictions and disabilities on the very class of same-sex couples that New York had sought to benefit. *Id.*

---

[6]All references to DOMA in the context of *Windsor* refer to Section 3 of DOMA.

By deviating from the usual tradition of recognizing and accepting state definitions of marriage, DOMA operated to deprive same-sex couples of benefits that would otherwise flow from the state's conferral of marriage. *Id.* at 2693. The essence of DOMA was to interfere with the equal dignity that some states, in the exercise of their sovereign power, had conferred upon same-sex marriages. *Id.* "DOMA forces same-sex couples to live as married for the purpose of state law but unmarried for the purpose of federal law, thus diminishing the stability and predictability of basic personal relations the State has found it proper to acknowledge and protect." *Id.* at 2694. Where the states had sought to dignify certain personal moral and sexual choices, DOMA was designed to take away a portion of that dignity. *See id.*

It was this federal intrusion upon rights that had been conferred by the state that infringed the constitutional liberty interests of same-sex couples. *Id.* at 2692. New York and other states that had legalized same-sex civil marriage had thereby conferred upon same-sex couples important rights and benefits that reside at the heart of the zone of personal autonomy protected by the Due Process Clauses. The federal government, in DOMA, had reached into that constitutionally protected zone and taken away a portion of what the states had chosen to give. It is because DOMA restricted the freedom of same-sex couples married under such state laws, that it "raise[d] a most serious question under the Constitution's Fifth Amendment." *Id.* at 2694.

In contrast, a state's decision *whether* to expand the definition of marriage to include same-sex couples does not raise similar concerns. *Id.* at 2697 (Roberts, dissenting). Accordingly, the *Windsor* majority expressly noted that its opinion and holding were limited to those same-sex marriages authorized by state law. *Windsor*, 133 S. Ct. at 2696. *Windsor* thus did not expand the scope of the Due Process Clauses so far as to compel the states to affirmatively license, endorse, and support same-sex marriages. Although the *Windsor* majority

expressly did not answer the question, the reaffirmation of the distinction between negative and positive rights in both *Lawrence* and *Windsor* strongly suggests that the Due Process Clause does not preclude a state from choosing not to give same-sex couples the positive right to enter the legal status of civil marriage under state law. In sum, the Supreme Court has applied the Due Process Clause only to protect negative liberties, not grant positive rights.

### B. Principles of federalism support the conclusion that Wisconsin is not constitutionally compelled to give same-sex couples the positive right to civil marriage.

Basic principles of federalism and the state's well-established primary role in the legal governance of marriage also support the conclusion that Wisconsin is not constitutionally required to give same-sex couples the positive right to civil marriage.

Federalism requires that the states be treated as "residuary sovereigns and joint participants in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999) (Kennedy, J.); *see also Bond v. United States*, 131 S. Ct. 2355, 2364 (2011) (recognizing "integrity, dignity, and residual sovereignty of the States"). "By 'splitting the atom of sovereignty,' the Founders established 'two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.'" *Alden*, 527 U.S. at 751 (quoting *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999)). Combined with the separation of powers, federalism creates "'a double security . . . to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.'" *United States v. Lopez*, 514 U.S. 549, 576 (1995) (quoting The Federalist No. 51, at 323 (C. Rossiter ed. 1961)).

Federal intrusion into areas of state concern tends to erode the security given to liberty by this system of dual sovereignties. "Were the Federal Government to take over the regulation of entire areas of traditional state concern . . . the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." *Lopez*, 514 U.S. at 577 (Kennedy, J., concurring). Accordingly, the Supreme Court is generally averse to projecting its authority into areas of traditional state concern. *See, e.g.*, *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73 n.4 (2009) (rejecting a substantive due process claim that would have "thrust the Federal Judiciary into an area previously left to state courts and legislatures."); *see also, e.g.*, *Poe v. Ullman*, 367 U.S. 497, 503 (1961).

Family law, including the definition of marriage, is a quintessential area of traditional state concern. Long ago, the Supreme Court observed that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890); *see also Boggs v. Boggs*, 520 U.S. 833, 850 (1997); *Mansell v. Mansell*, 490 U.S. 581, 587 (1989); *Moore v. Sims*, 442 U.S. 415, 435 (1979); *Sosna v. Iowa*, 419 U.S. 393, 404 (1975) (observing that a state "has [the] absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created") (quoting *Pennoyer v. Neff*, 95 U.S. 714, 734-35 (1877)).

Concern for federalism and the traditional authority of the states to define marriage was critical to the Supreme Court's decision in *Windsor*. There, the court emphasized that "'regulation of domestic relations' is 'an area that has long been regarded as a virtually exclusive province of the States.'" *Windsor*, 133 S. Ct. at 2691 (quoting *Sosna*, 419 U.S. at 404). The court further noted that "[t]he recognition of civil marriages is central to state domestic relations law[.]" *Windsor*, 133 S. Ct. at 2691. Accordingly, the court observed that "[b]y history and tradition the

definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *Id.* at 2689-90. "The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for 'when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States.'" *Id.* at 2691 (quoting *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383–84 (1930)). This traditional authority of the states over the subject of marriage was not delegated to the federal government with the adoption of the Constitution. *Id.*

"Consistent with this allocation of authority," *Windsor* found that "the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." *Id.* In fact, DOMA was constitutionally suspect in the Court's eyes precisely because it failed to respect the state's "historic and essential authority to define the marital relation," and thus "depart[ed] from this history and tradition of reliance on state law to define marriage." *Id.* at 2692; *see also id.* at 2697 (Roberts, C. J., dissenting) ("The dominant theme of the majority opinion is that the Federal Government's intrusion into an area 'central to state domestic relations law applicable to its residents and citizens' is sufficiently 'unusual' to set off alarm bells.").

In *Windsor*, the principle of deferring to the state's power in defining the marital relation weighed in favor of invalidating DOMA's attempt to take from same-sex couples the rights and benefits otherwise flowing from the state-conferred legal status of civil marriage. In this case, the principle of deference to the same state power points in the opposite direction, in favor of upholding the constitutionality of state definitions of civil marriage. *See Windsor*, 133 S. Ct. at 2697 (Roberts, C. J., dissenting). This Court, therefore, should exercise extreme caution

before taking the bold step of using the Due Process Clause to compel the states to affirmatively modify important state-law decisions in an area of historical state primacy.

The principles of federalism also encourage the states to serve as laboratories of democracy. The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems" and has acknowledged that it "should not diminish that role absent impelling reason to do so." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). Thus, at times when "[s]tates are presently undertaking extensive and serious evaluation" of disputed social issues, "'the challenging task of crafting appropriate procedures for safeguarding liberty interests is entrusted to the 'laboratory' of the States in the first instance.'" *Washington v. Glucksberg*, 521 U.S. 702, 737 (1997) (O'Connor, J., concurring) (internal punctuation omitted) (quoting *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 292 (1990) (O'Connor, J., concurring)); *accord Lopez*, 514 U.S. at 581 (Kennedy, J., concurring). "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

*Windsor* recognized that the states are performing their "laboratory" role in the same-sex marriage context. The Court noted that "until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage." *Windsor*, 133 S. Ct. at 2689. It observed that "a new perspective, a new insight" on this issue had emerged in "some States," leading to recognition of same-sex marriages in those states but not others. *Id.* This action was "a proper exercise of its sovereign authority within our federal system, all in the way that the

Framers of the Constitution intended." *Id.* at 2692. "The dynamics of state government in the federal system are to allow the formation of consensus" on such issues. *Id.*

A key problem with DOMA was its attempt to stifle the states' democratic experimentation. *Windsor* criticized the fact that "the congressional purpose" in enacting the bill was "to influence or interfere with state sovereign choices about who may be married." *Id.* at 2693. "The congressional goal was to put a thumb on the scales and influence a state's decision as to how to shape its own marriage laws." *Id.* (internal quotations omitted). Such deliberate stifling of state-level innovation was, in the Court's view, inconsistent with the states' role as laboratories of democracy.

Innovation in the direction of *transforming* traditional societal norms, however, is not the only legitimate and proper role for the states when performing their laboratory function. Some states may choose to enthusiastically embrace, endorse, and support changes in traditional norms by authorizing and recognizing same-sex civil marriage. Other states may find it prudent to proceed with caution, resisting demands for rapid change and instead reaffirming, clarifying, or strengthening long-standing legal recognition of traditional norms. Still others may follow a middle path that refashions traditional norms in a nuanced way by, for example, continuing to reserve the legal status of civil marriage for opposite-sex couples, while experimenting with various forms of civil unions, domestic partnerships, or other mechanisms for conferring legal recognition and governmental support for same-sex relationships. Wisconsin has taken both a prudent and experimental approach, affirming its traditional marriage laws while also recognizing domestic partnerships. *See* Wis. Stat. ch. 770.

Each experimental approach is likely to have both positive and negative consequences, both direct and indirect, in both short and long term. Given the diversity of modern society and the

inherent variability of human affairs, it is impossible to predict what the consequences—particularly the indirect, unanticipated, and long-term consequences—of each approach may be. As Justice Alito put it:

> The long-term consequences of [a wide acceptance of same-sex marriage] are not now known and are unlikely to be ascertainable for some time to come. There are those who think that allowing same-sex marriage will seriously undermine the institution of marriage. Others think that recognition of same-sex marriage will fortify a now-shaky institution.
>
> At present, no one—including social scientists, philosophers, and historians—can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be. And judges are certainly not equipped to make such an assessment.

*Windsor*, 133 S. Ct. at 2715-16 (Alito, J., dissenting) (citations and footnotes omitted).

In contrast to judges, the people—directly or through their political representatives—are equipped to handle this type of democratic experimentation. Left free to experiment in the state laboratories of democracy, the people will be able to observe and compare various outcomes as they develop over time. Prudent action, as the political philosopher Edmund Burke observed, demands "[a] constant vigilance and attention to the train of things as they successively emerge." *The Works of the Right Hon. Edmund Burke*, vol. 1 at 573 (1834). The people can deliberate about emerging developments in the public marketplace of ideas, and thereafter implement new or different public policies if, when, and to the extent they decide that change is appropriate. As Burke said: "We must all obey the great law of change. It is the most powerful law of nature, and the means perhaps of its conservation. All we can do, and that human wisdom can do, is to provide that the change shall proceed by insensible degrees." *The Works of Edmund Burke, With a Memoir*, (New York 1849) vol. 2 at 82.

**C. Wisconsin may affirmatively grant or withhold the positive right of civil marriage based on majoritarian policy choices made through the democratic political process.**

Whether to legalize same-sex marriage is a contentious and novel issue in which deep and serious disagreements between large segments of the public exist. When called upon to decide such volatile and novel liberty issues, the Supreme Court treads with "the utmost care." *Washington*, 521 U.S. at 720 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)); *see also Osborne*, 557 U.S. at 73 (same). Such "judicial self-restraint" is a touchstone of the Court's reasoned judgment in such cases: "A decision of this Court which radically departs from [America's political tradition] could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 850 (1992) (plurality opinion) (quoting *Poe*, 367 U.S. at 542 (Harlan, J., dissenting)). Utmost care and judicial restraint are warranted in the present case, where Plaintiffs seek a novel and significant expansion of the scope of the Due Process Clause into the domain of positive rights.

Based on this principle of judicial self-restraint, the Supreme Court accepts that the Constitution leaves the area of affirmative governmental obligations "to the democratic political processes." *DeShaney*, 489 U.S. at 196. Within this domain of positive rights, established principles of substantive due process do not, and should not, preclude government from giving effect to the views—including the value judgments—of a majority of citizens when those citizens or their elected representatives are deciding whether, and to what extent, to legally recognize, endorse, or subsidize particular social practices. Justice Harlan, for example, in arguing for the invalidation of a state criminal ban on contraceptives, maintained that morality is a legitimate concern of government and that the state was entitled to embody in law the belief

that contraception is immoral, but it could not effectuate that policy through the "obnoxiously intrusive means" of bringing the machinery of the criminal law to bear on the private marital relations of husband and wife. *Poe*, 367 U.S. at 554 (Harlan, J., dissenting).

In subsequent cases, the Supreme Court has embraced the view that, with regard to controversial social issues, the political branches of government—state and federal—are not required to be neutral between competing visions of the good, but rather are permitted to affirmatively grant or withhold tangible or intangible benefits on the basis of value judgments that may be hotly contested within society, as long as the government action does not coercively infringe the negative liberty of individuals in their personal affairs. *See*, *e.g.*, *Rust*, 500 U.S. at 192 ("[T]he government 'may make a value judgment favoring childbirth over abortion'") (quoting *Maher*, 432 U.S. at 474); *see also Windsor*, 133 S. Ct. at 2719 (Alito, J., dissenting).

The Supreme Court has applied this reasoning in the context of controversies related to homosexuality. In *Lawrence*, the Court acknowledged the existence of voices in society that condemned homosexual conduct, but reasoned that, with regard to such views, "[t]he issue is whether the majority may use the power of the State to enforce these views on the whole society *through operation of the criminal law*." *Lawrence*, 539 U.S at 571 (emphasis added); *see also id.* at 585 (O'Connor, J., concurring). *Lawrence* did not suggest that the Due Process Clause precludes the majority from using the power of the state to advance such views *by non-coercive means*. Nor did it suggest that the Due Process Clause requires the state to affirmatively recognize, endorse, or subsidize conduct that may be disapproved by a majority of citizens.

Justice Alito articulated a similar perspective in his dissenting opinion in *Windsor*. The parties, he noted, were "really seeking to have the Court resolve a debate between two competing views of marriage." *Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting). The Constitution,

however, "does not codify either of these views of marriage," but rather "assigns the resolution of questions of this nature to the people[.]" *Id.* at 2718-19 (Alito, J., dissenting). Moreover, such questions are "intractable to typical judicial processes of decisionmaking" and threaten to involve courts in dubious efforts to treat complex and contested moral, philosophical, historical, and sociological issues as if they were judicially resolvable questions of fact. *Id.* at 2718 n.7 (Alito, J., dissenting). Accordingly, the states "are entitled to enact laws recognizing either of the two understandings of marriage." *Id.* at 2719 (Alito, J., dissenting).

Consistent with these views, the Supreme Court held, in a very recent decision, that in the absence of injury to individual rights by the unlawful exercise of governmental power, our constitutional system protects the "fundamental right held not just by one person but by all in common. . . . [T]o speak and debate and learn and then, as a matter of political will, to act through a lawful electoral process." *Schuette v. Coal. to Defend Affirmative Action*, 2014 WL 1577512, at *15 (U.S. Apr. 22, 2014).

It follows that a state's decision to preserve the traditional definition of marriage need not be seen as an attempt by the majority to force its moral opinions upon or otherwise harm a dissenting minority. To the contrary, as long as the boundary between positive and negative rights is respected, the coercive power of government cannot infringe the liberty of dissenting individuals in their personal affairs. Even if the majority view embodies moral generalizations that are imperfect and that would not be sufficient to support a law that coercively infringes negative rights, that view may be sufficient in the sphere of positive rights to sustain an effort to provide continuing support for fragile traditional norms.

For example, a moral conservative may reasonably take the position that traditional moral and societal norms take centuries to develop, are not easily replaceable, and are intertwined in

innumerable complex ways with a wide variety of social institutions.  As Justice Alito said in his *Windsor* dissent:

> The family is an ancient and universal human institution.  Family structure reflects the characteristics of a civilization, and changes in family structure and in the popular understanding of marriage and the family can have profound effects.  Past changes in the understanding of marriage—for example, the gradual ascendance of the idea that romantic love is a prerequisite to marriage—have had far-reaching consequences.  But the process by which such consequences come about is complex, involving the interaction of numerous factors, and tends to occur over an extended period of time.

*Windsor*, 133 S. Ct. at 2715 (Alito, J., dissenting); *see also* Edmund Burke, *Works*, Rivington Edition (London 1803-27), vol. X at 97 ("It is a presumption in favour of any settled scheme of government against any untried project, that a nation has long existed and flourished under it").

On the basis of such views, a morally conservative majority of citizens might reasonably believe that—in the face of demands for a cultural change as significant as the abandonment of the traditional definition of marriage and the legalization of same-sex marriage—the advisable and prudent course is not to tamper with traditional norms, but instead to retain existing laws that affirmatively endorse those norms and do not officially endorse same-sex marriages.

It is likewise reasonable for a state to enact and enforce new laws that confirm the legal licensure of traditionally-defined civil marriages and clarify that same-sex marriages are not eligible for the same type of affirmative governmental recognition and support.  Under the distinction between negative and positive rights, such a new law is constitutionally permissible, as long as it merely withholds affirmative governmental recognition and licensure of same-sex civil marriage, without prohibiting individuals from deciding for themselves how to arrange their own private and domestic affairs.

There may even be circumstances in which demands for significant changes to traditional norms are building so rapidly that a conservative majority may find it appropriate—as did the people of Wisconsin in the present case—to moderate the speed and abruptness of change by

protecting traditional norms not simply through ordinary legislation, but rather by amending the state's constitution.

One of the purposes of a constitution in a democratic society is to provide stability by insulating against unduly rapid and abrupt change in areas of particular importance. A constitution does this, in part, by making it procedurally burdensome to change the law in those important areas. Thus, if and when change comes, it will be the result not of momentary public whims or a transient constellation of political forces, but rather of the settled will and considered judgment of the political community. The placement of Wisconsin's Marriage Amendment in the state constitution thus is not an attempt to harm individuals in same-sex relationships, but rather is a reasonable and permissible attempt to adopt a prudently conservative approach to a controversial cultural change. Indeed, the voters knew that changes in other states were not being made through democratic process, but rather by courts. (*See* Dkt. #73-3).

Of course, when an area of law is insulated from change through the ordinary legislative process, the same procedures that protect against overly rapid or abrupt transformation necessarily impose a political disadvantage on those who might wish to amend the law by making it procedurally more difficult for them to effectuate such change.

It does not logically follow, however, that the placement of such a law in a state constitution unjustly discriminates against the advocates of change. There are two reasons for this. First, placement in the constitution does not make it impossible to change that law, but only makes it procedurally more difficult. Second, and more importantly, the additional difficulty in changing the law does not unfairly discriminate against the advocates of change for the simple reason that the difficulty is no greater than the difficulty previously involved in placing that law in the constitution in the first place. In other words, the complex procedures for placing Wisconsin's

Marriage Amendment in the state constitution ensured that the action was the product of the settled will and considered judgment of the community. It is, therefore, both proper and fair that any subsequent removal of that law from the constitution should likewise be achievable only through the same amendment procedures. That process again guarantees that any change in the law would itself be the product of the settled will and considered judgment of the people of Wisconsin.

## II. Wisconsin's Marriage Laws Are Not Subject To Heightened Scrutiny.

### A. Plaintiffs' substantive due process claims are not subject to heightened scrutiny because they are not based upon fundamental rights.

Counts 1 and 2 of Plaintiffs' Amended Complaint are based on an alleged "fundamental right to marry the person of one's choice" irrespective of gender and an alleged "fundamental right to remain married." (*See* Dkt. #26, ¶¶ 126-31, 132-37; Dkt. #71 at 8-15). These counts assert a substantive due process theory.[7] Both claims fail because there is no fundamental right to marry a person of the same sex. Therefore, the Plaintiffs' due process claims must be tested under rational basis. Count 2 also fails because the Marriage Amendment does not interfere with any right to remain married.

#### 1. The fundamental right to marry does not include a fundamental right to marry a person of the same sex.

Due process "protects an individual from the exercise of governmental power without a reasonable justification." *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007). Both the Supreme Court and the Seventh Circuit have cautioned that "the scope of substantive due process is very limited." *Id.*; *see also Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995) ("[W]e have spent some time looking through the Constitution for the

_____

[7]All references to due process claims are referring to "substantive" due process theories, the only due process theories advanced by Plaintiffs.

Substantive Due Process Clause without finding it. . . .  The fact that [this] doctrine ow[es] its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use.").  Thus, due process analysis "must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires [the Court] to exercise the utmost care whenever [it is] asked to break new ground in this field."  *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal quotations and citation omitted).

As the Seventh Circuit has made clear, "only state action that impinges on fundamental rights is subject to evaluation under substantive due process.  If a law is arbitrary, then it might flunk the rational-basis test that applies to all legislation, but this differs (fundamentally) from substantive due process."  *Idris v. City of Chicago*, 552 F.3d 564, 566 (7th Cir. 2009).

There is no fundamental right to marry a person of the same sex.  The United States Supreme Court has never recognized that right.  *See In re Kandu*, 315 B.R. 123, 140 (Bankr. W.D. Wash. 2004) ("it would be incorrect to suggest that the Supreme Court, in its long line of cases on the subject, conferred the fundamental right to marry on anything other than a traditional, opposite-sex relationship.").  Nor has the Seventh Circuit.  Thus, notwithstanding their assertion otherwise,[8] Plaintiffs are asking this Court to recognize a *new* fundamental right in the Fourteenth Amendment's Due Process Clause.

Plaintiffs rely on *Loving*, which concededly recognizes the fundamental right to marry.  *See* 388 U.S. at 2, 12 (*see* Dkt. #71 at 9, 10, 12, 17).  *Loving*, however, does not suggest that this fundamental right includes a right to marry a person of the same sex.  Instead, *Loving* focused solely on the criminalization of marriage between persons of different races.  388 U.S. at 2, 11.  The fact that Virginia's overtly racial anti-miscegenation criminal laws impermissibly encroached upon the Lovings' fundamental right to marry says nothing about Plaintiffs' alleged

_____

[8]"Here, Plaintiffs do not seek a new right to same-sex marriage[.]"  (Dkt. #71 at 11).

right to same-sex marriage or the constitutionality of Wisconsin laws defining marriage as an opposite-sex institution. *Loving* was limited to racial classifications that infringed upon personal liberty, and expressed no opinion about whether there is a fundamental right to marry someone of the same sex. This Court should reject Plaintiffs' invitation to extend *Loving* far beyond its holding, which was anchored in the criminal anti-miscegenation statutes and the negative rights they abridged.

Plaintiffs' reliance upon *Lawrence* is similarly misplaced. (Dkt. #71 at 11). As explained above, the *Lawrence* court did not recognize a fundamental due process right to marry a person of the same sex, but instead recognized a liberty interest in private adult consensual homosexual conduct protected by the Due Process Clause. *See* 539 U.S. at 578 ("[*Lawrence*] does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."); *see also* § I.A., *supra*. *Lawrence* had nothing to do with the alleged fundamental right to marry at issue here.

Finally, Plaintiffs enlist *Windsor* to support the new fundamental right to marry someone of the same sex. As a threshold matter, *Windsor* neither stands for nor recognizes—nor even *hints at* recognizing—a fundamental right to marry someone of the same sex under the Due Process Clause of *the Fourteenth Amendment*, the clause at issue here. *Windsor* was a Fifth Amendment case. *See Windsor*, 133 S. Ct. at 2696 ("By seeking to displace this protection and treating those persons as living in marriages less respected than others, the federal statute is in violation of the Fifth Amendment. This opinion and its holding are confined to those lawful marriages."); *see also id.* at 2710 (Scalia, J., dissenting) ("State and lower federal courts should take the Court at its word and distinguish away.").

Moreover, Plaintiffs' fundamental right due process analysis is inconsistent with the *Windsor* majority opinion. There, the Supreme Court stated that "the limitation of lawful marriage to heterosexual couples" has "for centuries been deemed both necessary and *fundamental*." *Windsor*, 133 S. Ct. at 2689 (emphasis added); *see also* § I.B., *supra*. Fundamental rights are those that are "deeply rooted in this Nation's history and tradition" and "so rooted in the traditions and conscience of our people as to be ranked as fundamental," and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [the asserted right] were sacrificed." *Washington*, 521 U.S. at 720 (citations and internal quotation marks omitted). Same-sex marriage is not such a right. *See Windsor*, 133 S. Ct. at 2715 (Alito, J., dissenting) ("It is beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation's history and tradition.").

Plaintiffs ask this Court to do what the Supreme Court was unwilling to do in *Windsor*: expressly recognize that a fundamental right to same-sex marriage exists in the Constitution. No decision by the Supreme Court or the Seventh Circuit has ever held that the guarantee of due process includes the right to marry a person of one's own gender. Moreover, the Supreme Court has cautioned against incautiously expanding Fourteenth Amendment rights and protections, emphasizing that it should only be done with the utmost care and only for the most egregious government conduct. This Court should, therefore, find that Plaintiffs' due process claims in Counts 1 and 2 are not subject to heightened scrutiny because they are not based upon fundamental rights.

The Marriage Amendment must still comport with the Due Process Clause. But, since heightened scrutiny is not applicable, it need only pass the rational basis test, which requires the state to prove that it has a legitimate governmental interest and that the challenged law is

reasonably related to that interest.  As the State Defendants will show below, *see infra* at § III.C., the Marriage Amendment passes the rational basis test.

## 2. Wisconsin's marriage laws do not interfere with Plaintiffs' right to remain married.

Wisconsin's marriage laws do not interfere with certain Plaintiffs' claimed fundamental right to *remain* married.  Count 2 asserts a due process claim based upon the allegation that Wisconsin's marriage laws interfere with Plaintiffs Wallman and Borden's existing marital relationship, "*effectively*" nullifying their California marriage.  (*See* Dkt. #26, ¶¶ 132-37; Dkt. #71 at 12-15) (emphasis added).  Count 2 fails as a matter of law because Wisconsin law does not, on its face, nullify existing same-sex marital relationships or otherwise invalidate existing marriages validly contracted in other jurisdictions.

First, the Wisconsin statutes declare that void marriages are those "contracted in violation of ss. 765.02, 765.03, 765.04 and 765.16 . . . except as provided in ss. 765.22 and 765.23." Wis. Stat. § 765.21.  Same-sex marriage is not included in this list.  Therefore, Wallman and Borden's California marriage is not "void" and has not been nullified.  They admit as much. (*See* Plaintiffs' Responses to State Defendants' First Set of Requests for Admission ("Rqst. Admit"), No. 30 (admitting they "subjectively consider themselves to be a married couple")).  Moreover, Wallman and Borden admit that their California marriage has not *actually* been nullified.  (*See* Dkt. #95 at 16) ("The validity of Plaintiffs' marriage in California is not at issue[.]"); *see also* Rqst. Admit No. 32 (admitting Wisconsin has not annulled their marriage).

Second, the Marriage Amendment does not, on its face, void existing marriages lawfully contracted in other jurisdictions.  Although it refuses to *recognize* same-sex marriages from other jurisdictions as valid in Wisconsin, the Marriage Amendment does not purport to invalidate

out-of-state marriages or otherwise disrupt the regulation of domestic relations in other sovereign states as DOMA did. *See Windsor*, 133 S. Ct. at 2694; *see also* § I.B., *supra*.

As discussed above, *Windsor* emphasized the historic power of the states to define and regulate marriage. 133 S. Ct. at 2689-92. The court faulted "DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage." *Id.* at 2693. DOMA fell because it imposed "restrictions and restraints" on state-defined marriages, and effectively deprived the *Windsor* plaintiffs of marriage benefits granted by New York law. *Id.* at 2695. In contrast, Wisconsin's Marriage Amendment does not deprive Plaintiffs of the benefits and responsibilities that come with valid out-of-state marriages. Wallmann and Borden were married in Canada (Dkt. #26, ¶ 101) and their marriage was recognized as valid in California no later than May 2008. (*Id.*, ¶ 103). They currently possess the same benefits and responsibilities under California law that they possessed the day their marriage was recognized there. The Marriage Amendment does nothing to affect their California marriage. At the same time, the State of California did not, by recognizing Wallmann and Borden's marriage, grant them any benefits or responsibilities under Wisconsin law. Nor could it.

Third, Plaintiffs' arguments are contrary to Section 2 of DOMA. *See* 28 U.S.C. § 1738C. The Full Faith and Credit Clause of the United States Constitution empowers Congress to "prescribe . . . the Effect" of a state's acts and records in another state. U.S. Const. art. IV, § 1. Pursuant to that authority, DOMA provides that "[n]o State . . . shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State . . . or a right or claim arising from such relationship." 28 U.S.C. § 1738C. Section 2 of DOMA

was not invalidated in *Windsor* and has not been challenged here. It continues to provide that Wisconsin is not required to recognize or give effect to any out-of-state same-sex marriage.

Count 2 of the Amended Complaint fails as a matter of law, and this Court should deny Plaintiffs' summary judgment motion as to Count 2.

> **B.** **Plaintiffs' equal protection claims are not entitled to heightened scrutiny because sexual orientation is not a suspect class and Wisconsin's marriage laws do not discriminate on the basis of gender.**

In Counts 3 and 4, Plaintiffs claim that the application of Wisconsin's marriage laws violates the Equal Protection Clause of the Fourteenth Amendment, by discriminating on the basis of sexual orientation (Count 3) and gender (Count 4). (*See* Dkt. #26, ¶¶ 138-44, 145-50; Dkt. #71 at 15-21).

A legislative classification that neither affects a fundamental right nor targets a suspect class "is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). Such a classification does not violate the Equal Protection Clause so long as it rationally relates to some legitimate governmental purpose. *Id.*; *Romer v. Evans*, 517 U.S. 620, 631 (1996). In other words, "[a] statutory classification fails rational-basis review only when it rests on grounds wholly irrelevant to the achievement of the State's objective." *Heller*, 509 U.S. at 324 (internal quotations and citation omitted).

Plaintiffs' claims fail because binding Seventh Circuit authority holds that sexual orientation is not a protected class and Wisconsin's marriage laws do not discriminate on the basis of gender.

### 1. Sexual orientation is not a suspect class.

The Supreme Court has never held that sexual orientation constitutes a suspect class. *See Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1071 (D. Haw. 2012). The Seventh Circuit has explicitly held that "homosexuals are not entitled to any heightened protection under the Constitution." *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 953-54 (7th Cir. 2002); *see also id.* at 957 ("Discrimination against homosexuals by public entities violates the equal protection clause only if it lacks a rational basis[.]") (Posner, J., concurring). That decision binds this Court. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("district judges must follow the decisions of this court whether or not they agree").

Since homosexuals are not a suspect class, classifications based on sexual orientation are subject to rational basis scrutiny. As the State Defendants will show below, *see infra* at § III.C., Wisconsin's marriage laws withstand rational-basis review.

### 2. The Marriage Amendment does not discriminate on the basis of gender.

The Marriage Amendment simply does not, on its face, create a classification based upon gender. Neither men nor women are permitted to marry someone of the same sex in Wisconsin. Wis. Const. art. XIII, § 13. Similarly, no other challenged provision of Wisconsin law, including Wis. Stat. § 765.30(1)(a), discriminates on the basis of gender.

The vast majority of courts have easily held that marriage laws like Wisconsin's do not discriminate on the basis of gender. *See, e.g.*, *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1286 (N.D. Okla. 2014) (collecting cases for the proposition that the opposite-sex definition of marriage does not constitute gender discrimination); *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1005 (D. Nev. 2012) (Nevada's prohibition of same-sex

marriage not "directed toward persons of any particular gender" and did not "affect people of any particular gender disproportionately such that a gender-based animus [could] reasonably be perceived"); *Jackson*, 884 F. Supp. 2d at 1089 (collecting cases) ("The Court thus agrees with the vast majority of courts considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination"). This Court should similarly conclude that Wisconsin's marriage laws do not discriminate on the basis of gender.

## III. Wisconsin's Marriage Laws Are Supported By Rational Bases.

### A. Under rational basis, laws must be upheld where plausible policy reasons exist.

In a rational-basis case, the plaintiff has the burden to prove the law is irrational, not the defendant's burden to justify it. *See Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006); *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 490 (7th Cir. 1988). "This is an onerous test to overcome, as 'the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 946 (7th Cir. 2009) (quoting *Smith*, 457 F.3d at 652; *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it'")) (internal citation omitted).

"[R]ational-basis scrutiny . . . is the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989). Especially when applied to state laws, such review is a "paradigm of judicial restraint" that denies courts any "license . . . to judge the wisdom, fairness, or logic of legislative choices." *Beach Commc'ns*, 508 U.S. at 314, 313. Wisconsin's marriage laws must be upheld "so long as there is

a *plausible* policy reason for the classification." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (emphasis added). Those reasons, moreover, "may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

Accordingly, under the rational basis test, the government's proffered rationale need only be *conceivable*—that is, it need not be the legislators' actual motivation. "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 685 (7th Cir. 2005) ("A court will not strike down a state policy merely because it 'may be unwise, improvident, or out of harmony with a particular school of thought.'"). As a result, a law must be upheld "if any facts either known or reasonably assumed will support it." *Clark v. Cnty. of Winnebago*, 817 F.2d 407, 409 (7th Cir. 1987). *See also, e.g.*, *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003) ("any reasonably conceivable facts can make the classification rational"); *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cnty.*, 57 F.3d 505, 514 (7th Cir. 1995) ("[G]overnmental action passes the rational basis test if a sound reason may be hypothesized. The government need not prove the reason to a court's satisfaction."); *Wroblewski v. City of Washburn*, 965 F.2d 452, 458 (7th Cir. 1992) (internal quotations omitted) ("[E]vidence that the identified justification was the actual motivation for the law's enactment is not required.").

In same-sex marriage cases, Wisconsin is not required to show that "denying marriage to same-sex couples is necessary to promote the state's interest or that same-sex couples will suffer no harm by an opposite-sex definition of marriage." *Jackson*, 884 F. Supp. 2d at 1106 (footnote omitted). Instead, "the relevant question is whether an opposite-sex definition of marriage

furthers legitimate interests that would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry." *Id.* at 1107.

Under rational basis, Wisconsin's marriage laws must be "accorded a strong presumption of validity." *Heller*, 509 U.S. at 319. The rational basis inquiry "is not subject to courtroom factfinding and may be based on rational speculation unsupported by empirical data." *Beach Commc'ns*, 508 U.S. at 315; *accord, e.g.*, *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1127. The Seventh Circuit explained that rationality is always a matter of law:

> Outside the realm of "heightened scrutiny" there is therefore never a role for evidentiary proceedings. By holding a trial, the district court conceded that there were material factual disputes-as there were. . . . The district court therefore should not have conducted a trial, and we disregard its conclusions.

*Id*.

**B.      Wisconsin's marriage laws were not motivated by animus.**

Plaintiffs suggest that the Marriage Amendment was solely based on a "desire to thwart" and a "bare desire to harm" same-sex couples and that, as a result, heightened scrutiny applies. (Dkt. #71 at 37-40). Although Plaintiffs avoid the word "animus," they nonetheless suggest that the Marriage Amendment is constitutionally impermissible because it was motivated by animus. *See, e.g.*, *Lawrence*, 539 U.S. 558; *Romer*, 517 U.S. 620; *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973). Plaintiffs, however, advance no animus arguments regarding the portions of the "marriage ban" beyond the Marriage Amendment and do not assert that any of Wisconsin's other marriage laws were improperly motivated, effectively conceding such laws did not result from any bias.

Plaintiffs' claim that the Marriage Amendment was motivated by animus fails for four reasons. First*,* Plaintiffs have the burden to establish animus and they fail to meet it. The facts show that the Marriage Amendment was intended to maintain the status quo of traditional

marriage laws, not to harm same-sex couples. Second, the gay and lesbian community is not the type of powerless class referred to in *Cleburne.* Third, *Windsor* does not imply that the Marriage Amendment was motivated by animus. Finally, federal district courts, both pre- and post- *Windsor*, have consistently rejected the argument that similar marriage amendments were motivated by animus. Therefore, rational basis scrutiny applies.

        **1.**        **Plaintiffs fail to meet their burden of establishing that the Marriage Amendment and Wisconsin's other marriage laws were motivated by animus.**

A plaintiff has the burden of proving that the challenged law was motivated by some illegitimate purpose. *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002). Moreover, the plaintiff must demonstrate that ill will was the *sole* cause of the complained-of action. *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998) (If "defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action"); *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (citing *Cleburne*, 473 U.S. at 367) (even where animus is a motivating factor, law survives rational basis review if it also has a conceivable legitimate purpose).

Plaintiffs cannot meet their burden of establishing that the Marriage Amendment was motivated by animus.

Even before the Marriage Amendment, Wisconsin law recognized only a marriage between a man and woman as valid. *See supra* at 5-6. The Marriage Amendment neither withdrew any existing rights nor effected a broad change in the legal status of homosexuals or same-sex couples.

Plaintiffs rely on evidence showing that the Marriage Amendment was intended to maintain the status quo following the Vermont and Massachusetts court rulings that extended marriage

benefits to same-sex couples. (*See* Dkt. #73-1, 73-3, 73-4; *see also supra* at 4-5). For example, the "Vote Yes for Marriage" flyer focuses on "preserving traditional marriage between one man and one woman" and "making sure Wisconsin citizens determine the definition of marriage in our state, not a judge." (Dkt. #73-3 at 2) (emphasis omitted). And, the Family Research Institute of Wisconsin circular claims the Marriage Amendment "won't . . . [t]ake any existing rights away from anyone, [a]ffect benefits offered by private employers, [a]ffect wills, contracts or visitation agreements, [or] [c]hange current law." (Dkt. #73-4 at 16).

Plaintiffs do not explain how either voter pamphlet establishes animus towards homosexuals or same-sex couples. To the contrary, the "primary reason" for the Marriage Amendment was, as recognized by the Wisconsin Supreme Court, to protect the status quo:

> The sponsors of the amendment were quite clear that state supreme court decisions overturning the marriage laws of other states were the primary reason for the amendment. In short, the sponsors of the amendment wanted to protect the current definition and legal status of marriage[.]

*McConkey*, 326 Wis. 2d 1, ¶ 55 (footnote omitted). The interest in maintaining the status quo is not a "bare desire" to thwart or harm, and Plaintiffs cannot prove otherwise. *See Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting) (a desire to maintain the status quo "is not animus—just stabilizing prudence"); *Sevcik*, 911 F. Supp. 2d at 1021 ("the challenged laws neither withdraw any existing rights nor effect a broad change in the legal status or protections of homosexuals based upon pure animus").

It is impossible to identify every conceivable motivation of the 1,264,310 Wisconsin voters (59%) who voted for the Marriage Amendment. (State Defs. Facts, ¶ 18). Nor have Plaintiffs made any effort to do so.

Any suggestion that the 1.2 million voters and 88 legislators who supported the Marriage Amendment in Wisconsin (*see id.*, ¶¶ 9-13, 17-19) were motivated by a "bare desire to harm" the

homosexual community is both wrong and unfair. *See Windsor*, 133 S. Ct. at 2696 (Roberts, C.J., dissenting) (it would be wrong and unfair to "tar" with "the brush of bigotry" the proponents of traditional marriage, including "the 342 Representatives and 85 Senators who voted for [DOMA], and the President[9] who signed it"). Regardless, voter motivations should be taken with a grain of salt. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (quoting *O'Brien*, 391 U.S. at 383–84) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork"); *see also Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it").

Rather than being borne from a "bare desire to harm" or a discriminatory intent against homosexuals or same-sex couples, the preference for traditional marriage is based on sociological and historical norms that cross all cultures, religions, and times:

> Humans are social, they live in groups. They strongly seek to reproduce themselves. They are sexually embodied. They carry out sexual (not asexual) reproduction. And they

---

[9]President Clinton's statement upon signing DOMA into federal law in 1996 suggests that he was not motivated by animus:

> Throughout my life I have strenuously opposed discrimination of any kind, including discrimination against gay and lesbian Americans. . . .
>
> I have long opposed governmental recognition of same-gender marriages and this legislation is consistent with that position. The Act confirms the right of each state to determine its own policy with respect to same gender. . . .
>
> . . . .
>
> . . . [T]his legislation should not . . . be understood to provide an excuse for discrimination . . . on the basis of sexual orientation.

(State Defs. Facts, ¶ 28).

have devised an institution to bridge the sexual divide, facilitate group living, and carry out reproduction. All human societies have this institution. They call it "marriage."

Sherif Girgis, Ryan T. Anderson, Robert P. George, *What is Marriage? Man and Woman: A Defense* (New York: Encounter Books 2012), at 39 (citing David Blankenhorn, *The Future of Marriage* (New York: Encounter Books 2009), at 5.

Traditional marriage knows no bounds with respect to religion, culture, or philosophy:

> Ancient thinkers who had no contact with religions such as Judaism or Christianity— including Xenophanes, Socrates, Plato, Aristotle, Musonius Rufus, and Plutarch— reached remarkably similar views of [traditional] marriage. . . . [T]his suggests only that no one religion invented marriage. It is rather marriage—the demands of a natural institution—that has helped to shape our religious and philosophical traditions.

Girgis, *What is Marriage?*, at 10-11. The Wisconsin Supreme Court has confirmed that the State's interest in marriage is not based upon a particular religious tradition. *See Fricke v. Fricke*, 257 Wis. 124, 126, 42 N.W.2d 500 (1950) (traditional marriage not based upon "religious and moral aspects").

Other judges have acknowledged that traditional marriage laws are rooted in sociology and biology.

> Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined (particularly in the modern age of widespread effective contraception and supportive social welfare programs), but an orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism.

*Goodridge*, 798 N.E.2d at 995 (Cordy, J., dissenting); *see also Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting).

Traditional marriage norms, Wisconsin's traditional marriage laws, and Wisconsinites' support for it, derive from sociology, philosophy, and biology rather than an intention to discriminate, a moral judgment, or solely from religious tradition. There is no animus here.

**The gay and lesbian community is not the type of powerless class referred to in *Cleburne*.**

Plaintiffs refer to "the limited ability of gay people as a group to protect themselves in the political process." (Dkt. #71 at 24).[10] This argument is undercut by how the legislative process has unfolded in our sister states of Minnesota and Illinois, where same-sex couples have recently secured the right to marry through the democratic process. *See, e.g.*, Minn. Stat. § 517.01;[11] 750 ILCS 80/5 (effective 6/1/14). The strength of the gay and lesbian political community was acknowledged by the District of Nevada in *Sevcik*:

> The States are currently in the midst of an intense democratic debate about the novel concept of same-sex marriage, and homosexuals have meaningful political power to protect their interests. . . . It simply cannot be seriously maintained, in light of . . . recent democratic victories, that homosexuals do not have the ability to protect themselves from discrimination through democratic processes such that extraordinary protection from majoritarian processes is appropriate.

911 F. Supp. 2d at 1013 (footnote omitted). Moreover, support for same-sex marriage rights is increasing in Wisconsin and elsewhere. *See* Nate Silver, "How Opinion on Same-Sex Marriage Is Changing, and What It Means," New York Times FiveThirtyEight blog (March 26, 2013) (predicting 64% of Wisconsinites will favor same-sex marriage by 2020) (State Defs. Facts, ¶ 26).

---

[10] Although Plaintiffs cite various authorities to support their claim that "sexual orientation is an 'immutable' characteristic," none actually supports it. (Dkt. #71 at 25). First, *Bowen v. Gilliard* does not support this assertion. 483 U.S. 587, 602 (1987). Second, the discussion in *Cece v. Holder* regarding sexual orientation was dicta. 733 F.3d 662, 669 (7th Cir. 2013). Third, the Ninth Circuit found that "[h]omosexuality is not an immutable characteristic[.]" *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990). Fourth, studies regarding whether sexual orientation is an immutable characteristic are equivocal. *See, e.g.*, Joseph Osmundson, "'I Was Born this Way': Is Sexuality Innate, and Should it Matter?" LGBTQ Policy Journal at the Harvard Kennedy School: 2011 Edition ("the science of human sexuality is in its infancy and . . . there is currently little conclusive evidence that sexuality is genetically or hormonally induced" and concluding that the "innateness of sexual orientation is a poor metric upon which to formulate policy or law"). (State Defs. Facts, ¶ 39). Neither legal nor scientific authority definitively finds sexual orientation is an immutable characteristic.

[11] Minnesota voters rejected a constitutional ban on same-sex marriage in November 2012. (State Defs. Facts, ¶ 27).

In Wisconsin, within the past ninety days, both the Assembly and Senate have introduced bills to eliminate constitutional restrictions on marriage. (*Id.*, ¶¶ 20-21). Although recent Wisconsin polling data on same-sex marriage is mixed, with one poll showing 48% "'favor allowing marriage of gay couples,'" and another finding that "51% of Wisconsin citizens favor the . . . Marriage Amendment," the statistics nonetheless confirm that same-sex couples are not the type of "powerless" class referred to in *Cleburne*. (State Defs. Facts, ¶¶ 23-24). The data shows that many Wisconsinites' beliefs are evolving[12] on the subject, just as President Obama's opinion famously evolved in 2012. (*Id.*, ¶ 29).

Meanwhile, Wisconsin has historically enacted legislation protecting rights of its LGBT citizens. *Romer* found Colorado Amendment 2 unconstitutional in part because it withdrew "from homosexuals, but no others, specific legal protection from the injuries caused by discrimination," including "all transactions in housing, sale of real estate, insurance, health and welfare services, private education, and employment." 517 U.S. at 629. In Wisconsin, homosexuals are guaranteed the very rights discussed in *Romer*. *See, e.g.*, Wis. Stat. §§ 106.50 and 106.52 (prohibiting housing discrimination based on sexual orientation); § 50.36(3j) (providing hospital visitation rights); §§ 118.13 and 118.46 (prohibiting bullying in schools based on sexual orientation); §§ 111.31 and 111.36(1)(d)(1) (prohibiting employment discrimination based on sexual orientation). Wisconsin also extends rights far beyond those discussed in *Romer*. *See, e.g.*, Wis. Stat. ch. 770 (domestic partnerships); § 48.82 (adoptions rights for gays and lesbians); § 939.645 (hate crime enhancers based on sexual orientation) (State Defs. Facts, ¶¶ 40-47). Wisconsin's protection of LGBT rights both before and after the Marriage Amendment suggests the Amendment was not solely motivated by animus.

---

[12]Just two years ago, Wisconsin citizens opposed same-sex marriage by a 47%-43% margin. (State Defs. Facts, ¶ 22).

Facts showing the democratic process working to protect or promote rights of gays and lesbians in both Wisconsin and neighboring states vitiate the assertion that gay and lesbian persons are politically powerless. (*See* Dkt. #71 at 24).

### 3. *Windsor* does not support the animus theory.

Relying on *Windsor*, Plaintiffs suggest that the Marriage Amendment was based on animus because it is "line-drawing merely for 'the purpose of disadvantaging'" homosexuals and "not rationally related to any legitimate interest." (Dkt. #71 at 37, 39). *Windsor* does not support their theory.

*Windsor* declared Section 3 of DOMA unconstitutional, providing that marriage under federal law, regardless of state law, was limited to opposite-sex couples. *Windsor*'s primary rationale was that Congress acted with illicit animus and therefore violated equal protection. 133 S. Ct. at 2693-95.[13] Plaintiffs cite *Windsor* for the principle that, to withstand constitutional scrutiny, a challenged law cannot be based on "'a bare . . . desire to harm a politically unpopular group.'" *Id.* at 2694 (quoting *Moreno*, 413 U.S. at 528); *see also* (Dkt. #71 at 39-40). However, it does not follow that *Windsor* establishes that Wisconsin's marriage laws result from illicit animus, for three reasons.

First, *Windsor* acknowledged there were two competing marriage traditions: the tradition of opposite-sex marriage, recognized "throughout the history of civilization," and the tradition of treating marriage questions "as being within the authority and realm of the separate States." *Id.* at 2689, 2690. Unlike DOMA, Wisconsin's marriage laws simultaneously honor both traditions.

---

[13]*Windsor* did not apply heightened scrutiny; the Court instead concluded there was "no legitimate purpose" for DOMA. *Id.* at 2696.

Second, the *Windsor* court noted that "'discriminations of an unusual character' especially suggest careful consideration." *Id.* at 2693 (quoting *Romer*, 517 U.S. at 633). The states typically "possess[] full power over the subject of marriage and divorce," and the federal government has historically "deferred to state-law policy decisions with respect to domestic relations." *Id.* at 2691. DOMA "impose[d] restrictions and disabilities" on Windsor's New York marriage not imposed by the State. *Id.* at 2692. This was an "unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage." *Id.* at 2693. In this context, DOMA was unconstitutional because it took away Windsor's preexisting state rights. *Id.* The federal government's interference with Windsor's New York marriage was both significant and quantifiable, resulting in a $363,053 estate tax payment for which she sought a refund. Unlike DOMA, the Marriage Amendment took away no existing rights. Instead, it sought to maintain the status quo without affecting any changes to the legal status of homosexuals or same-sex couples. *McConkey*, 326 Wis. 2d 1, ¶ 55.

Third, as shown by the *Windsor* dissents, DOMA *did* serve legitimate government interests and did so in a rational manner. DOMA preserved within the federal domain an approach to marriage that had prevailed throughout history and reflected a reasoned understanding of marriage. *Id.* at 2718 (Alito, J., dissenting) ("throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship"). DOMA also advanced interests in legal "uniformity and stability . . . that, at that point, had been adopted by every State in our Nation, and every nation in the world." *See id.* at 2696 (Roberts, C.J., dissenting). Finally, DOMA avoided difficult choice-of law questions. *See id.* at 2708 (Scalia, J., dissenting)

("DOMA avoids difficult choice-of-law issues that will now arise absent a uniform federal definition of marriage.").

**4. District courts, both pre- and post-*Windsor*, have rejected the argument that similar marriage laws were motivated by animus.**

Before *Windsor*, district courts in same-sex marriage cases rejected the suggestion that legislators and voters were motivated by animus. *See Sevcik*, 911 F. Supp. 2d at 1021 ("the challenged laws neither withdraw any existing rights nor effect a broad change in the legal status or protections of homosexuals based upon pure animus"); *Jackson*, 884 F. Supp. 2d at 1093 ("The actions of the state do not support that the legislature and people of Hawaii acted out of pure animus towards homosexuals in adopting Hawaii's marriage laws.").

After *Windsor*, district courts have rejected the argument that marriage laws similar to Wisconsin's were motivated by animus. *See, e.g.*, *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1207-10 (D. Utah 2013) (declining to rely on the anti-animus principle, finding that "the Supreme Court has not yet delineated the contours of such an approach"); *Bourke v. Beshear*, 2014 WL 556729, at *7 (W.D. Ky. Feb. 12, 2014) ("Absent a clear showing of animus, . . . the Court must still search for any rational relation to a legitimate government purpose.").[14]

Significantly, no decision by the Supreme Court or the Seventh Circuit ever has held that similar state marriage amendments were motivated by animus.

---

[14]*See also Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 993 (S.D. Ohio 2013) (suggesting but not concluding that Ohio's same-sex marriage recognition ban "was passed because of, not in spite of, its burden on same-sex couples") (Black, J.). *But see Henry v. Himes*, 2014 WL 1418395, at *6 (S.D. Ohio Apr. 14, 2014) (Ohio "enacted the marriage recognition bans with discriminatory animus," relying upon *Obergefell* despite its equivocal holding) (Black, J.).

### C. Many rational bases support Wisconsin's marriage laws.

Plaintiffs claim no "conceivable rational bas[e]s" exist for Wisconsin's marriage laws because "[n]one of the purported interests offered by [other] states . . . provide a rational basis for" Wisconsin. (Dkt. #71 at 28).[15] Each of the three bases identified by Plaintiffs—tradition, responsible procreation, and optimal childrearing (*see id.* at 29-40)—is integral to the State's rationale for supporting traditional marriage and each is alone sufficient to establish the validity of Wisconsin's marriage laws under any standard of review. Many other bases exist, including maintaining tradition and the status quo, protecting the democratic process, proceeding with caution, and protecting religious liberties. Collectively, these bases withstand any level of judicial scrutiny.

### 1. Tradition, maintaining the status quo, protecting the democratic process, and proceeding cautiously are rational bases for Wisconsin's marriage laws.

#### a. Tradition is a rational basis.

Plaintiffs incorrectly claim that marriage has been "universally recognized" as focused on "a couple's love for and commitment to each other." (Dkt. #26, ¶ 2). Marriage focused on love and commitment—without regard to gender or procreation—is a new social construct, first recognized by the Netherlands in 2001 and Massachusetts in 2003. The traditional view of marriage—between a man and woman with an eye toward procreation—has been recognized for millennia. *See* John C. Eastman, Decoding the Constitutional Challenges to Traditional Marriage, 14 Engage: J. Federalist Soc'y Prac. Groups 4, at *8 (2013) (citing G. Robina Quale, *A History of Marriage Systems* (New York: Greenwood Press, 1988) ("Marriage, as the socially

---

[15]In a footnote, Plaintiffs state "moral disapproval cannot be a rational basis." (Dkt. #71 at 28 n.7). Moral disapproval is *not* a basis for Wisconsin's marriage laws. Sixty-five years ago, the Wisconsin Supreme Court held that the rights and obligations associated with traditional marriage are not based upon "religious and moral aspects." *See Fricke*, 257 Wis. at 126.

recognized linking of a specific man to a specific woman and her offspring, can be found in all societies.").

Plaintiffs suggest that "[m]aintaining a 'traditional' definition of marriage is not a legitimate state interest and thus cannot justify the marriage ban." (Dkt. #71 at 29). It is both reasonable and rational for the people of the State of Wisconsin to define marriage as they always have, for the purpose of promoting the traditional family structure. This alone is sufficient to withstand rational basis scrutiny. *See, e.g.*, *Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring) (recognizing that "preserving the traditional institution of marriage" is itself a "legitimate state interest."); *Bruning*, 455 F.3d at 867-68 (the "expressed intent of traditional marriage laws" withstands rational basis); *Sevcik*, 911 F. Supp. 2d at 1014 ("The protection of the traditional institution of marriage, which is a conceivable basis for the [limitation of marriage to different-sex couples], is a legitimate state interest."); *see also Jackson*, 884 F. Supp. 2d at 1097 ("the Supreme Court never stated that history and tradition are not important in determining whether an asserted new right is fundamental.").

> **b.      Proceeding with caution and maintaining the status quo are rational bases.**

Some states may embrace change in traditional norms and others may proceed with caution. *See* § I.B., *supra*. Most states, including Wisconsin, maintain traditional marriage laws. (State Defs. Facts, ¶¶ 4-5). Against this backdrop, and with a nod towards the states' historic power to define the legal status of civil marriage, Wisconsin people and their political representatives could rationally choose to wait and analyze the impact that changing marriage laws have had in other states before deviating from the status quo. Indeed, the Wisconsin Supreme Court has recognized that the Marriage Amendment was intended to maintain Wisconsin's marriage laws and protect the status quo. *McConkey*, 326 Wis. 2d 1, ¶ 55; *see also* § III.B., *supra*.

*Jackson* endorsed the cautious approach as rational: "[T]he state could rationally conclude that it is addressing a divisive social issue with caution," and "may rationally decide to observe the effect of allowing same-sex marriage in other states before changing its definition of marriage." 884 F. Supp. 2d at 1072, 1118. Justice Ginsburg has also endorsed the cautious approach in speeches, stressing the virtues of "judicial restraint" and allowing "change [to] develop in the political process." (State Defs. Facts, ¶ 30 (internal quotations omitted)). This has even been practiced by President Obama and his famously "evolving" point of view on same-sex marriage. (*Id.*, ¶ 29).

### c.     Protecting the democratic process is a rational basis.

Wisconsinites' desire to retain the right to define marriage through the democratic process is rational. "If the traditional institution of marriage is to be restructured, as sought by Plaintiffs, it should be done by a democratically-elected legislature or the people through a constitutional amendment, not through judicial legislation that would inappropriately preempt democratic deliberation regarding whether or not to authorize same-sex marriage." *See Jackson*, 884 F. Supp. 2d at 1072.

Similarly, avoiding federal judicial intrusion into a state-based legislative function is rational. *See, e.g.*, *Windsor*, 133 S. Ct. at 2692, discussing the State's "historic and essential authority to define the marital relation." And preferring that Wisconsin's law, not that of our sister states, applies to marriage in Wisconsin, too, is rational. *See Sevcik*, 911 F. Supp. 2d at 1021 ("As to those Plaintiffs validly married in other jurisdictions whose marriages the State of Nevada refuses to recognize, the protection of Nevada's public policy is a valid reason for the State's refusal to credit the judgment of another state, lest other states be able to dictate the public policy of Nevada."); *Wilson v. Ake.*, 354 F. Supp. 2d 1298, 1304 (M.D. Fla. 2005) (rejecting the

plaintiffs' attempt to apply Full Faith and Credit Clause to require Florida to recognize their Massachusetts marriage in violation of Florida's statute banning same-sex marriage).

> **2.** **Responsible procreation and optimal childrearing are rational bases for Wisconsin's marriage laws.**

Justice Alito described Plaintiffs' theory of marriage as the "consent-based" view of marriage. *See Windsor*, 133 S. Ct. at 2718 (Alito, J, dissenting) (under the "consent-based" view, "marriage [is] the solemnization of mutual commitment—marked by strong emotional attachment and sexual attraction—between two persons[;]" under this view, "the exclusion of same-sex couples . . . is rank discrimination"). It stands in stark contrast to traditional marriage. *Id.* (under the traditional view, "marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so"). A key difference is the procreative component.

> **a.** **Wisconsin recognizes traditional marriage as optimal for families.**

Wisconsin's marriage laws promote the traditional marriage as optimal for families, children and society.

> The proper mating of the male and female of the human race as the foundation of the family and thereby of the general well-being of the community at large, has been deemed of such paramount importance that the state has constantly assumed a wide control over the relationship of husband and wife of those resting within its borders.

*Lyannes v. Lyannes*, 171 Wis. 381, 177 N.W. 683, 685 (1920). This is at odds with marriage solely based upon adult love and commitment. Although Plaintiffs claim their definition is "universal[]" (*see* Dkt. #26, ¶ 2), nearly every culture has defined marriage as Wisconsin has, between one man and one woman with an eye toward procreation and children. *See, e.g.*, *Windsor*, 133 S. Ct. at 2718 (Alito, J, dissenting) ("virtually every culture . . . has limited marriage to people of the opposite sex").

Wisconsin's policy bases for marriage are identified in the Family Code:

> It is the intent . . . to promote the stability and best interests of marriage and the family. . . . Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization, and of vital interest to society and the state. The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. . . . The impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned. Under the laws of this state, marriage is a legal relationship between 2 equal persons, a husband and wife, who owe to each other mutual responsibility and support. Each spouse has an equal obligation in accordance with his or her ability to contribute money or services or both which are necessary for the adequate support and maintenance of his or her minor children and of the other spouse.

Wis. Stat. § 765.001(2).

Plaintiffs suggest that the State's interest should be in promoting loving, committed adult-centric relationships. Since this applies equally to same-sex couples, it is irrational (in their view) for the State to limit marriage to opposite-sex couples. However, "the right to marry is not grounded in the State's interest in promoting loving, committed relationships. While desirable, nowhere in any marriage statute of this state has the legislature expressed this goal." *See Andersen v. King Cnty.*, 138 P.3d 963, 979 n.12 (Wash. 2006). Such goals are conspicuously absent from the Wisconsin Family Code. *See* Wis. Stat. § 765.001(2).

### b. Wisconsin promotes responsible procreation and optimal childrearing.

Wisconsin's marriage laws promote stable, traditional marital relationships and children by promoting responsible, *i.e.*, socially beneficial, procreation. Marriage is "the institution developed in our society, its predecessor societies, and by nearly all societies on Earth throughout history to solidify, standardize, and legalize the relationship between a man, a woman, and their offspring." *Sevcik*, 911 F. Supp. 2d at 1015; *see also Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting) ("the institution of marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing;" "marriage is

essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so;" "marriage has been viewed as an exclusively opposite-sex institution . . . inextricably linked to procreation and biological kinship.").

Marriage "is a civil contract, to which the consent of the parties capable in law of contracting is essential, and which creates the legal status of husband and wife." Wis. Stat. § 765.01. It is not a purely private contract; "[t]here are three parties to a marriage contract—the husband, the wife, and the state. The husband and wife are presumed to have, and the state unquestionably has, an interest in the maintenance of the relation which for centuries has been recognized as a bulwark of our civilization." *Fricke*, 257 Wis. at 126. The State's interests may even trump those of the married couple; it is "quite clear that the interests of the parties [to a marriage] are subordinated to the policy of the state." 47 Op. Atty. Gen. 236, 238 (1958).

It therefore follows that Wisconsin has a strong interest in regulating marriage. *See Kitzman v. Kitzman*, 167 Wis. 308, 166 N.W. 789, 792 (1918) ("The state has the right to control and regulate by reasonable laws the marriage relationship of its citizens and the wishes and desires or even immediate welfare of the individual must yield to that of the public welfare as determined by the public policy of the state."). The State's interest is strong enough to warrant treating marriage differently than any other contractual relationship:

> [M]arriage is a civil contract. It is different from ordinary contracts in that it cannot be modified or abrogated by the parties themselves. Once entered into, a valid marriage contract continues until the contract is changed by law or by the death of one of the parties.

*Campbell v. Blumberg*, 260 Wis. 625, 628, 51 N.W.2d 709 (1952). Wisconsin treats marriage differently from other contracts, as acknowledged in case law and the Family Code, because it is optimal for families, children, and society. *See, e.g.*, *Lyannes*, 177 N.W. at 685.

The interest in promoting stable, traditional marital relationships and responsible procreation is shown by the State's adultery laws that treat marital and non-marital sexual relationships differently.[16]  *See* Wis. Stat. ch. 944 ("Crimes Against Sexual Morality").  It has always been the State's policy to support traditional marital relationships and the children borne from them, and since adultery adversely affects both, it follows that the State criminalizes adultery but not the private sexual activity of non-married consenting adults.  This suggests that the *responsible* procreative component of marriage is important to the State and worthy of legal protection.

### c. Wisconsin's interests in promoting responsible procreation and optimal childrearing are supported by authority.

The Supreme Court has emphasized responsible procreation in discussing the importance of marriage to our society.  *See Zablocki*, 434 U.S. at 383 (footnote omitted) ("[Marriage] is the foundation of the family in our society. . . .  [I]f appellee's right to procreate means anything at all, it must imply some right to enter the only relationship in which the State of Wisconsin allows sexual relations legally to take place."); *Skinner*, 316 U.S. at 541 ("Marriage and procreation are fundamental to the very existence and survival of the race."); *Maynard*, 125 U.S. at 211 ("[Marriage] is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.").

Wisconsin could, therefore, rationally "find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born.  [Wisconsin] thus could choose to offer an inducement—in the form of marriage and its attendant benefits—to opposite-sex couples who make a solemn, long-term commitment to each

---

[16]"Adultery was condemned at common law because it tended to introduce spurious heirs into a family and to adulterate the issue of an innocent husband and turn the inheritance away from his own blood to that of a stranger."  *State v. Roberts*, 169 Wis. 570, 173 N.W. 310, 311 (1919).

other." *Hernandez*, 855 N.E.2d at 7.  Other courts have reached the same conclusion.  *See, e.g.*, *Bruning*, 455 F.3d at 867-68; *Sevcik*, 911 F. Supp. 2d at 1015-16; *Jackson*, 884 F. Supp. 2d at 1111-14; *In re Kandu*, 315 B.R. at 145-46; *Adams v. Howerton*, 486 F. Supp. 1119, 1124-25 (C.D. Cal. 1980), *aff'd on other grounds*, 673 F.2d 1036 (9th Cir. 1982); *Standhardt v. Superior Court*, 77 P.3d 451, 461-65 (Ariz. Ct. App. 2003); *Morrison v. Sadler*, 821 N.E.2d 15, 23-31 (Ind. Ct. App. 2005); *Conaway v. Deane*, 932 A.2d 571, 630-34 (Md. 2007);  *Baker v. Nelson*, 291 Minn. 310, 314-15 (1971); *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 677-78 (Tex. App. 2010); *Andersen*, 138 P.3d at 982-83; *Singer v. Hara*, 522 P.2d. 1187, 1195 (Wash. Ct. App. 1974).

### d.  Children benefit from stable, married, biological parenting.

Social science data suggests that traditional marriage is optimal for families.  "[T]he best available social science suggests that children tend to do best when reared by their married mother and father."  *See* Girgis, *What is Marriage?*, at 42.  This is in contrast to Plaintiffs' unsupported claim that "the overwhelming scientific consensus, based on decades of peer-reviewed research, shows that children raised by same-sex couples are just as well adjusted as those raised by different-sex couples."  (Dkt. #71 at 36).  Contrary to Plaintiffs claim, "research clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage. . . .  There is . . . value for children in promoting strong, stable marriages between biological parents."  Kristen Anderson Moore, Susan M. Jekielek, and Carol Emig, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?*, Child Trends Research Brief (June 2002), at 6.  (State Defs. Facts, ¶ 35-36).  Moreover, "it is not simply the presence of two parents, . . . but the presence of *two biological*

*parents* that seems to support children's development." *Id.* at 1-2. Another study similarly finds that "[t]he advantage of marriage appears to exist primarily when the child is the biological offspring of both parents." Wendy D. Manning and Kathleen A. Lamb, "Adolescent Well-Being in Cohabitating, Married, and Single-Parent Families," *Journal of Marriage and Family* 65, no. 4, 25-26 (November 2003) (State Defs. Facts, ¶ 37). The State can, therefore, justifiably promote biological parenting as the ideal.[17]

> **e.   The social science data on same-sex parenting is undeveloped and unreliable.**

The available scientific data regarding the effects of same-sex marriage on children is equivocal. Same-sex marriage is a new, untested social construct and, therefore, sufficient data has not been collected or analyzed from which nationally representative, comprehensive, and scientifically tested conclusions may be drawn. *See, e.g.*, Douglas W. Allen, *More Heat Than Light: A Critical Assessment of the Same-Sex Parenting Literature, 1995-2010* (April 2012) (social science consensus on gay parenting is premature because of methodological flaws in research) (State Defs. Facts, ¶ 32-33); Loren Marks, "Same-sex parenting and children's outcomes: a closer examination of the American psychological associations brief on lesbian and gay parenting," Social Science Research 41 (2012) 735-51 (criticizing studies for using small convenience samples, not large, random, representative samples) (State Defs. Facts, ¶ 34).

---

[17]Traditional marriage may also be the optimal for adults. Thirteen years ago, in *Irizarry v. Bd. of Educ. of Chicago*, Judge Posner discussed empirical data comparing heterosexual married persons to homosexual persons: "so far as heterosexuals are concerned, the evidence that on average married couples live longer, are healthier, earn more, have lower rates of substance abuse and mental illness, are less likely to commit suicide, and report higher levels of happiness—that marriage civilizes young males, confers economies of scale and of joint consumption, minimizes sexually transmitted disease, and provides a stable and nourishing framework for child rearing refutes any claim that policies designed to promote marriage are irrational." 251 F.3d 604, 607-08 (7th Cir. 2001) (citations omitted). These, too, are reasons why the State may justifiably promote traditional marriage.

Ten years ago, the Eleventh Circuit recognized the limitations of research regarding gay and lesbian parenting, noting "significant flaws in the studies' methodologies and conclusions, such as the use of small, self-selected samples; reliance on self-report instruments; politically driven hypotheses; and the use of unrepresentative study populations consisting of disproportionately affluent, educated parents." *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 825 (11th Cir. 2004) (footnote omitted). Current studies reflect the same flaws.

The newness and complexity of same-sex parenting means social scientists have not yet drawn meaningful conclusions about the impact of same-sex marriage on children or society in general. Thus, in light of transforming traditional societal norms regarding marriage, it is both rational and prudent to proceed with caution. *See Marshall v. United States*, 414 U.S. 417, 427 (1974) (where a Legislature "undertakes to act in areas fraught with medical and scientific uncertainties . . . legislative options must be especially broad and courts should be cautious not to rewrite legislation"). Since reasonable scientists, legislators, and jurists may differ in their opinions regarding the available social science data, Plaintiffs cannot eliminate all reasonably conceivable bases that support Wisconsin's marriage laws. *See Beach Commc'ns*, 508 U.S. at 315; *Srail*, 588 F.3d at 946; *Smith*, 457 F.3d at 652.

> **f.** **Plaintiffs' arguments in opposition to tradition, responsible procreation, and optimal childrearing are unavailing.**

Some same-sex marriage proponents have argued that same-sex marriage will not harm the State's interests in traditional marriage (*i.e.*, no heterosexual couple will avoid marriage or responsible procreation simply because same-sex couples are allowed to marry). This, however, misses the point. The focus under rational-basis review is whether the challenged statute rationally supports a State interest, not whether expanding the class of beneficiaries to marriage

would harm the State's interest. Thus, a classification will be upheld if "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not." *Johnson v. Robison*, 415 U.S. 361, 383 (1974).

Here, Wisconsin's marriage laws promote the traditional family structure as ideal for raising children, which in turn perpetuates and benefits society. This was recognized as a legitimate basis by Justice O'Connor in her *Lawrence* concurrence. 539 U.S. at 585 (O'Connor, J., concurring) (recognizing that "preserving the traditional institution of marriage" is itself "a legitimate state interest."). Wisconsin's marriage laws, therefore, withstand judicial scrutiny.

### 3. Same-sex marriage could affect other legal restrictions to marriage and adversely affect the institution of marriage.

Extending the fundamental right to marriage to include same-sex couples could also have indirect, unanticipated and long-term consequences, including affecting other legal restrictions and limitations on marriage. *See Windsor*, 133 S. Ct. at 2715-16 (Alito, J., dissenting). Two such bases are discussed below, both of which are rational.

#### a. Extending the fundamental right to marriage to include same-sex couples logically results in other restrictions to marriage being found unconstitutional.

At oral argument in *Hollingsworth*, Justice Sotomayor asked respondents' counsel the following question:

> If you say that marriage is a fundamental right, what State restrictions could ever exist? Meaning, what State restrictions with respect to the number of people, with respect to -- that could get married -- the incest laws, the mother and child, assuming that they are the age -- I can -- I can accept that the State has probably an overbearing interest on -- on protecting a child until they're of age to marry, but what's left?

*See* Transcript of Proceedings, *Hollingsworth v. Perry*, No. 12-144 (Supreme Court) at 46:9-19. (State Defs. Facts, ¶ 31). As Justice Sotomayor recognized, if Plaintiffs are granted a fundamental right to marry someone of the same sex, it will be logically impossible to exclude

from that same fundamental right, for example, close relatives who could claim with equal fervor that they, too, have the right to marry because they have forged a loving, committed relationship just like the Plaintiff couples.

The statutory ban on consanguinity illustrates the point. Wisconsin Stat. § 765.03(1) provides that marriage shall not be contracted

> between persons who are nearer of kin than 2nd cousins except that marriage may be contracted between first cousins where the female has attained the age of 55 years or where either party, at the time of application for a marriage license, submits an affidavit signed by a physician stating that either party is permanently sterile.

In response to Justice Sotomayor's question, it logically follows that if the type of marital relationship advanced by Plaintiffs becomes the norm, other restrictions on the fundamental right of marriage would also logically be constitutionally impermissible.

Plaintiffs' definition of marriage based solely on love and commitment does not have a procreative component. If the desire for recognition and validation of loving, committed relationships was the only basis for civil marriage, no adult relationships can be excluded *a priori* from making claims upon the government for recognition. A variety of relationships— even those that if sexual in nature could plainly be prohibited, *e.g.*, consanguinity—could qualify on equal terms with marriage. Any two persons without limitation could decide to live with each other and form a family based on their loving, committed relationships, and demand positive legal recognition of their relationship as "marriage" by the State.

> **b.** **Redefining marriage without regard to gender and procreation transforms the marital norm, potentially with indirect, unanticipated, and long-term consequences.**

Although Plaintiffs frame the issue as requesting access to an existing right, they are asking the Court to redefine marriage without respect to gender, procreation, and child rearing. *See Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting) (discussing the "debate between two

competing views of marriage" and distinguishing consent-based marriage based on "strong emotional attachment" from traditional marriage).  It is impossible to predict all consequences resulting from transforming the marital norm.  *See, e.g.*, *id.* at 2715 (Alito, J., dissenting) ("There are those who think that allowing same-sex marriage will seriously undermine the institution of marriage."); *Goodridge*, 798 N.E.2d at 1003 n.36 (Cordy, J., dissenting) ("Concerns about such unintended consequences cannot be dismissed as fanciful or far-fetched.  Legislative actions taken in the 1950's and 1960's in areas as widely arrayed as domestic relations law and welfare legislation have had significant unintended adverse consequences.").  However, it is reasonable to believe that such a transformation would result in shifting the public understanding of marriage away from a largely child-centric institution to an adult-centric institution focused on emotion.  *See Lewis v. Harris*, 908 A.2d 196, 222 (N.J. 2006) ("To alter [the] meaning [of marriage] would render a profound change in the public consciousness of a social institution of ancient origin."); Girgis, *What is Marriage?*, at 40 (redefining marriage "affects people's beliefs, and therefore their expectations and choices, about their own prospective or actual marriages.")

Reshaping social norms about marriage could have harmful effects as shown by no-fault divorce laws.  *See* William J. Goode, *World Changes in Divorce Patterns* 144 (Yale University 1993) (no-fault divorce laws "helped to create a set of social understandings as to how easy it is to become divorced if married life seems irksome"); Judith S. Wallerstein, Julia Lewis, and Sandra Blakeslee, *The Unexpected Legacy of Divorce: The 25 Year Landmark Study* 297 (New York: Hyperion, 2000) (no-fault divorce laws "created new kinds of families in which relationships are fragile and often unreliable"); *see also* Girgis, *What is Marriage?*, at 40 ("The mutual influence of law and culture is confirmed by empirical evidence on the effects of no-fault divorce laws").  No-fault divorce laws also resulted in a "sharp rise in divorce rates following the

advent of no-fault divorce." *See Windsor*, 133 S. Ct. at 2715 n.5 (Alito, J., dissenting); *see also* Prof. Douglas W. Allen and Maggie Gallagher, "Does Divorce Law Affect the Divorce Rate? A Review of Empirical Research, 1995-2006," Institute for Marriage and Public Policy (July 2007), at 1 ("Seventeen of 24 recent empirical studies find that the introduction of no-fault divorce laws increased the divorce rate, by one estimate as much as 88 percent. More typically, studies estimate no-fault divorce increased divorce rates on the order of 10 percent."). (State Defs. Facts, ¶ 38).

Transforming another norm regarding marriage—removing the biological link between marriage and procreation—could also have unanticipated consequences on children and society. *See also* Monte Neil Stewart, *Marriage Facts*, 31 Harv. J.L. & Pub. Pol'y 313, 323-25 (2008) (discussing how genderless marriage is a profoundly different institution than man-woman marriage); *Windsor*, 133 S. Ct. at 2715 n.6 (Alito, J., dissenting) (citing Lynn D. Wardle, "'Multiply and Replenish': Considering Same-Sex Marriage in Light of State Interests in Martial Procreation," 24 Harv. J.L. & Pub. Pol'y 771, 799 (Summer 2001) ("Culturally, the legalization of same-sex marriage would send a message that would undermine the social boundaries relating to marriage and family relations. The confusion of social roles linked with marriage and parenting would be tremendous. . .")). The change to marital norms may not be immediate, but they would likely be profound and irreversible. *See, e.g.*, *Windsor*, 133 S. Ct. at 2715 n.5 (Alito, J., dissenting) (discussing changes to marriage laws and noting that it "sometimes takes decades to document the effects of social changes . . . on children and society").

The State's traditional marriage laws are based on experience and sociology, supported by rational policy reasons, and confirmed by social science data. The State's interests in proceeding

with caution in the face of rapidly transitioning social norms is both prudent and reasonable, particularly where, as here, such changes would be both profound and irreversible. The point is not that harm necessarily flows from recognizing same-sex marriage, but that it is uncertain whether harms will flow and that it is therefore rational to not adopt a transformative change to the institution of marriage in light of that uncertainty.

## IV. *Baker v. Nelson* Forecloses Plaintiffs' Fourteenth Amendment Claims.

*Baker v. Nelson* forecloses Plaintiffs' Fourteenth Amendment claims. *See* 409 U.S. 810. In *Baker*, the Minnesota Supreme Court found that Minnesota's restriction of marriage to opposite-sex couples violated neither the Equal Protection nor the Due Process Clauses. *See Baker*, 291 Minn. at 314-15, *appeal dismissed*, 409 U.S. 810. On *certiorari* review, the United States Supreme Court summarily dismissed the case "for want of a substantial federal question." *Baker*, 409 U.S. 810.

The questions presented in *Baker* are virtually identical to those presented here. Both cases involve equal protection and substantive due process challenges to a state law prohibiting marriage for same-sex couples. *See Baker*, 291 Minn. at 312 (holding that Minnesota law "does not authorize marriage between persons of the same sex and that such marriages are accordingly prohibited"). The *Baker* plaintiffs made arguments similar to those presented by Plaintiffs here, and the Minnesota Supreme Court rejected them. *See id.* at 313-14.

The Supreme Court's summary dismissal in *Baker* binds this Court and accordingly, this case should be dismissed for lack of a substantial federal question. Although *Baker* was a summary disposition, it is nevertheless precedential and binding on lower courts. *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (summary dispositions "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided"). While a summary

disposition may not have the precedential value *before the Supreme Court* that a full Supreme Court opinion would have, the Court has never suggested that directly-on-point summary dispositions do not control in lower federal courts. *See Tully v. Griffin, Inc.*, 429 U.S. 68, 74 (1976) (summary disposition remains "controlling precedent, unless and until re-examined by th[e] [Supreme] Court"); *accord Mandel*, 432 U.S. at 176.

*Baker* is directly on point, and has been accepted as controlling by many courts. *See Mass. v. Dep't of Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) ("*Baker* is precedent binding on us unless repudiated by subsequent Supreme Court precedent" and "limit[s] the arguments to ones that do not presume or rest on a constitutional right to same-sex marriage"); *Bruning*, 455 F.3d at 870-71 (finding "good reason" for the judicial restraint as applied by the Supreme Court in *Baker*); *Sevcik*, 911 F. Supp. 2d at 1002 (under *Baker*, district courts are "prevented" from concluding that "a state's refusal to recognize same-sex marriage offends the Equal Protection Clause"); *Jackson*, 884 F. Supp. 2d at 1087 (Fourteenth Amendment challenge to Hawaii law limiting marriage to opposite-sex couples controlled by *Baker*); *Wilson*, 354 F. Supp. 2d at 1304-05 ("Although *Baker v. Nelson* is over thirty (30) years old, the decision addressed the same issues presented in this action and this Court is bound to follow the Supreme Court's decision.").[18]

Plaintiffs may argue that summary dispositions lose their precedential value and are no longer binding "'when doctrinal developments indicate otherwise.'" *Hicks v. Miranda*, 422 U.S. 332, 344 (1975). (*See* Dkt. #95 at 28-32). However, there are no subsequent doctrinal developments on the present topic that would permit this Court to ignore directly-on-point Supreme Court precedent. It is *not* sufficient to merely suggest that the Supreme Court *might*

---

[18]Courts beyond the Seventh Circuit have found *Baker* no longer controls. *See, e.g.*, *Kitchen*, 961 F. Supp. 2d at 1194-95.

now consider a question open to debate or unresolved. Obviously, only the Supreme Court can overrule the Supreme Court. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Therefore, intervening case law must *unmistakably* show that the Supreme Court would decide the question differently than it did in its summary disposition. *See United States v. Booker*, 375 F.3d 508, 513 (7th Cir. 2004) ("We are mindful of the Supreme Court's case law that the lower federal courts are not to overrule a Supreme Court decision even if it seems manifestly inconsistent with a subsequent decision, unless the subsequent decision explicitly overruled the earlier one. *State Oil Co. v. Khan,* 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).").

The Supreme Court had every opportunity to overrule *Baker* in *Windsor*. Significantly, the Second Circuit in *Windsor* bluntly disclaimed *Baker*'s relevance to the Equal Protection inquiry and relied upon later doctrinal developments to minimize *Baker*'s authority, concluding that "*Baker* might have had resonance for Windsor's case in 1971, but it does not today." *Windsor v. United States*, 699 F.3d 169, 178 (2d Cir. 2012), *affirmed*, 133 S. Ct. 2675 (2013). The Second Circuit practically begged the Supreme Court to overrule *Baker*. Yet it did not; *Baker* is not mentioned even once in *Windsor*, much less overruled.

*Baker* remains valid and controlling law. This Court should conclude that *Baker* forecloses Plaintiffs' Fourteenth Amendment claims.

**CONCLUSION**

For the foregoing reasons, State Defendants respectfully request that this Court deny Plaintiffs' motion for summary judgment.

Dated this 9th day of May, 2014.

<div style="margin-left:40%">

Respectfully submitted,

J.B. VAN HOLLEN
Attorney General


s/Timothy C. Samuelson
TIMOTHY C. SAMUELSON
Assistant Attorney General
State Bar #1089968

THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

CLAYTON P. KAWSKI
Assistant Attorney General
State Bar #1066228

Attorneys for Defendants,
Scott Walker, J.B. Van Hollen,
and Oskar Anerson

</div>

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin  53707-7857
(608) 266-3542 (Samuelson)
(608) 266-7477 (Kawski)
(608) 266-8690 (Bellavia)
(608) 267-2223 (fax)
*samuelsontc@doj.state.wi.us*
*kawskicp@doj.state.wi.us*
*bellaviatc@doj.state.wi.us*