IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VIRGINIA WOLF and CAROL
SCHUMACHER; KAMI YOUNG and
KARINA WILLES; ROY BADGER and
GARTH WANGEMANN; CHARVONNE
KEMP and MARIE CARLSON; JUDITH
TRAMPF and KATHARINA HEYNING;
SALUD GARCIA and PAM KLEISS;
WILLIAM HURTUBISE and LESLIE
PALMER; and JOHANNES WALLMANN
and KEITH BORDEN,

Plaintiffs,

v.                                              Case No. 14-C-00064-bbc

SCOTT WALKER; J.B. VAN HOLLEN;
RICHARD G. CHANDLER; OSKAR
ANDERSON; GARY KING; JOHN
CHISHOLM; JOSEPH CZARNEZKI;
WENDY CHRISTENSEN; and
SCOTT MCDONELL,

Defendants.

---

**BRIEF OF *AMICI CURIAE* JULAINE K. APPLING, JO EGELHOFF, JAREN E.
HILLER, RICHARD KESSENICH AND EDMUND L. WEBSTER**

---

Plaintiffs challenge the constitutionality of Wisconsin's "Marriage Amendment," Wis.

Const. art. XIII, § 13, which was overwhelmingly ratified by Wisconsin voters in a statewide

referendum following approval by the legislature in successive biennial sessions in 2006. Wis.

Const. art. XII, § 1. Ratification of the Amendment by its citizens was a profoundly significant

exercise of the authority reserved to the State of Wisconsin by the United States Constitution to

provide for the "regulation of domestic relations." *United States v. Windsor*, 133 S. Ct. 2675,

2691 (2013).

When voters ratified the Marriage Amendment, they simply chose to affirm the understanding of marriage that had prevailed throughout the history of the state and likely universally throughout time and across cultures. *See Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006) ("[t]he idea that same-sex marriage is even possible is a relatively new one. Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex.") They did this in order to retain the benefits marriage has provided through time related to securing children's well-being.

These crucial interests—protecting the self-determination of the people of the state, affirming the inherent nature of marriage, and preserving the child-centered purposes of Wisconsin's marriage law—provide rational, even compelling, reasons to find the Marriage Amendment is consistent with constitutional guarantees.

## INTEREST OF *AMICI*

*Amici* are corporate directors and president of Wisconsin Family Action ("WFA"), a Wisconsin not-for-profit organization engaged in public education and advocacy regarding marriage, family and social issues. *Amicus* Julaine Appling is WFA's president. Appling also serves as president of Wisconsin Family Council, a Wisconsin not-for-profit organization engaged in public education regarding those issues.

Appling and WFA led the effort of drafting and securing approval of the Wisconsin Marriage Amendment by the legislature in its 2003-04 and 2005-06 sessions. Appling then served as director of both WFA's 2006 ratification campaign, Vote Yes For Marriage, and the Wisconsin Coalition for Traditional Marriage, a Wisconsin not-for-profit organization which engaged in

public education regarding the Amendment and related family and marriage issues. Other *Amici* also served leading roles in the legislative approval process and voter ratification campaign. They have spent the last four years litigating the history, meaning and effect of the Amendment. *Amici* have a clear interest in defending the Amendment against the attempt to invalidate it in this case. In this brief, they will provide this court "a unique perspective, or information, that can assist the court . . . beyond what the parties are able to do." *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997).

## ARGUMENT

## I.  IN AFFIRMING THE NATURE OF MARRIAGE RECOGNIZED BY VIRTUALLY ALL CULTURES THROUGH TIME, WISCONSIN VOTERS WERE ACTING REASONABLY TO ADVANCE THE INTERESTS MARRIAGE HAS ALWAYS SERVED.

The state, in recognizing marriage, does not write on a blank slate. Specifically, when Wisconsin's legislature proposed and the people of the State ratified the Marriage Amendment, they were not creating a new legal arrangement to accomplish novel purposes, and specifically were not trying to send a message of stigma or exclusion. Rather, they reaffirmed an understanding of marriage consistently recognized across virtually all cultures throughout recorded history. Such acknowledged consensus reflects societies' recognition of the inherent nature of marriage and its function of advancing important child-centered interests by sanctioning the procreative relationships of men and women to take place in a normative setting where the children who may result have the opportunity to know and be reared by their own mothers and fathers, firmly bound to one another.

### A.  Reflecting Biological and Social Realities, Marriage Has Historically Been Recognized As the Union of a Man and a Woman Which Serves, Among Other Purposes, Interests Related to Procreation.

Marriage has virtually unanimously been recognized as the union of an opposite-sex

couple. This recognition is inextricably bound to the basic realities of sex difference and the related procreative capacity of male-female couplings. Indeed, as the distinguished sociologist Claude Levi-Strauss explained, marriage is "a social institution with a biological foundation." Claude Levi-Strauss, *Introduction* in A HISTORY OF THE FAMILY: DISTANT WORLDS, ANCIENT WORLDS 5 (vol. 1, Andre Burguiere, et al., eds. 1996). A group of respected family scholars similarly acknowledged that "as a virtually universal human idea, marriage is about regulating the reproduction of children, families and society." W. BRADFORD WILCOX, ET AL., WHY MARRIAGE MATTERS 15 (2d ed. 2005).

Marriage has, of course, served a variety of purposes across a variety of cultures and times, but this one purpose has been consistent. As Georg Simmel, an early sociologist, explained: "The peculiar combination of subjective and objective, personal and super-personal or general elements in marriage is involved in the very process that forms its basis—physiological pairing. It alone is common to all historically known forms of marriage, while perhaps no other characteristic can be found without exceptions." GEORG SIMMEL, THE SOCIOLOGY OF GEORG SIMMEL 131 (Kurt H. Wolff, ed. 1950).

This ubiquitous recognition of marriage as an opposite-sex coupling is not arbitrary, much less a multicultural, multi-millennial conspiracy to exclude identified groups. Rather, it is an acknowledgment that the legal definition and regulation of marriage reflect and serve purposes directly connected to the nature of the relationship. Specifically, marriage has been universally recognized as a way to encourage those who are responsible for creating a child—a mother and father—to take responsibility for the child that their union may produce. A prominent sociologist explains this dynamic: "[t]he genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and for their offspring. By identifying

children with their parents . . . the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring." Kingsley Davis, *The Meaning & Significance of Marriage in Contemporary Society* in CONTEMPORARY MARRIAGE: PERSPECTIVES ON A CHANGING INSTITUTION 7-8 (Kingsley Davis, ed. 1985). Another sociologist concurs: "Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve." JAMES Q. WILSON, THE MARRIAGE PROBLEM 41 (2003).

This nature of marriage is not just a widely remarked upon truism, it is reality. Professor Levi-Strauss noted that "the family—based on a union, more or less durable, but socially approved, of two individuals of opposite sexes who establish a household and bear and raise children—appears to be a practically universal phenomenon, present in every type of society." CLAUDE LEVI-STRAUSS, THE VIEW FROM AFAR 40-41 (1985). Another historian noted that "[m]arriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies." G. ROBINA QUALE, A HISTORY OF MARRIAGE SYSTEMS 2 (1988). The Anthropological Institute of Great Britain defined marriage "as a union between a man and a woman such that children borne by the woman are recognized as the legitimate offspring of both partners." ANTHROPOLOGICAL INSTITUTE OF GREAT BRITAIN, NOTES AND QUERIES ON ANTHROPOLOGY 71 (6th ed. 1951).

Whatever the precise origin and contours of the marriage relationship over time and across societies, it is clear that this social institution is rooted in ontological realities and oriented towards a purpose uniquely tied to its nature as the union of the sexes—a pairing that alone may naturally create a child and provide that child with a social context that accounts for his or her biological origins.

Notably, in 1967, when the Supreme Court first applied the right to marry to invalidate a state regulation dealing with marriage, it cited two cases as precedent, both of which centered upon procreation and the family. *Loving v. Virginia*, 388 U.S. 1, 12 (1967). The first was *Skinner v. Oklahoma*, which had explicitly linked marriage and procreation: "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race." 316 U.S. 535, 541 (1942). The second was *Maynard v. Hill*, which called marriage "the foundation of the family." 125 U.S. 190, 211 (1888).

State courts addressing arguments for redefining marriage have noted the links between marriage and procreation in the right to marry cases. The Washington Supreme Court explained: "[n]early all United States Supreme Court decisions declaring marriage to be a fundamental right expressly link marriage to fundamental rights of procreation, childbirth, abortion, and childrearing." *Andersen v. King County*, 138 P.3d 963, 978 (Wash. 2006). Maryland's highest court concurred:

> All of the cases infer that the right to marry enjoys its fundamental status due to the male-female nature of the relationship and/or the attendant link to fostering procreation of our species. . . . Thus, virtually every Supreme Court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation, which necessarily and biologically involves participation (in ways either intimate or remote) by a man and a woman. *Conaway v. Deane*, 932 A.2d 571, 621 (Md. 2007).

In short, our Nation's law, along with the law of our antecedents from ancient to modern times, has consistently recognized the biological and social realities of marriage, including its nature as a male-female unit advancing purposes related to procreation and childrearing.

### B. The Wisconsin Marriage Amendment Should Be Understood as an Effort to Preserve the Interests Historically Served by the State's Recognition of Marriage.

Consistent with these historical understandings, Wisconsin has always understood

marriage as the union of a husband and wife. Thus, when voters ratified the Marriage Amendment in 2006, they were acting to preserve the interests marriage has always been understood to serve. This is not to say, of course, that marriage does not serve other important interests, only that marriage has never been understood to be totally divisible from interests grounded in child well-being. As the Wisconsin Supreme Court noted some decades ago: "Having children is a primary purpose of marriage." *Heup v. Heup*, 172 N.W.2d 334, 336 (Wis. 1969).

In codifying the universal understanding of marriage, Wisconsin's marriage laws sought to preserve the social goods marriage has produced across time and cultures—the goods that help explain the acknowledged universality of the institution. This is not to say that voters were merely trying to keep the status quo for its own sake. The longevity of a practice, in itself, does not settle the question of its constitutionality, but the Supreme Court has noted: "That the law has long treated the classes as distinct, however, suggests that there is commonsense distinction between" those the law in that case affected. *Heller v. Doe*, 509 U.S. 312, 326 (1993). A longstanding practice is not unassailable, but ought to be given great deference if it reflects lessons of experience, as do Wisconsin's marriage laws.

The relevance of this observation to the question of marriage is obvious. The Eighth Circuit held Nebraska's marriage amendment was justified by the purpose of "encourag[ing] heterosexual couples to bear and raise children in committed marriage relationships." *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 868 (8th Cir. 2006). The New York Court of Appeals held the state "could find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born." *Hernandez v. Robles*, 7 N.Y.3d 338, 350 (N.Y. 2006). Maryland's highest court said: "marriage enjoys its fundamental status due, in large part, to its link to procreation. This 'inextricable link' between marriage and procreation

reasonably could support the definition of marriage as between a man and a woman only, because it is that relationship that is capable of producing biological offspring of both members (advances in reproductive technologies notwithstanding)." *Conaway v. Deane*, 932 A.2d 571, 630-631 (Md. 2007) (citations omitted). Washington's Supreme Court similarly held that "limiting marriage to opposite-sex couples furthers the State's interests in procreation and encouraging families with a mother and father and children biologically related to both." *Andersen v. King County*, 138 P.3d 963, 985 (Wash. 2006). In a case involving adoption, the Eleventh Circuit endorsed the proposition: "the Legislature could rationally conclude that a family environment with married opposite-sex parents remains the optimal social structure in which to bear children." *Lofton v. Secretary of Department of Children & Family*, 385 F.3d 804, 825 n. 26 (11th Cir. 2004) (quoting *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 999 (2003) (Cordy, J., dissenting).

The state can also reasonably assume that some or all of the functions that have demonstrably been served by recognition of marriage would be at risk if marriage were redefined as government endorsement of private agreements—a psycho-social inversion of the purpose of marriage from promoting children's interests to promoting adult arrangements in which children are secondary. For instance, when Maine's legislature defined marriage as the union of any two people, it also struck out the official purpose statement in the previous marriage law. 2009 Maine LD1020. The deleted provision read:

> The union of one man and one woman joined in traditional monogamous marriage is of inestimable value to society; the State has a compelling interest to nurture and promote the unique institution of traditional monogamous marriage in the support of harmonious families and the physical and mental health of children; and that the State has the compelling interest in promoting the moral values inherent in traditional monogamous marriage. 19-A Maine Rev. Stat. §650.

One change that will come as a result of redefining marriage is diluting or eliminating its formerly child-centered purpose.

It could also more directly separate a child from at least one of her parents. For instance, a trial court in New Jersey concluded that "a child born within the context of a marriage with two female spouses" was the child of the mother and the mother's female partner. *In re Parentage of Robinson*, 890 A.2d 1036, 1042 (N.J. Super. 2005). A Massachusetts court granted joint legal custody to a child's mother and the mother's former same-sex spouse, even though the state's paternity presumption for artificial insemination referred to "husbands." *Della Corte v. Ramirez*, 961 N.E.2d 601, 603 (Mass. App. Ct. 2012). Citing the state's same-sex marriage case, an Iowa court held: "As parents, a mother's wife is identical to a mother's husband in every common and ordinary sense except for biology." *Buntemeyer v. Iowa Dep't of Pub. Health*, No. CV 9041, slip op. at 15 (Iowa Super 2012). Another Iowa case held the state constitution required the state's paternity presumption to apply to a female spouse of a child's mother because of the same-sex marriage of the two. *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335 (Iowa 2013).

Thus, same-sex marriage becomes a means of separating children, by operation of law, from at least one of their parents, not because of the parent's unfitness or inability to care for the child, but in order to facilitate the desires of the other parent.

Voters could clearly conclude that the experience of millennia suggests that it will matter whether its laws (1) recognize the institution of marriage as having a larger social purpose related to promoting the welfare of children or (2) redefine marriage to create a vehicle for bestowing government approbation on private relationship for purposes of sending a message about the worth of alternate family arrangements.

The state's recognition of marriage cannot plausibly be attributed to a desire to be either inclusive or exclusive of alternative family forms, since marriage is "not primarily about adult needs for official recognition and support" but about "the well-being of children and society."

*Hernandez v. Robles*, 805 N.Y.S.2d 354, 360 (N.Y. App. 2005). It hardly seems likely Wisconsin voters were trying to make a statement about sexual orientation when, as the Supreme Court has noted, "according to some scholars the concept of the homosexual as a distinct category of person did not emerge until the late 19th century." *Lawrence v. Texas*, 539 U.S. 558, 568 (2003).

### C. Attempts to Downplay the Significance of the State Interests in Marriage Related to Procreation are Misguided.

Advocates of redefining marriage attack the indispensability of marriage's male-female requirement by suggesting that it is like other historically rejected legal elements of marriage. Unlike the examples they invoke, the historical record demonstrates that the male-female understanding of marriage is fundamental to its very definition and tied directly to its animating purpose of binding children to the mothers and fathers whose sexual relationships brought them into the world.

For instance, the history of racially-discriminatory marriage laws makes clear that race restrictions, unlike the sex of the parties, were never essential to marriage.[1] For instance, "[u]nder the common law of England, difference in race was not a disability rendering parties incapable of contracting marriage." Robert Kovach, Note, *Miscegenation Statutes and the Fourteenth Amendment* 1 CASE W. RES. L. REV. 89, 89 (1949); Irving G. Tragen, *Statutory Prohibitions Against Interracial Marriage*, 32 CAL. L. REV. 269, 269 & n.2 (1944). Nearly half of the thirteen colonies did not have these laws; some states never enacted them; and even in the Southern states it was only during Reconstruction that anti-miscegenation laws "spread to a number of Southern states for the first time." Jill Elaine Hasday, *Federalism and the Family Reconstructed* 45 UCLA L. REV. 1297, 1345 n. 172 (1998); Peter Wallenstein, *Race, Marriage, and the Law of Freedom:*

---

[1] Even the most radical district court opinion on marriage admits that race "restrictions were never part of the historical core of the institution of marriage." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 993 (N.D. Cal. 2010).

*Alabama and Virginia, 1860s-1960s* 70 CHI.-KENT L. REV. 371, 372 (1994); Lynn Wardle & Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 HOW. L.J. 117, 180-81 (2007). Additionally, "many states repealed their anti-miscegenation laws after ratification of the Civil War amendments." James Trosino, Note, *American Wedding: Same-Sex Marriage and the Miscegenation Analogy* 73 B.U. L. REV. 93, 98 (1993) (citing ROBERT J. SICKELS, RACE, MARRIAGE AND THE LAW 64 (1972)). Throughout history, racial similarity has never been an essential element of marriage.

The same cannot be said of male-female genders, which has always been the universal essentialelement of the marriage definition. Indeed, just five years after the Supreme Court invalidated Virginia's anti-miscegenation law, it summarily and unanimously rejected a claim that the Fourteenth Amendment required a state to redefine marriage to include same-sex couples. *Baker v. Nelson*, 409 U.S. 810 (1972). This result is not surprising because throughout history the requirement "that the parties should be of different sex," unlike racial restrictions on marriage, "has always . . . been deemed requisite to the entire validity of every marriage." JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAW OF MARRIAGE & DIVORCE §225 (1st ed. 1852).

Common objections to the social interests in marriage related to procreation are similarly flawed. An oft-used tactic for avoiding the historical lesson of marriage's universal link to procreation and childrearing has been to suggest that it is irrelevant because of instances where married couples cannot or do not have children. But this is a complete red herring.

The existence of infertile married couples does not vitiate the child-centered purposes of marriage. All of the cultures that have recognized marriage have understood that some couples cannot or will not have children. *Wendel v. Wendel*, 30 A.D. 447, 449 (N.Y. App. 1898) ("it has never been suggested that a woman who has undergone [menopause] is incapable of entering the

marriage state"). But the fact that the traditional marriage model might include some male-female couples who do not have children does not mean that such unions either undermine that function or fail to fulfill other valuable and related functions.

Marriage is an essential social paradigm, a model, a norm that teaches, guides, and molds, albeit imperfectly and incompletely.  As one of the dissenters in Massachusetts' same-sex marriage case noted: "Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined (particularly in the modern age of widespread effective contraception and supportive social welfare programs), but an orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism." *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 995 (Mass. 2003) (Cordy, J., dissenting). Recognizing the marriages of infertile couples does not change this central purpose of marriage.

One obvious practical reason government does not limit marriage to fertile couples is that it would be difficult (if not impossible), and certainly inappropriately intrusive, to determine ahead of time which couples are fertile. *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 995 (Mass. 2003) (Cordy, J., dissenting). Whether a couple is fertile is often unknowable, and it is not uncommon to hear of married couples who learn that they cannot have children, adopt a child, and are then surprised to learn that the wife has become pregnant. Moreover, some couples who do not initially plan to have children may later change their minds or conceive unintentionally. *Morrison v. Sadler*, 821 N.E2d 15, 24-25 (Ind. App. 2005). Even in an age of easily-available contraception, a large majority of births are reportedly "unintended" by either the mother or father.[2]

---

[2] Joyce C. Abma, et al., *Fertility, Family Planning, and Women's Health: New Data from the 1995 National Survey of Family Growth* 23 VITAL HEALTH STATISTICS 28, table 17 (1997) (70.4 percent of births to married women were intended by both parents). *See also* Stanley K. Henshaw,

The Indiana Court of Appeals addressed and cogently rejected the fertility arguments raised against marriage laws, characterizing them as little more than a defective "overbreadth argument":

> A reasonable legislative classification is not to be condemned merely because it is not framed with such mathematical nicety as to include all within the reason of the classification and to exclude all others . . . There was a rational basis for the legislature to draw the line between opposite-sex couples, who as a generic group are biologically capable of reproducing, and same-sex couples, who are not. This is true, regardless of whether there are some opposite-sex couples that wish to marry but one or both partners are physically incapable of reproducing. *Morrison*, 821 N.E.2d at 27.

Further, a married husband and wife who cannot or do not have a child through their own sexual relationship still advance the historically-recognized procreative purposes of marriage. The interest in responsible procreation and childrearing is not solely in the birth of children, but in the rearing of children by a mother and father in a family unit once they are born. As the New York Court of Appeals explained, the state's interest in procreation includes more than just biological reproduction. The state can "rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father" because "[i]ntuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like." *Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006). And while "[i]t is obvious that there are exceptions to this general rule—some children who never know their fathers, or their mothers, do far better than some who grow up with parents of both sexes— . . . the Legislature could find that the general rule will usually hold." *Id*.

Legal historian John Witte agrees, explaining that:

---

*Unintended Pregnancies in the United States* 30 FAMILY PLANNING PERSPECTIVES 24, 28, table 3 (1998); Haishan Fu, et al., *Contraceptive Failure Rates: New Estimates from the 1995 National Survey of Family Growth* 31 FAMILY PLANNING PERSPECTIVES 55, 56 (1999); James Trussel & Barbara Vaughn, *Contraceptive Failure, Method-Related Discontinuation and Resumption of Use: Results from the 1995 National Survey of Family Growth* 31 FAMILY PLANNING PERSPECTIVES 64, 71 (1999).

> Procreation . . . means more than just conceiving children. It also means rearing and educating them for spiritual and temporal living—a common Stoic sentiment. The good of procreation cannot be achieved in this fuller sense simply through the licit union of husband and wife in sexual intercourse. It also requires maintenance of a faithful, stable, and permanent union of husband and wife for the sake of their children. John Witte, Jr., *Propter Honoris Respectum: The Goods and Goals of Marriage* 76 NOTRE DAME L. REV. 1019, 1035 (2001).

As Maryland's Court of Appeals explained, marriage is "conferred on opposite-sex couples not because of a distinction between whether various opposite-sex couples actually procreate, but rather because of the possibility of procreation." *Conaway v. Deane*, 932 A.2d 571, 633 (Md. 2007).

In addition, the law is concerned with encouraging those who might create children to take responsibility for them and not to create children in unstable nonmarital settings. As one commentator has explained, the law's "concern with illegitimacy was rarely spelled out, but discerning it clarifies why courts were so concerned with sex within marriage and renders logical the traditional belief that marriage is intimately connected with procreation even as it does not always result in procreation." Laurence Drew Borten, *Sex, Procreation, and the State Interest in Marriage* 102 COLUM. L. REV. 1089, 1114-15 (2002). As Massachusetts Justice Cordy explains, "[t]he institution of marriage encourages parents to remain committed to each other and to their children as they grow, thereby encouraging a stable venue for the education and socialization of children." *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 996 (Mass. 2003) (Cordy, J., dissenting).

Male-female couples rearing children via adoption are serving marriage's procreative function because, for children who would otherwise be deprived of a mother or father because of death, abuse, neglect, or abandonment, will still have that opportunity through adoption.

Even couples who neither have nor rear children set an important example for those that

may. Their observance of vows of faithfulness reinforces the social norm that men and women in a sexual relationship should join together in stable and committed marital relationships.

## II.   THE WISCONSIN MARRIAGE AMENDMENT ALSO ADVANCES AN IMPORTANT STATE CONSTITUTIONAL INTEREST IN PRESERVING CITIZEN SELF-DETERMINATION IN AN AREA OF STATE SOVEREIGNTY GUARANTEED BY THE UNITED STATES CONSTITUTION.

The interest in "increase[d] opportunity for citizen involvement in democratic processes" (*Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)) is particularly important in a case such as this in which the court is asked to second-guess a decision arrived at through a process which involved the citizens of a state acting in their direct and representative capacities. As Justice Black said, "the right of self-government that our Constitution preserves is just as important as any of the specific individual freedoms preserved in the Bill of Rights." *In re Winship*, 397 U.S. 358, 385 (1970) (Black, J., dissenting).  This is especially so where Wisconsin's constitution explicitly guarantees the right of citizens to directly participate in approving the Amendment at issue here. Wis. Const. art. XII, § 1

The Supreme Court has explained, "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). The constitutional system of federalism rests on two conceptual pillars. First, the powers of the national government are "delegated" rather than inherent powers. Second, the powers of the States are "reserved" powers. As James Madison explained: "The powers delegated by the proposed constitution to the federal government, are few and defined. Those which are to remain in the state governments, are numerous and indefinite." THE FEDERALIST No. 45, at 241 (George W. Carey & James McClellan, eds. 2001). "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2577 (2012).

Under our federal system, "the powers reserved to the States consist of the whole, undefined residuum of power remaining after taking account of powers granted to the National Government." *United States v. Comstock*, 1967 (2010) (Kennedy, J., concurring).

For this court to rule that the U.S. Constitution requires the state to redefine marriage would unnecessarily federalize an issue undoubtedly within the "residuum" of power reserved to the states. The Supreme Court noted: "One of the principal areas in which this Court has customarily declined to intervene is the realm of domestic relations." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 12 (2004). To intervene in state regulation of marriage would "thrust the Federal Judiciary into an area previously left to state courts and legislatures." *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 73 note 4 (2009). It would create "a federal intrusion on state power" and "disrupt[] the federal balance." *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013). All without any clear textual or precedential direction to do so.

As the Supreme Court forcefully reiterated last term: "By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *Id*. at 2689-2690. The Court noted "[t]he recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens." *Id*. at 2691. Further, "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" *Id*.

It has been so since the beginning: "'the states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce.'" *Id*. at 2691 (quoting *Haddock* v. *Haddock*, 201 U. S. 562, 575 (1906)).

"Consistent with this allocation of authority, the Federal Government, through our history, has deferred to state law policy decisions with respect to domestic relations." *Id*. Thus, it is a "long established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees[3], from one State to the next." *Id*. at 2692.

There is no reason for this court to depart from this "long established precept" by holding that the federal courts now have the authority to superintend the domestic relations laws of the states.

As Justice Kennedy explains, the federalist "theory that two governments accord more liberty than one requires for its realization two distinct and discernible lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States." *United States v. Lopez*, 514 U.S. 549, 576 (1995) (Kennedy, J., concurring). He continued:

> Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power. *Id*. (citations omitted).

The Supreme Court's recent decision striking down the federal Defense of Marriage Act, which the Court said "departs from this history and tradition of reliance on state law to define marriage," stresses this important value of political self-determination. *United States v. Windsor*,

---

[3] The constitutional guarantees referenced are not implicated here because the Court decisions striking down state marriage laws all involved laws that prevented individuals otherwise qualified for marriage from marrying, and have not gone to the essentials of what marriage means as the claim in this case does. *See Loving v. Virginia*, 388 U.S. 1 (1967); *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Turner v. Safley*, 482 U.S. 78 (1987).

133 S. Ct. 2675, 2692 (2013).  In that case, the Court spoke of the New York legislature's decision in terms that stressed the importance of citizen involvement: "After a statewide deliberative process that enabled its citizens to discuss and weigh arguments for and against same-sex marriage, New York acted to enlarge the definition of marriage." *Id*. at 2689. The Court said the decision "reflects . . . the community's considered perspective" (*id*. at 2692-2693) and that "New York was responding 'to the initiative of those who [sought] a voice in shaping the destiny of their own times.'" *Id*. at 2692 (quoting *Bond* v. *United States*, 131 S.Ct. 2355, 2359 (2011). The majority could not have been clearer when it said: "The dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other." *Id*.

This term, the Court has spoken even more emphatically about the importance of allowing state citizens to set policy on controversial matters. Weeks ago, a Supreme Court majority upheld a Michigan constitutional amendment enacted, like Wisconsin's marriage amendment, "[a]fter a statewide debate" in 2006. *Schuette v. BAMN*, 572 U.S. __ (2014), slip op at 2. Writing for the plurality, Justice Kennedy made clear that the federal courts "may not disempower the voters from choosing which path to follow" when "enacting policies as an exercise of democratic self-government." *Id*. at 13. The plurality characterized the voters' action as "exercis[ing] their privilege to enact laws as a basic exercise of their democratic power." *Id*. at 15. So, too, with the Amendment challenged in this case. Justice Kennedy's words fit well the Wisconsin Marriage Amendment: "freedom does not stop with individual rights. Our constitutional system embraces, too, the right of citizens to debate so they can learn and decide and then, through the political process, act in concert to try to shape the course of their own times." *Id*. at 15-16. This is true

even though the issue "raises difficult and delicate issues" and embraces "a difficult subject." *Id*. Justice Kennedy rejected the idea "that the electorate's power must be limited because the people cannot prudently exercise that power even after a full debate." *Id*. at 16. To accept this idea would have been "an unprecedented restriction on the exercise of a fundamental right held not just by one person but by all in common . . . the right to speak and debate and learn and then, as a matter of political will, to act through a lawful electoral process." *Id*. He concluded: "It is demeaning to the democratic process to presume that the voters are not capable of deciding an issue of this sensitivity on decent and rational grounds." *Id*. at 17. In his concurrence, Justice Breyer explains "the Constitution foresees the ballot box, not the courts, as the normal instrument for resolving differences and debates about the merits" of race-conscious programs. *Id*. at 3 (Breyer, J, concurring). This passage too is instructive in this case where the Constitution foresees the ballot box, not the courts, as the normal instrument for resolving differences and debates about the merits of preserving marriage as the union of a husband and wife or redefining it to include same-sex couples.

Clearly, state decisions reflecting the consensus of citizens about a matter as fundamental as the definition of marriage—the foundation of the family which is, in turn, the most basic unit of society—ought to be entitled to a high degree of respect.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully urge this Court to rule in favor of the constitutionality of Wisconsin's Marriage Amendment.

Respectfully submitted this 14th day of May, 2014.

By: ___/s/ Michael D. Dean___
Michael D. Dean, SBN 1019171
Attorney at Law
7035 W. Wisconsin Avenue, Suite 100
Brookfield, WI 53005
(262) 798-8044
miked@michaelddeanllc.com

William C. Duncan
Marriage Law Foundation
1868 N 800 E
Lehi, UT 84043
duncanw@marriagelawfoundation.org

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused to be served upon the following

counsel a true and correct copy of the attached *Amici Curiae* Brief of Julaine Appling, et al.,

on May 14, 2014, via ecf/cmf, as follows:

Representing the Plaintiffs:

John Anthony Knight (jknight@aclu-il.org)
Laurence J. Dupuis (ldupuis@aclu-wi.org)
Frank M. Dickerson, III (fdickerson@mayerbrown.com)
Gretchen E. Helfrich  (ghelfrich@mayerbrown.com)
Hans J. Germann (hgermann@mayerbrown.com)
James D. Esseks (jesseks@aclu.org)

Representing the Defendants:

Clayton P. Kawski (kawskicp@doj.state.wi.us)
Thomas Charles Bellavia (bellaviatc@doj.state.wi.us)
Timothy Craig Samuelson (samuelsontc@doj.state.wi.us)
Paul Bargren (paul.bargren@milwaukeecountywi.gov)
John Paul Serketich (john.serketich@goracine.org)
David Gault (gault@countyofdane.com)

 s/ Michael D. Dean