## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

VIRGINIA WOLF and CAROL
SCHUMACHER, KAMI YOUNG and
KARINA WILLES, ROY BADGER and
GARTH WANGEMANN, CHARVONNE
KEMP and MARIE CARLSON, JUDITH
TRAMPF and KATHARINA HEYNING,
SALUD GARCIA and PAM KLEISS,
WILLIAM HURTUBISE and LESLIE
PALMER, and JOHANNES WALLMANN
and KEITH BORDEN,

**Plaintiffs,**

**vs.**

SCOTT WALKER, in his official capacity as
Governor of Wisconsin, J.B. VAN HOLLEN,
in his official capacity as Attorney General of
Wisconsin, RICHARD G. CHANDLER, in his
official capacity as Secretary of Revenue of
Wisconsin, OSKAR ANDERSON, in his
official capacity as State Registrar of
Wisconsin, GARY KING, in his official
capacity as Eau Claire County District
Attorney, JOHN CHISHOLM, in his official
capacity as Milwaukee County District
Attorney, JOSEPH CZARNEZKI, in his
official capacity as Milwaukee County Clerk,
WENDY CHRISTENSEN, in her official
capacity as Racine County Clerk, and SCOTT
MCDONELL, in his official capacity as Dane
County Clerk,

**Defendants.**

Case No.  14-cv-64

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 2

   I. Marriage Is A Fundamental Right To Which All People Are Entitled ......................... 2

     A. The State Defendants' Artificial Distinction Between Positive And Negative Rights Has No Role In The Analysis ........................................ 2

     B. State Autonomy Must Yield To Federal Constitutional Protections ................. 5

     C. The State's Democratic Process May Not Infringe Upon Individual Constitutional Rights ...................................................................... 6

   II. Wisconsin's Marriage Ban Is Subject To Heightened Scrutiny ................................. 8

     A. Marriage Is A Fundamental Right Guaranteed By The Due Process Clause ...................................................................................... 8

       1. Lesbians and Gay Men Have The Fundamental Right To Marry The Person Of Their Choice ................................................... 8

       2. Wisconsin's Marriage Laws Interfere With Plaintiffs' Fundamental Right To Remain Married ...................................... 12

     B. Sexual Orientation Is A Suspect Classification Subject To Heightened Scrutiny ...................................................................................... 15

     C. The Marriage Ban Discriminates On The Basis Of Gender And Is Thus Subject To Heightened Scrutiny ........................................................ 20

       1. The Marriage Ban Discriminates On The Basis Of Gender ................ 20

       2. The Marriage Ban Discriminates On The Basis Of Sex Stereotypes .................................................................... 21

   III. Wisconsin's Marriage Ban Fails Under Any Standard Of Review ......................... 22

     A. Rational Basis Is Not A Rubber Stamp For Discrimination ......................... 22

     B. Wisconsin's Marriage Ban Is Line-Drawing Merely For The Purpose Of Disadvantaging Same-Sex Couples ................................................ 24

       1. The Facts Support A Conclusion That The Marriage Ban Was Motivated By A Desire To Exclude Lesbian And Gay Couples From The Tangible & Intangible Benefits & Obligations Of Marriage .................................................... 25

       2. Cleburne's Political Powerlessness Standard Is Irrelevant To Whether The Marriage Ban Was Motivated By Animus ............ 27

       3. Windsor Supports The Conclusion That The Marriage Ban Had An Improper Purpose .................................................. 28

       4. Well Reasoned District Court Opinions Support A Finding Of Improper Purpose ...................................................... 30

5. Proof Of Animus Is Not Necessary To Strike Down The
Marriage Ban ................................................................................. 32

C. Tradition, Maintaining The Status Quo, And Protecting The
Democratic Process Are Not Rational Bases For The Marriage Ban ...... 32

1. Tradition Is Not A Rational Basis ........................................................ 32

2. Proceeding With Caution And Maintaining The Status Quo Are
Not Rational Bases For The Marriage Ban ................................... 34

3. Protecting The Democratic Process Is Not A Rational Basis For
The Marriage Ban ......................................................................... 35

D. There Is No Relationship Between Wisconsin's Marriage Ban And
Either Responsible Procreation Or "Optimal Childrearing." .................. 36

E. The Potential For Unintended Consequences Cannot Be A Rational
Basis For The Marriage Ban .................................................................. 44

IV. Baker v. Nelson Is Not Controlling .......................................................... 47

CONCLUSION ................................................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1996)..................................................................................................11

*Baehr v. Lewin*,
852 P.2d 44 (Haw. 1993), *aff'd sub. nom Baehr v. Miike*, 950 P.2d 1234 (Haw. 1997)........20

*Baker v. Nelson*,
191 N.W.2d 185 (1971) .........................................................................................47, 49

*Baker v. Nelson*,
409 U.S. 810 (1972)..........................................................................................47, 49, 50

*Baskin v. Bogan*,
--- F. Supp. 2d ---, 2014 WL 1568884 (S.D. Ind. Apr. 18, 2014)..............................................1

*Bassett v. Snyder*,
951 F. Supp. 2d 939 (E.D. Mich. 2013)...........................................................................31

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) (Kennedy, J., concurring)..................................................................27

*Ben-Shalom v. Marsh*,
881 F.2d 454 (7th Cir. 1989) .......................................................................................19

*Bishop v. United States ex rel Holder*,
962 F. Supp. 2d 1252 (N.D. Okla. 2014)................................................................... passim

*Bostic v. Rainey*,
970 F. Supp. 2d 456 (E.D. Va. 2014) ...................................................................... passim

*Bostic v. Rainey*,
No. 2:13-cv-00395 (E.D. Va. Feb. 24, 2014) ....................................................................52

*Bourke v. Beshear*,
--- F. Supp. 2d ---, 2014 WL 556729 (W.D. Ky. Feb 12, 2014)...................................... passim

*Bowers v. Hardwick*,
478 U.S. 186 (1986)..................................................................................................19

*Cece v. Holder*,
733 F.3d 662 (7th Cir. 2013) .......................................................................................17

i

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*
    130 S. Ct. 2971 (2010) ................................................................................................18

*Citizens for Equal Protection v. Bruning,*
    455 F.3d 859 (8th Cir. 2006) ...............................................................................32, 33

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)........................................................................................23, 24, 27

*Cleveland Bd. of Educ. v. LaFleur,*
    414 U.S. 632 (1974)...................................................................................................8

*Colby v. J.C. Penney Co.,*
    811 F.2d 1119 (7th Cir. 1987) .................................................................................20

*Craig v. Boren,*
    429 U.S. 190 (1976).................................................................................................48

*De Leon v. Perry,*
    --- F. Supp. 2d ---, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014) ................... passim

*DeBoer v. Snyder,*
    --- F. Supp. 2d. ----, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014) ............ passim

*DeShaney v. Winnebago County Department of Social Services,*
    489 U.S. 189 (1989)...........................................................................................2, 3, 7

*Doe by Doe v. City of Belleville,*
    119 F.3d 563 (7th Cir. 1997), *vacated and remanded on other grounds, City of
    Belleville v. Doe by Doe,* 523 U.S. 1001 (1998).................................................21, 22

*Dragovich v. U.S. Dep't of Treasury,*
    872 F. Supp. 2d 954 (N.D. Cal. 2012) ....................................................................44

*Estelle v. Gamble,*
    429 U.S. 97 (1976).....................................................................................................5

*Frontiero v. Richardson,*
    411 U.S. 677 (1973).................................................................................................48

*Garden State Equality v. Dow,*
    2012 WL 540608 (N.J. Sup. Ct. Feb. 21 2012) ......................................................49

*Gault v. Garrison,*
    523 F.2d 205 (7th Cir. 1975) ...................................................................................50

*Geiger v. Kitzhaber,*
    No. 6:13-cv-01834 (D. Ore. May 19, 2014) .......................................................1, 46

*Glen Theatre, Inc. v. Pearson*,
    802 F.2d 287 (7th Cir. 1986) ................................................47

*Golinski v. U.S. Office of Pers. Mgmt.*,
    824 F. Supp. 2d 968 (N.D. Cal. 2012) ....................................15, 17, 19

*Graham v. Richardson*,
    403 U.S. 365 (1971) ................................................15

*Griego v. Oliver*,
    316 P.2d 865 (N.M. 2013) ................................................47

*Griswold v. Conn.*,
    381 U.S. 479 (1965) ................................................8

*Henry v. Himes*,
    --- F. Supp. 2d ---, 2014 WL 1418395 (S.D. Ohio Apr. 14, 2014) .................. passim

*Hernandez–Montiel v. Immigration and Naturalization Serv.*,
    225 F.3d 1084 (9th Cir. 2000), *overruled in part on other grounds by Thomas v.*
    *Gonzales*, 409 F.3d 1177 (9th Cir. 2005) ................................................18

*Hicks v. Miranda*,
    422 U.S. 332 (1975) ................................................47

*High Tech Gays v. Defense Industrial Security Clearance Office*,
    895 F.2d 563 (9th Cir. 1990) ................................................17

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ................................................26

*In re Adoption of Doe*,
    2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008), *aff'd sub nom. Fla. Dep't of*
    *Children & Families v. Adoption of X.X.G.*, 45 So. 3d 79 (Fla. Dist. Ct. App 2010)..............42

*In re Marriage Cases*,
    183 P.3d 384 (Cal. 2008) ................................................4, 17, 45

*Izarry v. Bd. of Educ. of Chicago*,
    251 F.3d 604 (7th Cir. 2001) ................................................39

*Jackson v. Abercrombie*,
    884 F. Supp. 2d 1065 (D. Haw. 2012)) .......................... passim

*Jackson v. City of Joliet*,
    715 F.2d 1200 (7th Cir. 1983) ................................................3

*Jantz v. Muci*,
    759 F. Supp. 1543 (D. Kan. 1991), *rev'd*, 976 F.2d 623 (10th Cir. 1992) ............................17

*Johnson v. Cal.*,
    543 U.S. 499 (2005)............................................................................................................21

*Johnson v. Robison*,
    415 U.S. 361 (1974)......................................................................................................43, 44

*Karouni v. Gonzales*,
    399 F.3d 1163 (9th Cir. 2005) ........................................................................................18

*Kitchen v. Herbert*,
    961 F. Supp. 2d 1181 (D. Utah 2013)...................................................................... passim

*Latta v. Otter*,
    --- F. Supp. 2d ---, 2014 WL 1909999 (D. Idaho May 13, 2014).................................. passim

*Lawrence v. Texas*,
    539 U.S. 558 (2003).......................................................................................... passim

*Lee v. Orr*,
    2014 WL 683680 (N.D. Ill. Feb. 21, 2014) .....................................................................1

*Lofton v. Sec'y of the Dep't of Children & Family Servs.*,
    358 F.3d 805 (11th Cir. 2004) ....................................................................................41, 42

*Loving v. Virginia*,
    381 U.S. 1 (1967) ........................................................................................... passim

*Mahaffey v. Ramos*,
    588 F.3d 1142 (7th Cir. 2009) .........................................................................................46

*Maher v. Roe*,
    432 U.S. 464 (1977)...........................................................................................................5

*Mandel v. Bradley*,
    432 U.S. 173 (1977)....................................................................................................47, 49

*Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*,
    299 F.3d 643 (7th Cir. 2002) ...........................................................................................51

*Mass. v. Dep't of Health & Human Servs.*,
    682 F.3d 1 (1st Cir. 2012)................................................................................................50

*Maynard v. Hill*,
    125 U.S. 190 (1888)........................................................................................................37

*McGee v. Cole*,
   --- F. Supp. 2d ---, 2014 WL 321122 (S.D. W. Va. Jan. 29, 2014) .........................................49

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)..................................................................................................................22

*Nyquist v. Mauclet*,
   432 U.S. 1 (1977)......................................................................................................................18

*Obergefell v. Wymyslo*,
   962 F. Supp. 2d 968 (S.D. Ohio 2013) ....................................................................... passim

*Palmer v. Thompson*,
   403 U.S. 217 (1971)..................................................................................................................26

*Pedersen v. U.S. Office of Pers. Mgmt.*,
   881 F. Supp. 2d 294 (D. Conn. 2012)..............................................................................17, 19

*Perry v. Schwarzenegger*,
   704 F. Supp. 2d 921 (N.D. Cal. 2010), *aff'd sub. nom. Perry v. Brown*, 671 F.3d
   1052, *vacated and remanded sub. nom. Hollingsworth v. Perry*, 133 S. Ct. 2652
   (2013)........................................................................................................................... passim

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)..................................................................................................................25

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989)..................................................................................................................21

*Romer v. Evans*,
   517 U.S. 620, 632 (1996)............................................................................................. passim

*Saenz v. Rowe*,
   526 U.S. 489 (1999)..................................................................................................................15

*Schroeder v. Hamilton School District*,
   282 F.3d 946 (7th Cir. 2002) ...................................................................................................19

*Schuette v. Coalition to Defend Affirmative Action*,
   134 S. Ct. 1623 (2014)................................................................................................................8

*Sevcik v. Sandoval*,
   911 F. Supp. 2d 996 (D. Nev. 2012)................................................................26, 30, 33, 50

*Skinner v. State of Okla. ex rel. Williamson*,
   316 U.S. 535 (1942)..................................................................................................................37

*Smelt v. Cnty. of Orange*,
   374 F. Supp. 2d 861 (C.D. Cal. 2005), *overrruled on other grounds*, 447 F.3d 673
   (9th Cir. 2006)........................................................................................................49

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)...................................................................................................50

*Tanco v. Haslam*,
   --- F. Supp. 2d ---, 2014 WL 997525 (M.D. Tenn. Mar. 14, 2014)...........................................1

*Tully v. Griffin, Inc.*,
   429 U.S. 68 (1976).................................................................................................50

*Turner v. Safley*,
   482 U.S. 78 (1987)............................................................................................ passim

*U.S. Dep't of Agriculture v. Moreno*,
   413 U.S. 528 (1973)...........................................................................................23, 24

*United States v. Apex Oil Co., Inc.*,
   579 F.3d 734 (7th Cir. 2009) ..................................................................................51

*United States v. Windsor*,
   133 S. Ct. 2675............................................................................................... passim

*Varnum v. Brien*,
   763 N.W.2d 862 (Iowa 2009) ...................................................................................22

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
   429 U.S. 252 (1977)...............................................................................................29

*Vill. Of Willowbrook v. Olech*,
   528 U.S. 562 (2000)...........................................................................................25, 32

*W. Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)..................................................................................................7

*White v. Fleming*,
   522 F.2d 730 (7th Cir. 1975) ...................................................................................21

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012), *aff'd* 133 C. Ct. 2675 (2013)....................................15, 18, 19, 49

*Wis. Educ. Ass'n Council v. Walker*,
   705 F.3d 640 (7th Cir. 2013) ...................................................................................23

*Wright v. Arkansas*,
   No. 60CV-13-2662 (Pulaski Cty. (Ark.) Cir. Ct., May 9, 2014) .........................................1, 33

*Zablocki v. Redhail*,
434 U.S. 374 (1978) ........................................................................................... passim

S<small>TATUTES</small>

HRS § 572-1.7 ............................................................................................................. 23

U.S. Const., Amend. XIV ................................................................................... passim

U.S. Const. Art. VI, cl. 2 ........................................................................................... 35

Wis. Const. Art. XIII, § 13 ....................................................................... 6, 31, 34, 51

Wis. Stat. ch. 765 ....................................................................................................... 51

Wis. Stat. § 48.92 ....................................................................................................... 43

Wis. Stat. § 765.01 ..................................................................................................... 51

Wis. Stat. § 765.001(2) .............................................................................................. 51

Wis. Stat. § 765.16 ..................................................................................................... 51

Wis. Stat. § 765.23 ..................................................................................................... 51

Wis. Stat. § 765.24 ..................................................................................................... 51

Wis. Stat. § 765.30(3)(a) ........................................................................................... 51

Wis. Stat. § 767.18 ..................................................................................................... 14

Wis. Stat. § 767.313 ................................................................................................... 14

Wis. Stat. § 891.40 ..................................................................................................... 51

O<small>THER</small> A<small>UTHORITIES</small>

Adam P. Romero, et al., *Census Snapshot: Wisconsin*, The Williams Institute (Dec.
2007), *available at* http://williamsinstitute.law.ucla.edu/wp-
content/uploads/WisconsinCensus2000Snapshot.pdf ............................................ 38

American Psychiatric Association, *Position Statement: Psychiatric Treatment and Sexual
Orientation* (1998) .................................................................................................. 16

American Psychiatric Association, *Report of the APA Task Force on Appropriate
Therapeutic Responses to Sexual Orientation* (Aug. 2009) ................................... 16

American Psychiatric Association, *Resolution on Appropriate Therapeutic Responses to
Sexual Orientation*, 53 Am. Psychologist 934 (1998) ........................................... 16

American Psychiatric Association, *Resolution on Prejudice, Stereotypes, and Discrimination*, 62 Am. Psychologist 475 (2006) .................................................................16

Brief in Support of Motion to Withdraw, *Appling v. Doyle*,
No. 2010-CV-4434 (Dane Cty. Cir. Ct. (Wis.) May 13, 2011), *available at* http://www.lambdalegal.org/in-court/legal-docs/appling_wi_20110513_brief-iso-defendants-motion-to-withdraw..............................................................................................6

Brief of American Psychological Ass'n, et al., as Amici Curiae on the Merits in Support of Affirmance, *Windsor*, 133 S. Ct. 2675 (No. 12-307), 2013 WL 871958 ...............16, 41, 42

Brief of the American Sociological Ass'n in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, *Hollingsworth v. Perry*,
133 S. Ct. 2653 (2013), and *Windsor*, 133 S. Ct. 2675 (Nos. 12-144, 12-307), 2013 WL 840004 .........................................................................................................................41, 44

Darren E.. Sherkat, *The Editorial Process and Politicized Scholarship: Monday Morning Editorial Quarterbacking and a Call for Scientific Vigilance*, 41 Soc. Sci. Research. 1346, 1347 (2012)....................................................................................................................42

Fed. R. Civ. P. 65(d) .............................................................................................................51

Joseph Osmunson, "*I Was Born this Way": Is Sexuality Innate, and Should it Matter?* LGBTQ Policy Journal at the Harvard Kennedy School: (2011) ...........................................16

Kristen Anderson Moore, *et al.*, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?*, Child Trends Research Br. (June 2002)...............................................................................................................40, 41

Ruth Institute, http://www.ruthinstitute.org/about/aboutRuth.shtml (last visited May 15, 2014) ......................................................................................................................................42

Sherif Gergis, *et al.*, *What is Marriage? Man and Woman: A Defense* (New York: Encounter Books 2012), *available at* http://whatismarriagebook.com/authors/#.U3ib7sdM7NU (last visited May 18, 2014). ........40

Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 Mɪᴄʜ. L. Rᴇᴠ. 1421 (2012)...............................................................................................................13

Wendy D. Manning, *et al.*, "Adolescent Well-Being in Cohabiting, Married, and Single-Parent Families," 65:4 *J. of Marriage and Family* (Nov. 2003)........................................40, 41

## INTRODUCTION

Wisconsin's marriage ban violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. In *United States v. Windsor*, 133 S. Ct. 2675, the Supreme Court struck down Section 3 of the Defense of Marriage Act ("DOMA"), which banned federal recognition of the marriages of same-sex couples, concluding that "no legitimate purpose overcomes the purpose and effect to disparage and to injure [same-sex couples]." *Id*. at 2696. Since *Windsor*, every court to consider the question has concluded that state bans on marriage by same-sex couples violate either or both of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.[1] As Defendants concede, there are no factual disputes to be resolved by this Court. Response and Appendix of State Defendants Walker, Van Hollen, and Anderson in Opposition to Plaintiffs' Motion for Summary Judgment, Dkt # 102 ("Resp."), at 35. Among many other deficiencies, Defendants' arguments and submissions fail to identify any conceivable rational basis for Wisconsin's marriage ban. This Court should therefore conclude that Wisconsin's marriage ban violates the Fourteenth Amendment of the United States Constitution, and grant Plaintiffs' Motion for Summary Judgment.

---

[1] *See Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968 (S.D. Ohio 2013); *Bishop v. United States ex rel Holder*, 962 F. Supp. 2d 1252 (N.D. Okla. 2014); *Bourke v. Beshear*, --- F. Supp. 2d ---, 2014 WL 556729 (W.D. Ky. Feb 12, 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456 (E.D. Va. 2014); *Lee v. Orr*, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014); *De Leon v. Perry*, --- F. Supp. 2d ---, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014); *Tanco v. Haslam*, --- F. Supp. 2d ---, 2014 WL 997525 (M.D. Tenn. Mar. 14, 2014) (issuing preliminary injunction); *DeBoer v. Snyder*, --- F. Supp. 2d. ----, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014); *Henry v. Himes*, --- F. Supp. 2d ---, 2014 WL 1418395 (S.D. Ohio Apr. 14, 2014); *Baskin v. Bogan*, --- F. Supp. 2d ---, 2014 WL 1568884 (S.D. Ind. Apr. 18, 2014) (issuing temporary restraining order); *Wright v. Arkansas*, No. 60CV-13-2662 (Pulaski Cty. (Ark.) Cir. Ct., May 9, 2014); *Latta v. Otter*, --- F. Supp. 2d ---, 2014 WL 1909999 (D. Idaho May 13, 2014); *Geiger v. Kitzhaber*, No. 6:13-cv-01834 (D. Ore. May 19, 2014).

**ARGUMENT**

**I.     Marriage Is A Fundamental Right To Which All People Are Entitled.**

As Plaintiffs demonstrated in their opening Brief in Support of Their Motion for Summary Judgment, Dkt # 71 ("Pl. Br.") at 8-10, and as Defendants concede, Resp. at 26, the right to marry is a fundamental right.  As explained further below, this right is not limited to different-sex couples.  *See* II.A, *infra*.  Defendants' attempt to recharacterize the right to marry as a "positive right" that is therefore immune from constitutional review and subject to the whims of democratic majorities is flatly wrong.

**A.     The State Defendants' Artificial Distinction Between Positive And Negative Rights Has No Role In The Analysis.**

Attempting to place the right to marry outside the scope of the Fourteenth Amendment's guarantees, Defendants suggest that the right to marry is a "positive right," and therefore the State has no obligation to extend the attributes of civil marriage to same-sex couples.  Resp. at 7-14.  This argument is deeply flawed for numerous reasons.

First, in a staggeringly broad reading of *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), Defendants conflate "government aid" with access to a fundamental right.  *DeShaney* did not hold that no "positive right" can ever be derived from the requirements of substantive due process.  Rather, it held only that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by *private actors*."  *Id*. at 195 (emphasis added).  More specifically, it held that a young boy was not entitled to the state's protection from abuse by his father.  *Id*. at 191. *DeShaney* has no bearing on this case.  Plaintiffs here do not contend that private actors are

depriving them of their liberties; it is the state that does so by prohibiting Plaintiffs from marrying and refusing to recognize their out-of-state marriages.[2]

Second, Defendants' "no positive rights theory" cannot be squared with *Loving v. Virginia*, 388 U.S. 1 (1967), *Zablocki v. Redhail*, 434 U.S. 374 (1978), or *Turner v. Safley*, 482 U.S. 78, 95 (1987). Defendants claim that "[t]hose cases do not establish a positive right requiring government to affirmatively license or endorse a person's domestic relationships or to affirmatively support the relationships with the tangible or intangible benefits of marriage." Resp. at 10. But it is inconceivable that after *Loving*, the Supreme Court would have allowed the State of Virginia to withhold its recognition of and affirmative support for the Lovings' marriage—including whatever tangible benefits it offered to married couples in 1967. Nor is it conceivable that the state would have been permitted to withhold marriage licenses from interracial couples. The same is true of *Zablocki*. There, the Court unquestionably found that Wisconsin's law infringed the right to marry because "[t]he State flatly *denies a marriage license* to anyone who cannot afford to fulfill his support obligations and keep his children from becoming wards of the State." *Zablocki*, 434 U.S. at 394 (emphasis added).

*Turner* makes the point even more clearly. There, the Supreme Court noted that despite the restrictions of the prison setting, "[m]any important attributes of marriage remain." *Turner*, 482 U.S. at 95. Among these attributes, the Court specifically observed that "marital status often is a precondition to the receipt of government benefits." *Id.* at 96. Moreover, *Turner* made clear that Missouri has an affirmative obligation to facilitate marriage ceremonies for inmates, though

---

[2]    *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir. 1983), which Defendants quote, is no more on point than *DeShaney*. *Jackson* also addressed government aid, specifically, whether a police officer who happened upon the scene of a car accident was obligated to examine the burning car and assist the occupants. *Id.* at 1202. Those facts bear no resemblance to this case, where the State's own prohibition is at issue.

it "may regulate the time and circumstances" under which the ceremony occurs. *Id*. at 99. It was not enough simply "to refrain from infringing the freedom of individuals to decide for themselves how to arrange their own private and domestic affairs." Resp. at 10. Defendants' characterization of the right to marry as imposing no affirmative obligation on the state is absurd in the prison context, and does not hold water anywhere else. The fundamental right to marry is indistinguishable from the right to have one's marriage sanctioned by the state.[3] *Accord In re Marriage Cases*, 183 P.3d 384, 426-27 (Cal. 2008) (construing the California Constitution to find that "[t]he substantive protection embodied in the constitutional right to marry, however, goes beyond what is sometimes characterized as simply a 'negative' right insulating the couple's relationship from overreaching governmental intrusion or interference, and includes a 'positive' right to have the state take at least some affirmative action to acknowledge and support the family unit," including "obligat[ing] the state to take affirmative action to grant official, public recognition to the couple's relationship as a family.")

Defendants' characterization of marriage as an affirmative right that may be denied same-sex couples is not supported by *Windsor* either. *Windsor* simply does not turn on any distinction between negative or positive rights. Indeed, *Windsor* shows that the Constitution requires the federal government to affirmatively recognize and grant the federal spousal protections, obligations, and benefits to same-sex married couples that DOMA denied them. DOMA did not take away from same-sex couples federal law protections "that the states had chosen to give," as Defendants imply, Resp. at 13, but preemptively denied federal spousal protections to same-sex

---

[3]     Defendants contend that their "negative right" view is compelled by *Loving*, *Turner*, and *Zablocki* because "[u]nder any other reading, a state would be constitutionally prohibited from deciding to simply get out of the marriage licensing business altogether and to instead regulate domestic relations through other means." Resp. at 10. But whether States are required by the Due Process Clause to sanction any marriages at all is not an issue before the Court in this case. States currently *do* sanction marriages, and that sanction is what Plaintiffs' right to marry entails.

couples at a time when no state allowed same-sex couples to marry. *Windsor* confirmed same-sex couples' right to federal spousal protections they had never had before.

Furthermore, Defendants' effort to analogize marriage to government funding for abortions is wide of the mark. There is no constitutional right to free medical care, including abortion, for those who are not held in state custody. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (obligation to provide medical care to incarcerated people derives from Eighth Amendment); *accord Maher v. Roe*, 432 U.S. 464, 469 (1977) (The constitution imposes no obligation to pay for medical care). Marriage, in contrast, brings with it the protections and benefits the states and federal government have chosen to accord that relationship. Moreover, Plaintiffs here are not asking to be freed from any costs the State imposes on couples who wish to marry, such as the fee for their marriage license, but for the status, recognition, protections and obligations that Wisconsin currently denies them solely because of their sex and sexual orientation.

**B.     State Autonomy Must Yield To Federal Constitutional Protections.**

Defendants devote many pages to a panegyric to federalism. Resp. at 14-20. At bottom, their argument is simply that "Wisconsin is not constitutionally required to give same-sex couples the positive right to civil marriage." *Id.* at 14. But federalism does not trump the individual's constitutional rights secured by the Fourteenth Amendment against infringement *by the states*. U.S. Const., Amend. XIV ("nor shall *any State* deprive any person of life, liberty, or property, without due process of law . . .) (emphasis added). "State laws defining and regulating marriage, of course, must respect the constitutional rights of persons." *Windsor*, 133 S. Ct at 2691 (citing *Loving*). The "virtually exclusive province" of the states to regulate domestic affairs is always "subject to those guarantees." *Id.* (quoting *Sosna v. Iowa*, 419 U.S. 393, 404 (1975)).

For this reason, "the Supreme Court has not hesitated to invalidate state marriage laws whenever such laws intrude on an individual's protected realm of liberty." *De Leon*, 2014 WL 715741, at *19. Moreover, numerous district courts addressing state marriage bans have reaffirmed the "unremarkable proposition" that state prerogatives are subordinate to constitutional protections. *Bishop*, 962 F. Supp. 2d at 1279; *Latta*, 2014 WL 1909999, at *9 ("[t]he Due Process Clause of the Fourteenth Amendment to the United States Constitution . . . places substantive limits on the States' authority to constrain individual liberty."); *Bostic*, 970 F. Supp. 2d at 476 (E.D. Va. 2014); *Bourke*, 2014 WL 556729, at *1; *DeBoer*, --- F. Supp. 2d ---, 2014 WL 1100794 (E.D. Mich. Mar. 21, 2014) (quoting *Windsor*); *Kitchen*, 961 F. Supp. 2d at 1196.[4]

Whatever authority the federal system confers on states, that authority must be exercised within constitutional limits imposed by the Fourteenth Amendment.

## C. The State's Democratic Process May Not Infringe Upon Individual Constitutional Rights.

Defendants' argument that "established principles of substantive due process do not, and should not, preclude government from giving effect to the views—including the value judgments—of a majority of citizens when those citizens or their elected representatives are deciding whether, and to what extent, to legally recognize, endorse, or subsidize particular social

---

[4]  Defendants claim, at 18, that "Wisconsin has taken both a prudent and experimental approach, affirming its traditional marriage laws while also recognizing domestic partnerships;" however, Defendants have made no effort to defend the "prudent approach" of providing domestic partnerships from challenge. Defendant Van Hollen refused to defend the state's domestic partnership law in a state case, instead stating that he would "concede that the law is unconstitutional [under Wis. Const. Art. XIII, § 13] and consent to an order enjoining the domestic registry program." Brief in Support of Motion to Withdraw at 2, *Appling v. Doyle*, No. 2010-CV-4434 (Dane Cty. Cir. Ct. (Wis.) May 13, 2011). http://www.lambdalegal.org/in-court/legal-docs/appling_wi_20110513_brief-iso-defendants-motion-to-withdraw. Defendant Walker moved to withdraw from defense of Wisconsin's domestic partnership law after determining that "defending [the] law would be contrary to the state's constitution." *Id*. at 4.

practices," Resp. at 20, falter for the same reasons as their federalism argument.[5] "One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

Almost all of the marriage bans recently struck down by federal courts were enacted by referendum, but that did not exempt them from constitutional review. *See, e.g.*, *DeBoer*, 2014 WL 1100794 ("The popular origin of the MMA does nothing to insulate the provision from constitutional scrutiny."); *Obergefell*, 962 F. Supp. 2d at 981 ("*The electorate cannot order a violation of the Due Process or Equal Protection Clauses by referendum or otherwise*, just as the state may not avoid their application by deferring to the wishes or objections of its citizens." (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 448 (1985)); *Latta*, 2014 WL 1909999 at *6 ; *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 927 (N.D. Cal. 2010), *aff'd sub. nom. Perry v. Brown*, 671 F.3d 1052, *vacated and remanded sub. nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *Kitchen*, 961 F. Supp. 2d at 1191.

---

[5]     In fact, Defendants' entire democratic process argument, Resp. at 20-25, is premised on a variation of its flawed argument distinguishing between negative and positive rights. *See, e.g.*, *id*. at 20 ("[T]he Supreme Court accepts that the Constitution leaves the area of affirmative governmental obligations 'to the democratic political processes.' *DeShaney*, 489 U.S. at 196. Within this domain of positive rights . . . "). Because the distinction does not hold, the entire argument collapses. Defendants' effort to suggest that a state may make value judgments regarding contested issues also fails. The legislative value judgments approved in *Rust* were made with respect to state-funded abortions for which there is no constitutional right. Moreover, the *Lawrence* Court did not cabin its reasoning regarding the liberty of "[p]ersons in a homosexual relationship" to make decisions free from the imposition of the moral judgments of "the governing majority in a State [which] has traditionally viewed a particular practice as immoral," 539 U.S at 577, to laws that criminalize the conduct at issue. Rather, the Court reasoned that to characterize the rights of lesbians and gays as "simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse." *Id*. at 567. Lesbians and gays have autonomy to make "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," *id*. at 574, notwithstanding the contrary moral judgments of lawmakers.

Defendants' reliance on *Schuette v. Coalition to Defend Affirmative Action*, 134 S. Ct. 1623 (2014), is misplaced. *Schuette* reaffirmed that the outcomes of democratic processes are subject to constitutional review. *Id.* at 1632 (reviewing the outcome of a Michigan referendum and reaffirming "the unremarkable principle that the State may not alter the procedures of government to target racial minorities"). Defendants' own characterization of the decision in *Schuette*, which begins with the caveat "in the absence of injury to individual rights by the unlawful exercise of governmental power," makes exactly this point. Resp. at 22.

## II. Wisconsin's Marriage Ban Is Subject To Heightened Scrutiny.

### A. Marriage Is A Fundamental Right Guaranteed By The Due Process Clause.

Defendants' argument that Plaintiffs' due process claims are not subject to heightened scrutiny because they are not based upon fundamental rights is without merit. Plaintiffs are *not* asking the Court to recognize a *new* fundamental right to same sex marriage. Rather, Plaintiffs are seeking to affirm their right to marry the partner of their choosing—a fundamental right that has been recognized by the Supreme Court consistently for decades. *See*, *e.g.*, *Turner v. Safley*, 482 U.S. 78, 95 (1987); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974); *Loving*, 388 U.S. at 12; *Griswold v. Conn.*, 381 U.S. 479, 486 (1965).

#### 1. Lesbians and Gay Men Have The Fundamental Right To Marry The Person Of Their Choice.

Defendants argue that Plaintiffs' right to marry the partner of their choosing is somehow different from the right of a heterosexual person to do the same. But the Supreme Court has never defined the right to marry by reference to those permitted to exercise that right. Thus, the Supreme Court addresses "the fundamental right to marry" in its decisions. *See Loving*, 388 U.S. at 12; *Turner*, 482 U.S. at 94-96; *Zablocki*, 434 U.S. at 383-86. Indeed, the Supreme Court has "framed [the right to marry] in remarkably broad terms." *Latta*, 2014 WL 1909999, at *12.

> *Loving* was no more about the "right to interracial marriage" than *Turner* was about the "prisoner's right to marry" or *Zablocki* was about the "dead-beat dad's right to marry." Even in cases with such vastly different facts, the Supreme Court has consistently upheld the right to marry, as opposed to a subright tied to the facts of the case.

*Id. See also Henry*, 2014 WL 1418395, at *7 ("The Supreme Court has consistently refused to narrow the scope of the fundamental right to marry by reframing a plaintiff's asserted right to marry as a more limited right that is about the characteristics of the couple seeking marriage."); *Bostic*, 970 F. Supp. 2d at 472 ("The reality that marriage rights in states across the country have begun to be extended to more individuals fails to transform such a fundamental right into some 'new' creation."); *Obergefell*, 962 F. Supp. 2d at 982 n.10 ("Cases subsequent to *Loving* have similarly confirmed that the fundamental right to marry is available even to those who have not traditionally been eligible to exercise that right. . . . [W]hen analyzing other fundamental rights and liberty interests in other contexts, the Supreme Court has consistently adhered to the principle that a fundamental right, once recognized, properly belongs to everyone."). That right is entitled to protection under the Due Process Clause.

Defendant's proposed distinction between marriage and "same-sex marriage" has repeatedly been rejected by courts. As the court in *Kitchen* recently explained:

> The alleged right to same-sex marriage that the State claims the Plaintiffs are seeking is simply the same right that is currently enjoyed by heterosexual individuals: the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond. This right is deeply rooted in the nation's history and implicit in the concept of ordered liberty because it protects an individual's ability to make deeply personal choices about love and family free from government interference.

*Kitchen*, 961 F. Supp. 2d at 1202-03; *see also Latta*, 2014 WL 1909999, at *12 (finding that the fundamental right to marry includes same sex couples); *Henry*, 2014 WL 1418395, at *7-9

(same); *De Leon*, 2014 WL 715741, at *17-20 (same); *Bostic*, 970 F. Supp. 2d at 470-73 (same); *Schwarzenegger*, 704 F. Supp. 2d at 991-93 (same).

Defendants argue that the fundamental right to marry cannot include same sex couples because *Loving* "was limited to racial classifications that infringed upon personal liberty, and expressed no opinion about whether there is a fundamental right to marry someone of the same sex." Resp. at 27. But the Supreme Court itself has explicitly rejected this idea. *See Zablocki*, 434 U.S. at 384 ("Although *Loving* arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals."). *Accord De Leon*, 2014 WL 715741, at *20 ("Instead of declaring a new right to interracial marriage, the Court [in *Loving*] held that individuals could not be restricted from exercising their 'existing' right to marry on account of their chosen partner. That is, an interracial marriage was considered to be a subset of 'marriage,' in the same way that same-sex marriage is included within the fundamental right to marry." (citation omitted)); *Kitchen*, 961 F. Supp. 2d at 1202 (same); *Perry*, 704 F. Supp. 2d at 992 ("When the Supreme Court invalidated race restrictions in *Loving*, the definition of the right to marry did not change. Instead, the Court recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry." (citations omitted)).[6]

---

[6]     Amici argue that sex and race are different because "race restrictions, unlike the sex of the parties, were never essential to marriage." Brief of *Amici Curiae* Julaine K. Appling, Jo Egelhoff, Jaren E. Hiller, Richard Kessenich and Edmund L. Webster ("Amici"), Dkt. # 109, at 10. But the court in *Perry* found, based on the testimony of an expert historian of marriage, that "[a]s many as 41 states and territories" "had laws restricting the race of marital partners so that whites and non-whites could not marry each other." 704 F. Supp. 2d at 957. The court further found that "people who supported [racially restrictive marriage laws] saw these as very important definitional features of who could and should marry, and who could not and should not." *Id*. The supporters of Virginia's ban would agree: according to the trial judge who sentenced the Lovings, "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement

Defendants similarly fail to appreciate the significance of *Lawrence v. Texas*, 539 U.S. 558 (2003), for this case. Defendants argue that *Lawrence* is irrelevant because it did not explicitly recognize the right to marriage. But, as other courts addressing this issue have recognized, the court in *Lawrence*:

> held that the right of consenting adults (including same-sex couples) to engage in private, sexual intimacy is protected by the Fourteenth Amendment's protection of liberty, notwithstanding the historical existence of sodomy laws and their use against gay people. For the same reasons, the fundamental right to marry is "deeply rooted in this Nation's history and tradition" for purposes of constitutional protection even though same-sex couples have not historically been allowed to exercise that right. "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." [*Lawrence*, 539 U.S. at 572 (citation omitted)]. While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a right, once that right is recognized as one that due process protects.

*Henry*, 2014 WL 1418395, at *8 (quoting *Lawrence*, 539 U.S. at 572); *see also Kitchen*, 961 F. Supp. 2d at 1203-04 (discussing the role of *Lawrence* in the fundamental rights analysis); *Obergefell*, 962 F. Supp. 2d at 982 n.10 (same).

Defendants also fundamentally misconstrue *Windsor*, 133 S. Ct. 2675 (2013). First, Defendants argue that *Windsor* is somehow irrelevant because it deals with the Fifth, rather than the Fourteenth, Amendment. However, "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 201 (1996) (citing *Buckley v. Valeo*, 424 U.S. 1, 93). Defendants next misquote

---

there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix." *Loving*, 388 U.S. at 3.

Furthermore, Wisconsin's marriage laws did not restrict marriage to a "husband" and a "wife" until 1983. *See* State Defendants' Proposed Finding of Fact in Opposition to Plaintiffs' Motion for Summary Judgment, No. 7 (Dkt # 103 at 3). The recent date of the statute shows that a legal ban is not the only means by which societies and citizens prevent or discourage marriages of which they do not approve.

*Windsor* in an attempt to argue that "Plaintiffs' fundamental right due process analysis is inconsistent with the *Windsor* majority opinion." Resp. at 28. According to Defendants: "There [in *Windsor*], the Supreme Court stated that 'the limitation of lawful marriage to heterosexual couples' has 'for centuries been deemed both necessary and *fundamental*.'" *Id.* (quoting *Windsor*, 133 S. Ct. at 2689).[7] The question whether same-sex couples have the right to marry was not even before the Court, but in any event, Justice Kennedy has elsewhere made clear that "history and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry," *Lawrence*, 539 U.S. at 572 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 857 (1998)), and "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Id.* at 579.

Numerous courts throughout the country have already recognized that lesbians and gay men must be accorded the fundamental right to marry. *See*, *e.g.*, *Latta*, 2014 WL 1909999, at *1; *Henry*, 2014 WL 1418395, at *7-9; *De Leon*, 2014 WL 715741, at *17-20; *Bostic*, 970 F. Supp. at 470-73; *Kitchen*, 961 F. Supp. 2d at 1196-1203; *Perry*, 704 F. Supp. 2d at 991-93; *see also Obergefell*, 962 F. Supp. 2d at 982 & n.10. The question is an open one in the Seventh Circuit for this Court to decide. It is neither novel nor without legal precedent to ask this Court to follow the compelling reasoning of these other federal decisions.

### 2. Wisconsin's Marriage Laws Interfere With Plaintiffs' Fundamental Right To Remain Married.

Defendants' argument that Wisconsin's marriage laws do not interfere with Plaintiffs' right to remain married is equally without merit. As other courts have recognized, "[t]here are a number of fundamental rights and/or liberty interests protected by the Due Process clause . . .

---

[7] The complete sentence from which Defendants extract their quote reads: "The limitation of lawful marriage to heterosexual couples, which for centuries had been deemed both necessary and fundamental, *came to be seen in New York and certain other States as an unjust exclusion.*" *Windsor*, 133 S. Ct. at 2689 (emphasis added).

including the right to marry [and] the right to remain married." *See Henry*, 2014 WL 1418395, at *7; *Obergefell*, 962 F. Supp. 2d at 978-82; *see also Bourke*, 2014 WL 556729, at *5 n.13 (explaining that "[s]ome courts have construed the right to marry to include the right to remain married"); Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 MICH. L. REV. 1421 (2012).

Defendants' argument appears to rest on a misunderstanding of the right at issue. They argue that "Wisconsin's marriage laws do not interfere with certain Plaintiffs' claimed fundamental right to *remain* married," Resp. at 29, yet two paragraphs later they expressly concede that "it [the marriage amendment] refuses to recognize same-sex marriages from other jurisdictions." *Id*. It is the refusal to recognize, for state law purposes, the marriage that Borden and Wallmann entered into and relied on in ordering their affairs before moving to Wisconsin that deprives them of their right to remain married in violation of due process. *See Henry*, 2014 WL 1418395, at *9 (finding that due process protects same-sex couples' right to remain married); *accord Obergefell*, 962 F. Supp. 2d at 978-82. The due process violation here is especially egregious in light of the fact that Borden and Wallman had lived for more than four years as a married couple in California before their transfer to Wisconsin resulted in the loss of the state law legal protections, as well as the status and recognition marriage previously brought them.

Defendants' argument that the Wisconsin marriage statutes and the Wisconsin marriage amendment do not actually "nullify" Plaintiffs Wallmann and Borden's marriage under California law is beside the point. Rather, the issue is whether Wisconsin *recognizes* this marriage and treats Wallmann and Borden like any other couple that has been lawfully married and lived as a married couple in a state where their marriage was recognized—and Defendants

expressly concede that it does not. Resp. at 29. Plaintiffs are unable to enjoy the numerous rights and responsibilities, as well as the status and recognition, automatically granted to different-sex couples in Wisconsin who were legally married in other states.

Defendants' argument that Plaintiffs Wallmann and Borden have "admitted" that their marriage was not voided by the State of Wisconsin is disingenuous. *Id.* Defendants' Request to Admit No. 30 asked Plaintiffs Wallmann and Borden to admit that they "currently *see themselves as married* regardless of the Wisconsin Marriage Amendment." Plaintiffs' Responses to State Defendants' First Set of Requests for Admission, No. 30 (emphasis added). Plaintiffs responded to the Request stating that they "*subjectively* consider themselves to be a married couple." *Id.* (emphasis added). A couple's "subjective" view of their relationship is irrelevant to the objective question of whether, in fact, they enjoy the benefits and have the legal obligations of a married couple in Wisconsin. Plaintiffs do not have the ability to "admit" that they are legally married under Wisconsin law.[8]

Defendants' final argument that Section 2 of DOMA somehow immunizes their unconstitutional actions is unpersuasive and has been rejected by all of the courts to consider it. Even assuming that Section 2 of DOMA is valid,[9] it is irrelevant. If the marriage ban violates the United States Constitution, DOMA cannot authorize the violation. "[N]either Congress nor a

---

[8]  None of Defendants' other citations to Plaintiffs' discovery responses are any more convincing. *See* Resp. at 29. In response to Defendants' Request to Admit No. 32, Plaintiffs Wallmann and Borden merely stated that "to the extent that Request No. 32 asks whether the State of Wisconsin has annulled Plaintiffs Wallmann and Borden's marriage pursuant to a judicial proceeding under Wis. Stat. § 767.18 or Wis. Stat. § 767.313 or any other judicial proceeding under Wisconsin law, Plaintiffs admit Request No. 32, subject to those qualifications. However, if Request No. 32 has any other intended meaning, Plaintiffs deny Request No. 32." And Defendants' citation to Plaintiffs' Response to State Defendants' Motion to Dismiss is equally irrelevant. Plaintiffs stated that "[t]he validity of Plaintiffs' marriage in California is not at issue . . . ." Dkt. # 95 at 16. That was, and continues to be, the case.

[9]  As Section 2 of DOMA is not at issue before this Court, Plaintiffs will not make arguments about its validity. Plaintiffs do not, however, concede that the statute is valid.

State can validate a law that denies the rights guaranteed by the Fourteenth Amendment." *Saenz v. Rowe*, 526 U.S. 489, 508 (1999)); *see also Graham v. Richardson*, 403 U.S. 365, 382 (1971) ("Congress does not have the power to authorize the individual States to violate the Equal Protection Clause."); *De Leon*, 2014 WL 715741, at *22 (quoting *Graham*); *Obergefell*, 962 F. Supp. 2d at 981 n.9; *Henry*, 2014 WL 1418395, at *17 n.24; *Latta*, 2014 WL 1909999, at *25 (quoting *Saenz*). Plaintiffs do not need to challenge Section 2 of DOMA to reach this outcome because it "is an entirely permissive federal law" that "does not mandate that states take any particular action, does not remove any discretion from states, does not confer benefits upon non-recognizing states, and does not punish recognizing states." *Bishop*, 962 F. Supp. 2d at 1266.

### B. Sexual Orientation Is A Suspect Classification Subject To Heightened Scrutiny.

As Plaintiffs argued in their opening brief, Pl. Br. at 21-26, sexual orientation meets all four criteria established by the Supreme Court for determining whether a given basis of classification is "suspect" and thus warrants application of heightened scrutiny. Defendants largely ignore the criteria and instead rely on Seventh Circuit decisions decided prior to *Lawrence* that declined to apply heightened scrutiny to classifications based on sexual orientation.

State Defendants do not dispute that gays and lesbians meet the two "necessary" criteria for suspect class status: a history of discrimination and whether the attribute in question bears a relation to ability to perform or contribute to society. *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) ("Immutability and lack of political power are not strictly necessary factors to identify a suspect class."), *aff'd* 133 C. Ct. 2675 (2013); *accord Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 987 (N.D. Cal. 2012). Defendants assert that the scientific evidence in support of the immutability of sexual orientation is equivocal, Resp. at 40, n.10, but

the paper they cite fails to support their position and in fact supports Plaintiffs. In "'*I Was Born this Way': Is Sexuality Innate, and Should it Matter?*" LGBTQ Policy Journal at the Harvard Kennedy School: 2011 Edition, Joseph Osmundson wrote that the concept of innateness of sexuality, *at it is currently understood*, has serious ramifications for the rights of the LGBT community." App. Tab No. 25, at Conclusion. Osmundson uses the word "innateness" to describe a "biological understanding of sexuality," *id.*, not as a synonym for immutability, and agrees with Plaintiffs and the Supreme Court that "[s]exuality is an integral part of human identity and should not be the basis for discrimination." *Id.*

Moreover, the American Psychological Association ("APA"), the American Academy of Pediatrics, the American Medical Association, the American Psychiatric Association, and the American Psychoanalytic Association have all agreed that sexual orientation is "highly resistant to change." Brief of American Psychological Ass'n, et al., as Amici Curiae on the Merits in Support of Affirmance, *Windsor*, 133 S. Ct. 2675, (No. 12-307), 2013 WL 871958, at *10. *See* also American Psychiatric Association, *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, at 2 (Aug. 2009), http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf. American Psychiatric Association, *Resolution on Appropriate Therapeutic Responses to Sexual Orientation*, 53 Am. Psychologist 934-35 (1998); American Psychiatric Association, *Resolution on Prejudice, Stereotypes, and Discrimination*, 62 Am. Psychologist 475-81 (2006); American Psychiatric Association, *Position Statement: Psychiatric Treatment and Sexual Orientation* (1998). Having reviewed the evidence, the court in *Perry* endorsed this view. *See Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."); *accord*

*Golinski*, 824 F. Supp. 2d at 986; *Pedersen*, 881 F. Supp. 2d at 320-24); *Cece v. Holder*, 733 F.3d 662, 669 (7th Cir. 2013) (sexual orientation is an "immutable or fundamental characteristic"); *Jantz v. Muci*, 759 F. Supp. 1543, 1548 (D. Kan. 1991) (finding that "available scientific evidence . . . strongly supports the view that sexual orientation is not easily mutable"), *rev'd*, 976 F.2d 623 (10th Cir. 1992) (based on qualified immunity).

Furthermore, the Supreme Court has recognized that sexual orientation is such a fundamental part of a person's identity that the government may not require a citizen to choose between sexual orientation and individual rights. *See Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom"). As the Seventh Circuit put it, "we respect an individual's right to maintain characteristics that are fundamental to their individual identities," even where those characteristics may be "alterable." *Cece*, 733 F. 3d at 669 (quoting *Escobar v. Holder*, 657 F.3d 537, 545 (7th Cir. 2011). *Accord In re Marriage Cases*, 183 P.3d at 442 ("[A] person's sexual orientation is so integral an aspect of one's identity [that] it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment."); *Jantz*, 759 F. Supp. at 1548 ("Immutability therefore defines traits which are central, defining traits of personhood, which may be altered only at the expense of significant damage to the individual's sense of self.").

As legal support for their position, State Defendants cite *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990). There, the Ninth Circuit asserted that sexual orientation was "behavioral and hence . . . fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes." *Id*. at 573. Since then, any distinction between sexual orientation and sexual conduct

has now been squarely repudiated by the Supreme Court. *Lawrence*, 539 U.S. at 575 ("[w]hen homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination.") (emphasis added)); *accord id.* at 583 ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class.") (O'Connor, J., concurring in judgment); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez* ("*CLS*"), 130 S. Ct. 2971, 2990 (2010) (rejecting a litigant's argument that a prohibition on same-sex intimate conduct is different from discrimination against gay people and explaining that that "[o]ur decisions have declined to distinguish between status and conduct in this context."). Further, more recent court decisions, including decisions in the Ninth Circuit, *see Hernandez–Montiel v. Immigration and Naturalization Serv.*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("Sexual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them."), *overruled in part on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005); *Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005) (agreeing with *Hernandez–Montiel* and finding that homosexuality is "a fundamental aspect of ... human identity"), have concluded that sexual orientation is an "obvious, immutable, or distinguishing" aspect of personal identity, that a person cannot—and should not—be required to change to escape discrimination. *Windsor*, 699 F.3d at 181.[10]

---

[10]      In addition, immutability is not a strict requirement for heightened scrutiny. Heightened scrutiny applies to classification based on alienage and "illegitimacy," even though "[a]lienage and illegitimacy are actually subject to change." *Windsor*, 699 F.3d at 183 n. 4; *see Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting the argument that alienage did not deserve strict security because it was mutable).

Further, Defendants' argument that gays and lesbians have too much political power to constitute a suspect class also misunderstands the analysis. "The question is not whether homosexuals have achieved political successes over the years; they clearly have. The question is whether they have the strength to politically protect themselves from wrongful discrimination." *Windsor*, 699 F.3d at 184. The marriage ban itself shows that they do not.

Not surprisingly, State Defendants would like this court to bypass the four-factor analysis altogether and rely instead on *Schroeder v. Hamilton School District*, 282 F.3d 946, 950-51 (7th Cir. 2002),[11] in which the Seventh Circuit held that "homosexuals do not enjoy any heightened protection under the Constitution." *Schroeder*, however, relied on *Bowers v. Hardwick*, 478 U.S. 186, 196 (1986), in holding that sexual orientation did not trigger heightened scrutiny. *Bowers*, of course, was explicitly overruled by *Lawrence v. Texas*, in which the Supreme Court stated that "[t]he foundations of *Bowers* have sustained serious erosion from our recent decisions in *Casey* and *Romer*" and that "its continuance as precedent demeans the lives of homosexual persons." 539 U.S. at 575-76. For this reason, other courts have concluded that "[t]he Supreme Court's holding in *Lawrence* remov[ed] the precedential underpinnings of the federal case law supporting the . . . claim that gay persons are not a [suspect or] quasi-suspect class." *Pedersen v. U.S. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012) (citations and quotation marks omitted); *accord Golinski*, 824 F. Supp. 2d at 984 ("[T]he reasoning in [prior circuit court decisions], that laws discriminating against gay men and lesbians are not entitled to heightened scrutiny because homosexual conduct may be legitimately criminalized, cannot stand post-

---

[11] In *Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989), the most recent case in which the Seventh Circuit applied the four-factor analysis in relation to sexual orientation, the court similarly relied upon *Bowers*' endorsement of criminalizing intimacy in same-sex relationships. *Id.* at 464-65.

*Lawrence*."); *see also Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987) (A lower court is bound to follow precedent of a higher "unless [it is] powerfully convinced that the [higher court] would overrule it at the first opportunity."). This Court should apply the four factors and hold that classifications based on sexual orientation are subject to strict scrutiny.

### C. The Marriage Ban Discriminates On The Basis Of Gender And Is Thus Subject To Heightened Scrutiny.

Wisconsin's marriage ban not only discriminates on the basis of sexual orientation, it also discriminates on the basis of gender, both facially and by subjecting Plaintiffs to sex stereotyping, by purporting to enshrine in state law historical assumptions regarding the "proper" roles of men and women in families.

### 1. The Marriage Ban Discriminates On The Basis Of Gender.

The marriage ban prohibits each Plaintiff from marrying the person of his or her choosing, even though such a marriage would be allowed were that Plaintiff of a different sex. Thus, each Plaintiffs' sex in relation to his or her chosen partner is the basis for the prohibition. A law that restricts marriage based on a person's sex is facially discriminatory. *See Kitchen*, 961 F. Supp. 2d at 1206; *Perry*, 704 F. Supp. 2d at 996; *Baehr v. Lewin*, 852 P.2d 44, 64 (Haw. 1993) (Hawa'ii marriage statute "on its face and as applied regulates access to the marital status and its concomitant rights and benefits on the basis of the applicants' sex."), *aff'd sub. nom Baehr v. Miike*, 950 P.2d 1234 (Haw. 1997).

In their Response, State Defendants contend that the marriage ban does not "create a classification based upon gender," Resp. at 32, citing a few district court cases. But other courts have held differently. *See e.g.*, *Kitchen*, F. Supp. 2d at 1206; *Perry*, 704 F. Supp. 2d at 996; *Baehr*, 852 P.2d at 64; Pl. Br. at 16 (collecting cases). As those courts have persuasively reasoned, just as with the race-based restriction on marriage in *Loving*, "the fact of equal

application to both men and women does not immunize [a law excluding same-sex couples from marriage] from the heightened burden of justification that the Fourteenth Amendment requires of state laws drawn according to sex." *Kitchen*, 961 F. Supp. 2d at 1206.

State Defendants further argue that *Loving* does not apply here because Wisconsin's marriage laws are not an effort to maintain the supremacy of one gender over another. Dkt # 96 at 19. But State Defendants read *Loving* too narrowly. The *Loving* court explained that "even assuming an even-handed state purpose to protect the 'integrity' of all races," Virginia's ban on interracial marriage was unconstitutional. *Loving*, 388 U.S. at 11 n.11. *Accord Johnson v. Cal.*, 543 U.S. 499, 506 (2005) (holding that California's racially "neutral" practice of segregating inmates by race, which did not single out any race for different treatment, was nonetheless a racial classification subject to strict scrutiny). Likewise, here, the marriage ban need not elevate one gender over the other to run afoul of the Equal Protection Clause.

## 2. The Marriage Ban Discriminates On The Basis Of Sex Stereotypes.

The State Defendants admit that the marriage ban is founded upon sex stereotypes, which they euphemistically refer to as "marital norms of gender complementarity." Def. Reply in Supp. of Mot. to Dismiss (Dkt # 96) at 19. A restriction based on such "norms" or "stereotypes" constitutes discrimination on the basis of gender. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). *See also White v. Fleming*, 522 F.2d 730, 737 (7th Cir. 1975) ("[I]t is impermissible under the equal protection clause to classify on the basis of stereotyped assumptions concerning propensities thought to exist in some members of a given sex."); *Doe by Doe v. City of Belleville*, 119 F.3d 563, 581 (7th Cir. 1997) (holding that "reliance upon stereotypical notions about how men and women should appear and behave" "reasonably suggests" that "a particular action . . . can be attributed to sex."), *vacated and remanded on other grounds*, *City of Belleville v. Doe by Doe*, 523 U.S. 1001 (1998).

State Defendants' brief opposing summary judgment does not address Plaintiffs' sex stereotyping argument at all. While they denied that stereotyping was at work in their reply brief to their motion to dismiss, Dkt # 96 at 10, the State Defendants asserted that Wisconsin's laws banning marriage for same-sex couples "simply acknowledge that *women and men bring undeniably unique gifts to parenting, gifts that are different and complementary*." *Id.* (emphasis added). That statement is an admission that the marriage ban is grounded in gender-based stereotypes. *See Varnum v. Brien*, 763 N.W.2d 862, 899 n.26 (Iowa 2009) ("[T]he traditional notion that children need a mother and a father to be raised into healthy, well-adjusted adults is based more on stereotypes than anything else.").

Defendants' "optimal child-rearing" argument similarly exposes the sex stereotyping underlying the ban. Defendants state: "Wisconsin's marriage laws promote traditional marriage as optimal" because "'[t]he *proper* mating of the male and female of the human race [is] the foundation of the family and thereby the general well-being of the community….'" Resp. at 48 (quoting *Lyannes v. Lyannes*, 177 N.W. 683, 685 (1920)) (emphasis added). The restriction of marriage to different-sex couples is thus admittedly grounded in preconceived notions— stereotypes—of what is "proper" for men and women to do in regard to having and raising children. "[F]ixed notions concerning the roles and abilities of males and females" are an impermissible basis for denying equal protection of the laws. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982).

## III. Wisconsin's Marriage Ban Fails Under Any Standard Of Review.

Wisconsin's marriage ban cannot survive any level of constitutional scrutiny.

### A. Rational Basis Is Not A Rubber Stamp For Discrimination.

Rational basis review requires a serious analysis of the connection between the marriage ban and its asserted justifications. As the Supreme Court explained in *Romer v. Evans*, "even in

the ordinary equal protection cases calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be obtained." 517 U.S. 620, 632 (1996). This "search for the link between classification and objective gives substance to the Equal Protection Clause" and "provides guidance and discipline for the legislature." *Id*. The Defendants, relying on one pre-*Windsor* district court opinion, argue that "Wisconsin is not required to show that 'denying marriage to same-sex couples is necessary to promote the state's interest or that same-sex couples will suffer no harm by an opposite-sex definition of marriage.'" Resp. at 34 (quoting *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1106 (D. Haw. 2012)).[12] But *Jackson* is inconsistent with Supreme Court and Seventh Circuit precedent on this point. Both the Supreme Court and the Seventh Circuit have repeatedly required there to be a governmental interest for the exclusion of the disfavored class for a classification to survive rational basis review. *See U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 535-38 (1973) (evaluating federal government's interest in *excluding* unrelated household from food stamp benefits, not in maintaining food stamps for related households); *Cleburne*, 473 U.S. at 448-50 (examining the city's interest in *denying* housing for people with developmental disabilities, not in continuing to allow residence for others); *Loving*, 388 U.S. at 12 (deciding whether "*restricting* the freedom to marry solely because of racial classification" violated equal protection, rather than whether Virginia had reason for providing the right to marry to couples of the same race) (emphasis added); *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013) (finding that there must be "a rational relationship between the *disparity of treatment* and some legitimate government purpose.'") (emphasis added). In other words, any purportedly

---

[12] *Jackson* is an outlier decision whose reasoning has been rejected by numerous other courts, *see, e.g.*, *Bishop*, 962 F. Supp. 2d at 1295; *Henry*, 2014 WL 1418395 at *7, and the appeal of the decision was never decided because in the interim the Hawai'i legislature extended the freedom to marry to same-sex couples. *See* HRS § 572-1.7.

rational basis must support drawing a distinction between marriage for different-sex and marriage for same-sex couples. Merely demonstrating that marriage (whether opposite-sex or otherwise) is a social good and should be promoted is insufficient to demonstrate a rational basis for disparate treatment between opposite-sex couples and same-sex couples.

Such an approach is consistent with that of every court to address the exclusion of same-sex couples from marriage under rational basis since *Windsor*, as shown in Plaintiffs' opening brief at p. 28.  *See also Latta*, 2014 WL 1909999, at *14 ("The Court in [rational basis] cases presumes the law is valid unless the challenger can show *the difference in treatment* bears no rational relation to a conceivable government interest."  (citing *Heller v. Doe*, 509 U.S. 312, 319-21 (1993) (emphasis added)).

### B.      Wisconsin's Marriage Ban Is Line-Drawing Merely For The Purpose Of Disadvantaging Same-Sex Couples.

As discussed in Plaintiffs' opening brief, Pl. Br. at 37-40, courts look for a rational connection between purported legislative ends and the chosen legislative means to ensure that the state has not engaged in line-drawing merely for "the purpose of disadvantaging the group burdened by the law."  *Romer*, 517 U.S. at 633; *see also Windsor*, 133 S. Ct. at 2693; *Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534. Laws whose purpose is to disadvantage a politically unpopular group violate equal protection.  *Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S. at 634-35; *Cleburne*, 473 U.S. at 446-47; *Moreno*, 413 U.S. at 534.   The history of Wisconsin's marriage ban shows that it is an instance of such line drawing. Pl. Br. at 38 (quoting legislative history indicating that the purpose of the marriage ban was to prevent "our State

Supreme Court" from "legislating from the bench to … judicially impose same-sex marriage on this state").[13]

> ### 1. The Facts Support A Conclusion That The Marriage Ban Was Motivated By A Desire To Exclude Lesbian And Gay Couples From The Tangible & Intangible Benefits & Obligations Of Marriage.

A finding that the marriage ban was motivated by an impermissible purpose is not required for this Court to find that the ban violates equal protection. *See Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (allegations of irrational discrimination "quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis"). However, the purpose and effect of the ban was to disadvantage same-sex couples. Defendants argue that the marriage ban was intended to maintain the status quo of traditional marriage laws, and was not enacted on the basis of animus. But the *Windsor* Court addressed exactly the same circumstances, since no state allowed same-sex couples to marry in 1996 when Congress passed DOMA. *Windsor*, 133 S. Ct. at 2681. However, the "history of DOMA's enactment," including a stated interest in "defend[ing] the institution of traditional heterosexual marriage," demonstrated "that interference with the equal dignity of same-sex marriages . . . was more than an incidental effect of the federal statute" but "was its essense." *Id.* at 2693. As Justice Scalia recognized in *Lawrence*, "'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples." 539 U.S. at 601 (Scalia, J., dissenting). As Plaintiffs showed in their opening brief and submissions, both the legislative and non-legislative proponents of the marriage ban saw it as a

---

[13]     Defendants' argument that "Plaintiffs, however, advance no animus arguments regarding the portions of the 'marriage ban' beyond the Marriage Amendment and do not assert that any of Wisconsin's other marriage laws were improperly motivated, effectively conceding such laws did not result from any bias," Resp. at 35, has no traction, since the Equal Protection Clause is violated when government has "selected *or reaffirmed* a particular course of action" because of its negative effect on an identifiable group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added).

way to thwart any extension of marriage to same-sex couples. Pl. Br. at 37-38. Non-legislative proponents went further, actively disparaging gays and lesbians by comparing same-sex marriage to polygamy. *Id.* at 37-38, n.11.

Defendants claim that "voter motivations should be taken with a grain of salt," relying on *Hunter v. Underwood*, 471 U.S. 222 (1985). *Hunter* does not support Defendants' position. Immediately following the portion that they quote, the Supreme Court relied on historical evidence and quotations from legislators to determine that an Alabama law was enacted out of racial animus. *Id.* at 230-31. Defendants also cite *Palmer v. Thompson*, 403 U.S. 217 (1971), but it is similarly unavailing. The *Palmer* court held that a law cannot violate equal protection "*solely* because of the motivations of the men who voted for it," unless there is some evidence that the "actual effects of the enactments" are discriminatory. *Id.* at 224-25. The marriage ban targets same-sex couples who wish to become married and has the actual effect of preventing them from doing so.

Defendants cite Justice Alito's dissent in *Windsor* for the proposition that "a desire to maintain the status quo 'is not animus—just stabilizing prudence.'" Resp. at 37 (quoting *Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting)). The opinion of the *Windsor* majority—that is, the opinion of the Supreme Court—rejected that view, stating that the "avowed purpose and practical effect of [DOMA] are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages." *Windsor*, 133 S. Ct. at 2693. Wisconsin's marriage ban similarly imposes "a disadvantage, a separate status, and so a stigma" on same-sex couples, who are denied access to marriage. Defendants also cite the District of Nevada's opinion in *Sevcik v. Sandoval*, 911 F. Supp. 2d 996 (D. Nev. 2012). Resp. at 37. *Sevcik*'s reasoning regarding animus

is unpersuasive as applied to Wisconsin's ban, has not been followed by other courts and, in any event, predates the Supreme Court's ruling in *Windsor.*

Defendants assert that, because Wisconsin's "[t]raditional marriage norms, Wisconsin's traditional marriage laws, and Wisconsinites' support for it, derive from sociology, philosophy, and biology rather than an intention to discriminate, a moral judgment, or solely from a religious tradition," Resp. at 39, they cannot be motivated by animus. Defendants again misunderstand the nature of the analysis. A plaintiff need not show animus in the sense of hatred or hostility or moral disapproval, but only a purpose to disadvantage. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring) (an impermissible motive does not always reflect "malicious ill will"). Wisconsin's ban on marriage does not have to be motivated by a particular religion or philosophy to be intended to "disadvantag[e] the group burdened by the law." *Romer*, 517 U.S. at 633. It was undoubtedly designed to exclude same-sex couples from the advantages of marriage. If it were not, Defendants would allow the Plaintiffs in this case to marry. That is animus enough to strike it down.

### 2. *Cleburne*'s Political Powerlessness Standard Is Irrelevant To Whether The Marriage Ban Was Motivated By Animus.

Defendants argue that gays and lesbians have had success in the legislative process in Illinois and Minnesota, and thus are not politically powerless under *Cleburne*. Resp. at 40-42. Electoral success in other states has no relation to the question of whether *Wisconsin's* marriage ban was motivated by a purpose to deprive same-sex couples of the advantages and dignity of marriage. Defendants' argument that "support for same-sex marriage rights is increasing in Wisconsin and elsewhere" also is unresponsive to the question of whether those who proposed and enacted the marriage ban eight years ago were motivated by an intent to deprive same-sex couples of marriage, especially in light of the fact that Wisconsin's constitutional amendment

places a political burden on lesbians and gays that no other discrete group in Wisconsin must overcome. To the extent that these arguments are relevant to the analysis of whether gays and lesbians constitute a suspect class, they are addressed in Part II.B, *supra*.

### 3. *Windsor* Supports The Conclusion That The Marriage Ban Had An Improper Purpose.

Defendants recognize that the *Windsor* Court found that Congress intended to harm same-sex couples who would seek recognition of their relationships in marriage and that this finding was a part of the Court's analysis in striking down DOMA. Resp. at 42. However, Defendants fail to grapple with the fact that the legislative history that led the Court to find Congress was motivated by "a bare … desire to harm a politically unpopular group," *Windsor*, 133 S. Ct. at 2694 (citation omitted), is materially indistinguishable from the history of Wisconsin's marriage ban. DOMA was enacted in response to a court decisions in Hawa'ii recognizing the freedom to marry, while Wisconsin's ban was enacted in response to court decisions in Massachusetts and Vermont recognizing the rights of same-sex couples. *See* Resp. at 4-5 (describing the "backdrop" to the proposal and adoption of the Wisconsin ban). Both exclusions were justified by appeals to tradition and fears of change. *See* Pl. Br. at 37-39 and Part III.B.1, *supra*. The record in *Windsor* was sufficient to strike down DOMA's deprivation from gay and lesbian couples of the federal recognition and benefits of marriage,[14] and the record here is likewise sufficient to strike down Wisconsin's marriage ban.

---

[14] Defendants repeatedly attempt to distinguish DOMA from Wisconsin's ban by describing DOMA as a "federal intrusion" on state power, Resp. at 13, an "attempt to take from same-sex couples the rights and benefits otherwise flowing" from state marriage laws, *id.* at 16, and "depriving the *Windsor* plaintiffs [sic] of marriage benefits granted by New York Law," *id.* at 30, and as a law that "took away Windsor's pre-existing state rights." *Id.* at 43. But DOMA took no preexisting *state* or *federal* conferred rights from Edith Windsor, since it was passed before marriage was available anywhere in the United States  It deprived her of *federal* rights (specifically, the right to an exemption from the *federal* estate tax).

Defendants argue that *Windsor*'s rationale does not apply to Wisconsin's ban for three reasons. First, Defendants argue that the ban vindicates two competing marriage traditions supposedly recognized by *Windsor*, "the tradition of opposite-sex marriage" and "the tradition of treating marriage questions as being within the authority and realm of the separate States." Resp. at 42. But any suggestion that *Windsor* was about a conflict between "competing marriage traditions" turns *Windsor* into a case about federalism, which it plainly was not. *Windsor*, 133 S. Ct. at 2692-93 (finding it "unnecessary to decide whether [DOMA's] federal intrusion on state power is a violation of the Constitution, because it disrupts the federal balance," since DOMA "violates basic due process and equal protection principles[.]").

Next, Defendants argue that improper motive may only be demonstrated by "discriminations of an unusual character." Resp. at 43 (quoting *Windsor*, 133 S. Ct. at 2693). First, the "unusual character" of DOMA's regulation of domestic relations was only one piece of evidence of the law's purpose and effect to disadvantage same-sex couples. *Windsor*, 133 S. Ct. at 2693. The other evidence included "[t]he history of DOMA's enactment and its own text," *id.,* as well as it "operation in practice." *Id.* at 2694. *See also Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267 (1977) ("historical background of the decision" is relevant when determining legislative intent). Second, the "sheer breadth" of Wisconsin's marriage ban "is so discontinuous with the reasons offered for it that" the exclusion of same-sex couples is "inexplicable by anything by animus toward the class it affects." *Romer*, 517 U.S. at 632. Finally, Wisconsin's marriage ban is an instance of discrimination of an "unusual character" becuase it singles out a politically unpopular group not only to bar them from marriage but also to burden their ability to seek marriage through the ordinary political process by placing the marriage ban in the Wisconsin Constitution. Indeed, this was one of the express

purposes of the proponents of the ban. Pl. Br. 37-38 and n.11 (purpose to prevent courts *or legislature* from recognizing marriage for same-sex couples).

Finally, Defendants argue that the Defense of Marriage Act could not have been based on animus because the various dissenting opinions identified reasons other than animus for the law. But what matters is that the majority opinion found that the Defense of Marriage Act was motivated by animus. *Windsor*, 133 S. Ct. at 2693-96, since its holding is what is binding on the Court.

> ### 4. Well Reasoned District Court Opinions Support A Finding Of Improper Purpose.

Defendants argue that *Sevcik*, 911 F. Supp. 2d at 1021, and *Jackson*, 884 F. Supp. 2d at 1093, support the conclusion that Wisconsin's marriage laws are not based on animus. As previously noted, these decisions predate *Windsor*, and their reasoning has not been followed by other courts. Moreover, both the *Jackson* and *Sevcik* courts based their animus conclusion in part on their respective states' civil union laws, which "grant[ed] same-sex couples all of the state legal rights of marriage." *Jackson*, 884 F. Supp.2d at 1093; *see also Sevcik*, 911 F. Supp. 2d at 1015 (recognizing that civil union laws that "made all of the fundamental rights comprising the 'right to marry' available" to same-sex couples). The *Jackson* court noted that "[t]he actions of the state do not support that the legislature and people of Hawaii acted out of pure animus towards homosexuals" "[s]pecifically" because the legislature passed laws allowing same-sex couples to obtain the benefits of marriage, at first through "the Reciprocal Beneficiaries Act" and later through the state's "civil union law." *Jackson*, 884 F. Supp. 2d at 1093; *see also Sevcik*, 911 F. Supp. 2d at 1021 (distinguishing Nevada's marriage ban from the amendment at issue in *Romer* because it did not "remove any of the many protections already in place in the State of Nevada prohibiting discrimination on the basis of sexual orientation or prohibit the adoption of

additional protections."). By contrast, Wisconsin's marriage ban explicitly prohibits access to the full panoply of rights incident to marriage by same-sex couples. Wis. Const. Art. XIII, § 13.

While Defendants correctly point out, at 44, that neither *Kitchen* nor *Bourke* relied on animus to strike down Utah and Kentucky's marriage bans, these decisions should provide them no comfort. First, both *Kitchen* and *Bourke* concluded that the marriage bans at issue in those cases did not survive rational basis review, making a finding on animus unnecessary. *Kitchen*, 961 F. Supp. 2d at 1215; *Bourke*, 2014 WL 556729, at *8. Moreover, both courts strongly implied that animus existed, even though it was not the basis for their decision. *Kitchen*, 961 F. Supp. 2d at 1215 (finding that Utah's marriage ban "closely resembles the type of law containing discrimination of an unusual character that the Supreme Court struck down in *Romer* and *Windsor*"); *Bourke*, 2014 WL 556729, at *7-8 (finding that "it is clear that Kentucky's laws treat gay and lesbian persons differently in a way that demeans them" and noting that "[e]ven if one were to conclude that Kentucky's laws do not show animus, they cannot withstand traditional rational basis review").

Other district courts have found that similar laws are motivated by animus. In *Obergefell*, the court concluded that "*the clear primary purpose and practical effect of the marriage bans* [is] *to disparage and demean the dignity of same-sex couples in the eyes of the State and the wider community*." *Obergefell*, 962 F. Supp. 2d at 995. The district court clarified its holding in *Henry*, concluding that "Ohio enacted the marriage recognition bans with discriminatory animus and without a single legitimate justification." *Henry*, 2014 WL 1418395, at *6. Wisconsin's marriage ban, like Ohio's, "was intended to, and on its face does, stigmatize and disadvantage same-sex couples and their families, denying only to them protected rights to recognition of their marriages and violating the guarantee of equal protection." *Id. See also Bassett v. Snyder*, 951 F.

Supp. 2d 939, 968 (E.D. Mich. 2013) ("The historical background and legislative history of [a Michigan law prohibiting public employers from providing employment benefits to same-sex domestic partners] demonstrate that it was motivated by animus against gay men and lesbians.").

5. **Proof Of Animus Is Not Necessary To Strike Down The Marriage Ban.**

Plaintiffs have demonstrated that the marriage ban was enacted for "the purpose of disadvantaging the group burdened by the law," *Romer*, 517 U.S. at 633, and that its "purpose and practical effect [is] to impose a disadvantage, a separate status, and so a stigma" on same-sex couples. *Windsor*, 133 S. Ct. at 2693. However, as previously noted, the Court can of course conclude that the marriage ban violates equal protection without considering whether it is motivated by an impermissible purpose. *See Vill. Of Willowbrook*, 528 U.S. at 565. Accordingly, a finding of animus is not necessary to hold that the marriage ban lacks a rational basis. *See*, *e.g.*, *Kitchen*, 961 F. Supp. 2d at 1215 (declining to rule on animus, but finding that Utah's marriage ban lacked a rational basis).

C. **Tradition, Maintaining The Status Quo, And Protecting The Democratic Process Are Not Rational Bases For The Marriage Ban.**

1. **Tradition Is Not A Rational Basis.**

As discussed in Plaintiffs' brief, at 28, maintaining a "traditional" definition of marriage is not a legitimate state interest and thus cannot justify the marriage ban. Defendants claim that "it is both reasonable and rational for the people of the State of Wisconsin to define marriage as they always have, for the purpose of promoting the traditional family," and claim that "[t]his alone is sufficient to withstand rational basis scrutiny." Resp. at 46. Defendants make no further argument on this point, instead relying on a string cite to four cases, all decided prior to *Windsor*.

The first two cases Defendants cite, *Lawrence* and *Citizens for Equal Protection v. Bruning*, do not support their claims. Justice O'Connor's reference to tradition as a rational basis

32

in her *Lawrence* concurrence, 539 U.S. at 585 (O'Connor, J., concurring), is an insufficient basis for overcoming the majority's strong statements about the insufficiency of tradition alone as a rational basis. *Id.* at 577 (recognizing that "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice" and that "neither history nor tradition could save a law prohibiting miscegenation from constitutional attack"). The Eighth Circuit's opinion in *Bruning* likewise does not support Defendants' claims. Contrary to Defendants' assertion, *Bruning* did not find that tradition was a rational basis supporting Nebraska's marriage ban. *Bruning*, 455 F.3d 859, 868 (8th Cir. 2006). Rather, *Bruning* held that the "expressed intent of traditional marriage laws" is "to encourage heterosexual couples to bear and raise children in committed marriage relationships," *id*, a purpose which likewise cannot survive rational basis review. *See* Part III.C, *supra*. Moreover, *Bruning* was decided in 2006, long before the Supreme Court's opinion in *Windsor*.

Defendants' other two cases, *Sevcik*, 911 F. Supp. 2d 996, and *Jackson*, 884 F. Supp. 2d 1065, were wrongly decided, and their reasoning has been superseded by *Windsor*. Indeed, *Windsor* rejected a congressional purpose to "defend the institution of traditional heterosexual marriage," 133 S. Ct. at 2693, as a rational basis for DOMA. *Id.* at 2696 ("no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State . . . sought to protect in personhood and dignity."). Moreover, as discussed in detail in Plaintiffs' brief, at 29-31, every court to consider the issue since *Windsor* has concluded that tradition is not a rational basis for a state marriage ban. *See also Wright v. Arkansas*, No. 60CV-13-2662 at 9 ("Tradition alone cannot form a rational basis for a law.").

### 2. Proceeding With Caution And Maintaining The Status Quo Are Not Rational Bases For The Marriage Ban.

Defendants argue that "proceed[ing] with caution" and "protecting the status quo" constitute rational bases for the marriage ban. Resp. at 46-47. Defendants rely on *Jackson*, as well as statements by President Obama and Justice Ginsberg. President Obama's "evolving" personal opinion on marriage is irrelevant to the constitutionality of Wisconsin's marriage ban. Justice Ginsberg's extrajudicial statement regarding "judicial restraint" in the context of reproductive rights, cited by Defendants at 47, is similarly irrelevant to the case at hand. Moreover, there is no indication from her remarks that she believes that "proceeding with caution" is a rational basis for a marriage ban. *Jackson* held that proceeding with caution was a rational basis because of concerns about "the link between marriage, procreation, and the family structure." 884 F. Supp. 2d at 1117. Those concerns are addressed in detail in Plaintiffs' brief at 31-39 and in Part III.D, *infra*. In addition, *Jackson* recognized that Hawa'ii was proceeding with caution by "enacting the reciprocal beneficiaries act, followed years later by the civil unions law," which "afford[ed] same-sex couples the right to enter civil unions and obtain all of the state legal rights of married couples (except the title marriage)." *Jackson*, 884 F. Supp.2d at 1118. Wisconsin's marriage ban, by contrast, provides that "[a] legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state." Wis. Const. Art. XIII, § 13. Indeed, Defendants concede that the purpose of the amendment is to "protect the status quo," Resp. at 37, which would prevent proceeding, with caution or otherwise.

Moreover, every court to consider the proceeding with caution argument after *Windsor* has rejected it. For example, the court in *DeBoer* held that "[t]he state may not shield itself with the 'wait-and-see' approach and sit idly while social science research takes its plodding and

deliberative course." *DeBoer*, 2014 WL 1100794, at *14. As the *Kitchen* court noted, "[t]he State can plead an interest in proceeding with caution in almost any setting. If the court were to accept the State's argument here, it would turn the rational basis analysis into a toothless and perfunctory review." *Kitchen*, 961 F. Supp. 2d at 1213. *See also Bostic*, 970 F. Supp. 2d at 474-75 (rejecting opposition to "'radical change'" as a rational basis for marriage ban); *Bourke*, 2014 WL 556729, at *8 (rejecting "proceeding with caution" as a rational basis for marriage ban).

Finally, Defendants cite no authority supporting their position that maintaining the status quo is a plausible rational basis for the marriage ban. Indeed, it is simply a variation on their tradition argument and thus fails to provide a rational basis for the marriage ban as shown in Section III.C.1, *supra*.

### 3. Protecting The Democratic Process Is Not A Rational Basis For The Marriage Ban.

The Defendants argue that "Wisconsinites' desire to retain the right to define marriage through the democratic process is rational" and that "avoiding federal judicial intrusion into a state-based legislative function is rational." Resp. at 47-48. Neither of these justifications is a rational basis for the marriage ban. First, if "democratic process" were a rational basis, virtually every law would evade review, no matter how arbitrary and irrational. Such an interpretation would "turn the rational basis analysis into a toothless and perfunctory review" and should be rejected. *Kitchen*, 961 F. Supp. 2d at 1213. The outcome of the democratic process is constrained by the constitution. U.S. Const. Art. VI, cl. 2 ("This Constitution … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Henry*, 2014 WL 1418395, at *11 ("In particular, the Court notes that *given that all practicing attorneys, as well as the vast majority of all citizens in this country, are fully aware that unconstitutional laws cannot stand,*

*even when passed by popular vote, Defendants' repeated appeal to the purportedly sacred nature of the will of Ohio voters is particularly specious*.").

Second, "avoiding federal judicial intrusion" is not a rational basis. Defendants cite *Windsor* for the proposition that states have the "historic and essential authority to define the marital relation," but ignore the Court's admonition that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons." *Windsor*, 133 S. Ct. at 2691; *see also Bishop*, 962 F. Supp. 2d at 1279 ("[T]he 'state rights' portion of the *Windsor* decision stands for the unremarkable proposition that a state has broad authority to regulate marriage, so long as it does not violate its citizens' federal constitutional rights."). The court in *Bostic* noted that "[i]n *Windsor*, our Constitution was invoked to protect the individual rights of gay and lesbian citizens, and the propriety of such protection led to upholding state law against conflicting federal law," but concluded that "[t]he propriety of invoking such protection remains compelling when faced with the task of evaluating the constitutionality of *state* laws." *Bostic*, 970 F. Supp 2d at 476.

> **D.    There Is No Relationship Between Wisconsin's Marriage Ban And Either Responsible Procreation Or "Optimal Childrearing."**

As explained in Plaintiffs' opening brief, at 31-36, there is no rational relationship between Wisconsin's marriage ban and governmental interests in "responsible procreation" or "optimal childrearing." Defendants' attempts to show otherwise fall flat.

First, there is no rational connection between Wisconsin's marriage ban and any state interest in child welfare, since marriage is not limited to couples with children. No matter how important a "child-centered vision of marriage" may be, Wisconsin "does not require heterosexual couples to accept or follow this norm." *Latta*, 2014 WL 1909999, at *23. "Whatever the beliefs or intentions of the parties, there is nothing conjugal or child-centric about

the formality of obtaining a marriage license." *Id.* Moreover, child-raising does not distinguish different-sex couples from same-sex ones, whose children are harmed by excluding their families from the advantages of marriage. *Id.* ("Idaho's Marriage Laws fail to advance the States' interest because they withhold legal, financial, and social benefits from the very group they purportedly protect—children."). *See also* Pl. Br. at 31-32.

Defendants attempt to connect the marriage ban to child welfare by claiming that marriage is solely about procreation and that, in contrast, Plaintiffs are seeking marriage that is "adult-centric." Resp. at 48-53. However, the Supreme Court has not limited the purposes of marriage to procreation, as the State claims. Resp. at 51. *Zablocki*, 434 U.S. at 386, recognizes independent constitutional protections for the decisions to marry, to procreate, and to seek an abortion, rather than limiting the purpose of marriage to procreation, as the Defendants suggest. Resp. at 51. The Court reasons that a person's marriage to someone with whom he wishes to have an intimate relationship, in a state that criminalizes fornication, also secures his right to procreate, since he cannot procreate outside of marriage without facing criminal prosecution. 434 U.S. at 386. However, *Zablocki* offers no support for Defendants' position that marriage's purpose is *limited* to procreation. Similarly, *Skinner v. State of Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942), and *Maynard v. Hill*, 125 U.S. 190, 211 (1888), fail to support Defendants' position that marriage's purpose is limited to procreation, but simply recognize marriage's importance for family and the importance of *both* marriage and procreation. *Turner*, 482 U.S. at 96, definitively shows that the right to marry is not limited to couples who can or will procreate, since prisoners have the right to marry even if they are unable to procreate, since many of the "incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected" by incarceration and "are sufficient to form a constitutionally protected marital

relationship in the prison context." *Id.; see also Kitchen*, 961 F. Supp. 2d at 1201 (finding that "however persuasive the ability to procreate might be in the context of a particular religious perspective, it is not a defining characteristic of conjugal relationships from a legal and constitutional point of view.").

Moreover, Plaintiffs seek access to the same kind of marriage that is available to different-sex couples under Wisconsin law, not the State's reinterpretation of their claim as something it characterizes as "consent-based" and "adult-centric" marriage. *Id*. at 48, 49. The only support for the Defendants' characterization of marriage for same-sex couples as "consent-based" is Justice Alito's dissent in *Windsor*, where he describes such marriage as "the solemnization of mutual commitment," based on "strong emotional attachment and sexual attraction." 133 S. Ct. at 2718. But Plaintiffs seek marriage for the same reasons different-sex couples seek it, Findings of Fact, ¶¶ 29-31, 33-40, including "the stability and protection that it will bring to [their] children." Dkt # 86, ¶ 9. They want their children "to know that their family has the same status and recognition that other families enjoy," Dkt # 80, ¶ 11; *see also* Findings of Fact, ¶ 37. Three of the Plaintiff couples are currently raising children, (Findings of Fact, ¶ 37; Docket No. 80, ¶ 6), as are many other same-sex couples in Wisconsin,[15] and two of the Plaintiff couples have grandchildren. Findings of Fact, ¶ 37; Dkt # 80, ¶ 6. Neither the State's

---

[15]     *See* Adam P. Romero, et al., *Census Snapshot:  Wisconsin*, The Williams Institute (Dec. 2007),            *available            at*            http://williamsinstitute.law.ucla.edu/wp-content/uploads/WisconsinCensus2000Snapshot.pdf   (finding that as of 2005 there were approximately 16 percent of Wisconsin's 14,894 same-sex couples who were raising children under 18 years of age).

nor the Amici's[16] description of marriage for same-sex couples has any basis in the reality of

Plaintiffs' or other same-sex couples' requests for the freedom to marry.[17]

In *Kitchen*, the court rejected an identical effort to mischaracterize the nature of marriage

for same-sex couples, finding that:

> Like opposite-sex couples, same-sex couples may decide to marry partly or primarily for the benefits and support that marriage can provide to the children the couple is raising or plans to raise. Same-sex couples are just as capable of providing support for future generations as opposite-sex couples, grandparents, or other caregivers. And there is no difference between same-sex couples who choose not to have children and those opposite-sex couples who exercise their constitutionally protected right not to procreate.

*Kitchen*, 961 F. Supp. 2d at 1202 (citing *Griswold,* 381 U.S. 479).

Accordingly, Wisconsin's "strong interest in regulating marriage" and in "treating

marriage differently than any other contractual relationship," because it benefits "families,

children, and society," Resp. at 50, fails to justify its ban on marriage for same-sex couples, who

would also benefit from the stability and security that marriage provides.

In a further attempt to justify the marriage ban, the State asserts that the ideal parents are

of different sexes and both biologically related to their children, and that the research regarding

parenting by same-sex couples is "undeveloped and unreliable." Resp. at 52-54. But allowing

same-sex couples to marry has no impact on the decisions that different-sex couples make about

marriage and procreation. *Bishop*, 962 F. Supp. 2d at 1291 ("Marriage is incentivized for

---

[16]     *See* Amici at p 8 (asserting that allowing same-sex couples to marry will result in "a psycho-social inversion of the purpose of marriage from promoting children's interests to promoting adult arrangement in which children are secondary").

[17]     The benefits of marriage for different-sex couples discussed by Judge Posner in *Izarry v. Bd. of Educ. of Chicago*, 251 F.3d 604, 607-08 (7th Cir. 2001), may promote different-sex marriage, as the State asserts, Resp. at 53 n.17, but fail to justify Wisconsin's denial of those same benefits to same-sex couples. Judge Posner cited papers to show that the city may promote different-sex marriage over cohabitation, *not* to justify denying marriage to same-sex couples. 251 F.3d at 607-08.

naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included."); *accord De Leon*, 2014 WL 715741, at *16; *Bourke*, 2014 WL 556729, at *10; *Kitchen*, 961 F. Supp. 2d at 1201. Additionally, Wisconsin does not deny marriage to other groups who are unable to naturally procreate.[18] *See, e.g., Bishop*, 962 F. Supp. 2d at 1291-92; *see also* Plaintiffs' Brief at 32-33.[19]

Moreover, the studies the Defendants cite fail to back up Defendants' claims that married different-sex "biological" parents are better than same-sex or adoptive parents. The authors of *What is Marriage? Man and Woman: A Defense* (New York: Encounter Books 2012), were a philosophy and law graduate student, a political philosophy student, and a professor of jurisprudence[20] and are unqualified to support such a claim.[21] The authors of the two other papers Defendants cite do not even look at parenting by same-sex or adoptive different-sex

---

[18]    Amici make the astounding claim that ending the marriage ban could "separate a child from at least one of her parents," at 9, but the cases Amici cite involve lesbian couples raising children they have given birth to using sperm from anonymous donors, a practice also used by many infertile different-sex couples.

[19]    Amici further argue that it would be impractical and invasive to limit marriage to those who are fertile, since "fertility is often unknowable" and couples may change their minds about having children or accidentally procreate. Amici at 12-13. None of these arguments has any merit. To examine the constitutionality of Wisconsin's current marriage law, a court must decide whether governmental interests are promoted by the law as drafted. *See Zablocki*, 434 U.S. at 388-89 (evidence that statute, as originally drafted, would require counseling before marriage was irrelevant to the constitutionality of statute, since "[t]he statute actually enacted … does not expressly require or provide for any counseling whatsoever, … and thus it can hardly be justified as a means for ensuring counseling of the persons within its coverage."). The practicalities of drafting a different marriage law are therefore irrelevant. And narrowing the purpose of marriage to channeling "accidental procreation" into marriage has such an attenuated relationship to the marriage ban that it is irrational. *See* Pl. Br. at 33.

[20]    *See Sherif Gergis, et al., What is Marriage? Man and Woman: A Defense*, *available at* http://whatismarriagebook.com/authors/#.U3i b7sdM7NU (last visited May 18, 2014).

[21]    Moreover, the portion of Gergis, *et al.*, *What is Marriage?* that Defendants quote fails to offer any comparison of different-sex biological parents to same-sex or adoptive parents, but simply asserts that different-sex biological parents are the ideal. Two of the studies it cites for this proposition are Moore, *et al.*, *Marriage from a Child's Perspective*, and Manning, *et al.*, "Adolescent Well-Being," discussed in the text *infra*.

parents, so they fail to support any assertion that different-sex biological parents are better than same-sex parents. *See* Kristen Anderson Moore, *et al.*, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?*, Child Trends Research Br. (June 2002), Dkt # 110-22 at 1 (warning that "no conclusions can be drawn from this research about well-being of children raised by same-sex parents or adoptive parents"); Wendy D. Manning, *et al.*, "Adolescent Well-Being in Cohabiting, Married, and Single-Parent Families," 65:4 *J. of Marriage and Family* (Nov. 2003), Dkt # 110-23 at 1-2 (comparing the parenting of married biological parents to that of married and cohabiting step-families and single mothers).

Defendants' claims that the research regarding parenting by same-sex couples is "undeveloped and unreliable," Resp. at 53, are equally unavailing. Decades of peer-reviewed research shows that children raised by same-sex parents are as well-adjusted as those raised by different-sex parents, and the State does not show otherwise. Every major pediatric, mental health, and child welfare organization has agreed with this scientific consensus. Brief of APA, *et al.*, as Amici Curiae on the Merits in Support of Affirmance, *Windsor*, 133 S. Ct. 2675, (No. 12-307), 2013 WL 871958, at *14-26; Brief of the American Sociological Ass'n in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, *Hollingsworth v. Perry*, 133 S. Ct. 2653 (2013), and *Windsor*, 133 S. Ct. 2675, (Nos. 12-144, 12-307), 2013 WL 840004, at *6-14. Courts that have heard from experts in the field have endorsed the validity of these scientific findings. *See, e.g., DeBoer*, 2014 WL 1100794, at *4; *see also* Pl. Br. at 36-37.[22]

---

[22]    *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 805, 825 (11th Cir. 2004), cited by the State, Resp. at 54, is distinguishable from *DeBoer*, 2014 WL 1100794, and the other cases cited by Plaintiffs, Pl. Br. at 36-37, because it did not involve the review of a factual record as those decisions did. And when a court actually reviewed the scientific testimony regarding the impact of parenting by gays and lesbians on children, it struck down the

The two studies cited by the State fail to raise any doubts about these consistent findings. Loren Marks' paper, Dkt # 110-21, failed to consider any studies after 2005, and his "wholesale rejection of an entire body of research fails to recognize the realities of scientific knowledge" in the parenting research field. APA Amicus Br., 2013 WL 871958, at *28 n.49.[23] The Douglas W. Allen paper cited by Defendants, Resp. at 53, is an advocacy piece, rather than a peer-reviewed study.[24] *See* Dkt # 110-20. Attempts, such as these, to cast doubt on the scientific consensus have been thoroughly discredited. *See* Am. Psychological Ass'n Amicus Br.; Am. Sociological Ass'n Br. The *DeBoer* court concluded that Marks and Allen "represent a fringe viewpoint that is rejected by the vast majority of their colleagues across a variety of social sciences fields." *DeBoer*, 2014 WL 1100794, at *10. The most that can be said about the opinions expressed in these papers "is that the 'no differences' consensus has not been proven with scientific certainty, not that there is any credible evidence showing that children raised by same-sex couples fare worse than those raised by heterosexual couples." *Id.*

But even if Defendants' "optimal childrearing" claims are credited, denying same-sex couples the benefits of marriage will not promote this ideal of married "biological" parents. *Bishop*, 962 F. Supp. 2d at 1293; *see also* Pl. Br. at 34-35. Moreover, in addition to the fact that marriage is not limited to different-sex couples who naturally procreate, Wisconsin law draws no

---

ban on adoption by gays and lesbians that was at issue in *Lofton*. *See In re Adoption of Doe*, 2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008), *aff'd sub nom. Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So. 3d 79 (Fla. Dist. Ct. App 2010).

[23]   The journal *Social Science Research,* where the Marks paper was originally published, later conducted an internal audit of the editorial process and the professor who conducted the audit concluded that the Marks paper should never have been published. Darren E.. Sherkat, *The Editorial Process and Politicized Scholarship: Monday Morning Editorial Quarterbacking and a Call for Scientific Vigilance*, 41 Soc. Sci. Research. 1346, 1347 (2012).

[24]   The Ruth Institute, where the paper is published, says its purpose is "cleaning up the mess of the sexual revolution" and one of its core values is "[m]arriage as a life long commitment between one man and one woman." Ruth Institute, http://www.ruthinstitute.org/about/aboutRuth.shtml (last visited May 15, 2014).

distinction between adoptive and biological children. Wis. Stat. § 48.92 ("After the order of adoption is entered the relation of parent and child and all the rights, duties and other legal consequences of the natural relation of child and parent thereafter exists between the adopted person and the adoptive parents."). Finally, any relationship between the marriage ban and a purported interest in "optimal childrearing" is belied by the fact that Wisconsin, like Michigan, "does not similarly exclude certain classes of heterosexual couples from marrying whose children persistently have had 'sub-optimal' developmental outcomes" in scientific studies. *DeBoer,* 2014 WL 1100794, at *13.

The State seems to suggest that this Court need not even consider the relationship between the ban on marriage for same-sex couples and child welfare interests. According to the State, it is sufficient to find that allowing different-sex couples to marry promotes "tradition, responsible procreation, and optimal parenting," since "[t]he focus under rational-basis review is whether the challenged statute rationally supports a State interest, not whether expanding the class of beneficiaries to marriage would harm the State's interest." Resp. at 54-55. But as shown in Section III.A, *supra*, rational basis review requires more.

*Johnson v. Robison*, 415 U.S. 361 (1974), fails to support the Defendants' distorted analysis, Resp. at 55, but is entirely consistent with Plaintiffs' position that there must be a relationship between the marriage ban and the child welfare interests furthered by marriage. There, the Court analyzed whether there were governmental interests to explain the denial of veteran's benefits to conscientious objectors and found "quantitative and qualitative distinctions" between veterans and conscientious objectors with respect to a number of governmental interests. 415 U.S. at 381-82. The *Johnson* Court did not simply ask whether certain educational benefits help military veterans, but asked whether conscientious objectors who were denied the

benefits were similarly situated to military veterans with regard to those benefits and found that there were not. 415 U.S. at 382. In contrast, same-sex couples are similarly situated with respect to the benefits of marrying, since both same-sex and different-sex couples have children, and same-sex couples and their children benefit in the same ways from marriage as different-sex couples. *Dragovich v. U.S. Dep't of Treasury*, 872 F. Supp. 2d 954, 958 n.10 (N.D. Cal. 2012) (rejecting similar attempt to use *Johnson* to defend DOMA). Moreover, even if the purpose of marriage were limited to natural procreation, the marriage ban is distinguishable from the classification in *Johnson,* since "the 'carrot' of educational benefits could never actually incentivize military service for the excluded group due to their religious beliefs" whereas "the 'carrot' of marriage is equally attractive to procreative and non-procreative couples, is extended to most non-procreative couples, but is withheld from just one type of non-procreative couple." *Bishop*, 962 F. Supp. 2d at 1293.

### E. The Potential For Unintended Consequences Cannot Be A Rational Basis For The Marriage Ban.

Defendants argue that the marriage ban avoids the risk of "indirect, unanticipated and long-term consequences"[25] of allowing same-sex couples to enjoy the protections, obligations and dignity of marriage. Resp. at 55. Defendants first claim that striking down Wisconsin's marriage ban "logically results in other restrictions to marriage being found unconstitutional." For support, Defendants cite a question from Justice Sotomayor in the argument from *Hollingsworth v. Perry*, in which Justice Sotomayor asked counsel for Plaintiffs, Ted Olson, if restrictions on incest and polygamy could still exist if "marriage is a fundamental right." Transcript of Proceedings, *Hollingsworth*, No. 12-144 (Supreme Court) at 46:9-19. Mr. Olson correctly responded that the Supreme Court had identified several rational bases to prohibit

---

[25]     It is difficult to see how this differs from the asserted interest in "proceeding with caution" and "preserving the status quo" discussed earlier.

polygamous or incestuous marriages, including concerns about "exploitation, abuse, [and] patriarchy." *Id*. at 46:20-25. *Accord In re Marriage Cases*, 183 P.3d at 434 n.52 ("Past judicial decisions explain why our nation's culture has considered [polygamous and incestuous] relationships inimical to the mutually supportive and healthy family relationships promoted by the constitutional right to marry." (citing *Reynolds v. United States*, 98 U.S. 145, 165–166 (1878); *Davis v. Beason*, 133 U.S. 333, 341 (1890); *People v. Scott*, 157 Cal.App.4th 189, 192–194 (2007); *State v. Freeman*, 801 N.E.2d 906, 909 (Ohio 2003); *Smith v. State*, 6 S.W.3d 512, 518–520.(Tenn.Crim.App.1999)). . . . [T]he state continues to have a strong and adequate justification for refusing to officially sanction polygamous or incestuous relationships because of their potentially detrimental effect on a sound family environment.").

Defendants claim that "[i]f the desire for recognition and validation of loving, committed relationships was the only basis for civil marriage, no adult relationships can be excluded *a priori* from making claims upon the government for recognition." Resp. at 56. This argument depends on the false premise that Plaintiffs are seeking a different form of marriage from what already exists. But more to the point, Wisconsin has rational bases to support the bans on polygamous and incestuous marriages, but has none for denying marriage to same-sex couples.

Defendants further argue that there is a rational basis for Wisconsin's marriage ban because "[i]t is impossible to predict all consequences resulting from transforming the marital norm." Resp. at 57. Defendants do not specifically identify any of the potential consequences resulting from removing the marriage ban. Instead, Defendants argue that no-fault divorce laws had harmful effects. While Plaintiffs do not concede that no-fault divorce had the harmful effects Defendants suggest, it is difficult to see the relevance of no-fault divorce laws to the marriage

ban.[26] The available evidence from states that removed barriers to marriage of same-sex couples, discussed in Plaintiffs' brief at 30, shows that "the implementation of same-sex unions in [states that allow same-sex couples to marry] has not resulted in any decrease in opposite-sex marriage rates, any increase in divorce rates, or any increase in the number of nonmarital births." *Kitchen*, 961 F. Supp. 2d at 1213 (citing Brief of State Amici at 24-28, *Sevcik v. Sandoval*, No. 12-17668 (9th Cir. Oct. 25, 2013), ECF No. 24).

In addition, every court that has considered this argument after *Windsor* has rejected it. As the *Bishop* court recognized, "[t]he 'negative impact' argument is impermissibly tied to moral disapproval of same-sex couples as a class." *Bishop*, 962 F. Supp. 2d at 1295. The *Bishop* court addressed similar arguments, based in "procreation, one morally 'ideal' parenting model, and sexual fidelity." *Id*. The court noted that Oklahoma, like Wisconsin, "has [with respect to marriage licenses] already opened the courthouse doors to opposite-sex couples without any moral, procreative, parenting, or fidelity requirements." *Id*. The *Bishop* court concluded that "[e]xclusion of just one class of citizens from receiving a marriage license based upon the perceived 'threat' they pose to the marital institution is, at bottom, an arbitrary exclusion based upon the majority's disapproval of the defined class." *Id. See also Kitchen*, 961 F. Supp. 2d at 1213; *Bourke*, 2014 WL 556729, at *8.[27]

---

[26]     It also defies reason to believe that the "negative" consequence identified by Defendants—an entirely forseeable increase in the divorce rate—was an "unintended" consequence of no-fault divorce.

[27]     Defendants assert without argument that "protecting religious liberties" is a rational basis for the marriage ban. Resp. at 45. "Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009). Even if the argument were not waived, it would fail because overturning the marriage ban will have no effect on Wisconsinites' religious freedom. *See, e.g.*, *Geiger*, No. 6:13-cv-01834, slip op. at 19; *Kitchen*, 961 F. Supp. 2d at 1214 ("[T]he court notes that its decision does not mandate any change for religious institutions, which may continue to express

## IV.    *Baker v. Nelson* **Is Not Controlling.**

Defendants are mistaken in claiming that the Supreme Court's 1972 summary dismissal for want of a substantial federal question in *Baker v. Nelson*, 409 U.S. 810 (1972), controls Plaintiffs' claims here.    *Baker* has been overtaken by events and is no longer dispositive of the questions before this Court.

Plaintiffs do not dispute that a dismissal for want of a substantial federal question is a binding decision on the merits.    *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975).    But the reach of a summary disposition is limited to "the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).    Moreover, the Supreme Court has explicitly instructed that even when it has "branded a question as unsubstantial," lower courts are not bound by that conclusion "when doctrinal developments indicate otherwise."    *Hicks*, 422 US at 344.    *Accord*, *Glen Theatre, Inc. v. Pearson*, 802 F.2d 287, 288 (7th Cir. 1986) (discussing *Hicks* and noting that "[i]f the facts, issues, or law is different, then there is reason not to follow the summary action."); *Mandel*, 432 U.S. at 180 (Brennan, J. concurring) (clarifying *Hicks* and explaining that "appropriate, but not necessarily conclusive, weight is to be given this Court's summary dispositions.") (internal quotation marks omitted).

Here, a number of major doctrinal developments have occurred since 1972 that make reliance on *Baker* inappropriate.

First, the year after the *Baker* summary dismissal,[28] the Supreme Court held that classifications based on sex must, like race and national origin, be subjected to heightened

---

their own moral viewpoints and define their own traditions about marriage."); *Griego v. Oliver*, 316 P.2d 865, 871 (N.M. 2013).

[28]    The lower court's holding in *Baker* appeared to rest on the premise that the marriage ban was a classification based on sex.    *See Baker v. Nelson*, 191 N.W.2d 185, 187 (1971) (distinguishing *Loving v. Virginia*, 381 U.S. 1 (1967), and holding that "in commonsense and in

judicial scrutiny.  *See Frontiero v. Richardson*, 411 U.S. 677, 688 (1973); *Craig v. Boren*, 429 U.S. 190, 218 (1976) (Rehnquist, J. dissenting) (identifying the Court's scrutiny of sex-based classifications as "intermediate").

Second, in 1996, the Court in *Romer* held that a Colorado state constitutional amendment imposing a disadvantage on gay and lesbian people and "born of animosity" lacked any rational relation to a legitimate governmental purpose.  517 U.S. at 634-35 ("We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else.").

Third, in 2003, the Supreme Court decided in *Lawrence* that two adults of the same sex were free under the Constitution to engage in intimate sexual conduct "and still retain their dignity as free persons."  539 U.S. at 567.  The Court found that "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring.  The liberty protected by the Constitution allows homosexual persons the right to make this choice."  *Id*.  Further, Justice O'Connor in concurrence found that "[m]oral disapproval of this group [i.e. gays and lesbians], like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause."  *Id*. at 582 (citing *Romer*, 517 U.S. at 634-35).

Finally, the Supreme Court held last year in *Windsor* that the federal government could not treat the state-sanctioned marriages of same-sex couples differently from the state-sanctioned marriages of different-sex couples for purposes of federal protections and obligations based on marital status.  133 S. Ct. at 2694.  The Court found that this differential treatment "demeans the couple, whose moral and sexual choices the Constitution protects."  *Id*.

---

a constitutional sense, there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex.").

The doctrinal developments sketched above are dramatic, and are "sufficient to overcome the narrow precedential effect of a summary dismissal." *Latta*, 2014 WL 1909999 at *9. Hence, courts that have considered the matter recently have concluded that *Baker* no longer has force. *See*, *e.g.*, *Windsor*, 699 F. 3d at 178-79 (2d Cir. 2012) ("Even if *Baker* might have had resonance for Windsor's case in 1971, it does not today. . . . In the forty years after *Baker*, there have been manifold changes to the Supreme Court's equal protection jurisprudence."); *Kitchen*, 961 F. Supp.2d at 1194-95; *Bishop*, 962 F. Supp. 2d at 1276; *Bostic*, 960 F. Supp. 2d at 469; *McGee v. Cole*, --- F. Supp. 2d ---, 2014 WL 321122, at *8-10 (S.D. W. Va. Jan. 29, 2014); *DeBoer*, 2014 WL 1100794, at *15 n.6; *Latta*, 2014 WL 1909999 at *9; *Smelt v. Cnty. of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005), *overrruled on other grounds*, 447 F.3d 673 (9th Cir. 2006); *Garden State Equality v. Dow*, 2012 WL 540608, at *4 (N.J. Sup. Ct. Feb. 21 2012).

In addition to the above changes in doctrine, this case does not involve "the precise issues presented and necessarily decided" in *Baker*. *Mandel*, 432 U.S. at 176. The Minnesota law at issue in *Baker* lacked "an express statutory prohibition against same-sex marriages." *Baker*, 191 N.W.2d at 185. Here, Wisconsin's marriage ban clearly, unequivocally, and intentionally excludes same-sex couples from marriage and refuses to recognize valid marriages between people of the same sex entered into in other jurisdictions (an issue totally absent in *Baker*). A law of this kind "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 634. The *Baker* court did not have occasion to consider the issues raised by such a law and thus does not preclude this Court from doing so now.

Essentially ignoring the Supreme Court's explicit instruction to consider doctrinal developments in evaluating the precedential weight to be given to summary dispositions, Defendants argue that "intervening case law must *unmistakably* show that the Supreme Court would decide the question differently than it did in its summary disposition." Resp. at 61. Defendants' authority for that contention is *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997), as cited in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004). But *Khan* nowhere mentions summary dispositions, and instead reaffirms that "[s]tare *decisis* is not an inexorable command." 522 U.S. at 20. And indeed, the courts have long held that summary dispositions "are not of the same precedential value as would be an opinion of [the Supreme Court] treating the question on the merits." *Gault v. Garrison*, 523 F.2d 205, 207 (7th Cir. 1975) (quoting *Edelman v. Jordan*, 415 U.S. 651, 671 (1974)). *See also Tully v. Griffin, Inc.*, 429 U.S. 68, 74 (1976) (same).

Defendants cite a handful of cases in which courts have found *Baker* to control, but these authorities are not compelling. To begin with, *all* of the cited cases predate the Supreme Court's decision in *Windsor*, which the *Kitchen* court described as "highly relevant and . . . therefore a significant doctrinal development." *Kitchen*, 2013 WL 6697874, at *8. Second, the cases cited by the Defendants involve either no consideration of doctrinal developments at all, *see Sevcik*, 911 F. Supp. 2d at 1003-04, or an inappropriate analysis of whether *Baker* has been directly repudiated. *See, e.g.*, *Mass. v. Dep't of Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) ("*Baker* is precedent binding on us unless repudiated by subsequent Supreme Court precedent."); *Jackson*, 884 F. Supp. 2d at 1085 ("The Supreme Court has not explicitly or implicitly overturned its holding in *Baker* or provided the lower courts with any reason to believe that the holding is invalid.").

# CONCLUSION

As demonstrated above, Wisconsin's marriage ban violates both the Due Process Clause and the Equal Protection Clause of the United States Constitution. As a result, Plaintiffs are entitled to judgment as a matter of law on all four counts of their amended complaint. Plaintiffs therefore respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment and enter judgment in their favor.[29]

---

[29]    Plaintiffs are very mindful of the Court's concern regarding the specificity of the injunctive relief (*see* Dkt # 97 at 7), but Plaintiffs believe that their requested injunction, Dkt # 26 at 42, complies with Fed. R. Civ. P. 65(d). Rule 65(d) requires that an injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *See id. See also United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 739 (7th Cir. 2009). This requirement stems from "[t]he aims of Rule 65(d)," which "are to minimize the occasion for follow-on proceedings to the issuance of an injunction and to protect defendants from being held in contempt for failure to follow a directive that was a trap because of its ambiguity." *Apex Oil*, 579 F.3d at 739. *See also Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 646 (7th Cir. 2002) ("The purpose [of Rule 65(d)] is to provide a solid foundation for any subsequent efforts to enforce the injunction by contempt proceedings or otherwise. It is also to spare the courts and the litigants a struggle over the injunction's scope and meaning." (citations omitted)).

   Defendants cannot plausibly claim that there is any ambiguity here as to what the injunction requires them to do. They must treat same-sex couples identically to different-sex couples with regard to marriage in Wisconsin. They must allow same-sex couples to marry if those couples meet the requirements applicable to different-sex couples with the exception of the requirement that they be of different genders, and they must recognize the out-of-state marriages of same-sex couples who meet the requirements applicable to the marriages different-sex couples. Article XIII, § 13 of the Wisconsin Constitution and Wis. Stat. ch. 765 (*e.g.*, Wis. Stat. § 765.001(2); Wis. Stat. § 765.01; Wis. Stat. § 765.16 (intro. par.) & (c); Wis. Stat. § 765.23; Wis. Stat. § 765.24; Wis. Stat. § 765.30(3)(a)) specifically bar same-sex couples from marrying or have been construed to do so. There are other places in Wisconsin law that use gendered terms for spouses, *see, e.g.*, Wis. Stat. § 891.40. However, it is unnecessary for this Court to name every provision of state law that uses "wife" and "husband" for the injunction "to describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d). And even if every statute using gendered terms for spouse is not precisely identified, the Court's declarative relief would apply *a fortiori* to any unnamed statute that had the same effect. There is simply no possibility of confusion here.

   Injunctions issued by other courts to plaintiffs challenging marriage bans support this conclusion. *See*, *e.g.*, *Latta*, 2014 WL 1909999, at *29 (D. Idaho May 13, 2014) (enjoining enforcement of amendment, statutes, and "any other laws or regulations to the extent they do not recognize same-sex marriages validly contracted outside Idaho or prohibit otherwise qualified same-sex couples from marrying in Idaho"); *De Leon*, 2014 WL 715741, at *28 (enjoining

Dated: May 19, 2014                     By: /s Gretchen E. Helfrich
                                        Counsel for Plaintiffs

JOHN A. KNIGHT                          JAMES D. ESSEKS
American Civil Liberties Union Foundation    American Civil Liberties Union Foundation
Lesbian Gay Bisexual Transgender Project     Lesbian Gay Bisexual Transgender Project
180 North Michigan Avenue               125 Broad Street
Suite 2300                              New York, New York 10004
Chicago, Illinois 60601                 (212) 549-2623
(312) 201-9740                          jesseks@aclu.org
jaknight@aclu.org

LAURENCE J. DUPUIS                       HANS J. GERMANN
SBN: 1029261                            GRETCHEN E. HELFRICH
American Civil Liberties Union of       FRANK DICKERSON
Wisconsin Foundation                    Mayer Brown LLP
207 E. Buffalo Street, Suite 325        71 South Wacker Drive
Milwaukee, Wisconsin 53202              Chicago, Illinois 60606-4637
(414) 272-4032                          (312) 782-0600
ldupuis@aclu-wi.org                     hgermann@mayerbrown.com
                                        ghelfrich@mayerbrown.com
                                        fdickerson@mayerbrown.com

---

defendants from "enforcing Article I, Section 32 of the Texas Constitution, any related
provisions in the Texas Family Code, and any other laws or regulations prohibiting a person
from marrying another person of the same sex or recognizing same-sex marriage."); *Bostic v.
Rainey*, No. 2:13-cv-00395 (E.D. Va. Feb. 24, 2014) (enjoining defendants from enforcing
"Article I, § 15-A, of the Constitution of Virginia; Virginia Code § 20-45.2; Virginia Code § 20-
45.3; and any other Virginia law if and to the extent that it denies to same-sex couples the rights
and privileges of marriage that are afforded to opposite-sex couples").