IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIRGINIA WOLF and CAROL SCHUMACHER,
KAMI YOUNG and KARINA WILLES,
ROY BADGER and GARTH WANGEMANN,
CHARVONNE KEMP and MARIE CARLSON,
JUDITH TRAMPF and KATHARINA HEYNING,
SALUD GARCIA and PAMELA KLEISS,
WILLIAM HURTUBISE and LESLIE PALMER,
JOHANNES WALLMANN and KEITH BORDEN,

                               OPINION and ORDER

         Plaintiffs,

                               14-cv-64-bbc

     v.

SCOTT WALKER, in his official capacity as
Governor of Wisconsin,
J.B. VAN HOLLEN, in his official capacity as
Attorney General of Wisconsin,
OSKAR ANDERSON, in his official capacity as
State Registrar of Wisconsin,
JOSEPH CZARNEZKI, in his official capacity as
Milwaukee County Clerk,
WENDY CHRISTENSEN, in her official capacity as
Racine County Clerk and
SCOTT MCDONELL, in his official capacity as
Dane County Clerk,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiffs Virginia Wolf, Carol Schumacher, Kami Young, Karina Willes, Roy Badger,

Garth Wangemann, Charvonne Kemp, Marie Carlson, Judith Trampf, Katharina Heyning,

Salud Garcia, Pamela Kleiss, William Hurtubiseurbise, Leslie Palmer, Johannes Wallmann

1

and Keith Borden are eight same-sex couples residing in the state of Wisconsin who either want to get married in this state or want the state to recognize a marriage they entered into lawfully outside Wisconsin.  Standing in their way is Article XIII, § 13 of the Wisconsin Constitution, which states that "[o]nly a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state."  In addition, various provisions in the Wisconsin Statutes, primarily in chapter 765, limit marriage to a "husband" and a "wife."  The parties agree that both the marriage amendment and the statutory provisions prohibit plaintiffs from marrying in Wisconsin or obtaining legal recognition in Wisconsin for a marriage they entered in another state or country.  The question raised by plaintiffs' complaint is whether the marriage amendment and the relevant statutes violate what plaintiffs contend is their fundamental right to marry and their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

Two motions are before the court:  (1) a motion to dismiss for failure to state a claim upon which relief may be granted filed by defendants Scott Walker, J.B. Van Hollen and Oskar Anderson, dkt. #66; and (2) a motion for summary judgment filed by plaintiffs.  Dkt. #70.  (Defendants Joseph Czarnezki, Scott McDonell and Wendy Christensen, the clerks for Milwaukee County, Dane County and Racine County, have not taken a position on either motion, so I will refer to defendants Walker, Van Hollen and Anderson simply as "defendants" for the remainder of the opinion.)  In addition,  Julaine K. Appling, Jo Egelhoff,

2

Jaren E. Hiller, Richard Kessenich and Edmund L. Webster (all directors or officers of Wisconsin Family Action) have filed an amicus brief on behalf of defendants. Dkt. #109. Having reviewed the parties' and amici's filings, I am granting plaintiffs' motion for summary judgment and denying defendants' motion to dismiss because I conclude that the Wisconsin laws prohibiting marriage between same-sex couples interfere with plaintiffs' right to marry, in violation of the due process clause, and discriminate against plaintiffs on the basis of sexual orientation, in violation of the equal protection clause.

In reaching this decision, I do not mean to disparage the legislators and citizens who voted in good conscience for the marriage amendment. To decide this case in favor of plaintiffs, it is not necessary, as some have suggested, to "cast all those who cling to traditional beliefs about the nature of marriage in the role of bigots or superstitious fools," United States v. Windsor, 133 S. Ct. 2675, 2717-18 (2013) (Alito, J., dissenting), or "adjudg[e] those who oppose [same-sex marriage] . . . enemies of the human race." Id. at 2709 (Scalia, J., dissenting). Rather, it is necessary to conclude only that the state may not intrude without adequate justification on certain fundamental decisions made by individuals and that, when the state does impose restrictions on these important matters, it must do so in an even-handed manner.

This case is not about whether marriages between same-sex couples are consistent or inconsistent with the teachings of a particular religion, whether such marriages are moral or immoral or whether they are something that should be encouraged or discouraged. It is not even about whether the plaintiffs in this case are as capable as opposite-sex couples of

3

maintaining a committed and loving relationship or raising a family together.  Quite simply, this case is about liberty and equality, the two cornerstones of the rights protected by the United States Constitution.

Although the parties in this case disagree about many issues, they do agree about at least one thing, which is the central role that marriage plays in American society.  It is a defining rite of passage and one of the most important events in the lives of millions of people, if not *the* most important for some.  Of course, countless government benefits are tied to marriage, as are many responsibilities, but these practical concerns are only one part of the reason that marriage is exalted as a privileged civic status.  Marriage is tied to our sense of self, personal autonomy and public dignity.  And perhaps more than any other endeavor, we view marriage as essential to the pursuit of happiness, one of the inalienable rights in our Declaration of Independence.  Linda Waite and Maggie Gallagher, Case for Marriage 2 (Broadway Books 2000) (stating that 93% of Americans rate "having a happy marriage" as one of their most important goals, an ever higher percentage than "being in good health").  For these reasons and many others, "marriage is not merely an accumulation of benefits. It is a fundamental mark of citizenship."  Andrew Sullivan, "State of the Union," New Republic (May 8, 2000).  Thus, by refusing to extend marriage to the plaintiffs in this case, defendants are not only withholding benefits such as tax credits and marital property rights, but also denying equal citizenship to plaintiffs.

It is in part because of this strong connection between marriage and equal citizenship that the marriage amendment must be scrutinized carefully to determine whether it is

consistent with guarantees of the Constitution. Defendants and amici defend the marriage ban on various grounds, such as preserving tradition and wanting to proceed with caution, but if the state is going to deprive an entire class of citizens of a right as fundamental as marriage, then it must do more than say "this is the way it has always been" or "we're not ready yet."  At the very least it must make a showing that the deprivation furthers a legitimate interest separate from a wish to maintain the status quo.  Defendants attempt to do this by arguing that allowing same-sex couples to marry may harm children or the institution of marriage itself.  Those concerns may be genuine, but they are not substantiated by defendants or by amici.

Under these circumstances, personal beliefs, anxiety about change and discomfort about an unfamiliar way of life must give way to a respect for the constitutional rights of individuals, just as those concerns had to give way for the right of Amish people to educate their children according to their own values, Wisconsin v. Yoder, 406 U.S. 205 (1972), for Jehovah's Witnesses to exercise their religion freely, West Virginia Board of Education v. Barnette, 319 U.S. 624 (1943), and for interracial couples to marry the person they believed was irreplaceable.  Loving v. Virginia, 388 U.S. 1 (1967).  In doing this, courts do not "endorse" marriage between same-sex couples, but merely affirm that those couples have rights to liberty and equality under the Constitution, just as heterosexual couples do.

## BACKGROUND

All plaintiffs in this case are same-sex couples. Virginia Wolf and Carol Schumacher

5

reside in Eau Claire, Wisconsin; Kami Young and Karina Willes reside in Milwaukee, Wisconsin.   Both couples left Wisconsin to enter into a legal marriage in Minnesota and they wish to have their marriages recognized in Wisconsin. At the time that plaintiffs filed their summary judgment motion, plaintiffs Young and Willes were expecting a baby imminently.

Johannes Wallmann and Keith Borden reside in Madison, Wisconsin.  They were married in Canada in 2007 and wish to have their marriage recognized in Wisconsin.

Roy Badger and Garth Wangemann reside in Milwaukee, Wisconsin, as do Charvonne Kemp and Marie Carlson.  Judi Trampf and Katy Heyning reside in Madison, Wisconsin, as do plaintiffs Salud Garcia and Pam Kleiss. William Hurtubise and Leslie "Dean" Palmer reside in Racine, Wisconsin.  Each of these five couples wishes to marry in Wisconsin.  Hurtubise and Palmer want to adopt a child jointly, which they cannot do in Wisconsin while they are unmarried.

All plaintiffs meet the requirements for getting married in Wisconsin, with the exception that each wishes to marry someone of the same sex.


## OPINION

## I.  PRELIMINARY ISSUES

Defendants raise three preliminary arguments supporting their belief that Wisconsin's marriage ban on same-sex couples is immune from constitutional review, at least in this court: (1) Baker v. Nelson, 409 U.S. 810 (1972), is controlling precedent that precludes

lower courts from considering challenges to bans on same-sex marriage under the due process clause or the equal protection clause; (2) marriage between same-sex couples is a "positive right," so the state has no duty to grant it; (3) under principles of federalism, states are entitled to choose whether to extend marriage rights to same-sex couples.  None of these arguments is persuasive.

A.  Baker v. Nelson

In Baker v. Nelson, 191 N.W.2d 185, 187 (Minn. 1971), the Minnesota Supreme Court held that same-sex couples do not have a right to marry under the due process clause or the equal protection clause of the United States Constitution.  When the plaintiffs appealed, the United States Supreme Court had "no discretion to refuse adjudication of the case on its merits" because the version of  28 U.S.C. § 1257 in effect at the time required the Court to accept any case from a state supreme court that raised a constitutional challenge to a state statute.  Hicks v. Miranda, 422 U.S. 332, 344 (1975).  (In 1988, Congress amended § 1257 to eliminate mandatory jurisdiction in this context).  However, the Court "was not obligated to grant the case plenary consideration," id., and it chose not to do so, instead issuing a one sentence order stating that "[t]he appeal is dismissed for want of a substantial federal question."  Baker v. Nelson, 409 U.S. 810 (1972).  At the time, this type of summary dismissal was a common way for the Court to manage the relatively large number of cases that fell within its mandatory jurisdiction.  Randy Beck, Transtemporal Separation of Powers in the Law of Precedent, 87 Notre Dame L. Rev. 1405, 1439-40

(2012) ("Because the volume of . . . mandatory appeals did not permit full briefing and argument in every case, the Court adopted the practice of summarily affirming many lower court decisions and summarily dismissing others for want of a substantial federal question. These summary affirmances and dismissals were routinely issued without any opinion from the Court explaining its disposition.").  In fact, a few years later, the Court similarly handled another case involving gay persons when it summarily affirmed a decision upholding the constitutionality of a statute criminalizing sodomy.  Doe v. Commonwealth's Attorney for City of Richmond, 403 F. Supp. 1199 (E.D. Va. 1975), aff'd, 425 U.S. 901 (1976).

Despite the absence of an opinion, full briefing or oral argument, a summary dismissal such as Baker is binding precedent "on the precise issues presented and necessarily decided by" the lower court.  Mandel v. Bradley, 432 U.S. 173, 176 (1977).  See also Chicago Sheraton Corp. v. Zaban, 593 F.2d 808, 809 (7th Cir. 1979) ("[A] summary disposition for want of a substantial federal question is controlling precedent."). As a result, defendants argue that this court has no authority to consider the question whether a ban on marriage between same-sex couples violates the Constitution.  They cite Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989), in which the Court stated that lower courts should adhere to the holdings of the Supreme Court, even if they "appea[r] to rest on reasons rejected in some other line of decisions, . . .  leaving to this Court the prerogative of overruling its own decisions."

The rule for summary affirmances and dismissals is not so clear cut.  Those orders "are not of the same precedential value as would be an opinion of [the Supreme] Court

treating the question on the merits." Edelman v. Jordan, 415 U.S. 651, 671 (1974).  For example, a summary dismissal is no longer controlling "when doctrinal developments indicate" that the Court would take a different view now.  Hicks, 422 U.S. at 344 (internal quotations omitted).  See also C. Steven Bradford, Following Dead Precedent: The Supreme Court's Ill-Advised Rejection of Anticipatory Overruling, 59 Fordham L. Rev. 39, 51 (1990) (citing Hicks for the proposition that "a precedent that has not been overruled may be disregarded when later doctrinal developments render it suspect.").

It would be an understatement to say that the Supreme Court's jurisprudence on issues similar to those raised in Baker has developed substantially since 1972.  At the time, few courts had addressed any issues relating to the constitutional rights of gay persons; favorable decisions were even less frequent.  E.g., Boutilier v. Immigration & Naturalization Service, 387 U.S. 118 (1967) (homosexual individual could be denied admission to United States on ground that homosexuality is a "psychopathic personality").  Perhaps because there were so few people who identified publicly as gay, it was difficult for courts to empathize with their plight.

In more recent years, the Supreme Court has issued a series of cases in which it has denounced the view implicit in cases such as Baker that gay persons are "strangers to the law."  Romer v. Evans, 517 U.S. 620, 635-36 (1996).  In Romer, the Court invalidated under the equal protection clause a state constitutional amendment that discriminated on the basis of sexual orientation.  In Lawrence v. Texas, 539 U.S. 558 (2003), the Court concluded that a Texas law criminalizing homosexual sodomy violated the due process

clause, overruling <u>Bowers v. Hardwick</u>, 478 U.S 186 (1986), and implicitly the summary affirmance in <u>Doe</u>, 425 U.S. 901 (which the Court did not even mention).

To the extent <u>Romer</u> and <u>Lawrence</u> left any room for doubt whether the claims in this case raise a substantial federal question, that doubt was resolved in <u>United States v. Windsor</u>, 133 S. Ct. 2675 (2013), in which the Court invalidated the Defense of Marriage Act, a law prohibiting federal recognition of same-sex marriages authorized under state law. Before the case reached the Supreme Court, the Court of Appeals for the Second Circuit had discussed at length the continuing vitality of <u>Baker</u> and the majority had concluded over a vigorous dissent that <u>Baker</u> was no longer controlling. <u>Compare</u> <u>Windsor v. United States</u>, 699 F.3d 169, 178-79 (2d Cir. 2012) ("Even if <u>Baker</u> might have had resonance for Windsor's case in 1971, it does not today."), <u>with</u> <u>id.</u> at 210 (Straub, J., dissenting) ("Subjecting the federal definition of marriage to heightened scrutiny would defy or, at least, call into question the continued validity of <u>Baker</u>, which we are not empowered to do."). On appeal before the Supreme Court, those defending the law continued to press the issue, arguing that the lower court's rejection of <u>Baker</u> as precedent made "the case for this Court's review . . . overwhelming." <u>Windsor v. United States of America</u>, Nos. 12-63 and 12-307, Supplemental Brief for Respondent Bipartisan Legal Advisory Group of the U.S. House of Representatives, <u>available at</u> 2012 WL 5388782, at *5-6.

Despite the lower court's and the parties' debate over <u>Baker</u>, the Supreme Court ignored the case in both its decision and during the oral argument for <u>Windsor</u>. (In a companion case regarding same-sex marriage that was dismissed on prudential grounds,

counsel for petitioners began discussing <u>Baker</u> during oral argument, but Justice Ginsburg cut him off, stating, "Mr. Cooper, <u>Baker v. Nelson</u> was 1971. The Supreme Court hadn't even decided that gender-based classifications get any kind of heightened scrutiny." Oral argument in <u>Hollingsworth v. Perry</u>, No. 12-144, available at 2013 WL 1212745, at *12.) The Court's silence is telling. Although the Court did not overrule <u>Baker</u>, the Court's failure to even acknowledge <u>Baker</u> as relevant in a case involving a restriction on marriage between same-sex persons supports a view that the Court sees <u>Baker</u> as a dead letter. <u>Cf.</u> <u>Romer</u>, 517 U.S. at 642 (Scalia, J, dissenting) (noting Court's failure to discuss <u>Bowers</u> in case decided before Court overruled <u>Bowers</u> in <u>Lawrence</u>). Not even the dissenters in <u>Windsor</u> suggested that <u>Baker</u> was an obstacle to lower court consideration challenges to bans on same-sex marriage.

Before <u>Windsor</u>, the courts were split on the question whether <u>Baker</u> was still controlling. <u>Compare</u> <u>Pedersen v. Office of Personnel Management</u>, 881 F. Supp. 2d 294, 307 (D. Conn. 2012) (<u>Baker</u> not controlling); <u>Smelt v. County of Orange</u>, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) (same); <u>In re Kandu</u>, 315 B.R. 123, 138 (Bankr. W.D. Wash. 2004) (same), <u>with</u> <u>Massachusetts v. United States Dept. of Health and Human Services</u>, 682 F.3d 1, 8 (1st Cir. 2012) (<u>Baker</u> controlling); <u>Sevcik v. Sandoval</u>, 911 F. Supp. 2d 996, 1003 (D. Nev. 2012) (same); <u>Jackson v. Abercrombie</u>, 884 F. Supp. 2d 1065, 1086 (D. Haw. 2012) (same); <u>Morrison v. Sadler</u>, 821 N.E.2d 15, 19 (Ind. Ct. App. 2005) (same). (Oddly, the first federal court to rule in favor of the right of same-sex couples to marry did not discuss <u>Baker</u>. <u>Perry v. Schwarzenegger</u>, 704 F. Supp. 2d 921 (N.D. Cal. 2010).) Since

<u>Windsor</u>, nearly every court to consider the question has concluded that <u>Baker</u> does not preclude review of challenges to bans on same-sex marriage.   <u>E.g.</u>, <u>Latta v. Otter</u>, 1:13-CV-00482-CWD, — F. Supp. 2d. — , 2014 WL 1909999, *9 (D. Idaho May 13, 2014); <u>Bostic v. Rainey</u>, 970 F. Supp. 2d. 456, 470 (E.D. Va. 2014); <u>Bishop v. U.S. ex rel. Holder</u>, 962 F. Supp. 2d 1252, 1277 (N.D. Okla. 2014); <u>Kitchen v. Herbert</u>, 961 F. Supp. 2d 1181, 1195 (D. Utah 2013).  The only outlier seems to be <u>Merritt v. Attorney General</u>, CIV.A. 13-00215-BAJ, 2013 WL 6044329 (M.D. La. Nov. 14, 2013), in which the court cited <u>Baker</u> for the proposition that "the Constitution does not require States to permit same-sex marriages." However, <u>Merritt</u> is not persuasive because the court did not discuss <u>Romer</u>, <u>Lawrence</u> or <u>Windsor</u> in its decision.

Even defendants seem to acknowledge that the writing is on the wall.  Although this is a threshold issue, they bury their short discussion of it at the end of their summary judgment brief. Accordingly, I conclude that, despite <u>Baker</u>, I may consider the merits of plaintiffs' claim.

## B. <u>Positive Rights vs. Negative Rights</u>

What is perhaps defendants' oddest argument relies on a distinction between what defendants call "positive rights" and "negative rights."   In other words, the Constitution protects the rights of individuals to be free from government interference ("negative rights"), but it does not give them a right to receive government benefits ("positive rights"). Defendants cite cases such as <u>DeShaney v. Winnebago County Dept. of Social Services</u>, 489

U.S. 189, 195 (1989), for the proposition that the Constitution "confer[s] no affirmative right to governmental aid." Thus, defendants say, although the due process clause may protect the right of individuals to engage in certain intimate conduct (a "negative right"), it "does not preclude a state from choosing not to give same-sex couples the positive right to enter the legal status of civil marriage under state law." Dfts.' Br., dkt. #102, at 8.

Defendants' argument has two problems. First, the Supreme Court has held on numerous occasions that marriage is a fundamental right protected by the Constitution. E.g., Turner v. Safley, 482 U.S. 78, 95 (1987); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640 (1974); Loving v. Virginia, 388 U.S. 1, 12 (1967). Thus, even if marriage is a "positive right" as defendants understand that term, marriage stands as an exception to the general rule.

Second, even if I assume that the state would be free to abolish the institution of marriage if it wished, the fact is that Wisconsin obviously has *not* abolished marriage; rather, it has limited the class of people who are entitled to marry. The question in this case is not whether the state is required to issue marriage licences as a general matter, but whether it may discriminate against same-sex couples in doing so. Even in cases in which an individual does not have a substantive right to a particular benefit or privilege, once the state extends that benefit to some of its citizens, it is not free to deny the benefit to other citizens for any or no reason on the ground that a "positive right" is at issue. In fact, under the equal protection clause, "the right to equal treatment . . . is not co-extensive with any substantive rights to the benefits denied the party discriminated against." Heckler v. Mathews, 465 U.S.

13

728, 739, 646 (1984).  Therefore, "[t]he State may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." DeShaney, 489 U.S. at 197 n.3.

Defendants fail to distinguish this case from the others in which the Supreme Court considered the constitutionality of laws that denied the right to marry to some class of citizens.  Loving, 388 U.S. 1 (interracial marriage); Zablocki v. Redhail, 434 U.S. 374 (1978) (marriage of parents who fail to make child support payments); Turner v. Safley, 482 U.S. 78 (1987) (marriage of prisoners).  Although defendants say that their argument is "consistent" with Loving, Zablocki and Turner because those cases did nothing more than "recognize a negative right," Dfts.' Br., dkt. #102, at 10, defendants do not explain why marriage is a "positive right" when the state discriminates on the basis of sexual orientation, but a "negative right" when it discriminates on the basis of race, custody or financial status.

Defendants make a related argument that the government should not be required to "officially endorse the intimate and domestic relationships that gay and lesbian persons may choose to enter."  Dfts.' Br., dkt. #102, at 9.  They cite cases in which the Court held that there is no constitutional right to subsidies for having an abortion and that the government is entitled to have a preference for childbirth.  Rust v. Sullivan, 500 U.S. 173, 201 (1991); Webster v. Reproductive Health Services, 492 U.S. 490, 509 (1989).  Along the same lines, defendants argue that they are entitled to have a preference for marriage between opposite-sex couples.

Even setting aside the many obvious factual differences between marriage and

14

abortion, the analogy defendants attempt to draw is inapt for three reasons.  First, as noted above, the state is already issuing marriage licenses to some citizens.  The comparison to abortion would be on point only if, in the cases cited, the state had decided to fund abortions for heterosexual women but not for lesbians.

Second, abortion cannot be compared to marriage because the government does not have a monopoly on providing abortions.  In other words, if the government refuses to use its resources to provide or fund abortions, a woman may seek an abortion somewhere else.  In contrast, it is the state and only the state that can issue a marriage license.  Thus, defendants' "preference" for marriage between opposite-sex couples is not simply a denial of a subsidy, it is a denial of the right itself.

Defendants' concern about "endorsing" marriage between same-sex couples seems to be one that has been shared by both judges and legislators in the past.  E.g., Goodridge v. Dept. of Public Health, 798 N.E.2d 941, 986-87 (Mass. 2003) (Cordy, J., dissenting) ("The plaintiffs' right to privacy . . . does not require that the State officially endorse their choices in order for the right to be constitutionally vindicated."); Dean v. District of Columbia CIV.A. 90-13892, 1992 WL 685364, *4 (D.C. Super. June 2, 1992) ("[L]egislative authorization of homosexual, same-sex marriages would constitute tacit state approval or endorsement of the sexual conduct, to wit, sodomy, commonly associated with homosexual status."); Transcript of the Mark-Up Record of the Defense of Marriage Act, House Judiciary Committee, June 12, 1996 (statement of Rep. Sonny Bono that he is voting for DOMA because "I can't tell my son [same-sex marriage is] ok, or I don't think I can yet."). These

15

concerns may be common, but they rest on a false assumption about constitutional rights. Providing marriage licenses to same-sex couples on an equal basis with opposite-sex couples is not "endorsing" same-sex marriage; rather, it simply represents "a commitment to the law's neutrality where the rights of persons are at stake." Romer, 517 U.S. at 623. See also Bowers, 478 U.S. at 205-06 (Blackmun, J., dissenting) ("[A] necessary corollary of giving individuals freedom to choose how to conduct their lives is acceptance of the fact that different individuals will make different choices.").

There are many situations in which the Constitution requires the government to provide benefits using neutral criteria, even with respect to groups that are unpopular or that the government finds abhorrent, without any connotation that the government is endorsing the group. E.g., Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819 (1995) (public university could not rely on concerns of improper endorsement to justify refusal to fund student newspaper when funds were available to similarly situated groups); Capitol Square Review & Advisory Board v. Pinette, 515 U.S. 753 (1995) (state could not rely on concerns about endorsement to deny request of Ku Klux Klan to erect monument on public land when other similarly situated groups were allowed to do so). Thus, extending marriage to same-sex couples does not require "approval" of homosexuality any more than the Supreme Court "approved" of convicted criminals or deadbeat dads when it held in Turner, 482 U.S. 78, and Zablocki, 434 U.S. 374, that the right to marry extends to prisoners and fathers who have failed to make child support payments. In re Opinions of the Justices to the Senate, 802 N.E.2d 565, 569 (Mass. 2004) ("This is not a matter of social

policy but of constitutional interpretation."); <u>Baker v. State</u>, 744 A.2d 864, 867 (Vt. 1999)

("The issue before the Court . . . does not turn on the religious or moral debate over intimate

same-sex relationships, but rather on the statutory and constitutional basis for the exclusion

of same-sex couples from the secular benefits and protections offered married couples.").


   C.   <u>Judicial Restraint, Federalism and Respect for the Democratic Process</u>

   Defendants and amici argue that federal courts should not question a state's

democratic determination regarding whether and when to extend marriage to same-sex

couples.  Rather, courts should allow states to serve as "laboratories of democracy" so that

each state can learn from the experience of others and decide what works best for its own

citizens.  <u>Oregon v. Ice</u>, 555 U.S. 160, 171 (2009); <u>New State Ice Co. v. Liebmann</u>, 285

U.S. 262, 311 (1932) (Brandeis, J., dissenting).  Defendants rely generally on principles of

federalism and more specifically on the fact that regulation of marriage is a matter

traditionally left to the states.  A number of courts and dissenting judges in other cases have

asserted a similar argument.  <u>Windsor</u>, 133 S. Ct. at 2718-19 (Alito, J., dissenting)

("Because our constitutional order assigns the resolution of questions of this nature to the

people, I would not presume to enshrine either vision of marriage in our constitutional

jurisprudence."); <u>In re Marriage Cases</u>, 183 P.3d 384, 463-64 (Cal. 2008) (Baxter, J.,

dissenting) ("By . . . moving the policy debate from the legislative process to the court, the

majority engages in faulty constitutional analysis and violates the separation of powers.");

<u>Hernandez v. Robles</u>, 855 N.E.2d 1, 12 (N.Y. 2006) ("[W]e believe the present generation

17

should have a chance to decide the issue through its elected representatives. We therefore express our hope that the participants in the controversy over same-sex marriage will address their arguments to the Legislature; that the Legislature will listen and decide as wisely as it can; and that those unhappy with the result—as many undoubtedly will be—will respect it as people in a democratic state should respect choices democratically made."); <u>Goodridge</u>, 798 N.E.2d at 974 (Spina, J.,  dissenting) ("What is at stake in this case is not the unequal treatment of individuals or whether individual rights have been impermissibly burdened, but the power of the Legislature to effectuate social change without interference from the courts, pursuant to art. 30 of the Massachusetts Declaration of Rights.").

Although I take no issue with defendants' observations about the important role that federalism plays in this country, that does not mean that a general interest in federalism trumps the due process and equal protection clauses.  States may not "experiment" with different social policies by violating constitutional rights.

The fundamental problem with defendants' argument is that it cannot be reconciled with the well-established authority of federal courts to determine the constitutionality of state statutes or with the Fourteenth Amendment, the very purpose of which was to protect individuals from overreaching by the states. <u>Jackson v. City of Joliet</u>, 715 F.2d 1200, 1203 (7th Cir. 1983) ("The Fourteenth Amendment . . . sought to protect Americans from oppression by state government."); <u>De Leon v. Perry</u>, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014) ("One of the court's main responsibilities is to ensure that individuals are treated equally under the law.").  To further that purpose, federal courts have invalidated state laws

that violate constitutional rights, even when the law enjoys popular support and even when the subject matter is controversial. <u>City of Cleburne, Texas v. Cleburne Living Center</u>, 473 U.S. 432, 448 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause."); <u>West Virginia Board of Education v. Barnette</u>, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."); <u>Chambers v. State of Florida</u>, 309 U.S. 227, 241 (1940) ("Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement."); Laurence Tribe, <u>American Constitutional Law</u> § 15–10, at 1351 (2d ed. 1988) ("As in the case of racial segregation, it is often when public sentiment is most sharply divided that the independent judiciary plays its most vital national role in expounding and protecting constitutional rights.").

Federalism was a common defense to the segregationist laws of the Jim Crow era. <u>E.g.</u>, <u>Naim v. Naim</u>, 87 S.E.2d 749, 756 (Va. 1955) (in case upholding anti-miscegenation law, stating that "[r]egulation of the marriage relation is, we think, distinctly one of the rights guaranteed to the States and safeguarded by that bastion of States' rights"). <u>See also</u>

Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 397 (1969)
(Douglas, J., dissenting) ("States' rights are often used as a cloak to cover unconstitutional
encroachments such as the maintenance of second-class citizenship for Negroes or Americans
of Mexican ancestry.").  However, that defense has long since been discredited.  Defendants'
federalism argument arises in a different context, but they identify no way to distinguish
their argument from those the Supreme Court rejected long ago.  Andersen v. King County,
138 P.3d 963, 1028-29 (Wash. 2006) (Bridges, J., dissenting) (in case involving claim for
same-sex marriage, stating that, "had the United States Supreme Court adopted the
plurality's [view of federalism], there would have been no Brown v. Board of Education of
Topeka, 347 U.S. 483 (1954).").

Although Wisconsin's same-sex marriage ban was approved by a majority of voters,
is part of the state constitution and deals with a matter that is a traditional concern of the
states, none of these factors can immunize a law from scrutiny under the United States
Constitution.  The Supreme Court has not hesitated to invalidate any of those types of laws
if it concludes that the law is unconstitutional.  Romer, 517 U.S. 620 (invalidating state
constitutional amendment);  Lucas v. Forty-Fourth General Assembly of State of Colorado,
377 U.S. 713, 736-37 (1964) ("[T]hat [a law] is adopted in a popular referendum is
insufficient to sustain its constitutionality. . . . A citizen's constitutional rights can hardly be
infringed simply because a majority of the people choose that it be."); Brown v. Board of
Education of Topeka, 347 U.S. 483, 493 (1954) (striking down school segregation while
noting that "education is perhaps the most important function of state and local

governments"). See also Baehr v. Lewin, 852 P.2d 44, 68 (Haw. 1993) ("The result we reach today is in complete harmony with the Loving Court's observation that any state's powers to regulate marriage are subject to the constraints imposed by the constitutional right to the equal protection of the laws."). Even in Baker, 191 N.W.2d at 187, in which the Minnesota Supreme Court brushed off a marriage claim brought by a same-sex couple, the court acknowledged that "Loving does indicate that not all state restrictions upon the right to marry are beyond reach of the Fourteenth Amendment."

To the extent that defendants mean to argue that a special rule should apply to the issue of same-sex marriage, they cite no authority for that view. There is no asterisk next to the Fourteen Amendment that excludes gay persons from its protections. Romer, 517 U.S. at 635.

In a footnote, amici argue that cases such as Loving, Turner and Zablocki are distinguishable because they "all involved laws that prevented individuals otherwise qualified for marriage from marrying, and have not gone to the essentials of what marriage means as the claim in this case does." Amici Br., dkt. #109, at 17 n.3. However, this argument has nothing to do with federalism or the democratic process; rather, it goes to the scope of the right to marry, which is discussed below. Even if I assume for the purpose of this discussion that amici are correct about the distinction between this and previous cases about marriage, it would not mean that a general interest in what amici call "state sovereignty" would preclude review of Wisconsin laws banning same-sex marriage.

Defendants and amici cite Windsor, 133 S. Ct. 2675, and Schuette v. Coalition to

21

Defend Affirmative Action, 134 S. Ct. 1623 (2014), to support their argument, but neither case is on point.  First, defendants quote the statement in <u>Schuette</u> that there is "a fundamental right held not just by one person but by all in common. It is the right to speak and debate and learn and then, as a matter of political will, to act through a lawful electoral process."  <u>Schuette</u>, 134 S. Ct. at 1637.  However, the holding in <u>Schuette</u> was that Michigan did not violate the equal protection clause by enacting a state constitutional amendment that *prohibits* discrimination in various contexts.  The Court said nothing about state laws such as Wisconsin's marriage amendment that *require* discrimination and the Court did not suggest that such laws are immune from constitutional review.

<u>Windsor</u> is closer to the mark, but not by much.  It is true that the Supreme Court noted multiple times in its decision that the regulation of marriage is a traditional concern of the states.  <u>Windsor</u>, 133 S. Ct. at 2689-90 ("By history and tradition the definition and regulation of marriage, as will be discussed in more detail, has  been treated as being within the authority and realm of the separate States."); <u>id.</u> at 2691 ("[R]egulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States.") (internal quotations omitted).  In addition, the Court noted that the Defense of Marriage Act departed from that tradition by refusing to defer to the states' determination of what qualified as a valid marriage.  <u>Id.</u> at 2692 ("DOMA, because of its reach and extent, departs from this history and tradition of reliance on state law to define marriage.").

However, defendants' and amici's reliance on <u>Windsor</u> is misplaced for three reasons. First, the Supreme Court's observations were not new; the Court has recognized for many

years that the regulation of marriage is primarily a concern for the states. In his dissent, Justice Scalia noted this point and questioned the purpose of the Court's federalism discussion. Id. at 2705 (Scalia, J., dissenting) ("But no one questions the power of the States to define marriage (with the concomitant conferral of dignity and status), so what is the point of devoting seven pages to describing how long and well established that power is?"). Thus, it would be inappropriate to infer that the Court was articulating a new, heightened level of deference to marriage regulation by the states.

Second, the Court declined expressly to rely on federalism as a basis for its conclusion that DOMA is unconstitutional. Windsor, 133 S. Ct. at 2692 ("[I]t is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution because it disrupts the federal balance."). See also id. at 2705 (Scalia, J., dissenting) ("[T]he opinion has formally disclaimed reliance upon principles of federalism."). But see id. at 2697 (Roberts, C.J., dissenting) ("[I]t is undeniable that its judgment is based on federalism.").

Third, and most important, the Court discussed DOMA's encroachment on state authority as *evidence that the law was unconstitutional*, not as a reason to preserve a law that otherwise would be invalid. In fact, the Court was careful to point out multiple times the well-established principle that an interest in federalism cannot trump constitutional rights. Id. at 2691 ("State laws defining and regulating marriage, of course, must respect the constitutional rights of persons."); id. at 2692 ("[T]he incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next."); id. ("The States' interest

23

in defining and regulating the marital relation [is] subject to constitutional guarantees.").

All this is not to say that concerns about federalism and the democratic process should be ignored when considering constitutional challenges to state laws.  It is obvious that courts must be sensitive to judgments made by the legislature and the voters on issues of social policy and should exercise the power of judicial review in rare instances.  However, these concerns are addressed primarily in the context of determining the appropriate standard of review.  We are long past the days when an invocation of "states' rights" is enough to insulate a law from a constitutional challenge.


## II.  STANDARD OF REVIEW

Plaintiffs' claim arises under two provisions in the Fourteenth Amendment to the United States Constitution.  First, plaintiffs contend that Wisconsin's ban on same-sex marriage violates their fundamental right to marry under the due process clause.  Second, they contend that the ban discriminates against them on the basis of sex and sexual orientation, in violation of the equal protection clause.  As other courts have noted, the rights guaranteed by these constitutional provisions "frequently overlap." Goodridge, 798 N.E.2d at 953.  See also Lawrence, 539 U.S. at 575 ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects.").  In this case, the ultimate question under both provisions is whether the state may discriminate against same-sex couples in the context of issuing marriage licenses and recognizing marriages performed in other states.  However, each clause

24

presents its own questions about the appropriate standard of review.   I will address the standard first under the due process clause and then under the equal protection clause.

## A. Fundamental Right to Marry

The "liberty" protected by the due process clause in the Fourteenth Amendment includes the "fundamental right" to marry, a conclusion that the Supreme Court has reaffirmed many times.  Turner, 482 U.S. at 95 ("[T]he decision to marry is a fundamental right."); Zablocki, 434 U.S. at 384 ("[The] right to marry is of fundamental importance for all individuals."); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); Loving, 388 U.S. at 12 (referring to marriage as "fundamental freedom"); Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (right to marry is "central part of the liberty protected by the Due Process Clause").  In Loving, 388 U.S. at 12, the Court went so far as to say that marriage is "one of the basic civil rights of man."

The Supreme Court has articulated a standard of review "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right" such as the right to marry, which is that the law "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." Zablocki, 434 U.S. at 388.  See also Beller v. Middendorf, 632 F.2d 788, 807 (9th Cir. 1980) (Kennedy, J.) ("[S]ubstantive due process scrutiny of a government regulation involves a

case-by-case balancing of the nature of the individual interest allegedly infringed, the importance of the government interests furthered, the degree of infringement, and the sensitivity of the government entity responsible for the regulation to more carefully tailored alternative means of achieving its goals.").

1.  Scope of the right to marry

The threshold question under the Zablocki standard is whether the right to marry encompasses a right to marry someone of the same sex.  Defendants say that it does not, noting that "[t]he United States Supreme Court has never recognized" a "right to marry a person of the same sex" and that same-sex marriage is not "deeply rooted in this Nation's history and tradition," which defendants say is a requirement to qualify as a fundamental right under the Constitution, citing Washington v. Glucksberg, 521 U.S. 702 (1997).  Dfts.' Br., dkt. #102, at 26.  Amici add that "our Nation's law, along with the law of our antecedents from ancient to modern times, has consistently recognized the biological and social realities of marriage, including its nature as a male-female unit advancing purposes related to procreation and childrearing." Amici Br., dkt. #109, at 6.  They cite cases in which they say the Supreme Court has "explicitly linked marriage and procreation."  Id. (quoting Skinner v. Oklahoma, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."), and Maynard v. Hill, 125 U.S. 190, 211 (1888) (marriage is "the foundation of the family.")).  For many years, arguments similar to these were accepted consistently by the courts. E.g., Sevcik, 911 F. Supp. 2d at

1013-14; <u>Jackson</u>, 884 F. Supp. 2d at 1071; <u>Hernandez</u>, 855 N.E. 2d at 10; <u>Andersen</u>, 138 P.3d at 979; <u>Lewis v. Harris</u>, 908 A.2d 196, 210 (N.J. 2006); <u>Dean</u>, 1992 WL 685364.

Defendants' observation that the Supreme Court has not yet recognized a "right to same-sex marriage" is both obvious and unhelpful.  When the Court struck down Virginia's anti-miscegenation law in <u>Loving</u>, it had never before discussed a "right to interracial marriage."  If the Court had decided previously that the Constitution protected marriage between same-sex couples, this case would not be here. The question is not whether plaintiffs' claim is on all fours with a previous case, but whether  plaintiffs' wish to marry someone of the same sex falls within the right to marry already firmly established in Supreme Court precedent.  For several reasons, I conclude that it does.

a. Purposes of marriage

I am not persuaded by amici's argument that marriage's link to procreation is the sole reason that the Supreme Court has concluded that marriage is protected by the Constitution. Although several courts have adopted that view, <u>e.g.</u>, <u>Dean v. District of Columbia</u>, 653 A.2d 307, 332 (D.C. 1995); <u>Baehr</u>, 852 P.2d at 56, I believe tat it is misguided.  First, gay persons have the same ability to procreate as anyone else and same-sex couples often raise children together, so there is no reason why a link between marriage and procreation should disqualify same-sex couples.

Second, although the Supreme Court has identified procreation as *a* reason for marriage, it has never described procreation as a requirement.  This point has been clear at

least since <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965). If it were true that the Court viewed procreation as a necessary component of marriage, it could not have found that married couples have a constitutional right *not* to procreate by using contraception.  Instead, the Court described marriage as "a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions."  <u>Id.</u> at 486.

To the extent that <u>Griswold</u> leaves any ambiguity, it is resolved by <u>Turner</u>, 482 U.S. 78, which raised the question whether prisoners retain the right to marry while incarcerated. The Supreme Court concluded that they did, despite the fact that the vast majority of prisoners cannot procreate with their spouses.  The Court stated:

> Many important attributes of marriage remain . . . after taking into account the limitations imposed by prison life.  First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated. Finally, marital status often is a precondition to the receipt of government benefits (e.g., Social Security benefits), property rights (e.g., tenancy by the entirety, inheritance rights), and other, less tangible benefits (e.g., legitimation of children born out of wedlock). These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.

<u>Id.</u> at  95-96.  <u>Turner</u> makes it clear that the Court views marriage as serving a variety of

28

important purposes for the couple involved, which may or may not include procreation, and that it is ultimately for the couple to decide what marriage means to them. (Although the Court stated that most inmate marriages "will be fully consummated" when the prisoner is released, there is obviously a difference between consummating a marriage and procreation. In any event, the Court did not suggest that an intent to consummate is a prerequisite to marriage.) Because defendants identify no reason why same-sex couples cannot fulfill the Court's articulated purposes of marriage just as well as opposite-sex couples, this counsels in favor of interpreting the right to marry as encompassing the choice of a same-sex partner.

b.  Nature of the decision

In describing the type of conduct protected by the due process clause, including marriage, family relationships, contraception, education and procreation, the Supreme Court has stated that the common thread is that they all relate to decisions that are central to the individual's sense of identity and ability to control his or her own destiny. This point may have been made most clearly in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 851 (1992):

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

See also Lawrence, 539 U.S. at 578 (state may not "control th[e] destiny" of its citizens by

criminalizing certain intimate conduct); Eisenstadt v. Baird, 405 U.S. 438, 453 (1972)
(Constitution protects right "to be free from unwarranted governmental intrusion into
matters . . . fundamentally affecting a person.").

In addition, the Supreme Court has stated that the liberty protected in the due
process clause includes the right to choose your own family.  Moore v. City of East
Cleveland, Ohio, 431 U.S. 494, 499, 506 (1977) ("A host of cases . . . have consistently
acknowledged a private realm of family life which the state cannot enter. . . . [W]hen the
government intrudes on choices concerning family living arrangements, this Court must
examine carefully the importance of the governmental interests advanced and the extent to
which they are served by the challenged regulation.").  With respect to marriage in
particular, the Supreme Court has stated repeatedly that it is a matter of individual choice.
 Hodgson v. Minnesota, 497 U.S. 417, 435 (1990) ("[T]he regulation of constitutionally
protected decisions, such as where a person shall reside or whom he or she shall marry, must
be predicated on legitimate state concerns other than disagreement with the choice the
individual has made."); Roberts v. U.S. Jaycees, 468 U.S. 609, 620 (1984) ("[T]he
Constitution undoubtedly imposes constraints on the State's power to control the selection
of one's spouse."); Loving, 388 U.S. at 12 ("Under our Constitution, the freedom to marry,
or not marry, a person of another race resides with the individual and cannot be infringed
by the State. . . The freedom to marry has long been recognized as one of the vital personal
rights essential to the orderly pursuit of happiness.").  See also Zablocki, 434 U.S. at 403-04
(Stevens, J., concurring in the judgment) ("The individual's interest in making the marriage

30

decision independently is sufficiently important to merit special constitutional protection.").

In <u>Bowers</u>, when the Supreme Court refused to acknowledge that homosexual relationships are entitled to constitutional protection, Justice Blackmun noted in his dissent that the Court was being inconsistent with previous cases in which it had protected decisions that "form so central a part of an individual's life." <u>Bowers</u>, 478 U.S. at 204-05 (Blackmun, J., dissenting). <u>See also</u> <u>id.</u> at 218-19 (Stevens, J., dissenting) ("[E]very free citizen has the same interest in 'liberty' that the members of the majority share. From the standpoint of the individual, the homosexual and the heterosexual have the same interest in deciding how he will live his own life."). In <u>Lawrence</u>, 539 U.S. at 567, the Court acknowledged that, in <u>Bowers</u>, it had "fail[ed] to appreciate the extent of the liberty at stake," when it framed the question as whether there is a "right to homosexual sodomy." Instead, the Court should have recognized that "our laws and tradition afford constitutional protection" to certain "personal decisions" and that "[p]ersons in a homosexual relationship may seek autonomy" to make those decisions "just as heterosexual persons do." <u>Id.</u> at 574.

Of course, <u>Lawrence</u> is not directly on point because that case was about sexual conduct rather than marriage, but even in <u>Lawrence</u>, the Supreme Court acknowledged that sexual conduct is but "one element in a personal bond that is more enduring." <u>Lawrence</u>, 539 U.S. at 567. The Court went on to state that its holding "should counsel against attempts by the State, or a court, to define the meaning of the relationship *or to set its boundaries* absent injury to a person or abuse of an institution the law protects." <u>Id.</u> (emphasis added). More generally, the Court reaffirmed the principle that, in determining

the scope of a right under the due process clause, the focus should be on the nature of the decision at issue and not on who is making that decision.  Turner, 478 U.S. 82 (right to marry extends to prisoners); Zablocki, 434 U.S. 374 (right to marry extends to father who failed to make court-ordered child support payments); Eisenstadt, 405 U.S. at 453 (right of married couples to use contraception recognized in Griswold must be extended to single persons as well).  See also Latta, 2014 WL 1909999, at *12 ("[The argument that the right to same-sex marriage is a] 'new right' . . .  attempts to narrowly parse a right that the Supreme Court has framed in remarkably broad terms.  Loving was no more about the 'right to interracial marriage' than Turner was about the 'prisoner's right to marry' or Zablocki was about the 'dead-beat dad's right to marry.'").

If the scope of the right to marry is broad enough to include even those whose past conduct suggests an inclination toward violating the law and abdicating responsibility, then it is difficult to see why it should not be broad enough to encompass same-sex couples as well.  Defendants do not suggest that the decision about whom to marry is any less important or personal for gay persons than it is for heterosexuals. Accordingly, I conclude defendants are making the same mistake as the Court in Bowers when they frame the question in this case as whether there is a "right to same-sex marriage" instead of whether there is a right to marriage from which same-sex couples can be excluded. Latta, 2014 WL 1909999, at *13; Kitchen, 961 F. Supp. 2d at 1199-1200; Andersen, 138 P.3d at 1022 (Fairhurst, J., dissenting).

c.  History of exclusion

Defendants argue that including the choice of a same-sex partner within the right to marry would contradict <u>Washington v. Glucksberg</u>, 521 U.S. 702, 722 (1997), in which the Supreme Court stated that its "substantive-due-process jurisprudence . . . has been a process whereby the outlines of the 'liberty' specially protected by the Fourteenth Amendment . . . have . . . been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition."  Although the Court previously had recognized "the right of a competent individual to refuse medical treatment," it declined to expand the scope of that right to include a more general "right to commit suicide," in part because of "a consistent and almost universal tradition that has long rejected the asserted right" to suicide. <u>Id.</u> at 723-24.  Defendants say that a similar conclusion is required with respect to the right of same-sex couples to marry because that right had not been recognized in any state until recently.

As an initial matter, it is hard to square aspects of <u>Glucksberg</u> with the holdings in <u>Griswold</u> and  <u>Roe v. Wade</u>, 410 U.S. 113 (1973), in which the Court recognized the rights to contraception and abortion, neither of which were "deeply rooted" in the country's legal tradition at the time.  <u>Lawrence</u>, 539 U.S. at 588 (Scalia, J., dissenting) ("<u>Roe</u> [has] been . . . eroded by [<u>Glucksberg</u>] . .. [because] . . .<u>Roe</u> . . . subjected the restriction of abortion to heightened scrutiny without even attempting to establish that the freedom to abort was rooted in this Nation's tradition.").  Despite the tension between these cases, the Court has reaffirmed the rights recognized in both <u>Roe</u> and <u>Griswold</u> since <u>Glucksberg</u>.  <u>Lawrence</u>, 539

33

U.S. at 564 (citing holding of <u>Griswold</u> and <u>Roe</u> with approval); <u>Stenberg v. Carhart</u>, 530 U.S. 914, 921 (2000) (reaffirming <u>Roe</u>).

In any event, I conclude that <u>Glucksberg</u> is not instructive because that case involved the question whether a right to engage in certain conduct (refuse medical treatment) should be expanded to include a right to engage in different conduct (commit suicide), "two acts [that] are widely and reasonably regarded as quite distinct." <u>Id.</u> at 725. In this case, the conduct at issue is exactly the same as that already protected: getting married. The question is whether the scope of that right may be restricted depending on *who* is exercising the right.

Both <u>Lawrence</u> and <u>Loving</u> support a view that the state cannot rely on a history of exclusion to narrow the scope of the right. When the Supreme Court decided those cases, there had been a long history of states denying the rights being asserted. Although the trend was moving in the other direction, many states still prohibited miscegenation in 1967 and many still prohibited homosexual sexual conduct in 2003. <u>Lawrence</u>, 539 U.S. at 573 (noting that 13 states retained sodomy laws); <u>Loving</u>, 388 U.S. at 7 (noting that 16 states had anti-miscegenation laws). <u>See</u> <u>also</u> Andrew Sullivan, <u>Same-Sex Marriage: Pro and Con</u> Introduction xxv (Vintage 2004) (in 1968, one year *after* <u>Loving</u>, 72 percent of Americans disapproved of interracial marriages); Michael Klarman, <u>Courts, Backlash and the Struggle for Same-Sex Marriage</u> Introduction i (Oxford University Press 2012) (when Court decided <u>Brown v. Board of Education</u>, 21 states required or permitted racial segregation in public schools).

In both <u>Loving</u> and <u>Lawrence</u>, proponents of the laws being challenged relied on this

34

history of exclusion as evidence that the scope of the right should not include the conduct at issue.  Bowers, 478 U.S. at  211 (Blackmun, J., dissenting) (In Loving, "defenders of the challenged statute relied heavily on the fact that when the Fourteenth Amendment was ratified, most of the  States had similar prohibitions."); Lawrence, 539 U.S. at 594-95 (Scalia, J., dissenting) ("[T]he only relevant point is that [sodomy] was criminalized—which suffices to establish that homosexual sodomy is not a right deeply rooted in our Nation's history and tradition.") (internal quotations omitted).  In fact, in Bowers, 478 U.S. at 192, the Court itself relied on the fact that laws against sodomy had "ancient roots."  However, in both Lawrence and Loving, the Supreme Court held that history was not dispositive, particularly in  light of more recent changes in law and society.  Lawrence, 539 U.S. at 571-72 ("[There is] an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex. History and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry.") (internal quotations and alterations omitted); Casey, 505 U.S. at 847–48 ("Interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in Loving v. Virginia.").

    Past practices cannot control the scope of a constitutional right.  If the scope of the right is so narrow that it extends only to what is so well-established that it has never been challenged, then the right serves to protect only conduct that needs no protection.  Casey,

505 U.S. at 847 (It is "tempting . . . to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified. . . . But such a view would be inconsistent with our law.").  Thus, the scope of the right must be framed in neutral terms to prevent arbitrary exclusions of entire classes of people.  In this way, courts remain true to their "obligation . . . to define the liberty of all [rather than] mandate [their] own moral code."  Id. at 850.

d. "Definition" of marriage

Finally, amici attempt to distinguish Loving on the ground that sex, unlike race, "go[es] to the essentials of what marriage means." Amici Br., dkt. #109, at 17 n.3.  See also id. at 11 (opposite-sex requirement "has always been the universal essential element of the marriage definition").  This sort of "definitional" argument against marriage between same-sex couples was prominent in many of the early cases, in which courts said that the right to marry was not implicated because it simply was "impossible" for two people of the same sex to marry.  Baker, 191 N.W.2d at 187 ("But in commonsense and in a constitutional sense, there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex."); Jones v. Hallahan, 501 S.W.2d 588, 590 (Ky. Ct. App. 1973) ("In substance, the relationship proposed by the appellants does not authorize the issuance of a marriage license because what they propose is not a marriage."); Singer v. Hara, 522 P.2d 1187, 1191 (Wash. Ct. App. 1974) ("The operative distinction

36

[between interracial marriage and same-sex marriage] lies in the relationship which is described by the term 'marriage' itself, and that relationship is the legal union of one man and one woman."); Adams v. Howerton, 486 F. Supp. 1119, 1122 (C.D. Cal. 1980) ("The term 'marriage' . . . necessarily and exclusively involves a contract, a status, and a relationship between persons of different sexes."); Dean, 653 A.2d at 361 (Terry, J., concurring)("same-sex 'marriages' are legally and factually—i.e., definitionally—impossible").

Although amici try to rely on the inherent "nature" of marriage as a way to distinguish anti-miscegenation laws from Wisconsin's marriage amendment, the argument simply reveals another similarity between the objections to interracial marriage and amici's objections to same-sex marriage.  In the past, many believed that racial mixing was just as unnatural and antithetical to marriage as amici believe homosexuality is today. Wolfe v. Georgia Railway & Electric Co., 58 S.E. 899, 902-03 (Ga. 1907) (stating that "there is a universally recognized distinction between the races" and that miscegenation is "unnatural" and "productive of evil, and evil only"); Kinney v. Commonwealth, 71 Va. 858, 869 (1878) (interracial marriage "should be prohibited by positive law" because it is "so unnatural that God and nature seem to forbid" it); Lonas v. State, 50 Tenn. (3 Heisk) 287, 310 (1871) ("The laws of civilization demand that the races be kept apart.").  This view about interracial marriage was repeated by the trial court in Loving, 388 U.S. at 3 ("Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to

37

mix.").

Mildred Loving herself, one of the plaintiffs in <u>Loving</u>, saw the parallel between her situation and that of same-sex couples.  Martha C. Nussbaum, <u>From Disgust to Humanity: Sexual Orientation and the Constitution</u> 140 (Oxford University Press 2010) (quoting Mildred Loving as stating that "[t]he majority believed . . . that it was God's plan to keep people apart and that the government should discriminate against people in love" but that she believes that "all Americans, no matter their race, no matter their sex, no matter their sexual orientation, should have that same freedom to marry").  Although amici may believe that a particular sex is more "essential" to marriage than a particular race, this may reveal nothing more than amici's own views about what seems familiar and natural.  <u>Cf.</u> John Stuart Mill and Harriet Taylor Mill, "The Subjection of Women," <u>included in</u> John Stuart Mill, <u>On Liberty and Other Writings</u> 129 (Stefan Collini ed., Cambridge University Press 1989) ("Was there ever any domination which did not appear natural to those who possessed it?").

Even if I assume that amici are correct that the condemnation against miscegenation was not as "universal" as it has been against same-sex marriage, the logical conclusion of amici's argument suggests that the Supreme Court would have been compelled to uphold bans on interracial marriage if the opposition to them had been even stronger or more consistent.  Of course, the Court's holding in <u>Loving</u> did not rest on a "loophole" that interracial marriage had been legal in some places during some times.

A second flaw in defendants' argument is that it is circular and would allow a state

to exclude a group from exercising a right simply by manipulating a definition.  Civil marriage is a *legal* construct, not a biological rule of nature, so it can be and has been changed over the years; there is nothing "impossible" about defining marriage to include same-sex couples, as has been demonstrated by the decisions of a number countries and states to do just that.

Amici say that opposite-sex marriage reflects "biological and social realities," Amici's Br., dkt. #109, at 3, but they do not explain what that means.  To the extent amici are referring again to procreation, I have discussed that issue above and need not address it again.  To the extent they are referring to stereotypically masculine and feminine roles that men and women traditionally have held in marriage, that is not a legitimate basis for limiting the scope of the right.  United States v. Virginia, 518 U.S. 515, 541-42 (1996) ("State actors may not rely on overbroad generalizations [about the sexes] to make judgments about people that are likely to perpetuate historical patterns of discrimination."); Goodridge, 798 N.E.2d at 965 n.28 (rejecting argument "that men and women are so innately and fundamentally different that their respective 'proper spheres' can be rigidly and universally delineated").  Although the Supreme Court has acknowledged that there are "[i]nherent differences between men and women," the state may not rely on those differences to impose "artificial constraints on an individual's opportunity."  Virginia, 518 U.S. at 533-34.  I see no reason why that principle should apply any differently in the context of marriage.  Accordingly, I conclude that the right to marry protected by the Constitution includes same-sex couples.

39

2.  Significant interference

The next question under <u>Zablocki</u> is whether Wisconsin "significantly interferes" with plaintiffs' right to marry. It seems obvious that it does because Wisconsin law prohibits plaintiffs from entering a marriage relationship that will be meaningful for them.  <u>Id.</u> at 403-04 (Stevens, J., concurring) ("A classification based on marital status is fundamentally different from a classification which determines who may lawfully enter into the marriage relationship.").  <u>Cf. Perez v. Lippold</u>, 198 P.2d 17, 25 (Cal. 1948) (under anti-miscegenation law, "[a] member of any of these races may find himself barred by law from marrying the person of his choice and that person to him may be irreplaceable").  Even defendants do not suggest that marrying someone of the opposite sex is a viable option for plaintiffs.  Thus, the practical effect of the law is to impose an absolute ban on marriage for plaintiffs.  <u>Varnum v. Brien</u>, 763 N.W.2d 862, 885 (Iowa 2009) ("[T]he right of a gay or lesbian person under the marriage statute to enter into a civil marriage only with a person of the opposite sex is no right at all" because it would require that person to "negat[e] the very trait that defines gay and lesbian people as a class."); Andrew Sullivan, <u>Virtually Normal</u> 44 (Vintage Books 1995)(ban on same-sex relationships bars gay persons "from the act of the union with another" that many believe "to be intrinsic to the notion of human flourishing in the vast majority of human lives").

Neither defendants nor amici argue that domestic partnerships, which are available to both same-sex and opposite-sex couples under Wis. Stat. chapter 770, are an adequate substitute for marriage, such that the marriage ban does not "significantly interfere" with

plaintiffs' rights, so I need not consider that question. However, most courts considering the issue have found that domestic partnerships and civil unions do not cure the constitutional injury because, even if the tangible benefits of a domestic partnership are similar to marriage, creating a "separate but equal" institution still connotes a second-class status. E.g., Perry v. Schwarzenegger, 704 F. Supp. 2d 921, 994 (N.D. Cal. 2010); Varnum, 763 N.W.2d at 906-07; Kerrigan v. Commissioner of Public Health, 957 A.2d 407, 412 (Conn. 2008); Marriage Cases, 183 P.3d at 445 (Cal. 2008); Opinions of the Justices, 802 N.E.2d at 571. But see Sevcik, 911 F. Supp. 2d at 1015 ("The State has not crossed the constitutional line by maintaining minor differences in civil rights and responsibilities that are not themselves fundamental rights comprising the constitutional component of the right to marriage, or by reserving the label of 'marriage' for one-man-one-woman couples in a culturally and historically accurate way.").

The only issue raised by defendants about the significance of the state's interference relates to the plaintiffs who were married legally in other states. Defendants say that Wisconsin law does not interfere with those plaintiffs' marriage rights because Wisconsin has done nothing to invalidate their marriages or to deprive them of benefits that they could receive from the state where they were married.

This argument is bewildering. Defendants acknowledge that Wisconsin "refuses to recognize same-sex marriages lawfully contracted in other jurisdictions," Dfts.' Br., dkt. #102, at 29, which means that the plaintiffs married in other states are deprived of any state rights, protections or benefits related to marriage so long as they reside in Wisconsin. I have

no difficulty concluding that such a deprivation qualifies as "significant interference" under Zablocki.  De Leon, 975 F. Supp. 2d 632 (holding that state's refusal to recognize out-of-state marriage interferes with plaintiffs' right to marry); Obergefell v. Wymyslo, 962 F. Supp. 2d 968 (S.D. Ohio 2013) (same).  See also Baskin v. Bogan, 1:14-CV-00355-RLY, 2014 WL 1814064 (S.D. Ind. May 8, 2014) (granting preliminary injunction on claim that state's refusal to recognize out-of-state marriage interferes with plaintiffs' right to marry).

In sum, I conclude that Wisconsin's marriage amendment and the Wisconsin statutes defining marriage as requiring a "husband" and a "wife" significantly interfere with plaintiffs' right to marry, so the laws must be supported by "sufficiently important state interests" that are "closely tailored to effectuate only those interests," Zablocki, 434 U.S. at 388, in order to survive constitutional scrutiny.  However, because this case is likely to be appealed, before I consider the state's asserted interests for these laws, I will consider plaintiffs' alternative argument that they are entitled to heightened protection under the equal protection clause, in the event the Court of Appeals for the Seventh Circuit disagrees with my conclusion regarding the scope of plaintiffs' rights under the due process clause.

## B.  Equal Protection

In addition to placing limits on state deprivations of individual liberty, the Fourteenth Amendment says that no state may "deny to any person within its jurisdiction the equal protection of the laws."  The equal protection clause "require[s] the state to treat each person with equal regard, as having equal worth, regardless of his or her status." Nabozny

42

v. Podlesny, 92 F.3d 446, 456 (7th Cir. 1996).  Stated another way, it "requires the democratic majority to accept for themselves and their loved ones what they impose on you and me."  Cruzan by Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 300 (1990) (Scalia, J. concurring).  "Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."  Railway Express Agency v. People of State of New York, 336 U.S. 106, 112-13  (1949) (Jackson, J., concurring).

Although the text of the equal protection clause does not distinguish among different groups or classes, the Supreme Court has applied different standards of review under the clause, depending on the type of classification at issue.  Most classifications "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  FCC v. Beach Commcations, Inc., 508 U.S. 307, 313 (1993).  Generally, under a rational basis review, the state has "no obligation to produce evidence" and "courts are compelled . . . to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality."  Heller v. Doe by Doe, 509 U.S. 312, 320-21 (1993).

However, under some circumstances, the Supreme Court has applied a heightened standard of review.  For "suspect" classifications, such as race, alienage and national origin, Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 313 & n.4 (1976), the court applies "strict scrutiny," under which the government must show that the classification is

"narrowly tailored" to achieve a "compelling" interest.  <u>Parents Involved in Community Schools v. Seattle School District No. 1</u>, 551 U.S. 701, 720 (2007).  With respect to a small number of other classifications, such as sex and legitimacy (often referred to as "quasi-suspect" classifications), the Court has applied what it calls intermediate scrutiny, under which the classifications must be "substantially related" to the achievement of an "important governmental objective."  <u>Virgini</u>a, 518 U.S. at 524.

In this case, plaintiffs contend that some form of heightened scrutiny should apply because the marriage amendment discriminates on the basis of sex and sexual orientation.  I will address both of these contentions in turn.

1.  <u>Sex discrimination</u>

Plaintiffs identify two theories of sex discrimination.  The first is straightforward: if each plaintiff was to choose a marriage partner of the opposite-sex, he or she would be permitted to marry in Wisconsin.  Therefore, plaintiffs say, it is because of their sex that they cannot marry.  Plaintiffs' second theory is more nuanced and relies on the concept of sex stereotyping. In particular, plaintiffs say that Wisconsin's ban on marriage between same-sex couples "perpetuates and enforces stereotypes regarding the expected and traditional roles of men and women, namely that men marry and create families with women, and women marry and create families with men."  Plts.' Br., dkt. #71, at 18.

With respect to the first theory of sex discrimination, plaintiffs analogize their situation to the plaintiffs in <u>Loving</u>, who were prohibited from marrying because of the race

of their partner.  The state argued in Loving that the anti-miscegenation law was not discriminatory because it applied to both whites and blacks, but the Supreme Court rejected that argument, stating that "we deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race." Loving, 388 U.S. at 7-8.  See also McLaughlin v. State of Florida, 379 U.S. 184, 191 (1964) (statute prohibiting interracial cohabitation is unconstitutional, even though it penalized both whites and blacks; "[j]udicial inquiry under the Equal Protection Clause . . . does not end with a showing of equal application among the members of the class defined by the legislation").  Plaintiffs argue that the same reasoning should apply in this case. In other words, plaintiffs believe that the same-sex marriage ban discriminates on the basis of sex, even though it applies equally to both men and women, because it draws a line according to sex.

In the first case resolved in favor of same-sex couples seeking to marry, the court adopted this theory, even though the plaintiffs had not argued it initially.  Baehr v. Lewin, 852 P.2d 44, 60 (Haw. 1993).  Since then, however, the sex discrimination theory has been rejected by most courts to consider it, even those ruling in favor of the plaintiffs on other grounds.  E.g., Geiger v. Kitzhaber, 6:13-CV-01834-MC, 2014 WL 2054264, at *7 (D. Or. May 19, 2014); Latta, 2014 WL 1909999, at *15; Bishop, 962 F. Supp. 2d at 1286-87; Sevcik, 911 F. Supp. 2d at 1005; Jackson v. Abercrombie, 884 F. Supp. 2d 1065, 1098-99 (D. Haw. 2012); Griego v. Oliver, 2014-NMSC-003, 316 P.3d 865, 880; Kerrigan, 957 A.2d

at 509; <u>Marriage Cases</u>, 183 P.3d at 438; <u>Conaway v. Deane</u>, 4932 A.2d 571, 601-02 (Md. 2007); <u>Hernandez</u>, 855 N.E.2d at 10-11.  <u>But see</u> <u>Kitchen</u>, 961 F. Supp. at 1206 ("[T]he court finds that the fact of equal application to both men and women does not immunize Utah's Amendment 3 from the heightened burden of justification that the Fourteenth Amendment requires of state laws drawn according to sex."); <u>Perry v. Schwarzenegger</u>, 704 F. Supp. 2d at 996 ("Sexual orientation discrimination can take the form of sex discrimination."); <u>Brause v. Bureau of Vital Statistics</u>, 3AN-95-6562 CI, 1998 WL 88743, *6 (Alaska Super. Ct. Feb. 27, 1998) ("That this is a sex-based classification can readily be demonstrated:  if twins, one male and one female, both wished to marry a woman and otherwise met all of the Code's requirements, only gender prevents the twin sister from marrying under the present law. Sex-based classification can hardly be more obvious.").

Although the reasoning of the courts rejecting the theory has varied, the general view seems to be that a sex discrimination theory is not viable, even if the government is making a sex-based classification with respect to an individual, because the intent of the laws banning same-sex marriage is not to suppress females or males as a class.  <u>E.g.</u>, <u>Sevcik</u>, 911 F. Supp. 2d at 1005 ("[B]ecause it is homosexuals who are the target of the distinction here, the level of scrutiny applicable to sexual-orientation-based distinctions applies."). In other words, courts view this theory as counterintuitive and legalistic, an attempt to "bootstrap" sexual orientation discrimination into a claim for sex discrimination.

With respect to plaintiffs' second theory, there is support in the law for the view that sex stereotyping is a form of sex discrimination.  <u>Virginia</u>, 518 U.S. at 541-42 ("State actors

controlling gates to opportunity . . . may not exclude qualified individuals based on fixed notions concerning the roles and abilities of males and females.") (internal quotations omitted); Price Waterhouse v. Hopkins, 490 U.S. 228, 250–51 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matc[h] the stereotypes associated with their group."). See also Doe by Doe v. City of Belleville, Illinois, 119 F.3d 563, 581 (7th Cir. 1997)("A woman who is harassed . . . because [she] is perceived as unacceptably 'masculine' is harassed 'because of' her sex. . . . In the same way, a man who is harassed because . . . he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex.") (citations omitted). But see Hamm v. Weyauwega Milk Products, Inc., 332 F.3d 1058, 1068 (7th Cir. 2003) (Posner, J., concurring) ("'Sex stereotyping' should not be regarded as a form of sex discrimination, though it will sometimes . . . be evidence of sex discrimination."). Some commentators have argued that sexual orientation discrimination should be seen as the ultimate form of sex stereotyping because it is grounded in beliefs about appropriate gender roles, e.g., Sylvia A. Law, Homosexuality and the Social Meaning of Gender, 1988 Wis. L. Rev. 187 (1988), but plaintiffs have not cited any courts that have adopted that theory and I am not aware of any.

Plaintiffs' arguments about sex discrimination are thought-provoking enough to have caught the interest of at least one Supreme Court justice. Oral argument, Hollingsworth v. Perry, No. 12-144, 2013 WL 1212745, at *13 (statement of Kennedy, J.) ("Do you believe [that a ban on same-sex marriage] can be treated as a gender-based classification? It's a

47

difficult question that I've been trying to wrestle with it.").  However, neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has embraced either theory asserted by plaintiffs.  With respect to the first theory, the court of appeals assumed in a recent case that a sex-based classification may be permissible if it imposes comparable burdens on both sexes.  Hayden ex rel. A.H. v. Greensburg Community School Corp., 743 F.3d 569, 581 (7th Cir. 2014) ("Sex-differentiated standards consistent with community norms may be permissible to the extent they are part of a comprehensive, evenly-enforced grooming code that imposes comparable burdens on both males and females alike.").  With respect to the second theory, the court has stated that there is "a considerable overlap in the origins of sex discrimination and homophobia," but the court declined to "go so far" as "to conclude that anti-gay bias should, in fact, be understood as a form of sex discrimination."  Doe, 119 F.3d at 593 n.27.  The Supreme Court has not discussed either theory as it relates to sexual orientation.

Because of the uncertainty in the law and because I am deciding the case in plaintiffs' favor on other grounds, I decline to wade into this jurisprudential thicket at this time. However, the court of appeals' statement that sex and sexual orientation are related provides some support for a view that, like sex discrimination, sexual orientation discrimination should be subjected to heightened scrutiny.

2.  Sexual orientation discrimination

a. Supreme Court guidance

48

The Supreme Court has never decided explicitly whether heightened scrutiny should apply to sexual orientation discrimination. Lee v. Orr, 13-CV-8719, 2013 WL 6490577 n.1 (N.D. Ill. Dec. 10, 2013) ("[T]he Supreme Court has yet to expressly state the level of scrutiny that courts are to apply to claims based on sexual orientation."). In Romer, 517 U.S. at 632, in which the Court invalidated a state constitutional amendment because it discriminated on the basis of sexual orientation, the Court ignored the question whether heightened scrutiny should apply, perhaps because it was unnecessary in light of the Court's conclusion that the law in dispute "lack[ed] a rational relationship to legitimate state interests." The Court did not discuss the standard of review in Windsor either.

Despite the lack of an express statement from the Supreme Court, some courts and commentators have argued that the Court's analyses in Romer and especially Windsor require a conclusion that the Court, in practice, is applying a higher standard than rational basis. For example, in SmithKline Beecham Corp. v. Abbott Laboratories, 740 F.3d 471, 480-81 (9th Cir. 2014), the court considered the standard of review to apply to sexual orientation discrimination in the context of jury selection. The court stated that "Windsor review is not rational basis review. In its words and its deed, Windsor established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review. In other words, Windsor requires that heightened scrutiny be applied to equal protection claims involving sexual orientation." Id. See also Evan Gerstmann, Same-Sex Marriage and the Constitution, 19 (2d ed. Cambridge University Press 2008) ("Some scholars, including this author, have argued that the Romer Court actually applied

a level of scrutiny somewhat greater than rational basis review" because "[t]he Court seemed unusually skeptical of [the state's] professed reasons" for [the law]."). This conclusion is consistent with Justice Scalia's dissenting opinion in <u>Windsor</u>, 133 S.Ct. at 2706, in which he stated that "the Court certainly does not apply anything that resembles [the rational-basis] framework."

In <u>SmithKline</u>, 740 F.3d at 981-83, the court of appeals relied on four factors to conclude that <u>Windsor</u> applied heightened scrutiny: (1) the Supreme Court did not consider "conceivable" justifications for the law not asserted by the defenders of the law; (2) the Court required the government to "justify" the discrimination; (3) the Court considered the harm that the law caused the disadvantaged group; and (4) the Court did not afford the law a presumption of validity. Finding all of these things inconsistent with rational basis review, the court of appeals concluded that the Supreme Court must have been applying some form of heightened scrutiny.

I agree with the court in <u>SmithKline</u> that the Supreme Court's analysis in <u>Windsor</u> (as well as in <u>Romer</u>) had more "bite" than a rational basis review would suggest. In fact, in Justice O'Connor's concurrence in <u>Lawrence</u>, 539 U.S. at 580, she acknowledged that the Court conducted "a more searching inquiry" in <u>Romer</u> than it had in the ordinary case applying rational basis review.

It may be that <u>Windsor</u>'s silence is an indication that the Court is on the verge of making sexual orientation a suspect or quasi-suspect classification. <u>Cf.</u> <u>Frontiero v. Richardson</u>, 411 U.S. 677, 683 (1973) (plurality opinion) (stating for first time that sex

discrimination should receive heightened scrutiny and relying on previous case in which Court had "depart[ed] from a 'traditional' rational-basis analysis with respect to [a] sex-based classificatio[n]" but Court did not say expressly in previous case that it was applying heightened standard of review).  Alternatively, it may be that <u>Romer</u> and <u>Windsor</u> suggest that "[t]he hard edges of the tripartite division have . . . softened," and that the Court has moved "toward general balancing of relevant interests." Cass Sunstein, <u>Foreword: Leaving Things Undecided</u>, 110 Harv. L. Rev. 4, 77 (1996). However, in the absence of a clear statement from the Court regarding the standard of review it was applying, it is difficult to rely on those cases as authority for applying heightened scrutiny to sexual orientation discrimination.  Accordingly, I will consider next whether the Court of Appeals for the Seventh Circuit has provided definitive guidance.

b. Guidance from the Court of Appeals for the Seventh Circuit

Defendants argue that circuit precedent prohibits this court from applying heightened scrutiny, but I disagree.  In <u>Ben–Shalom v. Marsh</u>, 881 F.2d 454, 464 (7th Cir.1989), the court of appeals applied rational basis review to a law banning gays in the military, but in <u>Nabozny</u>, 92 F.3d at 457-58, the court stated that <u>Ben-Shalom</u>'s holding was limited to the military context. This makes sense in light of the general rule that courts must be more deferential to the government in matters of national security.  <u>E.g.</u>, <u>Rostker v. Goldberg</u>, 453 U.S. 57, 68 (1981) (upholding sex-based classification in military context).  In <u>Nabozny</u>, a case involving allegations that school officials failed to protect a student from harassment

because of a perception that he was gay, the court stated that it "need not consider whether homosexuals are a suspect or quasi-suspect class" because, viewing the facts in the light most favorable to the plaintiff as required on a motion for summary judgment, the defendants' actions lacked any rational basis.  Id. at 458.

Since Nabozny, the court of appeals has not engaged in any further analysis of the question whether sexual orientation discrimination should be subjected to heightened scrutiny.  In Schroeder v. Hamilton School District, 282 F.3d 946, 950-51 (7th Cir. 2002), the court stated that "homosexuals do not enjoy any heightened protection under the Constitution," but that statement was dicta because the court did not rely on the standard of review to decide the case.  Instead, the court held that the plaintiff had failed to prove that the defendants treated him less favorably because of his sexual orientation.  Schroeder, 282 F.3d at 956 ("Schroeder failed to demonstrate that the defendants treated his complaints of harassment differently from those lodged by non-homosexual teachers, that they intentionally discriminated against him, or acted with deliberate indifference to his complaints because of his homosexuality.").

"[D]ictum is not authoritative.  It is the part of an opinion that a later court, even if it is an inferior court, is free to reject."  United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988).  As a general rule, district courts should be guided by the views of the court of appeals or the Supreme Court, even when those views are expressed in dicta, Reich v. Continental Casualty Co., 33 F.3d 754, 757 (7th Cir.1994), but, when dicta is not supported by reasoning, its persuasive force is greatly diminished.  Sutton v. A.O. Smith Co.,

52

165 F.3d 561, 564 (7th Cir.1999); Wilder v. Apfel, 153 F.3d 799, 803 (7th Cir. 1998); Indiana Harbor Belt Railroad Co. v. American Cyanamid Co., 916 F.2d 1174, 1176 (7th Cir. 1990).  In Schroeder, the court did not provide any reasoning for its conclusion that sexual orientation discrimination is not entitled to heightened scrutiny; instead the court simply cited Romer, 517 U.S. at 634-35, which did not address the issue, and Bowers, 478 U.S. at 196, which was overruled a year after Schroeder in Lawrence.  Cf. Kerrigan, 957 A.2d at 468 (2008) (concluding that sexual orientation discrimination is subject to heightened scrutiny, despite case law to contrary, because those cases "rely so heavily on Bowers").  Accordingly, I conclude that Schroeder does not resolve the question of the appropriate standard of review to apply to discrimination against gay persons.

c. Factors relevant to determining status as suspect or quasi-suspect class

Because neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has provided definitive guidance on whether sexual orientation discrimination requires heightened scrutiny, I must make that determination on my own.  Other courts  making the same determination have identified four factors that the Supreme Court has discussed, often in dicta, as relevant to the analysis: (1) whether the class has been subjected to a history of discrimination, Murgia, 427 U.S. at 313; (2) whether individuals in the class are able to contribute to society to the same extent as others, Cleburne, 473 U.S. at 440–41; (3) whether the characteristic defining the class is "immutable," Lyng v. Castillo, 477 U.S. 635, 638 (1986); and (4) whether the class is "politically powerless."  Bowen v. Gilliard, 483 U.S.

587, 602 (1987).  But see Virginia, 518 U.S. at 568 (Scalia, J., dissenting) ("We have no established criterion for 'intermediate scrutiny' either, but essentially apply it when it seems like a good idea to load the dice.").   Since Windsor, all the courts to consider the issue have concluded that each of the factors applies to sexual orientation discrimination.   E.g., Whitewood v. Wolf, 1:13-CV-1861, — F. Supp. 2d — , 2014 WL 2058105, at *14 (M.D. Pa. May 20, 2014);   De Leon, 975 F. Supp. 2d at 650-51;  Bassett v. Snyder, 951 F. Supp. 2d 939, 960 (E.D. Mich. 2013).

Defendants do not challenge plaintiffs' contentions that gay persons have been subjected to a history of discrimination and that sexual orientation does not impair an individual's ability to contribute to society, so I see no reason to repeat the analyses of the many courts that have reached the same conclusion.  E.g., Windsor v. United States, 699 F.3d 169, 182 (2d Cir. 2012); De Leon , 975 F. Supp. 2d at 650-51; Pedersen v. Office of Personnel Management, 881 F. Supp. 2d 294, 316 (D. Conn. 2012); Golinski v. U.S. Office of Personnel Management, 824 F. Supp. 2d 968, 986 (N.D. Cal. 2012); Perry, 704 F.Supp.2d at 1002; Varnum, 763 N.W.2d at 889; Kerrigan, 957 A.2d at 435 (2008).  In fact, I am not aware of *any* cases in which a court concluded that being gay hinders an individual's ability to contribute to society.

With respect to immutability, defendants do not directly challenge the view that it applies to sexual orientation, but instead argue in a footnote that the authorities plaintiffs cite do not support their position.  Dfts.' Br., dkt. #102, at 40 n.10.  With respect to political powerlessness, defendants deny that it applies to gay persons, pointing to various

statutes in Wisconsin and around the country that prohibit sexual orientation discrimination in contexts other than marriage, such as employment. Dfts.' Br., dkt. #102, at 40-41. In addition, they cite public opinion polls suggesting that attitudes about homosexuality have become more positive in recent years. Most courts concluding that sexual orientation discrimination is not subject to heightened scrutiny have relied on a similar argument about political power. E.g., Sevcik, 911 F. Supp. 2d at 1008 ("[The political success] the homosexual-rights lobby has achieved . . . indicates that the group has great political power. . . . In 2012 America, anti-homosexual viewpoints are widely regarded as uncouth.").

I disagree with defendants that heightened scrutiny is inappropriate, either because of any doubts regarding whether sexual orientation is "immutable" or because of any political successes gay persons have had. In applying the four factors to a new class, it is important to consider the underlying reasons for applying heightened scrutiny and to look at the classes that already receive heightened scrutiny to see how the factors apply to them.

With respect to immutability, the Supreme Court has applied heightened scrutiny to discrimination on the basis of alienage, e.g., In re Griffiths, 413 U.S. 717 (1973); Sugarman v. Dougall, 413 U.S. 634 (1973); Graham v. Richardson, 403 U.S. 365 (1971), even though aliens can become citizens. Sugarman, 413 U.S. at 657 (Rehnquist, J., dissenting) ("[T]here is a marked difference between a status or condition such as illegitimacy, national origin, or race, which cannot be altered by an individual and the 'status' [that can be] changed by . . . affirmative acts."). The Court also applies heightened scrutiny to discrimination on the basis of religion, e.g., Larson v. Valente, 456 U.S. 228 (1982), even though religion is

something that a person chooses.  (Although most religious discrimination claims arise under the First Amendment, it is likely that the same standard would apply under the equal protection clause.  Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring) ("[T]he Religion Clauses—the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, Art. VI, cl. 3, and the Equal Protection Clause as applied to religion—all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits.").)  Even a person's gender is not written in stone.  E.g., Glenn v. Brumby, 724 F. Supp. 2d 1284, 1289 (N.D. Ga. 2010) (discussing process leading up to sex reassignment surgery).

Rather than asking whether a person *could* change a particular characteristic, the better question is whether the characteristic is something that the person *should be required* to change because it is central to a person's identity.  Of course, even if one could change his or her race or sex with ease, it is unlikely that courts (or virtually anyone else) would find that race or sex discrimination is any more acceptable than it is now.

In Lawrence, 539 U.S. at 577, the Supreme Court found that sexual expression is "an integral part of human freedom" and is entitled to constitutional protection, which supports a conclusion that the law may not require someone to change his or her sexual orientation. Further, sexual orientation has been compared to religion on the ground that both "often simultaneously constitut[e] or infor[m] a status, an identity, a set of beliefs and practices, and much else besides." Christian Legal Society Chapter of the University of California,

56

Hastings College of the Law v. Martinez, 561 U.S. 661, 130 S. Ct. 2971, 2995 n.1 (2010) (Stevens, J., concurring).  See also Martha Nussbaum, From Disgust to Humanity:  Sexual Orientation & Constitutional Law 39 (Oxford University Press 2010) (like religion, sexual orientation "goes to the heart of people's self-definition, their search for identity and  self-expression").  For this reason, I agree with those courts that have concluded that, regardless whether sexual orientation is "immutable," it is "fundamental to a person's identity," De Leon, 975 F. Supp. 2d at 651, which is sufficient to meet this factor.  Bassett, 951 F. Supp. 2d at 960; Griego, 316 P.3d at 884.

With respect to political powerlessness, it seems questionable whether it is really a relevant factor.  When the Supreme Court has mentioned political power, it has been only to include it in a list of other reasons for denying a request for heightened scrutiny.  E.g., Bowen, 483 U.S. at 603; Cleburne, 473 U.S. at 445; Murgia, 427 U.S. 307 at 313–14. Defendants cite no case in which the Supreme Court has determined that it is a dispositive factor.  On a practical level, it would be challenging to apply because it would suggest that classes could fall in and out of protected status depending on some undetermined level of political success, an idea for which the Court has never even hinted support.  Regents of University of California v. Bakke, 438 U.S. 265, 298 (1978) (opinion of Powell, J.) (rejecting view that equal protection clause should be "hitch[ed] . . . to . . . transitory considerations [that] vary with the ebb and flow of political forces").

Perhaps most telling is that almost none of the classifications that receive heightened scrutiny, including race or sex, could satisfy this factor if the test were whether the group has

had any political success.  <u>Marriage Cases</u>, 183 P.3d at 443.  Particularly because discrimination against white citizens is subjected to strict scrutiny, <u>e.g.</u>, <u>City of Richmond v. J.A. Croson Co.</u>, 488 U.S. 469 (1989), it is difficult to understand why a group's political power should be determinative.

To the extent that "political powerlessness" is an appropriate factor, I conclude that the question is best framed as whether the class is inherently vulnerable in the context of the ordinary political process, either because of its size or history of disenfranchisement.  In light of the fact that gay persons make up only a small percentage of the population and that there is no dispute that they have been subjected to a history of discrimination, I have no difficulty in concluding that sexual orientation meets this factor as well.  <u>Windsor</u>, 699 F.3d at 184; <u>Pedersen</u>, 881 F. Supp. 2d at 332.

In any event, a review of the various classifications that receive heightened scrutiny (race, sex, alienage, legitimacy) reveals a common factor among them, which is that the classification is seldom "relevant to the achievement of any legitimate state interest." <u>Cleburne</u>, 473 U.S. at 440.  Under these circumstances, the classification is more likely "to reflect prejudice and antipathy," so courts should be more suspicious of the discrimination.  <u>Id.</u>  <u>See also</u> <u>Pedersen</u>, 881 F. Supp. 2d at 319 ("The ability to contribute to society has played a critical and decisive role in Supreme Court precedent both denying and extending recognition of suspect class to other groups.").  Neither defendants nor amici offer an argument that sexual orientation would not meet that standard.

Accordingly, I conclude that sexual orientation discrimination is subject to heightened

scrutiny. The Supreme Court has not explained how to distinguish a "suspect" classification from a "quasi-suspect" classification, but sexual orientation is most similar to sex among the different classifications that receive heightened protection, <u>Doe</u>, 119 F.3d at 593 n. 27. Because sex discrimination receives intermediate scrutiny and the difference between intermediate scrutiny and strict scrutiny is not dispositive in this case, I will assume that intermediate scrutiny applies, which means that defendants must show that Wisconsin's laws banning marriage between same-sex couples must be "substantially related" to the achievement of an "important governmental objective," <u>Virginia</u>, 518 U.S. at 524, to survive scrutiny under the equal protection clause.

3.  <u>Other considerations relevant to the standard of review</u>

In cases involving both suspect classes as well as other groups of people, the Supreme Court has taken into account the nature and severity of the deprivation at issue, particularly when it seems to threaten principles of equal citizenship or imposes a stigma on a particular class. <u>Cleburne</u>, 473 U.S. at 448 (striking down law that restricted where mentally disabled, a nonsuspect class, could live); <u>Plyler v. Doe</u>, 457 U.S. 202, 223-24, (1982) (in equal protection case involving nonsuspect class's access to public education, noting that "[p]ublic education is not a 'right' granted to individuals by the Constitution. But neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation" and that, as a result of a denial of education, the"[t]he stigma of illiteracy will mark [the uneducated children] for the rest of their lives"); <u>Brown</u>, 347 U.S. at 494 (segregation

"generates a feeling of inferiority as to [black students'] status in the community that may affect their hearts and minds in a way unlikely ever to be undone.").  See also Cleburne, 473 U.S. at 460 (Marshall, J., concurring in the judgment in part and dissenting in part) ("I have long believed the level of scrutiny employed in an equal protection case should vary with the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn.").   This focus on stigma and equal citizenship makes sense because one purpose of the equal protection clause is to prohibit "stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community."  Heckler v. Mathews, 465 U.S. 728, 739 (1984).

The Supreme Court's focus on the nature and severity of the deprivation is particularly apparent in its more recent cases touching on sexual orientation.  In Romer, 517 U.S. at 627, 629, 631, 635, the Court noted that the state constitutional amendment at issue (which prohibited municipalities from enacting ordinances that banned sexual orientation discrimination) imposed "severe consequence[s]," "special disabilit[ies]" and "immediate, continuing, and real injuries" on gay persons and no one else and that the amendment "put [them] in a solitary class with respect to transactions and relations in both the private and governmental spheres."   The Court contrasted the challenged law with differential treatment the Court had upheld in the past regarding economic activities such as advertising and operating a pushcart.  Id. at 632.  In part because of the nature of the harm, the Court concluded that the state law amounted to "class legislation" and "a

60

classification of persons undertaken for its own sake." Id. at 635. The Court quoted the famous dissenting opinion by Justice Harlan in Plessy v. Ferguson, 163 U.S. 537, 559 (1896), for the proposition that the Constitution "neither knows nor tolerates classes among citizens." Id. at 623.

Although the Supreme Court did not decide Lawrence under the equal protection clause, it continued to use similar language. For example, the Court noted that the sodomy law at issue "demeans the lives of homosexual persons," "invit[es] . . . discrimination [against gay persons] both in the public and in the private spheres" and "imposes" a "stigma" on them. Lawrence, 539 U.S. at 575.

Finally, in Windsor, 133 S. Ct. at 2693, the Supreme Court concluded that, by denying federal benefits to same-sex couples married under the laws of a particular state, the "practical effect [was] to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." The Court repeated the theme of stigma and second-class status multiple times. Id. at 2694 (DOMA "tells [same-sex] couples [married under state law], and all the world, that their otherwise valid marriages are unworthy of federal recognition. This places same-sex couples in an unstable position of being in a second-tier marriage.  The differentiation demeans the couple, whose moral and sexual choices the Constitution protects."); id. at 2696 ("DOMA instructs all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others."); id. (effect of DOMA is to treat some persons as "living in marriages less respected

61

than others."). Throughout the decision, the Court emphasized that DOMA imposes a disability on same-sex couples, demeans them, violates their dignity and lowers their status. Id. at 2692, 2695.

Although the Court did not explain in Romer, Lawrence or Windsor how these considerations affected the standard of review, it seems clear that they were important to the decisions. Thus, even if one assumes that same-sex marriage does not fall within the right recognized in Loving and other cases, this does not mean that courts may ignore the nature and severity of the deprivation that a ban imposes on those couples.

Of course, the tangible benefits that marriage provides a couple are numerous. However, many would argue that the intangible benefits of marriage are equally important, if not more so. Recognizing this, some courts have found that the denial of marriage rights to same-sex couples necessarily is a denial of equal citizenship. E.g., Goodridge, 798 N.E.2d at 948. Others have concluded that the significance of the deprivation must be incorporated into the standard of review. Baker, 744 A.2d at 884 ("The legal benefits and protections flowing from a marriage license are of such significance that any statutory exclusion must necessarily be grounded on public concerns of sufficient weight, cogency, and authority that the justice of the deprivation cannot seriously be questioned."). I agree with both conclusions.

In sum, I conclude that Wisconsin's marriage amendment and the other laws at issue are subject to heightened scrutiny under both the due process clause and the equal protection clause. First, because I have concluded that the marriage ban significantly

interferes with plaintiffs' right to marry under the due process clause, defendants must show that the ban furthers "sufficiently important state interests" that are "closely tailored to effectuate only those interests." <u>Zablocki</u>, 434 U.S. at 388. With respect to the equal protection clause, the marriage ban is subject to intermediate scrutiny because the ban discriminates on the basis of sexual orientation. In addition, the nature and severity of the deprivation is a relevant factor that must be considered. However, regardless whether I apply strict scrutiny, intermediate scrutiny or some "more searching" form of rational basis review under the equal protection clause, I conclude that the marriage amendment and related statutes cannot survive constitutional review.

## III. EVALUATING THE ASSERTED STATE INTERESTS

The final question is whether defendants have made an adequate showing that the Wisconsin laws prohibiting same-sex marriage further a legitimate interest. Defendants and amici rely on several interests in their briefs: (1) preserving tradition; (2) encouraging procreation generally and "responsible" procreation in particular; (3) providing an environment for "optimal child rearing"; (4) protecting the institution of marriage; (5) proceeding with caution; and (6) helping to maintain other legal restrictions on marriage. These interests are essentially the same as those asserted by other states in other cases around the country involving similar laws.

Defendants' asserted interests also overlap substantially with the interests asserted in <u>Windsor</u> by the proponents of the Defense of Marriage Act. Brief on the Merits for

Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives, United States of America v. Windsor, No. 12-307, 2013 WL 267026 (citing interests in "providing a stable structure to raise unintended and unplanned offspring," "encouraging the rearing of children by their biological parents" and "promoting childrearing by both a mother and a father").  However, the Supreme Court did not consider these interests individually, even though the dissenting justices relied on them.  Id. at 2718 (Alito, J., dissenting). Instead, the Court stated that "no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity."  Id. at 2696.  This is similar to the approach the Court took in Loving, 388 U.S. at 11 ("There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification.").

The Court's silence raises the question whether its refusal to credit the interests asserted by the defenders of DOMA requires the same approach in this case. On its face, Windsor does not apply to state law bans on marriage between same-sex couples.  Windsor, 133 S. Ct. at 2696 (limiting its holding to denial of federal benefits of same-sex couples married under state law); Kitchen, 961 F. Supp. 2d at 1194 ("The Windsor court did not resolve this conflict in the context of state-law prohibitions of same-sex marriage."). However, as noted by Justice Scalia in his dissent, it is difficult to cabin the Court's reasoning to DOMA only.  Windsor, 133 S. Ct. at 2709-10.  If anything, the Court's concerns about the "second-class status" imposed by DOMA on same-sex couples would be more pronounced by a total denial of the right to marry  than by the "second-tier" marriages

64

at issue in <u>Windsor</u> that provided state but not federal benefits.  Further, although <u>Windsor</u> involved a federal law rather than a state law, I am not aware of any other case in which the Court applied equal protection principles differently to state and federal government. <u>Buckley v. Valeo</u>, 424 U.S. 1, 93 (1976) ("Equal protection analysis [with respect to the federal government] in the Fifth Amendment  area is the same as that under the Fourteenth Amendment [with respect to the states.]").  This may be the reason why all federal courts reviewing a ban on same-sex marriage since <u>Windsor</u> have concluded that the ban is unconstitutional.

Defendants say that <u>Windsor</u> is distinguishable, arguing that the Supreme Court relied on the "unusual character" of the discrimination at issue in that case, just as the Court did in <u>Romer</u>.  In <u>Windsor</u>, 133 S. Ct. at 2693, the Court stated that DOMA was unusual because it departed from the federal government's ordinary practice of deferring to the states on marriage issues.  In <u>Romer</u>, 517 U.S. at 632 the Court relied on the "sheer breadth" of the discriminatory law.

Although defendants are correct that the facts in this case are not the same as <u>Windsor</u> or <u>Romer</u>, there is a colorable argument that Wisconsin's marriage amendment is "unusual" in other ways.  First, the amendment represents a rare, if not unprecedented, act of using the Wisconsin Constitution to *restrict* constitutional rights rather than expand them and to require discrimination against a particular class.  <u>Cf.</u> Akhil Amar, <u>America's Unwritten Constitution</u> 451, 453 (Basic Books 2012) ("[An amendment] to restrict the equality rights of same-sex couples should be viewed with special skepticism because the

amendmen[t] would do violence to the trajectory of the American constitutional project over the past two hundred years. . . . [Such an] illiberal amendment would be [a] radical departur[e] from our national narrative thus far."). Particularly because Wisconsin statutory law already limited marriage to opposite-sex couples, Phillips v. Wisconsin Personnel Commission, 167 Wis. 2d 205, 482 N.W.2d 121, 129 (Ct. App.1992), enshrining the ban in the state constitution seems to suggest that the amendment had a moral rather than practical purpose.

Second, like the constitutional amendment at issue in Romer, Wisconsin's ban on same-sex marriage (a) implicates a right "taken for granted by most people"; and (b) is sweeping in scope, denying same-sex couples hundreds of derivative rights that married couples have and excluding same-sex couples "from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." Id. at 631.

Although there is support for a view that Windsor is controlling in this case, I need not resolve that question. Even if I assume that Wisconsin's ban on same-sex marriage is not "unusual" in the same sense as the laws at issue in Romer and Windsor, I conclude that defendants have failed to show that the ban furthers a legitimate state interest.

## A.  Tradition

Both defendants and amici defend Wisconsin's same-sex marriage ban on the ground of tradition.  Defendants say that "[t]he traditional view of marriage—between a man and woman . . . —has been recognized for millennia."  Dfts.' Br., dkt. #102, at 45.  Amici go

even further to state that "virtually all cultures through time" have recognized  marriage "as the union of an opposite-sex couple."  Amici's Br., dkt. #109, at 3-4.

As an initial matter, defendants and amici have overstated their argument. Throughout history, the most "traditional" form of marriage has not been between one man and one woman, but between one man and *multiple* women, which presumably is not a tradition that defendants and amici would like to continue.  Stephanie Coontz, Marriage, a History 10 (2005) ("Polygyny, whereby a man can have multiple wives, is the marriage form found in more places and at more times than any other.").

Nevertheless, I agree with amici's more general view that tradition can be important because it often "reflects lessons of experience."  Amici's Br., dkt. #109, at 7.  For this reason, courts should take great care when reviewing long-standing laws to consider what those lessons of experience show.  However, it is the reasons for the tradition and not the tradition itself that may provide justification for a law.  Griego, 316 P.3d at 871-72 ("[L]egislation must advance a state interest that is separate and apart from the classification itself."); Kerrigan, 957 A.2d at 478-79 ("[W]hen tradition is offered to justify preserving a statutory scheme that has been challenged on equal protection grounds, we must determine whether the reasons underlying that tradition are sufficient to satisfy constitutional requirements.").  Otherwise, the state could justify a law simply by pointing to it.  Varnum, 763 N.W.2d at 898 ("When a certain tradition is used as both the governmental objective and the classification to further that objective, the equal protection analysis is transformed into the circular question of whether the classification accomplishes the governmental

objective, which objective is to maintain the classification."); Hernandez v. Robles, 805
N.Y.S.2d 354, 382 (2005) (Saxe, J., dissenting) ("Employing the reasoning that marriage
must be limited to heterosexuals because that is what the institution has historically been,
merely justifies discrimination with the bare explanation that it has always been this way.").
Like moral disapproval, tradition alone proves nothing more than a state's desire to prohibit
particular conduct. Lawrence, 539 U.S. at 583 (O'Connor, J., concurring in the judgment);
id. at 601-02 (Scalia, J., dissenting) ("'[P]reserving the traditional institution of marriage'
is just a kinder way of describing the State's moral disapproval of same-sex couples.").

Although many venerable practices are part of American history, there are darker
traditions as well, which later generations have rejected as denials of equality.  For example,
"[r]ote reliance on historical exclusion as a justification . . . would have served to justify
slavery, anti-miscegenation laws and segregation." Hernandez v. Robles, 794 N.Y.S.2d 579,
609 (Sup. Ct. 2005).  Similarly, women were deprived of many opportunities, including the
right to vote, for much of this country's history, often because of "traditional" beliefs about
women's abilities. E.g., Bradwell v. People of State of Illinois, 83 U.S. 130, 141-42 (1872)
(Bradley, J., concurring in the judgment) ("[T]he civil law, as well as nature herself, has
always recognized a wide difference in the respective spheres and destinies of man and
woman. . . .The paramount destiny and mission of woman are to fulfil the noble and benign
offices of wife and mother. This is the law of the Creator.").  With respect to marriage in
particular, there was a time when "the very being or legal existence of [a] woman [was]
suspended" when she married.  William Blackstone, Commentaries, Vol. I, 442-45 (1765).

68

In the 1870's, Elizabeth Cady Stanton went so far as to argue that marriage at that time was "slavery" for women because they were required to forfeit so many rights.  Jason Pierceson, Same-Sex Marriage in the United States 41 (Rowman & Littlefield 2013).

The rejection of these inequalities by later generations shows that sometimes a tradition may endure because of unexamined assumptions about a particular class of people rather than because the laws serve the community as a whole.  Compare Dronenburg v. Zech, 741 F.2d 1388, 1398 (D.C. Cir. 1984) ("[C]ommon sense and common experience demonstrate" that gay officers in military "are almost certain to be harmful to morale and discipline."), with Jim Garamone, "Don't Ask, Don't Tell' Repeal Certified by President Obama," American Forces Press Service (July 22, 2011), available at http://www.defense.gov/news/newsarticle.aspx?id=64780  (visited June 6, 2014) ("The President, the chairman of the Joint Chiefs of Staff, and [the Secretary of Defense] have certified that the implementation of repeal of [restrictions on gay persons in the military] is consistent with the standards of military readiness, military effectiveness, unit cohesion and recruiting and retention of the armed forces.").  For this reason, the Supreme Court has stated that the "[a]ncient lineage of a legal concept does not give it immunity from attack for lacking a rational basis," Heller v. Doe, 509 U.S. 312, 326 (1993), and it has "not hesitated to strike down an invidious classification even though it had history and tradition on its side." Levy v. Louisiana, 391 U.S. 68, 71 (1968).  Thus, if blind adherence to the past is the only justification for the law, it must fail.  Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that

. . . it was laid down in the time of Henry IV.  It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.").

## B.  Procreation

Perhaps the most common defense for restricting marriage to opposite-sex couples is that procreation is the primary purpose of marriage and that same-sex couples cannot procreate with each other.  E.g., Dean, 1992 WL 685364 (ban on same-sex marriage justified by state's interest in "fostering, at a socially-approved point in time (i.e. during marriage), that which is essential to the very survival of the human race, namely, procreation").  See also Kandu, 315 B.R. at 147; Standhardt v. Superior Court ex rel. County of Maricopa, 77 P.3d 451, 462 (Ariz. Ct. App. 2003); Adams, 486 F. Supp. at 1124-25; Singer, 522 P.2d at 1195; Baker, 191 N.W.2d at 187.  A more recent twist on this argument is that marriage is needed to help opposite-sex couples procreate "responsibly," but same-sex couples do not have the same need.  Morrison v. Sadler, 821 N.E.2d 15, 27 (Ind. Ct. App. 2005).  Defendants and amici repeat these arguments.

One problem with the procreation rationale is that defendants do not identify any reason why denying marriage to same-sex couples will encourage opposite-sex couples to have children, either "responsibly" or "irresponsibly."  Geiger, 2014 WL 2054264, at *13; Bishop, 962 F. Supp. 2d. at 1291.  Defendants say that this argument "misses the point" because "[t]he focus under rational-basis review is whether the challenged statute rationally supports

70

a State interest, not whether expanding the class of beneficiaries to marriage would harm the State's interest." Dfts.' Br., dkt. #102, at 65-66 (citing <u>Johnson v. Robison</u>, 415 U.S. 361, 383 (1974) (classification will be upheld under rational basis review if "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not")). In other words, defendants seem to concede that they have no reason to believe that marriage between same-sex couples will have an adverse effect on procreation between opposite-sex couples; however, preferential treatment for opposite-sex couples is permissible because they "need" marriage to better insure that they will stay together after procreation and same-sex couples do not need such assistance because they do not procreate "accidentally."

As defendants acknowledge implicitly by citing <u>Johnson</u>, 415 U.S. 361, this argument is contingent on applying the most deferential standard of review. Because I have concluded that Wisconsin's laws banning same-sex marriage are subject to heightened scrutiny under both the due process clause and the equal protection clause, this argument is a nonstarter. Defendants identify no other situation in which a right could be denied to a class of citizens simply because of a perception by the state that the class "doesn't need" the right as much as another class. Treating such a fundamental right as just another government benefit that can be offered or withheld at the whim of the state is an indicator either that defendants fail to appreciate the implications for equal citizenship that the right to marry has or that they do not see same-sex couples as equal citizens. <u>Cf.</u> John Stuart Mill, "The Subjection of Women," <u>included in</u> <u>Classics of Moral and Political Theory</u> 1145 (Michael Morgan ed., 5th

ed. 2011) ("[T]here are many persons for whom it is not enough that the inequality has no just or legitimate defence; they require to be told what express advantage would be obtained by abolishing it.  To which let me first answer, the advantage of having the most universal and pervading of all human relations regulated by justice instead of injustice.").

Further, despite the popularity of this argument in courts in other states, it is difficult to believe that Wisconsin voters and legislators were willing to go to the great effort of adopting a constitutional amendment that excluded a class of citizens from marriage simply because the voters and legislators believed that same-sex couples were so stable and responsible that marriage was unnecessary for them.  Even setting aside the standard of review, "the breadth of the amendment is so far removed from th[is] particular justificatio[n] that [I] find it impossible to credit."  Romer, 517 U.S. at 635 (interest in "conserving resources to fight discrimination against other groups" did not justify amendment permitting sexual orientation discrimination).

There is a second problem with the procreation rationale.  As other courts have noted, an argument relying on procreation raises an obvious question:  if the reason same-sex couples cannot marry is that they cannot procreate, then why are opposite-sex couples who cannot or will not procreate allowed to marry?  E.g., Baskin, 2014 WL 1568884, at *3; De Leon, 975 F. Supp. 2d at 655.  Wisconsin law does not restrict the marriages of opposite-sex couples who are sterile or beyond the age of procreation and it does not require marriage applicants to make a "procreation promise" in exchange for a license.

Defendants do not address this problem, but amici offer two responses.  First, amici

72

say that "it would be difficult (if not impossible), and certainly inappropriately intrusive, to determine ahead of time which couples are fertile."  Amici Br., dkt. #109, at 12.  Second, they quote Morrison, 821 N.E.2d at 27, for the proposition that a "reasonable legislative classification is not to be condemned merely because it is not framed with such mathematical nicety as to include all within the reason of the classification and to exclude all others."  Id. at 13.  See also Baker, 191 N.W.2d at 187 (making same arguments); Adams, 486 F. Supp. at 1124-25 (same).

Neither argument is persuasive.  First, amici's argument that it would be "difficult (if not impossible)" to attempt to determine a couple's ability or willingness to procreate is simply inaccurate.  Amici identify no reason that the state could not require applicants for a marriage license to certify that they have the intent to procreate and are not aware of any impediments to their doing so.  In fact, Wisconsin already *does* inquire into the fertility of some marriage applicants, though in that case it requires the couple to certify that they are *not* able to procreate, which itself is proof that Wisconsin sees value in marriages that do not produce children and is applying a double standard to same-sex couples.  Wis. Stat. § 765.03(1)  (permitting first cousins to marry if "the female has attained the age of 55 years or where either party, at the time of application for a marriage license, submits an affidavit signed by a physician stating either party is permanently sterile").  To the extent amici mean to argue that an inquiry into fertility would be inappropriately intrusive because opposite-sex married couples have a constitutional right *not* to procreate under Griswold, that argument supports a view that the same right must be extended to same-sex couples as well.  Cf.

Eisenstadt, 405 U.S. at 453 (denying access to contraception on basis of marital status violates equal protection clause).

Like defendants' argument regarding "responsible procreation," amici's alternative argument that "mathematical certainty is not required" is contingent on a rational basis review, which I have rejected.  Further, this rationale is suspicious not just because Wisconsin has failed to ban infertile couples from marrying or to require intrusive tests to get a marriage license.  Rather, it is suspicious because neither defendants nor amici cite any instances in which Wisconsin has ever taken *any* legal action to discourage infertile couples from marrying.  There is also little to no stigma attached to childless married couples.  Neither defendants nor amici point to any social opprobrium directed at the many millions of such couples throughout this country's history, beginning with America's first family, George and Martha Washington, who had no biological children of their own.  http://en.wikipedia.org/wiki/George_Washington (visited June 6, 2014).  The lack of any attempts by the state to dissuade infertile persons from marriage is proof that marriage is about *many* things, including love, companionship, sexual intimacy, commitment, responsibility, stability *and* procreation and that Wisconsin respects the decisions of its heterosexual citizens to determine for themselves how to define their marriage.  If Wisconsin gives opposite-sex couples that autonomy, it must do the same for same-sex couples.

C.  Optimal Child Rearing

74

Defendants argue that "[s]ocial science data suggests that traditional marriage is optimal for families." Dfts.' Br., dkt. #102, at 52 (citing articles). Amici make a similar argument that the state has a valid interest in encouraging "the rearing of children by a mother and father in a family unit once they are born." Amici Br., dkt. #109, at 13. See also Kandu, 315 B.R. at 146 ("[T]he promotion of marriage to encourage the maintenance of stable relationships that facilitate to the maximum extent possible the rearing of children by both of their biological parents is a legitimate congressional concern.").

This argument harkens back to objections to interracial marriage made by the state in Loving. Brief for Respondents at 47–52, Loving v. Virginia, 388 U.S. 1 (1967), 1967 WL 113931 ("Inasmuch as we have already noted the higher rate of divorce among the intermarried, is it not proper to ask, 'Shall we then add to the number of children who become the victims of their intermarried parents?'"). Further, it seems to be inconsistent with defendants' previous argument. On one hand, defendants argue that same-sex couples do not need marriage because they can raise children responsibly without it. On the other hand, defendants argue that same-sex couples should not be raising children at all.

The substance of defendants' and amici's argument has been seriously questioned by both experts and courts. E.g., Golinski., 824 F. Supp. 2d at 991 (citing evidence that "it is 'beyond scientific dispute' that same-sex parents are equally capable at parenting as opposite-sex parents"); Perry, 704 F. Supp. 2d at 1000 ("The evidence does not support a finding that California has an interest in preferring opposite-sex parents over same-sex parents. Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant

75

to children's developmental outcomes."); Charlotte Patterson, Children of Lesbian and Gay Parents: Summary of Research Findings, cited in <u>Same-Sex Marriage: Pro and Co</u> 240 (Andrew Sullivan ed., Vintage Book 2004) (finding no adverse effects on children of same-sex parents).  However, I need not resolve this sociological debate because, even if I assume that children fare better with two biological parents, this argument cannot carry the day for defendants for four reasons.

First, this is another incredibly underinclusive rationale.  Defendants point to *no* other restrictions that the state places on marriage in an attempt to optimize outcomes for children.  Marriage applicants in Wisconsin do not have to make any showing that they will make good parents or that they have the financial means to raise a child.  A felon, an alcoholic or even a person with a history of child abuse may obtain a marriage license.  Again, the state's singular focus on banning same-sex marriage as a method of promoting good parenting calls into question the sincerity of this asserted interest.  <u>Romer</u>, 517 U.S. at 635.

Second, even if being raised by two biological parents provides the "optimal" environment on average, this would not necessarily justify a discriminatory law.  Under heightened scrutiny, the government may "not rely on overbroad generalizations about the different talents, capacities, or preferences of" different groups.  <u>Virginia</u>, 518 U.S. at 533 (state violated equal protection clause by denying women admission to military college, despite evidence that college's "adversative method" was less suitable for women on average).

Third, with or without marriage rights, some same-sex couples will raise children

76

together, as they have been doing for many years.  Thus, the most immediate effect that the same-sex marriage ban has on children is to foster less than optimal results for children of same-sex parents by stigmatizing them and depriving them of the benefits that marriage could provide.  Goodridge, 798 N.E.2d at 963-64  ("Excluding same-sex couples from civil marriage . . . prevent[s] children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which children will be reared, educated, and socialized.") (internal quotations omitted).  Cf. Windsor, 133 S. Ct. at, 2694 (DOMA "humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.").  The state's failure to consider the interests of part of the very group it says it means to protect is further evidence of the law's invalidity.  Plyler, 457 U.S. at 223-24 ("In determining  the rationality of [law restricting some children's access to public schools], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims.").

Finally, and perhaps most important, defendants do not explain how banning same-sex marriage helps to insure that more children are raised by an opposite-sex couple.  I agree with the courts that see no way that it could.  DeBoer, 973 F. Supp. 2d at 770-71; De Leon, 975 F. Supp. 2d at 653; Bourke, 2014 WL 556729, at *8.  Defendants do not suggest that it would be rational to believe that the same-sex marriage ban causes any gay person to abandon his or her sexual orientation and enter an opposite-sex marriage for the purpose of

77

procreating or that, even if the ban had such an effect, the situation would be beneficial for the child in the long run.  Although it might be rational to believe that some same-sex couples would forgo raising children without the benefits and protections afforded by marriage, that result would not lead to more children being raised by opposite-sex couples; rather, it simply would mean that fewer children would be born or more would be left unadopted.  Not surprisingly, neither defendants nor amici argue that not being born at all or being a ward of the state is preferable to being raised by a same-sex couple.  Accordingly, Wisconsin's ban on marriage between same-sex couples cannot be justified on the ground that it furthers optimal results for children.

### D.  Protecting the Institution of Marriage

Both defendants and amici express concerns about the effect that allowing same-sex couples to marry could have on the institution of marriage as a whole.  Defendants say that "[r]eshaping social norms about marriage could have harmful effects," such as "shifting the public understanding of marriage away from a largely child-centric institution to an adult-centric institution focused on emotion."  Dfts.' Br., dkt. #102 at 57.  They analogize same-sex marriage to no-fault divorce laws, which defendants say led to an increase in divorce rates and generally made marriages "fragile and often unreliable."  Id. (quoting Sandra Blakeslee, Unexpected Legacy of Divorce 297 (New York: Hyperion, 2000)).  In addition, defendants quote an article in which the author argues that, if marriage between same-sex couples is legalized, "[t]he confusion of social roles linked with marriage and parenting would be

78

tremendous." Id. at 58 (quoting Lynn Wardle, "Multiply and Replenish": Considering Same–Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J.L. & Pub. Pol'y 771, 799 (2001)).   Amici make a similar argument, stating that allowing same-sex marriage risks "psycho-social inversion of the purpose of marriage from promoting children's interests to promoting adult arrangements in which children are secondary." Amici Br., dkt. #109, at 8.

As an initial matter, it is not clear whether the Supreme Court would view this interest as even legitimate.  In Windsor, 133 S. Ct. at 2693, the Court concluded that Congress' stated purpose to "defend" marriage from same-sex couples was evidence that the purpose of DOMA was to "interfer[e] with the equal dignity of same-sex marriages" and therefore improper.  Similarly, in Loving, 388 U.S. at 8, 11, the Court stated that there was "patently no legitimate overriding purpose" for a ban on interracial marriage despite an argument that "the scientific evidence is substantially in doubt" about the effect that interracial marriage would have on society.  Certainly, to the extent that defendants or amici are concerned about the erosion of strict gender roles in marriage, that is a sexist belief that the state has no legitimate interest in furthering.  Virginia, 518 U.S. at 541.

In addition, this interest suffers from the same problem of underinclusiveness as the other asserted interests.  Two strangers of the opposite sex can marry regardless of their intentions, without any demonstration or affirmation of the example they will set, even if they have been previously divorced or have a history of abusing the institution. Similarly, the no-fault divorce rules that defendants cite actually undermine their argument by showing

that Wisconsin *already* supports an "adult-centric" notion of marriage to some extent by allowing easy divorce even when the couple has children.  Coontz, supra, at 274 (excluding same-sex couples from marriage after liberalizing heterosexual marriages and relationships in other ways is "a case of trying to lock the barn door after the horses have already gone").

In any event, neither defendants nor amici cite any evidence or even develop a cogent argument to support their belief that allowing same-sex couples to marry somehow will lead to the de-valuing of children in marriage or have some other adverse effect on the marriages of heterosexual couples.   Thus, it is doubtful whether defendants' belief even has a rational basis.  Cf. Doe, 403 F. Supp. at 1205 (Merhige, J., dissenting) ("To suggest, as defendants do, that the prohibition of homosexual conduct will in some manner encourage new heterosexual marriages and prevent the dissolution of existing ones is unworthy of judicial response.  In any event, what we know as men is not forgotten as judges— it is difficult to envision any substantial number of heterosexual marriages being in danger of dissolution because of the private sexual activities of homosexuals.").

Under any amount of heightened scrutiny, this interest undoubtedly fails.  The available evidence from other countries and states does not support defendants' and amici's argument.  Nussbaum, supra, at 145 (states that allow marriage between same-sex couples have lower divorce rates than other states); Gerstmann, supra, at 22 (citing findings of economics professor M.V. Lee Badgett that same-sex partnerships in Europe have not led to lower rates of marriage, higher rates of divorce or higher rates of nonmarital births as compared to countries that do not offer legal recognition); William N. Eskridge, Jr. and

80

Darren Spedale, <u>Gay Marriage: For Better or Worse?</u> 205 (Oxford University Press 2006) (discussing study finding that percentage of children being raised by two parents in Scandinavia increased after registered partnership laws took effect).

### E.  <u>Proceeding with Caution</u>

Defendants say that the "Wisconsin people and their political representatives could rationally choose to wait and analyze the impact that changing marriage laws have had in other states before deviating from the status quo." Dfts.' Br., dkt. #102, at 46.  However, that argument is simply a restatement of defendants' argument that they are concerned about potential adverse effects that marriage between same-sex couples might have, so I need not consider it again.   In itself, a desire to make a class of people wait to exercise constitutional rights is not a legitimate interest.   <u>Watson v. Memphis</u>, 373 U.S. 526, 532–533 (1963) ("The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled.").  <u>See also</u> Martin Luther King, Jr., Letter from Birmingham Jail ("For years now I have heard the word 'Wait!' It rings in the ear of every Negro with piercing familiarity. This 'Wait' has almost always meant 'Never.'"); Evan Wolfson, <u>Why Marriage Matters</u> 121 (Simon & Schuster 2004) (quoting state senator's statement after <u>Goodridge</u>, 798 N.E.2d 941) ("<u>Goodridge</u> is ahead of our mainstream culture and our own sensibilities [but] my level of comfort is not the appropriate monitor of the Constitutional rights of our citizens. . . . [The Constitution] has always required us to reach beyond our moral and emotional

grasp.").

## F. Slippery Slope

Finally, defendants express concern about the legal precedent that allowing same-sex marriage will set. Dfts.' Br., dkt. #102, at 55 ("Extending the fundamental right to marriage to include same-sex couples could affec[t] other legal restrictions and limitations on marriage."). In other words, if same-sex couples are allowed to marry, then how can prohibitions on polygamy and incest be maintained?

I make three observations in response to defendants' concern about the slippery slope. First, and most important, the task of this court is to address the claim presented and not to engage in speculation about issues not raised that may or may not arise at some later time in another case. Socha v. Pollard, 621 F.3d 667, 670 (7th Cir. 2010) ("If [an] order represents a mere advisory opinion not addressed to resolving a 'case or controversy,' then it marks an attempted exercise of judicial authority beyond constitutional bounds."). Thus, the important question for this case is not whether another individual's marriage claim may be analogous to plaintiffs' claim, but whether *plaintiffs'* claim is like the claims raised in cases such as Loving, Zablocki, Turner and Windsor. I have concluded that it is. When the Supreme Court struck down the marriage restrictions in those other cases, it did not engage in hypothetical discussions about what might come next. See also Lewis v. Harris, 875 A.2d 259, 287-88 (N.J. Super. A.D. 2005) (Collester, J., dissenting) ("It is . . . unnecessary for us to consider here the question of the constitutional rights of polygamists to marry persons of

their choosing. . . . One issue of fundamental constitutional rights is enough for now.").

Second, there are obvious differences between the justifications for the ban on same-sex marriage and other types of marriage restrictions.  For example, polygamy and incest raise concerns about abuse, exploitation and threats to the social safety net.  A more fundamental point is that Wisconsin's ban on same-sex marriage is different from other marriage restrictions because it completely excludes gay persons from participating in the institution of marriage in any meaningful sense.  In other words, gay persons simply are asking for the right to marry *someone*.  With the obvious exception of minors, no other class is being denied this right.  As in <u>Romer</u>, plaintiffs are not asking for "special rights"; they are asking only for the rights that every adult already has.

Third, opponents of marriage between same-sex couples have been raising concerns about the slippery slope for many years, but these concerns have not proved well-founded.  Again, there is no evidence from Europe that lifting the restriction on same-sex marriage has had an effect on other marriage restrictions related to age, consanguinity or number of partners.  Eskridge and Spedale, <u>supra</u>, at 40.  Similarly, in Vermont and Massachusetts, the first states to give legal recognition to same-sex couples, there has been no movement toward polygamy or incest.  Further, I am aware of no court that even has questioned the validity of those restrictions.  <u>Marriage Cases</u>, 183 P.3d at 434 n.52 (rejecting comparison to polygamy and incest); <u>Goodridge</u>, 798 N.E.2d at 969 n.34 (2003) (same).  Accordingly, this interest, like all the others asserted by defendants and amici, does not provide a legitimate basis for discriminating against same-sex couples.

CONCLUSION

In 1954, in what likely was one of the first cases explicitly addressing issues involving gay persons, a federal district court denied a claim involving censorship of a gay news magazine, stating that the court "rejected" the "suggestion that homosexuals should be recognized as a segment of our people." Joyce Murdoch and Deb Price, Courting Justice 33 (Basic Books 2002) (quoting unpublished decision in ONE, Inc. v. Oleson). In the decades that followed, both courts and the public began to better appreciate that the guarantees of liberty and equality in the Constitution should not be denied because of an individual's sexual orientation. Despite these advances, marriage equality for same-sex couples remained elusive. Court rulings in favor of same-sex couples were rare and, even when achieved, they tended to generate strong backlash. Klarman, supra, at 58, 113 (noting that, after decision favorable to same-sex marriage in Baehr, 852 P.2d 44, Congress enacted Defense of Marriage Act and many states passed similar laws; in 2004, after Goodridge, 798 N.E.2d 941, eleven states passed constitutional amendments banning marriage between same-sex couples).

In my view, that initial resistance is not proof of the lack of merit of those couples' claims. Rather, it is evidence of Justice Cardozo's statement (quoted by Justice Ginsburg during her confirmation hearing) that "[j]ustice is not to be taken by storm. She is to be wooed by slow advances." Editorial, "Ginsburg's Thoughtful Caution," Chicago Tribune (July 22, 1993), available at 1993 WLNR 4096678. It took the Supreme Court nearly a century after the Fourteenth Amendment was enacted to hold that racial segregation violates the Constitution, a view that seems obvious today. It took another 12 years for the Court

to strike down anti-miscegenation laws.  (Although the Court had the opportunity to review Virginia's anti-miscegenation law shortly after <u>Brown</u>, the Court declined to do so at the time, <u>Naim v. Naim</u>, 350 U.S. 985 (1956) (dismissing appeal), leading some to speculate that the Court believed that the issue was still too controversial.  Eskridge and Spedale, <u>supra</u>, at 235.)  It took longer still for courts to begin to remedy the country's "long and unfortunate history of sex discrimination." <u>Frontiero</u>, 411 U.S. at 684.

In light of <u>Windsor</u> and the many decisions that have invalidated restrictions on same-sex marriage since <u>Windsor</u>, it appears that courts are moving toward a consensus that it is time to embrace full legal equality for gay and lesbian citizens.  Perhaps it is no coincidence that these decisions are coming at a time when public opinion is moving quickly in the direction of support for same-sex marriage.  <u>Compare</u> Richard A. Posner, <u>Should There Be Homosexual Marriage? And If So, Who Should Decide?</u> 95 Mich. L. Rev. 1578, 1585 (1997) ("Public opinion may change . . . but at present it is too firmly against same-sex marriage for the courts to act."), <u>with</u> Richard A. Posner, "Homosexual Marriage—Posner," The Becker-Posner Blog (May 13, 2012) ("[T]he only remaining basis for opposition to homosexual marriage . . . is religious. . . . But whatever the [religious objections are], the United States is not a theocracy and should hesitate to enact laws that serve religious rather than pragmatic secular aims.").

Citing these changing public attitudes, defendants seem to suggest that this case is not necessary because a majority of Wisconsin citizens will soon favor same-sex marriage, if they do not already.  Dfts.' Br., dkt. #102, at 40 (citing article by Nate Silver predicting that 64%

of Wisconsinites will favor same-sex marriage by 2020).  Perhaps it is true that the Wisconsin legislature and voters would choose to repeal the marriage amendment and amend the statutory marriage laws to be inclusive of same-sex couples at some point in the future. Perhaps it is also true that, if the courts had refused to act in the 1950s and 1960s, eventually all states would have voted to end segregation and repeal anti-miscegenation laws. Regardless, a district court may not abstain from deciding a case because of a possibility that the issues raised in the case could be resolved in some other way at some other time. Colorado River Water Conservation District v. United States, 424 U.S. 800, 817 (1976) (federal courts have "virtually unflagging obligation" to exercise jurisdiction in cases properly before them).

It is well-established that "the Constitution protects persons, not groups," Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995), so regardless of possible future events affecting the larger community, my task under federal law is to decide the claims presented by the plaintiffs in this case *now*, applying the provisions in the Fourteenth Amendment as interpreted by the Supreme Court in cases such as Loving, Romer, Lawrence and Windsor. Because my review of that law convinces me that plaintiffs are entitled to the same treatment as any heterosexual couple, I conclude that the Wisconsin laws banning marriage between same-sex couples are unconstitutional.


ORDER

IT IS ORDERED that

86

1.  The motion to dismiss filed by defendants Scott Walker, J.B. Van Hollen and Oskar Anderson, dkt. #66, is DENIED.

2.  The motion for summary judgment filed by plaintiffs Virginia Wolf, Carol Schumacher, Kami Young, Karina Willes, Roy Badger, Garth Wangemann, Charvonne Kemp, Marie Carlson, Judith Trampf, Katharina Heyning, Salud Garcia, Pamela Kleiss, William Hurtubise, Leslie Palmer, Johannes Wallmann and Keith Borden, dkt. #70 is GRANTED.

3.  It is DECLARED that art. XIII, § 13 of the Wisconsin Constitution violates plaintiffs' fundamental right to marry and their right to equal protection of laws under the Fourteenth Amendment to the United States Constitution.   Any Wisconsin statutory provisions, including those in Wisconsin Statutes chapter 765, that limit marriages to a "husband" and a "wife," are unconstitutional as applied to same-sex couples.

4.  Plaintiffs may have until June 16, 2014, to submit a proposed injunction that complies with the requirement in Fed. R. Civ. P. 65(d)(1)(C) to "describe in reasonable detail . . . the act or acts restrained or required."  In particular, plaintiffs should identify what they want *each* named defendant to do or be enjoined from doing.  Defendants may have one week from the date plaintiffs file their proposed injunction to file an opposition.   If defendants file an opposition, plaintiffs may have one week from that date to file a reply in support of their proposed injunction.

5.  I will address defendants' pending motion to stay the injunction after the parties have had an opportunity to file materials related to the proposed injunction.  If the parties

wish, they may have until June 16, 2014, to supplement their materials related to that motion in light of the Supreme Court's decision in <u>Geiger v. Kitzhaber</u> not to grant a stay in that case.

Entered this 6th day of June, 2014.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge