UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WISCONSIN

**VIRGINIA WOLF, et al.,**

     Plaintiffs,

vs.                                             Case No.: 14-cv-64-BBC

**SCOTT WALKER, et al.,**

     Defendants.

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
## FOR ATTORNEYS' FEES, COSTS AND EXPENSES

For the reasons set forth below, the plaintiffs request that this Court grant their

motion for an award of attorneys' fees and expenses of $1,243,804.83.

### STATEMENT OF THE CASE

The history of this case is described in greater detail in the Declaration of John A.

Knight, but is summarized briefly here for the convenience of the Court.

Attorneys from the American Civil Liberties Union of Wisconsin Foundation and

the national ACLU Foundation's LGBT & HIV Project began putting together a

freedom-to-marry case in Wisconsin in mid-November 2013. Marriage litigation was

underway in a number of federal district courts around the country after the U.S.

Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013). However,

the first federal court after *Windsor* to reach a final decision that it was unconstitutional

to deny same-sex couples marriage in a contested case was a court from the District of

Utah in *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013).  That case was decided on December 20, 2013, after the ACLU had already begun researching a possible case and speaking to potential plaintiffs.

ACLU attorneys and other staff from the national ACLU LGBT & HIV Project began interviewing potential clients in earnest in December 2013 and January 2014.

Given the speed with which marriage cases were proceeding in other districts, the ACLU determined that it would need the resources of a large firm with the flexibility to adequately staff the litigation in a compressed timeframe. After ruling out two large Wisconsin firms based on their prior refusals to work on litigation with similar subject-matter, the ACLU of Wisconsin attempted to recruit two other large Wisconsin firms, but both declined. After these two Wisconsin firms declined to work on the case, Mayer Brown, a Chicago-based national law firm that had worked on other LGBT litigation with the ACLU, including marriage litigation in Illinois, agreed to be cooperating counsel. Mayer Brown assembled a team of partners and associates, some of whom had worked on the prior marriage litigation. Given the likelihood that the case would ultimately be appealed to the Supreme Court, the team also included a senior partner in the firm's Supreme Court and Appellate Practice group.

District Court Proceedings

Plaintiffs filed their initial complaint [Dkt #1] on February 3, 2014, and an amended complaint [Dkt #26], adding several additional plaintiffs and defendants, on February 27, 2014. The amended complaint was accompanied by a motion for a preliminary injunction [Dkt #27] and supportive declarations. On March 4, 2014, the

Court issued an Order [Dkt #53] suggesting that, rather than litigating a preliminary injunction, the case should be set for expedited summary judgment proceedings and (if necessary) trial. Plaintiffs agreed to the Court's proposal on March 11, 2014, and suggested a summary judgment briefing schedule that would have concluded on April 24, 2014. [Dkt #55.]

On March 14, 2014, state defendants filed a motion seeking *Pullman* or *Burford* abstention and/or a stay of proceedings. [Dkt #57.] After plaintiffs responded to the motion on March 18, 2014, this Court denied the motion to abstain and stay on March 24, 2014. [Dkt #92.]

On March 20, 2014, state defendants filed a motion to dismiss [Dkt #66], accompanied by a 31 page brief [Dkt #67] arguing that certain defendants should be dismissed, that plaintiffs' claims were insufficiently specific under the *Iqbal/Twombly* pleading standards, that plaintiffs failed to state a claim under the Equal Protection or Due Process Clauses, and that the Supreme Court's 1973 summary dismissal in *Baker v. Nelson* foreclosed plaintiffs' claims. Plaintiffs filed their 32-page response brief on April 10, 2014. [Dkt #95.] On April 30, 2014, the Court denied the motion to dismiss in part, granted dismissal as to some but not all of the defendants that the state defendants argued should be dismissed, and reserved judgment on the arguments in the motion that overlapped the summary judgment briefing. [Dkt #97.]

On March 24, 2014, Plaintiffs filed their motion for summary judgment and supporting pleadings. [Dkt #70 *et seq.*] Plaintiffs' brief in support [Dkt #71] was 40 pages in length.

Although the plaintiffs took the position that discovery was unnecessary in this case, the defendants insisted that they be permitted to take discovery of plaintiffs. On or about March 26, 2014, state defendants sent plaintiffs' counsel a set of 12 interrogatories, a set of 33 requests to admit, and 9 requests for production of documents and things. On April 1, 2014, state defendants served another set of five interrogatories, bringing the total number of interrogatories to 17. Although some of these 59 discrete discovery requests were directed only to selected plaintiffs, most required responses by all 16 plaintiffs. Defendants asked plaintiffs to "identify all Wisconsin constitutional provisions, statutes, and administrative rules that comprise the 'marriage ban'" and to "[i]dentify all harms [Plaintiffs] are alleging as a result of [their] claims that the 'marriage ban' . . . is unconstitutional." Among other things, defendants sought plaintiffs' applications for domestic partnership and marriage, along with supporting documentation such as birth certificates; powers of attorney; and adoption and guardianship documentation.

Responding to these discovery requests required extensive legal research, multiple telephone calls, emails and meetings with plaintiffs to obtain information and responsive documents. Plaintiffs' counsel sent 16 sets of answers to defendants' first interrogatories on April 16, 18, 21 and 23. Plaintiffs produced documents for inspection by defendants' counsel on April 17, 2014, scanned identified documents and sent them by federal express on April 21, 2014, and supplemented production thereafter. Responses to requests to admit were sent on April 28, 2014, and responses to defendants' second interrogatories were sent on April 28 and 29, 2014.

On May 9, 2014, state defendants filed their opposition to summary judgment, including a 62-page brief [Dkt #102] and more than 300 pages of "appendices" [Dkt #102-1 to 102-3]. Defendants raised numerous arguments against plaintiffs' claims, including the novel argument that marriage was a "positive" right that the constitution does not protect. [Dkt #102 at 18-36.] In 62 pages of briefing, however, Defendants mentioned only two of Plaintiffs' discovery responses: two of the plaintiffs' admission that they subjectively considered themselves married, despite Wisconsin's refusal to recognize their marriage. [Dkt #102 at 40.]

On May 20, 2014, plaintiffs filed their reply brief in support of summary judgment and their responses to defendants' statement of facts. [Dkt #111.] A substantial portion of the brief was devoted to responding to defendants' novel "positive rights" argument, as well as to a number of other arguments presented in defendants' opposition.

On May 23, 2014, state defendants filed a "contingent" motion to stay relief if the district court "grant[ed] Plaintiffs' motion for summary judgment and enjoin[ed] enforcement of Wisconsin's marriage laws." [Dkt #114 at 2.] Plaintiffs filed their opposition on May 30, 2014. [Dkt #117.]

On June 6, 2014, this Court issued an opinion and order granting plaintiffs' motion for summary judgment and declaring Wisconsin's ban on marriage for same-sex couples unconstitutional. [Dkt #118.] The Court found that the ban violated plaintiffs' right to marry under the Due Process Clause and their right to equal protection by discriminating against them based on their sexual orientation. The Court did not

resolve plaintiffs' argument that the ban impermissibly discriminated based on sex, "declin[ing] to wade into this jurisprudential thicket." [Dkt #118 at 48.] The Court directed the plaintiffs to submit a proposed injunction and held defendants' request for a contingent stay until an injunction issued. [Dkt #118 at 87-88.]

When county clerks began issuing marriage licenses later that afternoon, defendants filed an emergency motion for a stay with this Court. [Dkt #119.] The Court scheduled a hearing on that motion for the afternoon of June 9, 2014. Prior to the hearing, the state defendants filed their notice of appeal [Dkt #120] and an emergency motion for a stay in the Seventh Circuit. After the hearing, this Court declined to stay the June 6 opinion and order. [Dkt #125.] The Court of Appeals, meanwhile, issued an order directing the parties to file memoranda addressing the court's jurisdiction over a non-final order. [CoA Dkt #4.]

Plaintiffs filed their proposed permanent injunction later that evening. [Dkt #126.] On June 11, 2014, Defendants filed a 13-page opposition to the proposed injunction. [Dkt #128.] Plaintiffs filed their memorandum on appellate jurisdiction with the Seventh Circuit that evening. [CoA Case No. 14-2266, Dkt #15-1.] On June 12, plaintiffs filed with this Court their reply submissions in support of a proposed injunction. [Dkt #132.]

On June 13, 2014, this Court held a hearing on the proposed injunction and defendants' request for a stay. Later that afternoon, the Court issued an order granting a permanent injunction, but staying all relief pending appeal. [Dkt #134.] On June 16, 2014, state defendants voluntarily dismissed their premature appeal. [Dkt #135.] This

Court entered its judgment on June 19, 2014. [Dkt #136.] Defendants, however, did not file a new notice of appeal promptly. Accordingly, because plaintiffs were negatively impacted by the delay, plaintiffs moved on July 3 to lift the stay pending defendants' filing a new notice of appeal, if any.

<u>Appellate Proceedings</u>

Defendants filed their notice of appeal (this time of a final judgment) on July 10, 2014. The next day, Plaintiffs moved to expedite briefing and consolidate the appeal with *Baskin v. Bogan*, a case challenging Indiana's statutory ban on marriage for same-sex couples. The Court of Appeals granted the motion.

On July 16, 2014, Defendants petitioned for initial hearing of the appeal *en banc*. [CoA Case No. 14-2526, Dkt #16.] Plaintiffs filed their opposition to hearing *en banc* on July 21, 2014. [CoA Dkt #29.] On July 25, 2014, the Court of Appeals denied the petition [CoA Case No. 14-2386, Dkt #99] and set oral argument for August 26, 2014. [CoA Case No. 14-2526, Dkt #62-1.]

On July 23, 2014, Defendants filed their 65-page opening brief and appendices. [CoA Dkt #53.] They reprised nearly all of their arguments below, including their novel "positive rights" argument, adopted by reference a number of the arguments of the defendants in *Baskin*, and added an argument that this Court's injunction and declaratory judgment were improper under Rule 65.

Plaintiffs filed their brief on August 4, 2014 [Dkt #92], and defendants filed their 32-page reply brief on August 11, 2014 [Dkt #153]. Dozens of amicus briefs were also filed in the combined *Baskin* and *Wolf* appeals. Plaintiffs' counsel had two weeks to

prepare for oral argument, which was set for the same day as oral argument in *Baskin*. Given the stakes in the litigation, Plaintiffs' counsel appropriately scheduled multiple moots, including one that included counsel in *Baskin*, as part of their preparation. Oral argument in *Wolf* took place on August 26, 2014, before the same panel as and immediately following the one hour argument in *Baskin*.

The Court of Appeals issued its decision on September 4, 2014. [CoA Case No. 14-2386, Dkt #212.] The Wisconsin defendants petitioned the Supreme Court for certiorari on September 9, 2014. Plaintiffs responded to the petition later that day.

On October 6, 2014, the Supreme Court denied certiorari in *Wolf*.

This chronology of the proceedings reflects a very intensely litigated action within a very compressed time-frame, necessitating an all-hands-on-deck approach. The necessary coordination with *Baskin* and the defendants' unusual request for initial hearing *en banc* further complicated the appellate process.

## ARGUMENT

The Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988(b), provides: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title . . ., the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." Congress enacted section 1988 to encourage private litigation of civil rights claims. "When a plaintiff succeeds in remedying a civil rights violation . . . he serves 'as a "private attorney general," vindicating a policy that Congress considered of the highest

priority.'" *Fox v. Vice*, 131 S.Ct. 2205, 2213 (2011) (*quoting Newman v. Piggie Park Ent., Inc.*, 390 U.S. 400, 402 (1968) (per curiam)).

Because such litigation advances important civil rights, a prevailing plaintiff "'should ordinarily recover an attorney's fee' from the defendant." *Id.* (citation omitted). Awarding attorney's fees to prevailing civil rights plaintiffs "at once reimburses a plaintiff for 'what it cos[t] [him] to vindicate [civil] rights,' and holds to account 'a violator of federal law.'" *Id.* (citations omitted).

Plaintiffs in this case succeeded fully in achieving marriage for same-sex couples in Wisconsin. They prevailed on summary judgment on their substantive due process and equal protection claims in this Court, overcoming defendants' motions to dismiss and to abstain and responding to defendants' burdensome (and largely unnecessary) discovery requests in the process. They won affirmance in the Seventh Circuit, and worked to make quick review by the Supreme Court possible. As a result of that Court's denial of certiorari, plaintiffs and other same-sex couples in Wisconsin are now able to marry, to enjoy spousal protections and obligations, and to have their out-of-state marriages recognized in Wisconsin. They are thus entitled under section 1988 to an award of reasonable attorneys' fees, costs and expenses. As explained below, the amounts sought by plaintiffs in this case are reasonable.

## I.  PLAINTIFFS ARE "PREVAILING PARTIES" ENTITLED TO FEES AND COSTS.

The Supreme Court has broadly defined "prevailing party" to include civil rights plaintiffs who "succeed on any significant issue in litigation which achieves some of the

benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quoting *Nadeau v. Helgemore*, 581 F.2d 275, 278-79 (1st Cir. 1978)); *see also Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791-792 (1989).

By securing a judgment on the merits and obtaining declaratory and injunctive relief, the plaintiffs "prevailed" within the meaning of section 1983. *See Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 604 (2001) ("enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship between the parties' necessary to permit an award of attorney's fees") (citation omitted).

## II.   PLAINTIFFS ARE ENTITLED TO A FULLY COMPENSATORY AWARD OF REASONABLE ATTORNEYS' FEES AND COSTS.

It is important that fee awards fully compensate successful plaintiffs so that the private attorney general function of the civil rights fee-shifting statutes is achieved. "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley*, 461 U.S. at 429 (citation omitted). Effective access to the judicial process requires the services of competent counsel, which in turn requires the prospect that an attorney will recover a compensatory fee. "Congress intended for plaintiffs [to] receive a reasonable fee that is adequate to attract competent counsel, and that counsel for prevailing parties be paid, as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended." *Lightfoot v. Walker*, 826 F.2d 516, 520 (7th Cir. 1987) (internal quotations and citations omitted). Accordingly,

"[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435.

 "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by the reasonable hourly rate." *Hensley*, 461 U.S. at 433. A fee determined by this "lodestar method" is entitled to a "strong presumption" that it "represents the 'reasonable' fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992); *see also Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010). Indeed, this method provides the appropriate measure of fees, even if the plaintiff is represented by counsel pursuant to a contingent fee contract that would produce a lower fee, *Blanchard v. Bergeron*, 489 U.S. 87 (1989), or by a lawyer working for a legal services organization whose salary cost would produce a lower fee. *Blum v. Stenson*, 465 U.S. 886 (1984).

Although a trial court has wide discretion in calculating an appropriate fee award, it may "not 'eyeball' the fee request and 'cut it down by an arbitrary percentage because it seem[s] excessive to the court.'" *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1314 (7th Cir. 1996) (citations and internal quotations omitted). If a court reduces the hourly rate or number of hours, it must provide a clear explanation. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 518 (7th Cir. 1993).

The table below summarizes the plaintiffs' lawyers' hours and hourly rates for purposes of calculating the lodestar amount.

| Attorney Name | Hours | Rate | Total | |
|---|---|---|---|---|
| Mary Anderson, Mayer Brown | 140.50 | $ 425.00 | $ | 59,712.50 |
| Paige Becker, Mayer Brown | 7.75 | $ 285.00 | $ | 2,208.75 |

| | | | | |
|---|---|---|---|---|
| Timothy Bishop, Mayer Brown | 81.75 | $ 980.00 | $ | 80,115.00 |
| Frank Dickerson, Mayer Brown | 307.75 | $ 555.00 | $ | 170,523.75 |
| Laurence Dupuis, ACLU WIF | 436.79 | $ 450.00 | $ | 196,555.50 |
| James Esseks, ACLUF | 126.30 | $ 650.00 | $ | 82,095.00 |
| Hans Germann, Mayer Brown | 62.00 | $ 705.00 | $ | 43,710.00 |
| Gretchen Helfrich, Mayer Brown | 525.25 | $ 565.00 | $ | 296,766.25 |
| Gretchen Helfrich, Loevy & Loevy | 25.50 | $ 300.00 | $ | 7,650.00 |
| Marc Kadish, Mayer Brown | 13.50 | $ 555.00 | $ | 7492.50 |
| Rebecca Klein, Mayer Brown | 118.00 | $ 480.00 | $ | 56,640.00 |
| John Knight, ACLUF | 404.50 | $ 450.00 | $ | 182,025.00 |
| Linda Shi, Mayer Brown | 17.00 | $ 480.00 | $ | 8,160.00 |
| Kristin Silverman, Mayer Brown | 27.25 | $ 595.00 | $ | 16,213.75 |
| Mayer Brown paralegals & support | 99.75 | variable | $ | 27,755.00 |
| **Totals** | **2393.09** | | $ | **1,237,623.00** |

## A.  The Time Spent by Plaintiffs' Attorneys Was Reasonable.

Plaintiffs in this case are represented by private counsel at the law firm of Mayer Brown and lawyers working for the American Civil Liberties Union Foundation and the American Civil Liberties Union of Wisconsin Foundation. Plaintiffs' lawyers have devoted more than 2707.45 hours to litigating this case in this Court and the Court of Appeals, responding to the defendants' petition to the Supreme Court for a writ of certiorari, and to subsequent activities, including attempts to settle the issue of fees and costs and preparing this motion. Although plaintiffs' counsel are not entitled to be paid for "hours that are excessive, redundant, or otherwise unnecessary," *Hensley*, 461 U.S. at 434, Congress intended that they be "paid for all time reasonably expended." *Lightfoot*, 826 F.2d at 520. As set forth in section II.B. below, plaintiffs' lawyers have exercised billing judgment and eliminated arguably excessive, redundant and unnecessary time from this fee request. The remaining 2393.09 hours were "reasonably expended."

Although the case was decided in the District Court on summary judgment as a matter of law, the litigation involved rapidly evolving substantive law, and the state defendants fought the case very aggressively, with extensive motion practice, discovery requests and post-judgment motions seeking to block relief to the plaintiffs.

Moreover, plaintiffs' success in this case – no matter how obviously correct the outcome may appear in hindsight – was far from certain. Never before had the Seventh Circuit addressed the question whether the fundamental right to marry extends to same-sex couples, and the last time the Seventh Circuit had examined the level of constitutional scrutiny applicable to sexual orientation classifications, such as the one at issue in this case, it adopted the deferential rational basis standard. The novelty and importance of the issues required careful and sometimes time-consuming research and assessment of potential arguments.

Plaintiffs' counsel at the ACLU and ACLU of Wisconsin Foundation are experienced civil rights lawyers with extensive experience in LGBT rights and marriage cases, but they were unable to litigate this case without assistance from outside cooperating counsel. Given the speed of similar litigation in other district courts, the ACLU reasonably determined that it would need the assistance of a large firm that would have the flexibility to assign multiple associates to the case when necessary. As set forth in the Declaration of Laurence J. Dupuis, the ACLU attempted to recruit large Wisconsin-based law firms, but was unsuccessful in doing so. The ACLU lawyers, therefore, partnered with highly qualified counsel from Mayer Brown in Chicago, which had co-counseled the ACLU's Illinois marriage case.

Eight lawyers at Mayer Brown and three from the ACLU Foundation and ACLU of Wisconsin Foundation contributed most of the time spent on this case. Using multiple lawyers in a case "is a common practice, primarily because it results in a more efficient distribution of work. It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones." *Gautreaux v. Chicago Hsg. Auth.*, 491 F.3d 649, 661 (7th Cir. 2007).

The plaintiffs made judicious use of the time of the private lawyers in this case. Lower paid associates from Mayer Brown performed initial legal research, while higher paid associates synthesized this research, communicated with clients, drafted discovery responses and pleadings, and participated in court conferences and hearings. Among the Mayer Brown lawyers, two associates – Gretchen Helfrich and Frank Dickerson – put in by far the greatest number of hours into the case. In general, Mayer Brown partners were involved only in high-level strategic decision-making, final reviews of briefs and other important documents, and preparation for oral argument.

It was particularly appropriate to use multiple lawyers in this case because of the compressed timeframe and multiple motions being litigated simultaneously. Without a relatively large pool of attorneys to draw upon, the time conflicts of individual attorneys would have made the fast-moving litigation unmanageable. The lawyers needed to meet to coordinate and allocate work and did so efficiently by using telephone conferences, rather than in-person meetings. Multiple lawyers participated in some of these calls so that work could be discussed and tasks assigned in one meeting,

14

rather than having meeting participants contact non-participants in multiple separate meetings. As the Seventh Circuit has recognized, "[t]here is no hard-and-fast rule as to how many lawyers can be at a meeting or how many hours lawyers can spend discussing a project." *Id.* at 661.

The case required intensive legal work from the beginning. The importance and notoriety of the constitutional issues required a very careful assessment of both the legal arguments and the factual circumstances of each potential plaintiff, as well as thorough advice to those clients about the risks and potential benefits of litigation. Defendants' decisions to file multiple pretrial motions, conduct discovery and assert novel arguments increased the substantive and procedural complexity of plaintiffs' counsel's work in the trial court and the Court of Appeals, and thus the time required to competently prosecute the action. As set forth more fully in the Declaration of John A. Knight, responding to defendants' discovery request was particularly time consuming, even though defendants barely used the responses in their briefs and pleadings. Responding to defendants' trial court motions to abstain, to dismiss, for a contingent stay and for an emergency stay, and their court of appeals motions for an emergency stay and for initial hearing en banc, also took considerable time.

While plaintiffs' counsel took advantage of the pleadings and research from other ACLU marriage cases to make their work more efficient, they could not simply cut and paste from other case's pleadings. Just as "[l]awyers do not come from cookie cutters," *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993), neither should their work product. Wisconsin's marriage ban and marriage laws differed from those in

other states. The plaintiffs in the Wisconsin litigation are different from those in other cases; the defendants, too, had different positions and duties than defendants in other states. The defendants made arguments that were not made in other cases or framed familiar arguments in different ways.

Plaintiffs' lawyers also had to keep up with rapid developments in marriage cases around the country. The new decisions coming down during the course of litigation needed to be evaluated and, where appropriate, integrated into plaintiffs' argument. Thirteen federal district court decisions were issued from late December 2014, after plaintiffs had begun preparing this case, through the filing of plaintiffs' summary judgment reply brief.[1] Federal district courts and courts of appeals issued another nine decisions during the appellate briefing and argument of this case.[2] Most of these decisions were cited at some point in the litigation of this case.

As the declarations of counsel illustrate, the plaintiffs' lawyers litigated this important case with the care and attention it deserved, but also did so very efficiently.

---

[1] *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah, Dec. 20, 2013); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968 (S.D. Ohio, Dec. 23, 2013); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252 (N.D. Okla., Jan. 14, 2014); *Bourke v. Beshear*, 996 F. Supp. 2d 542 (W.D. Ky., March 19, 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456 (E.D. Va., Feb. 13, 2014); *Lee v. Orr*, 2014 WL 683680 (N.D. Ill., Feb. 21, 2014); *DeLeon v. Perry*, 975 F. Supp. 2d 632 (W.D. Tex., Feb. 26, 2014); *Tanco v. Haslam*, 7 F. Supp. 3d 759 (M.D. Tenn., March 14, 2014); *DeBoer v. Snyder*, 973 F. Supp. 2d 757 (E.D. Mich., March 21, 2014); *Baskin v. Bogan*, 12 F. Supp. 3d 11137 (S.D. Ind., April 18, 2014); *Henry v. Himes*, 14 F. Supp. 3d 1036 (S.D. Ohio, April 14, 2014); *Latta v. Otter*, 19 F. Supp. 3d 1054 (D. Idaho, May 13, 2014); *Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128 (D. Ore., May 19, 2014).

[2] *Whitewood v. Wolf*, 992 F. Supp. 2d 410 (M.D. Penn., May 20, 2014); *Baskin v. Bogan*, 12 F. Supp. 3d 1144 (S.D. Ind., June 25, 2014); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir., June 25, 2014); *Love v. Beshear*, 989 F. Supp. 2d 536 (W.D. Ky., July 1, 2014); *Bishop v. Smith*, 760 F.3d 1070 (10th Cir., July 18, 2014); *Burns v. Hickenlooper*, 2014 WL 3634834 (D. Colo., July 23, 2014); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir., July 28, 2014); *Bowling v. Pence*, 2014 WL 4104814 (S.D. Ind., Aug. 19, 2014); *Brenner v. Scott*, 999 F. Supp. 2d 1278 (N.D. Fla., Aug. 21, 2014).

**B.** **Plaintiffs Have Exercised Reasonable Billing Judgment to Eliminate Excessive, Redundant or Unnecessary Time.**

As described in the declarations of plaintiffs' counsel, after gathering complete time records, plaintiffs reviewed those records to eliminate excessive, redundant and otherwise unnecessary time. Plaintiffs wrote off 10.25 hours of time for the more junior Mayer Brown lawyers who were present for conference calls, 55.25 hours of time for some of the Mayer Brown lawyers who participated in and assisted with moot arguments but were not assigned to the case for other purposes or were more junior lawyers on the team, 21.25 hours for the time of all but three of the lawyers who attended the argument, and .5 additional hours for the time of Mayer Brown attorneys spent on research or other work not directly related to the litigation of this case. In addition, plaintiffs wrote off some of the time spent on the fee petition, more than 100 hours of law intern time, close to 80 hours of staff time spent interviewing potential plaintiffs and plaintiffs, and more than 20 hours of Larry Dupuis' time. See chart of hours written off at Exhibit B to the Declaration of John A. Knight. As a result of this exercise of billing judgment, the plaintiffs have reduced the gross time spent on the case by more than 314.36 hours, or over 11 percent of the total hours worked.

It also bears emphasis that plaintiffs are not requesting fees for: Steven Shapiro, the ACLU's national legal director, for time he spent consulting on Supreme Court filings; Harvey Grossman, the ACLU of Illinois' legal director, for time spent consulting on Seventh Circuit issues; or ACLU and ACLU of Wisconsin paralegals, for assistance with filings and other tasks.

### C.       Plaintiffs' Attorneys' Hourly Rates Are Reasonable.

For lawyers practicing in private firms, such as the lawyers at Mayer Brown, the rates actually charged to and paid by paying clients are presumptively reasonable. An attorney's "actual billing rate" is "the best evidence" of the appropriate rate. *Johnson v. GDF, Inc.*, 668 F.3d 927, 933 (7th Cir. 2012). "[T]he best measure of the cost of an attorney's time is what that attorney could earn from paying clients. For a busy attorney, this is the standard hourly rate." *Gusman*, 986 F.2d at 1150. The presumption that actual rates are the appropriate rates rests on the principle that "the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff." *Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir. 1992).

Even "lawyers who fetch above average rates are presumptively entitled to them." *Gusman*, 986 F.2d at 1150. The Supreme Court has repeatedly noted the Congressional intent that "the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases . . . ." *Blum*, 465 U.S. at 893 (quoting S.Rep't No. 94-1011 at 6, 1976 U.S.C.C.A.N. 5908, 5913); *see also Blanchard*, 489 U.S. at 95.

The presumption that billed rates are reasonable applies even when an out-of-town lawyer's rates exceed those of other attorneys practicing in the geographical area of the forum court. *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009) ("[I]f an out of town attorney has a higher hourly rate than local practitioners, district courts should defer to the out-of-town attorney's rate when calculating the lodestar amount . . . .") (internal quotations and citations omitted); *see*

*also Gusman*, 986 F.2d at 1148-49 (vacating and remanding decision that rejected hourly

rates paid to lawyers in Chicago as "too steep for Madison").

The hourly rates for Mayer Brown lawyers[3] who worked on this case vary, but

all are reasonable. Associates billed at rates ranging from $285/hour to $595/hour. The

initial work on drafting many of the pleadings, declarations, and discovery responses

was performed by two senior associates, Gretchen Helfrich, whose hourly rate at Mayer

Brown was $565, and Frank Dickerson, whose hourly rate is $555. Ms. Helfrich

graduated with honors from the University of Chicago Law School in 2009. Mr.

Dickerson graduated with high honors from the University of Chicago in 2010, where

he was a member of the Law Review, and clerked for Seventh Circuit Judge Frank

Easterbrook. The two partners with the greatest involvement in the case, Hans

Germann and Timothy Bishop, bill at $705/hour and $980/hour respectively. Hans

Germann has been a partner at Mayer Brown since 2009 and graduated from Tulane

Law School in 2001, where he was a member of the Law Review and Order of the Coif.

Timothy Bishop is a senior partner in the firm's Supreme Court and Appellate Practice.

He was a law clerk in the Second Circuit and to Supreme Court Justice William B.

Brennan. He has argued several times before the U.S. Supreme Court and many times

---

[3] The hourly rates at Mayer Brown changed during the pendency of this case. However, plaintiffs are seeking compensation based on these lawyers' current rates in order to compensate for the delay in receiving payment. *See Missouri v. Jenkins*, 491 U.S. 274, 282 (1989) (compensation for the delay in payment is typically made "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value") (internal quotations omitted); *see also Lightfoot v. Walker*, 826 F.2d 516, 523 (7th Cir. 1987) ("To compensate for the delay in payment and to simplify its calculation, courts often calculate fee award using current market rates as opposed to historic rates.").

before the Seventh Circuit and other courts of appeals. He is a co-author of *Supreme Court Practice* (Bloomberg BNA, 10th Ed. 2013), the leading treatise in the field. Plaintiffs made judicious and efficient use of his extremely valuable time in a case with a high appellate profile.

For lawyers who do not have paying clients, such as those at the ACLU Foundation and ACLU of Wisconsin Foundation, the "reasonable" rate is determined based on "prevailing market rates in the relevant community." *Blum*, 465 U.S. at 895. The prevailing market rate is a rate that is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id*. at 895, n.11. As the Seventh Circuit in *Jeffboat* noted, the "relevant community" may "refer[] to a community of practitioners," rather than to a geographical community, "particularly when . . . the subject matter of the litigation is one where the attorneys specializing in it are highly specialized and the market for legal services in that area is a national market." 553 F.3d at 490.

James Esseks has been the director of the ACLU's LGBT & HIV Project since 2010. He was the litigation director of the Project from 2001 to 2010. His practice is based in New York, but the scope of his work is national. He was co-counsel in *United States v. Windsor*, 133 S.Ct. 2675 (2013), a foundational case upon which the current federal marriage litigation has been built. In addition to *Wolf*, he is or has been co-counsel in dozens of other marriage cases in state and federal courts throughout the country. He graduated from Harvard Law School and clerked for a federal district judge in the Southern District of New York and a federal circuit judge in the Ninth

Circuit. He worked for a private firm in New York prior to joining the ACLU. Although his claimed rate of $700 is commensurate with practitioners of similar skill and experience in the New York, New York market and is justified by his unique experience with marriage litigation nation-wide,[4] plaintiffs are seeking compensation for his time at the rate of $650.

John Knight is a senior staff attorney with the ACLU Foundation's LGBT & HIV Project, where he has worked since 2004. His office is in Chicago, but he has worked on cases and policy advocacy in many states and was the ACLU's lead counsel in marriage cases in state and federal court in Illinois. He currently has responsibility for LGBT & HIV litigation in Illinois, Wisconsin, Iowa, Michigan and Missouri. He is a 1988 graduate of the University of Chicago Law School and clerked for a federal district judge in the Northern District of Illinois for two years. He worked as an associate at a Chicago law firm for 5 years, was a clinical lecturer at the University of Chicago for 5 years, and was an EEOC trial attorney for 4 years before joining the ACLU. His rate of

---

[4] The $700 rate for someone of Mr. Esseks' skill and experience is consistent with other judicially-awarded rates in New York City. *See Chin v. RCN Corp.*, No. 08 Civ. 7349, 2010 WL 3958794, at *5 (S.D.N.Y. Sept. 8, 2010) (finding that a "blended hourly rate" of "roughly $605" is "roughly in line with what is typically considered reasonable in this district"); *Vikhu v. City of N.Y.*, No. 06 CV 2095, 2009 WL 1851019, at *5 (E.D.N.Y. June 26, 2009) (noting evidence of three affidavits from law firms in the Southern District with extensive experience in civil rights law that associates' hourly rates range from $200 to $450 and partners' rates from $400 to $900), *reversed on other grounds*, 372 Fed. Appx. 222 (2d Cir. 2010); *Rozell* v. *Ross–Holst, LLC*, 576 F. Supp. 2d 527, 544-46 (S.D.N.Y. 2008) (noting that it is reasonable to award hourly rates of $600 for partners, $350 for senior associates, $250 for junior associates, $175 for law clerks and $125 for paralegals).

$450/hour was set by general counsel of the ACLU of Illinois based on published fee awards for civil rights attorneys in Chicago.

Larry Dupuis has been the legal director of the ACLU of Wisconsin Foundation since 2003. He graduated magna cum laude in 1996 from New York University School of Law, where he was a Root Tilden Kern Public Service Scholar and was inducted into the Order of the Coif. He clerked for a federal district judge in the Southern District of New York and then was a Skadden Fellow and a staff attorney at Legal Action of Wisconsin prior to taking his current position. His rate of $450/hour is based on an assessment of the legal rates charged by civil rights lawyers of similar skill and experience in this district and is supported by the declarations of area civil rights attorneys Jeff Scott Olson and Michael Fox submitted with this motion.

## III.    PLAINTIFFS ARE ENTITLED TO COSTS AND LITIGATION EXPENSES ORDINARILY BILLED TO CLIENTS.

Plaintiffs seek a total of $9,281.78 in taxable costs and reasonable out-of-pocket expenses. Pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1) and Fed. R. App. P. 39(d), certain litigation costs are ordinarily taxed against the non-prevailing party and in favor of the prevailing party. In this case, plaintiffs are submitting with this motion a bill of costs seeking taxation of $3,099.95 for the district court filing fee, service of the summons, transcript fees, *pro hac vice* fees, and fees and disbursements for printing of appellate briefs.

In addition, plaintiffs are entitled "the out-of-pocket expenses for which lawyers normally bill their clients." *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir. 1984).

22

Here, plaintiffs seek $6,181.83 in reasonable out-of-pocket expenses. These include fees for conference calls, photocopies, and travel and lodging costs associated primarily with oral argument in the Seventh Circuit.

Plaintiffs have not included their costs for online legal research in this request. Had Mayer Brown charged for the hourly cost of Westlaw legal research time in this case, it would have amounted to $76,165.86. The ACLU of Wisconsin Foundation pays a flat monthly rate of $138.60.

## CONCLUSION

In summary, the following considerations support the requested award of $1,243,804.83 in this case: 1) Plaintiffs' counsel at the ACLU and highly qualified counsel from Mayer Brown efficiently litigated this case by taking advantage of the ACLU and Mayer Brown lawyers' research and experience in other marriage cases; 2) Defendants' decisions to file multiple motions, conduct discovery, assert novel arguments, and frantically try to stop marriages from occurring increased the substantive and procedural complexity of plaintiffs' counsels' work in the trial court and the Court of Appeals, and thus the time required to competently prosecute the action; 3) The developments in other marriage litigation, and in particular the cases moving forward in Indiana, made it essential that plaintiffs take steps to expedite the litigation process in order to protect their clients' interests in the prompt and successful resolution of this case; and 4) This case was a challenging one in which the law was in rapid flux and success was far from assured.

Dated this 12th day of December, 2014.

<u>/s John A. Knight</u>
JOHN A. KNIGHT
American Civil Liberties Union
  Foundation
Lesbian Gay Bisexual Transgender
Project
180 North Michigan Ave., Ste. 2300
Chicago, IL 60601
(312) 201-9740
jaknight@aclu.org

JAMES D. ESSEKS
American Civil Liberties Union
Foundation
Lesbian Gay Bisexual Transgender
Project
125 Broad Street
New York, NY 10004
(212) 549-2623
jesseks@aclu.org
Gretchen Helfrich
Loevy & Loevy
312 North May Street
Chicago, IL 60607
gretchenh@loevy.com

LAURENCE J. DUPUIS
American Civil Liberties Union of
  Wisconsin Foundation
207 E. Buffalo St., Ste. 325
Milwaukee, WI 53202
(414) 272-4032
ldupuis@aclu-wi.org

HANS J. GERMANN
FRANK DICKERSON
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 782-0600
hgermann@mayerbrown.com
fdickerson@mayerbrown.com

*Attorneys for Plaintiffs*